# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NANCY LIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LIBERTY HEALTH SCIENCES INC., GEORGE SCORSIS, RENE GULLIVER, and VIC NEUFELD<br><br>Defendants. | Case No. 1:19-cv-00161<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 4

PARTIES ............................................................................................................................. 5

SUBSTANTIVE ALLEGATIONS .................................................................................... 7

    Background ................................................................................................................. 7

    Unbeknownst to Investors, Liberty Engaged In A Share Issuance Scheme To Enrich
    Its Insiders ................................................................................................................ 10

    SecureCom Officially Becomes Liberty, Intertwined with Aphria and Its Insiders ........ 13

    DeFrancesco is Prime Beneficiary from 242 Cannabis Property .................................... 16

    Aphria Also Involved in Schemes to Enrich Insiders ..................................................... 18

    Aphria Divests Interest in Liberty ................................................................................. 21

    The Truth Emerges When the Insider Deals of Aphria and Liberty Are Exposed .......... 23

    Post-Class Period Developments .................................................................................. 27

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE
CLASS PERIOD ................................................................................................................ 30

    Materially False and Misleading Statements Concerning Liberty's Relationship with
    Aphria and its Insiders ................................................................................................. 30

    Materially False and Misleading Statements Concerning Liberty's Purchase of the
    242 Cannabis Shares ................................................................................................... 53

ADDITIONAL SCIENTER ALLEGATIONS ................................................................. 60

LOSS CAUSATION/ECONOMIC LOSS ....................................................................... 61

APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET ........ 63

PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................................ 64

CLAIMS FOR RELIEF .................................................................................................... 66

COUNT I ............................................................................................................................ 66

    (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
    Thereunder Against All Defendants) ............................................................................. 66

COUNT II .......................................................................................................................... 69

    (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants) . 69

PRAYER FOR RELIEF .................................................................................................... 70

DEMAND FOR TRIAL BY JURY .................................................................................. 70

Lead Plaintiff Nancy Lin and Plaintiff Gilbert Lee Silverbird ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, System for Electronic Document Analysis and Retrieval ("SEDAR") filings, wire and press releases published by and regarding Liberty Health Sciences Inc. ("Liberty" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired Liberty common stock between July 20, 2017 and December 6, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Liberty is a Toronto-based company whose principal business activity is the production and distribution of medical cannabis in Florida.  The Company was established by Aphria Inc. ("Aphria"), another cannabis company that operates in Canada, to serve as Aphria's U.S. operational entity.

3.      Andrew DeFrancesco ("DeFrancesco") is an Aphria insider who, through various entities and related individuals, obtained a stake in Liberty.  Not only did DeFrancesco have stakes

1

in Aphria and Liberty, he also established his entities as the middlemen on various deals to exploit more money out of Aphria and Liberty. This was all done under the supervision of Aphria's Chief Executive Officer, and Chairman of the Board of Directors (the "Board") of Liberty, Vic Neufeld, Liberty's Chief Executive Officer George Scorsis and Liberty's Chief Financial Officer Rene Gulliver.

4.      Aphria and Liberty subsisted with contractual arrangements and overlapping investors and personnel. They were also engaged in an overarching scheme to benefit their insiders to the detriment of shareholders. Investors were kept in the dark with regard to how insiders were benefitting from certain deals.

5.      When Liberty was born it was announced that Aphria had made a C$25 million investment in the Company in return for 120,192,308 shares and a substantial amount of control. What was hidden from investors is that many Aphria insiders had already participated in an unannounced round of financing for a bargain basement price of C$0.001. Therefore, the true extent of Aphria insider involvement in Liberty was undisclosed to the general investing public.

6.      DeFrancesco was in a perfect position to reap benefits from both Aphria and Liberty. For example, Aphria bought three companies in Latin America, none of which were what was described to investors or worth the money paid. Shortly before Aphria bought them, they were all named after DeFrancesco's global private equity firm, the Delavaco Group. The names were changed and therefore DeFrancesco's involvement was essentially hidden.

7.      Liberty also diverted money from shareholders and into the pockets of DeFrancesco. On January 4, 2018, Liberty announced that it entered into a binding term sheet to acquire all of the issued and outstanding shares of 242 Cannabis Canada Ltd. (the "242 Shares"), whose wholly-owned subsidiary 242 Cannabis, LLC, had agreed to purchase a 387 acre parcel of

land in Gainesville, Florida (the "Property").  Liberty portrayed the acquisition as a great move for the future of the Company, one that would do nothing but benefit shareholders.

8.      However, Liberty bought the Property for many millions more than 242 Cannabis, LLC paid that same month.  It left out that detail when speaking to investors.  And who owned 242 Cannabis Canada Ltd.? The entity was partially owned by DeFrancesco-affiliated entities and other Aphria insiders, a fact absent from Liberty's releases about the deal.

9.      Liberty's public statements were all focused on how the Company was dedicated to "maximizing shareholder value" but they omitted how insiders were benefitting at the expense of shareholders.

10.     On December 3, 2018, Quintessential Capital Management and Hindenburg Research issued a report entitled "Aphria:  A Shell Game with a Cannabis Business on the Side," claiming that Aphria was part of a scheme involving the acquisition of the Latin American shell companies at artificially inflated prices. Specifically, the report alleged:  "Aphria is part of a scheme orchestrated by a network of insiders to divert funds away from shareholders into their own pockets."  The article detailed a thorough and on-the-ground investigation into Aphria's latest investments that revealed the poor quality and worth of the assets of those investments.  For example, the article was accompanied by pictures showing that Aphria's latest investment in Jamaica was an abandoned building on dilapidated property.

11.     On this news, Liberty's stock fell $0.36, or nearly 34%, over the next two trading days to close at $0.70 on December 4, 2018.

12.     On December 6, 2018, Hindenburg uncovered fraud at Liberty with a report titled: "Aphria Part 2: We Believe This Rot Runs Deep"  (the "Liberty Report").  This time the report focused specifically on Liberty and the alleged insider deals associated with the Company.   It

specifically detailed the arrangement with 242 Cannabis Canada Ltd. and the quick profit insiders made on the Property.  It additionally detailed the C$0.001 round of financing, which solely benefited insiders.

13.     The Liberty Report urged readers to see the parallels between it and the report issued three days prior regarding Aphria.  Both reports clearly detailed insiders repeatedly profiting at the expense of shareholders.

14.     Liberty's stock fell approximately $0.05 per share, or 7.09%, to close at $0.66 per share on December 7, 2018.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Liberty securities are traded on OTC Markets ("OTC"), located within this Judicial District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.    Plaintiff Lin, as set forth in the certification previously provided to the Court, acquired Liberty securities at artificially inflated prices on a U.S. OTC marketplace during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  Lin purchased stock in the Company in USD.  All her trades in Liberty securities were executed by Virtu, a U.S. market maker.

21.    Plaintiff Silverbird acquired Liberty securities at artificially inflated prices on a U.S. OTC marketplace during the Class Period as set forth in the certification attached as an exhibit to this complaint and was damaged upon the revelation of the alleged corrective disclosures.  Silverbird's trades in Liberty stock were executed in the U.S. by a market maker in the U.S.  Silverbird resides in the U.S., used a U.S. broker and purchased stock in the Company in USD.

22.    Defendant Liberty is a Canadian corporation with its principal executive offices located at 35 McCaul Street, Suite 201, Toronto, Ontario, Canada.  Liberty's common stock trades in an efficient market on OTCQX under the ticker symbol "LHSIF."

23.    OTC Markets Group Inc., headquartered in New York, operates the OTCQX Best Market, the OTCQB Venture Market, and the Pink Open Market for 10,000 U.S. and global securities.  The OTCQX, OTCQB and Pink markets represent U.S. and global public companies that are traded in the U.S. off the exchanges.  OTC Markets is a privately owned company that permits members of the Financial Industry Regulatory Authority (FINRA) to quote securities available over the counter, such as on the OTCQX market.  FINRA only regulates brokerage firms and brokers in the United States.

24.    Defendant Vic Neufeld ("Neufeld") was the Chairman of the Board of Liberty during the Class Period.  He was Aphria's President and CEO from June 2014 until March 1, 2019.  He also served as Chairman of the Board of Aphria during the Class Period. It was announced

Neufeld was resigning from Liberty on January 9, 2019. Two days later, Aphria announced that Neufeld would "transition out of [his] executive role[] over the coming months but remain on the board." This occurred amidst an ongoing internal investigation into allegations of self-dealing and misconduct.

25.     Defendant George Scorsis ("Scorsis") was named Chief Executive Officer of Liberty on July 24, 2017 and held that position through the Class Period. He was also on the Board. His resignation was announced on February 22, 2019. He also stepped down from the Board at that time. Scorsis previously served as Chairman of the Board of another Aphria-linked company, SOL Global Investments Corp. (formerly Scythian Biosciences Corp.) ("Scythian").

26.     Defendant Rene Gulliver ("Gulliver") was named Chief Financial Officer of Liberty on July 24, 2017 and held that position through the Class Period. He resigned effective April 14, 2019.

27.     The Defendants referenced above in ¶¶ 24-26 are sometimes referred to herein collectively as the "Individual Defendants."

28.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of Liberty's corporate filings; press releases; documents posted by the Company on its official website; and other information released to the market.

29.     DeFrancesco and his private equity firm, the Delavaco Group, are also central to the scheme alleged herein. In 2013, DeFrancesco became one of Aphria's first shareholders by investing C$6.2 million into Aphria. He then served as a strategic advisor to Neufeld and others at Aphria. In 2014, DeFrancesco orchestrated the reverse merger that resulted in Aphria's shares being listed on the TSE and DeFrancesco owning 5.6% of the company's stock. According to a

recent DeFrancesco bio, DeFrancesco and the Delavaco Group have invested or advised on every Aphria equity financing since it went public, including Aphria's investment in Liberty, which was designed to be Aphria's U.S. offshoot.  Either directly or through his entities he also owns a significant stake in Liberty.

## SUBSTANTIVE ALLEGATIONS

### Background

30.     SecureCom Mobile Inc. ("SecureCom") was incorporated under the Business Corporations Act (British Columbia) on November 9, 2011.  SecureCom developed and marketed consumer software and hardware encryption communications products for mobile phones, tablets, and computer-based platforms—its work had nothing to do with Liberty's eventual work.  It was publicly traded on the Canadian Securities Exchange ("CSE").

31.     Aphria Inc. is a cannabis company.  It is a licensed producer under the "Access to Cannabis for Medical Purposes Regulations" and is one of Canada's lowest cost producers of medical cannabis.

32.     DeFrancesco and his private equity firm, the Delavaco Group, along with Serruya Private Equity ("Serruya," a fund with a long-standing relationship with DeFrancesco), made a C$6.2-million "founding" investment in Aphria in 2013 and became strategic advisors of the company, including of President and Chief Executive Officer Neufeld and co-founders Cole Cacciavillani ("Cacciavillani") and John Cervini ("Cervini").   As a show of how close DeFrancesco was with Cacciavillani and Cervini, in a now deleted photo once posted on Instagram, he posed with them when Aphria opened the Toronto Stock Exchange on April 7, 2017:



DeFrancesco is at the center as Cervini (left) and Cacciavillani (right) flank him.  According to DeFrancesco's bio, along with his Delavaco Group, he has "invested or advised on every Aphria equity financing."

33.  Michael Gallaro, CEO of SecureCom, was Chief Operating Officer at DeFrancesco's Delavaco Capital.

34.  On April 4, 2017, SecureCom announced it entered into an agreement with DFMMJ Investments Ltd. ("DFMMJ" or "Holdco"), a private holding company created by DeFrancesco's Delavaco Group and incorporated under the laws of British Columbia a few weeks prior, pursuant to which SecureCom agreed, among other things, to change its name to "Liberty Health Sciences Inc." and to effect a consolidation of the outstanding SecureCom common shares on a 3 to 1 basis.

35.  This was done with the backing of Aphria and Serruya.  As part of the transaction, Aphria agreed to purchase 120,192,308 common shares of Holdco for C$25 million or C$0.208 per share.  Aphria also gained significant control over Liberty as part of the transaction—it entered

into an investor rights agreement in favor of Aphria providing for, among other things, Board nomination rights entitling Aphria to appoint two of the expected five directors to the board of directors as long as it owned at least 10%, together with customary pre-emptive and other rights; a registration rights agreement in favor of Aphria providing for customary demand and "piggy back" registration rights; a trademark license agreement for the exclusive use by Liberty of the "Aphria" trademark and distinctive logo in certain permitted state jurisdictions in the United States; and an intellectual property license agreement for the non-exclusive license of the Aphria "system" to Liberty in respect of the use of certain Aphria "know-how" and other related intellectual property in connection with certain authorized medical marijuana sites and permitted state jurisdictions in the United States. Serruya had a "strategic lead investment."

36.     DFMMJ, through an American subsidiary, had previously signed an agreement to buy Chestnut Hill Tree Farm LLC ("Chestnut"), one of the seven entities at that point that was licensed to sell medical marijuana in Florida.  Aphria's C$25 million, combined with an additional $35 million to be raised in a brokered private placement led by Clarus Securities Inc. ("Clarus"), was to allow Liberty to eventually indirectly hold and operate the assets of Chestnut.

37.     Clarus was close with Aphria and DeFrancesco and worked on many deals associated with them. Clarus and Aphria also sponsored DeFrancesco's son's car racing career.

38.     According to Aphria's April 4, 2017 press release on the deal: "Aphria received transactional advisory services from the Delavaco Group, who arranged the acquisition of Chestnut and who is participating as a significant shareholder in Liberty."

39.     Basically Aphria was running everything through a DeFrancesco-related middleman entity, DFMMJ, instead of creating its own entity.

40.     According to an April 4, 2017 press release issued by Aphria, Liberty was to operate as "Aphria USA."  Aphria was to receive a perpetual 3% royalty on all sales of marijuana and related products by Liberty.

41.     In the press release, Defendant Neufeld said of the transaction: "Aphria's success story is no longer limited to Canada. Aphria's footprint expansion provides significant growth opportunities for our shareholders. The royalty agreement provides an additional cash flow stream to our industry leading cash flow from operations. The additional equity received for our intellectual property continues the validation of our greenhouse model. We will continue to examine other U.S. opportunities and strive to introduce new states to Liberty's business model."

**Unbeknownst to Investors, Liberty Engaged In A Share Issuance Scheme To Enrich Its Insiders**

42.     A week after the SecureCom/DFMMJ deal was announced, 242.6 million shares of Holdco were sold at C$0.001.  This is compared to the C$0.208 per share that Aphria would purchase shares at merely a few weeks later.

43.     The round of financing at C$0.001 was not announced to the public.  However, SecureCom's Management Information Circular, filed June 19, 2017, demonstrates the following:

The following table sets forth the number and price at which Holdco Shares have been sold within the 12 month period prior to the date of this Circular:

| Date | Aggregate Number and Type of Securities Issued | Issuance Price |
|---|---|---|
| April 11, 2017[1] | 242,600,000 Holdco Shares | $0.001 |
| April 18, 2017[2] | 192,400,000 Holdco Shares | $0.026[3] |
| April 27, 2017[4] | 164,182,679 Subscription Receipts | $0.208 |
| | 2,644,231 Holdco Shares | $0.208 |
| May 19, 2017 | 120,192,310 Holdco Shares | N/A[5] |

(1)   On April 11, 2017, Holdco completed a private placement of 242,600,000 Holdco Shares for aggregate gross proceeds of $242,600.
(2)   These shares were issued in connection with and as consideration entering into the Know-How License. Such agreement was dated April 25, 2017, with effect from April 18, 2017.
(3)   The consideration attributed to the Know-How was determined via an arm's length negotiation and set at $5 million, representing a deemed per share price of $0.026.
(4)   On April 27, 2017, Holdco completed the Offering. See "The Business Combination – The Offering".

44.     This means that investors in the mysterious April 11, 2017 round owned over 35% of HoldCo when the rounds were complete.  This at a bargain basement price of C$242,600.

45.     The April 18, 2017 round, in conjunction with the Know-How License between Aphria and Liberty, was solely for Aphria.

46.     On July 25, 2017, Liberty filed a Form 9, dated July 20, 2017, with the CSE with a list of the individuals who had purchased during the April 27, 2017 round.  There is no such document for the April 11, 2017 round, but logic dictates that participants in the April 11, 2017 round can be determined by the individuals and entities that had securities prior to April 27, 2017. These include:

| Name | No. of shares purchased on 4/27/17 | No. of shares owned total |
|---|---|---|
| Delavaco Holdings Inc. | 240,388 | 5,573,721 |
| DeFrancesco Motorsports, Inc. | 80,128 | 880,128 |
| Namaste Gorgie Inc. (owned by Andy DeFrancesco's then wife, Catherine DeFrancesco)[1] | 160,257 | 5,193,590 |
| Catherine DeFrancesco ITF Summer DeFrancesco | 40,064 | 1,373,397 |
| Catherine DeFrancesco ITF Devlin DeFrancesco | 40,064 | 1,373,397 |
| Catherine DeFrancesco ITF Ava DeFrancesco | 40,064 | 1,373,397 |
| Catherine DeFrancesco ITF Lachlan DeFrancesco | 40,064 | 1,373,397 |
| Curtis Cusinato ITF Connell Cusinato | 20,032 | 120,032 |
| Curtis Cusinato ITF Cristopher Cusinato | 20,032 | 120,032 |
| Curtis Cusinato ITF Caroline Cusinato | 20,032 | 120,032 |
| Curtis Cusinato ITF Callum Cusinato | 20,032 | 120,032 |

---

[1] This ownership was not listed on the Form 9.

| Anthony Vella/ 2443904 Ontario Inc. | 160,257 | 1,293,590 |
|---|---|---|
| GRQ Consultants Inc. Roth 401K FBO Barry Honig | 801,282 | 17,601,282 |

47.     As such, one can see that DeFrancesco, through his entities and his wife, gobbled up many shares during that placement.  In total, it appears 16,499,998 shares were acquired at C$0.001 (i) by entities owned and/or operated by DeFrancesco and/or his then wife; or (ii) in trust for his children.

48.     Additionally, Curtis Cusinato, another heavy investor at that stage, was DeFrancesco's brother-in-law.  Vella was a former member of the Aphria Board of Directors and was a partner with DeFrancesco and his entities on other investments.  Barry Honig was a friend of DeFrancesco and his partner in other investments.  (The Securities and Exchange Commission obtained partial consent judgments against defendants Barry Honig and GRQ Consultants, Inc. on July 12, 2019 in charges related to an alleged pump-and-dump scheme.)

49.     Many publicly available filings also show that Defendant Neufeld had over 2 million shares prior to the April 27, 2017 round.  However, the related currently available filing on the CSE website shows that Neufeld bought 280,451 shares the April 27, 2017 round and that was his total number of securities, indicating that he had no prior Liberty holdings.[2]

50.     Given that the stock was worth approximately C$1.30 at the time Liberty went public, the money raised by these purchasers was substantial.  Delavaco Holdings alone received an approximate C$7 million windfall from its purchase at the C$0.001 per share.

51.     However, the majority of Aphria shareholders were significantly diluted by Aprhria's issuance of hundreds of millions of shares to insiders virtually free of charge.

---

[2] The Liberty Report also indicated Neufeld had over 2 million shares prior to the April 27, 2017 round.  That was supported in the report by a screenshot of a CSE filing.  However, as detailed *infra* at ¶ 124, Liberty has since said that filing is erroneous.

52. Liberty never informed retail investors of who invested this round. The full list remains unknown to retail investors.

**SecureCom Officially Becomes Liberty, Intertwined with Aphria and Its Insiders**

53. In May 24, 2017, Aphria announced that, through DFMMJ, it now had an "exclusive Management Agreement" with Chestnut. This took the place of the previous arrangement to purchase Chestnut. (That purchase would eventually be effectuated in the fall.) Neufeld at the time emphasized how Liberty was an extension of Aphria. "This is an exciting moment for DFMMJ and Aphria," said Neufeld said in the press release. "Chestnut is one of a select few licensed producers serving a state with a population over 21 million people. For DFMMJ and eventually Liberty, this is an entry into an attractive market. Liberty will have the opportunity to leverage Aphria's pharmaceutical and agricultural expertise. Aphria's intellectual property and low cost production methodologies will further drive Liberty's growth."

54. On July 20, 2017, SecureCom held a shareholders meeting where its shareholders approved the previously announced Liberty transaction.

55. That day it became official. 1006397 B.C. Ltd., a British Columbia company and wholly-owned subsidiary of SecureCom, completed the business combination with DFMMJ whereby SecureCom acquired all of the issued and outstanding shares of DFMMJ by way of a three-cornered amalgamation. DFMMJ amalgamated with 1006397 B.C. Ltd. under the BCBCA to form a wholly owned subsidiary of SecureCom named "Liberty Health Sciences USA Ltd." Concurrently with the Business Combination, SecureCom changed its name to "Liberty Health Sciences Inc." Thus the present-day Liberty was officially born.

56. As part of this transaction the Company consolidated its issued and outstanding common shares on the basis of three (3) to one (1). The transaction was accounted for as a reverse acquisition.

57.     The CSE then approved the transaction.  The Company began trading on the CSE as Liberty, under the ticker LHS, as of July 26, 2017.

58.     After the transaction closed, the structure of the companies was technically the following:



59.     In a release announcing the transaction, it was stated: "***As part of the Transaction, Aphria Inc. (TSX: APH) ("Aphria") was issued and has acquired control of, directly or indirectly, an aggregate of 106,864,103 common shares of the Resulting Issuer. Such securities represent 37.63% of the Resulting Issuer's issued and outstanding common shares.***"

60.     Undisclosed to investors, Aphria insiders also owned chunks of Liberty thanks to the undisclosed round of financing.

61.     Aphria received transactional advisory services from DeFrancesco's Delavaco Group, who arranged the acquisition of Chestnut and who participated as a significant shareholder

in Liberty.  While DeFrancesco's involvement in this was disclosed to investors, his true stake in Liberty was not.

62.     In a September 2018 press release related to DeFrancesco's appointment on another company's board of directors, his involvement was characterized as follows: "In 2016, Mr. DeFrancesco led the Delavaco Group to create DFMMJ Investments Ltd. which successfully acquired one of Florida's original medical cannabis licenses. Through this acquisition, Andy and Delavaco founded Liberty Health Sciences and strategically negotiated with Aphria and Serruya Private Equity to join the partnership as the company transitioned though its public listing." DeFrancesco was not listed as a "founder" in contemporaneous releases issued by Liberty.

63.     Aphria appointed Neufeld and John Cervini to the Liberty Board of Directors (the "Board").  Neufeld served as Chairman of the Board and contractually Aphria would always name the Chairman as long as it continued to hold at least 10% of Liberty.  Serruya also made an appointment to the Board.

64.     The initial directors were Neufeld, Cervini, Aaron Serruya, Brady Cobb (a Florida lobbyist who was Director and CEO of DFMMJ) and SecureCom's Galloro.

65.     When Scorsis was named as CEO on July 24, 2017, he replaced Cobb on the Board. Gulliver was named CFO.

66.     DeFrancesco, under the nose of all the Individual Defendants, continued to use Liberty as his piggy bank in ways big and small.  For example, in November 2017, Liberty entered into a subscription agreement with Green Tank Holdings Corp. for the purchase of 49,213 preferred shares, for a total cost of US$250,000 (C$325,003).  The entity, which supplied vape pens, was owned by DeFrancesco's wife, though Liberty's disclosures did not mention this fact.

Aphria also had shares in Green Tank Holdings Corp.  This was just another one of many insider transactions.

67.    The overarching scheme had already become clear with insiders benefiting from both companies in the same or similar ways.

**DeFrancesco is Prime Beneficiary from 242 Cannabis Property**

68.    Liberty next announced to the public that it was set to acquire property, which "include[d] over 200,000 square feet of state-of-art greenhouses, head houses, tissue culture lab and processing facilities" and allegedly "show[ed] Liberty's commitment to provide patients with a consistent supply of high-quality cannabis to meet their medical needs."  What Liberty neglected to announce was that this so-called "arms-length" transaction involved providing money—well over-and-above what the property was worth—to a company recently formed by insiders.

69.    On January 4, 2018, Liberty made the official announcement regarding this deal. It announced that it entered into a binding term sheet to acquire all of the issued and outstanding shares of 242 Cannabis Canada Ltd. (the "242 Shares"), whose wholly-owned subsidiary 242 Cannabis, LLC, had agreed to purchase a 387 acre parcel of land in Gainesville, Florida (the "Property").

70.    Statements about the acquisition stressed that it would allow Liberty to greatly increase production after construction to retrofit the space was complete.  Liberty portrayed the transaction as a great deal, never letting investors in on the true machinations behind it.

71.    As consideration for the 242 Shares, Liberty announced that it would issue 18,815,322 units of the Company, with each unit being comprised of one common share of the Company and one-half common share purchase warrant, with each whole warrant exercisable at $2.07 for a period of three years from the closing date.  The consideration was computed at approximately C$31 million.

72.     What the release did not disclose to investors was that 242 Cannabis, LLC was an entity formed less than a month before with Catherine DeFrancesco, DeFrancesco's then wife, as the only named manager.

73.     According to a Form 9 filed on February 14, 2018—over a month after the deal was announced—the list of holders of the entity include multiple entities operated by DeFrancesco's friend Honig (again), multiple Serruya-affiliated entities and individuals and multiple entities affiliated with DeFrancesco's then wife and his children:

- NG Bahamas Ltd. (insiders Catherine DeFrancesco, Devlin DeFrancesco, Lachlan DeFrancesco, Ava DeFrancesco, Summer DeFrancesco, Cathy DeFrancesco);

- DSBI Bahamas Ltd. (insiders Catherine DeFrancesco, Devlin DeFrancesco, Lachlan DeFrancesco, Ava DeFrancesco, Summer DeFrancesco, Cathy DeFrancesco);

- DBIC Ltd. (insiders Catherine DeFrancesco, Devlin DeFrancesco, Lachlan DeFrancesco, Ava DeFrancesco, Summer DeFrancesco, Cathy DeFrancesco);

- Rockstar Kids Ltd. (insiders Catherine DeFrancesco, Devlin DeFrancesco, Lachlan DeFrancesco, Ava DeFrancesco, Summer DeFrancesco, Carmela DeFrancesco);

- Great Timing Bahamas Ltd. (insiders Catherine DeFrancesco, Devlin DeFrancesco, Lachlan DeFrancesco, Ava DeFrancesco, Summer DeFrancesco, Andrea DeFrancesco).

74.     While these names were on the Form 9, they were not mentioned when the deal was announced.  What also was not announced was that 242 Cannabis, LLC did not yet own any property when Liberty announced the deal with it on January 4, 2018—242 Cannabis, LLC was

newly formed by insiders and had no assets.  242 Cannabis, LLC also did not own any land when the deal between Liberty and 242 Cannabis Canada Ltd. was executed on January 31, 2018.

75.     Florida real estate records show the deal for 242 Cannabis, LLC to receive, via special warranty deed, the property in Alachua County, Florida was not formalized until February 9, 2018.  The total consideration paid by 242 Cannabis, LLC to the Florida-limited liability company Alico Citrus Nursery, LLC ("Alico") was $6,500,000 (or approximately C$8,112,650).

76.     On February 15, 2018, six days after 242 Cannabis, LLC had obtained the relevant property, Liberty closed on the previously announced deal to acquire the 242 Shares.

77.     As such, Liberty paid approximately C$31 million to the DeFrancesco entities essentially for a property that was recently purchased for C$8,112,650, yielding the DeFrancesco entities an immediate C$23 million windfall.

78.     On February 16, 2018 (the "February 16 Release"), Liberty issued a release in which it stated that Liberty closed on the acquisition of the Property, omitting the involvement of 242 Cannabis, LLC or any mention of it in fact having bought the 242 Shares.

**Aphria Also Involved in Schemes to Enrich Insiders**

79.     Aphria and Liberty were inextricably intertwined, both contractually (thanks to various agreements between the companies) and also because of overlapping investors and personnel.  Indeed, Confidential Witness #1, a former patient care liaison for Liberty, said Aphria company-wide emails would be sent to Liberty personnel.  She said there were also regular requests from Aphria to Liberty personnel.  Stock movements of the larger Aphria impacted Liberty.

80.     On July 17, 2018, Aphria, who at this point was still Liberty's prime backer, announced that it would be acquiring a series of entities in Latin America from SOL Global Investments Corp. (formerly Scythian Biosciences Corp.) ("Scythian"), which, like Liberty, was

another company closely related to Aphria.  In fact, Defendant Scorsis previously served as Chairman of the Board of Directors of Scythian.  Former Liberty board member Brady Cobb is, and was at all relevant times, CEO and a director of Scythian.

81.     The entities to be acquired by Aphria were Marigold Acquisitions Inc. ("Marigold"), which owned a 49% stake in a business named Marigold Projects Jamaica Ltd. ("Marigold Projects") located in Jamaica; MMJ International Investments Inc. ("MMJ International"), which owned 100% of ABP, S.A. ("ABP") located in Argentina; and MMJ Colombia Partners Inc. ("MMJ Colombia"), which owned 90% of ColCanna SAS ("ColCanna") located in Colombia (collectively the "Latin America Assets").

82.     Like with 242 Cannabis Canada Ltd., DeFrancesco and other Aphria insiders owned the Latin America Assets and flipped them at a hefty profit.

83.     On March 11, 2018, Scythian entered into a non-binding letter of intent with MMJ International to purchase MMJ International for approximately C$27 million.  Prior to January 16, 2018, MMJ International had been named Delavaco MMJ International Inc.  Of course that name would have immediately alerted savvy investors to DeFrancesco's involvement, so the name was changed.

84.     Aphria represented that ABP had a "strong retail platform" and was "one of the nation's leading importers and distributors of pharmaceuticals" with revenue in 2017 of approximately $11 million in U.S. dollars.  In fact, it was a pharmacy and a warehouse which reportedly had a 2017 revenue of below $500,000.

85.     During the Scythian/Aphria deal, Scythian announced that ABP had purchased product from Aphria for educational use by the Garrahan Hospital, described by Scythian as a

"World Renowned Pediatric Hospital for Research and Education."  However, a press release issued by Garrahan Hospital later revealed this as a donation from Aphria.

86.    Despite the paltry operations of MMJ International, Aphria purchased it from Scythian for C$50 million.

87.    On March 22, 2018, Scythian announced its intent to purchase Marigold for approximately C$34.5 million in stock.  Three days prior to this announcement, Marigold had been named Delavaco Caribbean Ventures Inc.

88.    When Aphria purchased Marigold from Scythian for C$145 million, Marigold Projects either did not exist or was not operational.  The building where it allegedly had its main corporate office was empty.  Other addresses linked to the company were similarly inaccurate – for example, Marigold Projects' office at 38a Trafalgar Road in Kingston, Jamaica, was supposedly in Suite 51, but there was no Suite 51 listed at the property.

89.    According to Aphria, Marigold Projects held various licenses to cultivate and grow cannabis, but, in fact, at the time of purchase, Marigold Projects did not have these licenses. Marigold Projects essentially had no operations, but yet DeFrancesco got paid handsomely for it.

90.    On April 8, 2018, Scythian entered into a binding letter of intent with MMJ Columbia to purchase it for approximately C$39 million.  Prior to February 16, 2018, MMJ Columbia had been named Delavaco Columbia Partners Inc.

91.    ColCanna was also not what was represented.  It was only six months old, had no operating activity, and only $16,000 in assets.  Its greenhouse facilities, touted by Aphria, were not yet operational.  The entity was not even licensed to produce cannabis.

92.    Despite this, Aphria paid C$84 million to Scythian for a controlling stake in the entity.

93.     DeFrancesco, who was integral to Scythian's listing on the TSE, later became the Chairman of Scynthian's Board of Directors and its Chief Investment Officer.

94.     All of this was hidden from investors—the substance of the acquisitions were exaggerated and DeFrancesco was never mentioned as having an interest in the acquired entities (which conveniently had each changed their name so they no longer bore the Delavaco name, which would have alerted investors to the relationship).

**Aphria Divests Interest in Liberty**

95.     Aphria is listed on the Toronto Stock Exchange, which has a more rigorous regulatory regime than the CSE.  The TSX Group, which runs the Toronto Stock Exchange, pressured Aphria to divest its interest in Liberty because cannabis use is still illegal under federal U.S. law and Liberty's operations are based in the United States.

96.     On February 5, 2018, Aphria announced that it entered into a purchase and sale agreement to sell 26,716,025 shares representing all its shares in Liberty that were not subject to CSE escrow requirements. Each of Michael Serruya, Simon Serruya and Jack Serruya was announced to purchase 80% of all transferred shares from Aphria individually or through an affiliate. The announcement stated the remaining 20% was being purchased by affiliates of Delavaco Capital owned and/or controlled by Catherine DeFrancesco. The transaction also included a call/put option for the remainder of Aphria's shares, which were subject to the CSE mandatory escrow requirements. Each purchaser was expected to sign a promissory note, together with a guarantee which guaranteed such purchaser's obligations under their promissory note and the obligations of such purchaser upon the exercise of the applicable call or put option, as the case may be.  Due to escrow requirements, under the agreement, Aphria retained an ownership position of 28.1% of the issued and outstanding shares of Liberty until the escrow period elapsed.  Once that occurred, the 80% Serruya/20% Delavaco division would include those shares.

97.     The Delavaco Group served as "special advisor" to Liberty with regard to the transaction.

98.     "We were very clear with complete disclosure on what we were doing. Constantly getting approved by the TSX," Neufeld said in a March 2018 piece with CBC news.  He noting there were no red flags until he received a warning letter from TSX. He said: "How it surfaced now, why it surfaced now, many of us have our own suspicions of conspiracy theories."

99.     The process of divesting Liberty not a quick one for Aphria.  It took until September 6, 2018, for Aphria to announce it had finally entered into a share purchase agreement with a group of buyers wherein it completed the sale of the shares making up 100% of its outstanding interest in Liberty, in exchange for a five-year promissory note due September 6, 2023, bearing interest at 12% per annum and in the amount of $59,097,986.  Each of brothers Michael Serruya, Simon Serruya and Jack Serruya purchased 80% of all transferred shares from Aphria individual or through an affiliate. The remaining 20% were purchased by affiliates of Delavaco Capital, namely 242 Cannabis Canada Ltd. part owners Rockstar Kids Ltd. and NG Bahamas Ltd.  Aphria retained an irrevocable option to repurchase its shares in Liberty from the buyers for a period of up to five years, subject to the satisfaction of certain conditions.

100.     Defendant Neufeld, CEO of Aphria, still served as Chairman of the Board of Liberty following this share purchase agreement.  Cervini, who co-founded Aphria and is co-chairman of Aphria's board, also remained a director on the Board.

101.     The overlapping investors in both companies also still remained.  The Serruya family, who contributed an Aphria seed investment, became Liberty's largest shareholders. Aphria's founders and largest shareholders, Cacciavillani and Cervini, remained large Liberty shareholders.

**The Truth Emerges When the Insider Deals of Aphria and Liberty Are Exposed**

102.    Before the market opened on December 3, 2018, Quintessential Capital Management ("QCM") and Hindenburg Research ("Hindenburg") issued a report entitled "Aphria: A Shell Game with a Cannabis Business on the Side," (the "Hindenburg Report") alleging that Aphria was part of a scheme involving the acquisition of shell companies at artificially inflated prices.

103.    Hindenburg is an entity that specializes in forensic research. Nate Anderson is the founder of Hindenburg.  Anderson is both a certified financial analyst and a Chartered Alternative Investment Analyst.

104.    QCM is New York-based asset management firm aiming for exceptional returns through the application of value investing, shareholder activism and deep due diligence.

105.    The Hindenburg Report detailed suspected fraud by Aphria and executives after conducting a significant and substantial investigation concerning the Latin America Assets.  The Hindenburg Report detailed Aphria overpaying for entities, with proceeds being pocketed by DeFrancesco and other insiders.  Specifically, it alleged:  "Aphria is part of a scheme orchestrated by a network of insiders to divert funds away from shareholders into their own pockets."

106.    The Hindenburg Report laid out the interrelations graphically:



107.    The Hindenburg Report detailed, among other things, the attempts to hide DeFrancesco's involvement in the sub-entities, how these assets were purchased under the direction of Neufeld (who was not only in charge of Aphria but was also the Chairman of Scythian's Board of Directors) and the many conflicts of interest in the transaction.  It included pictures of the non-operational entities.

108.    Later that same day, *Barrons.com* published an article (which it updated the following day on December 4, 2018), titled *Marijuana Stock Aphria Is Falling Again as It Fights a Short Seller Who Called Out 'Something Very Sinister'*, where DeFrancesco confirmed in an interview that "he had assembled the overseas assets that Aphria bought, but noted that the deals had passed fairness valuations by lawyers and investment bankers."

24

109.    Aphria issued a quick response generally denying the accusations in the report, but failed to substantively contradict most of them.

110.    Aphria's stock plummeted.  As many of the individuals mentioned in the Hindenburg Report were also involved in Liberty, including DeFrancesco and Neufeld, and Aphria and Liberty were closely associated, Liberty's stock also took a sharp hit.  Liberty's stock fell $0.36, or nearly 34%, over the next two trading days to close at $0.70 on December 4, 2018.

111.    On December 6, 2018, Aphria announced its Board of Directors had appointed a special committee of independent directors to review the Company's previously completed acquisition of the Latin America Assets.  The release stated:  "[Aphria]'s Board reiterated its confidence in the process leading to the Acquisition, as well as in its Latin American operations and strategy.  However, in the face of inaccurate and misleading accusations by certain short-sellers, whose sole interest is in profiting from a decline in the Company's shares, it is undertaking a comprehensive review, led by a Special Committee of independent directors of these, and any other, allegations in the interest of protecting Aphria shareholders."

112.    On that same day, Hindenburg issued the Liberty Report, which focused specifically on Liberty and the alleged insider deals associated with the Company.  Hindenburg stated: "We urge readers to note the parallels between this transaction and those of the LatAm transactions described in our previous report, which similarly involved Neufeld & DeFrancesco, intermediary shell entities placed between acquisitions, and presumed quick profits for the holders of those shell entities at the direct expense of public shareholders."

113.    The Liberty Report detailed the 242 Cannabis LLC deal, including showing the Special Warranty Deed related to the Property:

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 3106085      5    PG(S)
2/13/2018 10:19 AM
BOOK  4575        PAGE  2107
J.K.'JESS' IRBY
Clerk of the Court, Alachua County, Florida
ERECORDED                    Receipt #   813528
Doc Stamp-Mort:  $0.00
Doc Stamp-Deed:  $45,500.00
Intang. Tax:  $0.00

This instrument prepared by
and after recording return to:
Timothy M. Hughes, Esq.

**SHUMAKER**

Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Phone: (813) 229-7600

Total Consideration Paid $6,500,000.00
Documentary Stamp Tax Paid: $45,500.00

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED is made as of February ⁀, 2018, by **ALICO CITRUS NURSERY, LLC**, a Florida limited liability company, whose address is 10070 Daniels Interstate Court, Suite 100, Fort Myers, Florida 33913 (hereinafter referred to as "*Grantor*") to **242 CANNABIS, LLC,** a Florida limited liability company, whose address is 2300 East Las Olas Blvd., 5th Floor, Fort Lauderdale, Florida 33301, (hereinafter referred to as "*Grantee*").

114.   It also provided details about the April 11, 2017 private placement round of financing that allowed certain unnamed investors to purchase HoldCo shares, thereby diluting Aphria's investment and allowing those investors to reap a hefty reward.   Because of the revelations about this round, investors were notified of the extent of insider involvement in Liberty.

115.   Liberty issued a fairly boilerplate response on December 6, 2018: "[Liberty is] aware of a short-seller report attempting to manipulate Liberty's share price through a series of unconfirmed allegations. The Report contains a number of factual errors and outdated information. As cited in the Report's disclaimers, its authors stand to benefit financially by manipulating Liberty's stock. Investors should exercise caution in relying on the statements contained in this Report. Liberty takes the unconfirmed allegations contained in the Report very seriously and will provide updates as they relate to this matter in due course. Liberty is committed to good corporate governance and transparency."

116.   A Bloomberg article noted that Liberty shares tumbled following the Liberty Report, but rebounded, on a day when Aphria ended up 30% (likely thanks to the announcement of the special committee).  The Bloomberg article included this depiction:



117.   While Liberty had a slight bump on December 6, 2018, the following day it returned to its slide.  Liberty's stock fell approximately $0.05 per share, or 7.09%, to close at $0.66 per share on December 7, 2018.

**Post-Class Period Developments**

118.   On January 8, 2019, after market close, it was announced that Defendant Neufeld and Cervini would step down from the Liberty Board effective January 31, 2019.  Neufeld and Cervini also left the Aphria Board of Directors effective March 1, 2019.  Neufeld likewise ceased serving as CEO of Aphria, though remained on as a "special advisor."

119.   On January 21, 2019, Liberty announced Ian McKinnon ("McKinnon") and John Hick ("Hick") would join the Board.  McKinnon assumed the role of Chairman of the Board.

While Defendant Neufeld and Cervini were not supposed to step down until January 31, this was accelerated to January 18, 2019.  The appointment of the new directors was also effective as of that date.

120.   A January 29, 2019 report by Canaccord Genuity Capital Markets noted that Liberty had a "share price decline >30% after the publication of a short seller report (predominantly related to its previous strategic partner Aphria)" and that the decline was not "rooted in fundamentals" of the Company.

121.   On February 12, 2019 (the "February 12 Press Release"), Liberty announced that McKinnon and Hick were already resigning.

122.   Liberty also disclosed in the February 12 Press Release that, on January 11, 2019, it had retained Grassi & Co. ("Grassi") to investigate the claims in the Liberty Report.  Liberty stated that Grassi engaged the services of an industry-leading global real estate services company to prepare an appraisal of the fair market value of the real estate component of 242 Cannabis Ltd. and its affiliated entities.

123.   According to the February 12 Press Release, Grassi found that the owners of 242 Cannabis Ltd. did realize a substantial profit from flipping the Property, but the real estate appraisal showed the Property was still worth more than Liberty paid for it.

124.   With regard to Defendant Neufeld, the February 12 Press Release stated Grassi found that the Liberty Report's conclusions regarding Defendant Neufeld's shareholdings were based on "erroneous filings" which were allegedly corrected by Liberty.

125.   Liberty could not find a way to spin the allegations about the C$0.001 round of financing in the February 12 Press Release.  The release stated: "[A]llegations concerning the participation by certain investors in early financing rounds of the Company or its predecessors and

their ownership of equity in 242 Cannabis were supported by the available evidence but these findings, in and of themselves, were not seen as material to the ongoing business of the Company, given that these investors have no current role in the management or governance of the Company."

126.   William (Bill) Pfeiffer was announced as an independent Chair of the Board.

127.   A report in *The Financial Post* the following day quoted Anderson of Hindenburg as writing in an emailed statement: "despite declaring the report to be inaccurate, Liberty Health Sciences highlighted a total of zero inaccuracies except for the company's own inaccurate filing. Four directors have since resigned, which should speak volumes." *The Financial Post* could not obtain comments from DeFrancesco.

128.   On February 15, 2019, Aphria issued a release regarding the finding of its own special committee of independent directors (the "Special Committee"). According to the release, the Special Committee found the Latin America Assets were "in place" and the "consideration paid for the assets purchased in the Acquisition was determined to be within an acceptable range as compared to similar acquisitions by competitors, be it near the top of the range of observable valuation metrics."

129.   While Aphria found the consideration for the Latin America Assets was "within an acceptable range," it did find "certain of the non-independent directors of the Company had conflicting interests in the Acquisition that were not fully disclosed to the Board." While these non-independent directors were not named, Defendant Neufeld and Cervini were both among the non-independent directors of Aphria at that time.

130.   On February 19, 2019, Aphria announced that the independent members of its Board of Directors unanimously approved the early termination and liquidation of a promissory note, option and other agreements related to Aphria's divesture of Liberty. Aphria therefore lost

its option to repurchase its Liberty shares. Aphria also took a "penalty" for exiting the arrangement, receiving $47.4 million of the $59.1 million in Liberty shares originally placed in escrow. Aphria could only earn $10 million back subject to certain conditions. This was one of a series of moves a special committee created by Aphria had taken to distance itself from the insider behavior that had been rampant at the company.

131.    On February 22, 2019, Liberty announced Defendant Scorsis resigned as CEO and would be stepping down from the Board. It was also announced Gulliver would be resigning effective as of April 14, 2019. Liberty claimed these moves were done as the company "work[s] towards enhancing its directors and senior executives based in the United States, to more closely align with the US geographical focus of the business."

132.    In April 2019, Aphria announced it had "determined that a $50 million non-cash impairment charge to the carrying value of the [Latin American] assets was required." In other words, Aphria issued a partial write down of the assets it overpaid for.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### Materially False and Misleading Statements Concerning Liberty's Relationship with Aphria and its Insiders

133.    The Class Period begins on July 20, 2017 when Liberty was officially born. Right from the beginning the Company misled investors—it did not disclose how it was part of an overarching scheme to enrich insiders and omitted information regarding insider purchases and influence.

134.    On July 21, 2017, SecureCom issued a press release that said: "SecureCom Mobile Inc. (CSE: SCE) ("SecureCom") is pleased to announce the approval by its shareholders of all matters put before them at the annual and special shareholder meeting of SecureCom held on July 20, 2017. Among other things, shareholders have approved the previously announced business

combination (the "Transaction") between SecureCom and DFMMJ Investments Ltd. ("DFMMJ") pursuant to which SecureCom will continue the business of DFMMJ under the new name "Liberty Health Sciences Inc." (the "Resulting Issuer"). The Resulting Issuer will hereafter be engaged in the business of the cultivation and harvesting of medical cannabis in certain permitted state jurisdictions in the United States, with its initial focus of operations being in the State of Florida. . . *As part of the Transaction, Aphria Inc. (TSX: APH) ("Aphria") was issued and has acquired control of, directly or indirectly, an aggregate of 106,864,103 common shares of the Resulting Issuer. Such securities represent 37.63% of the Resulting Issuer's issued and outstanding common shares. The securities are held for investment purposes*, and Aphria may acquire additional securities, or dispose of its holdings of securities as investment conditions warrant, subject to applicable escrow requirements of the CSE."

135.    The statements referenced in ¶ 134 were materially false and misleading when made because they did not disclose that Aphria was not simply concerned with an investment in Liberty's medical cannabis business but rather:  (i) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (ii) unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

136.    On July 26, 2017, Liberty announced its trading symbol had changed to LHS on the CSE.  The release stated: "Liberty was launched to acquire and operate U.S.-based companies in the medical cannabis market. . . Liberty takes a science-based, data driven approach to continuous improvement and holds itself to the highest standards when it comes to the cultivation and production of medical cannabis. . . *Liberty's stringent investment criteria for expansion*

*maximizes returns to shareholders, while focusing on significant near and midterm opportunities. Liberty has an extensive background in highly regulated industries*[.]"

137.     The statements referenced in ¶ 136 were materially false and misleading when made because they did not disclose that Liberty's "extensive background" was based on Aphria's experience and Liberty was not focused on "maximiz[ing] returns to shareholders" but rather:  (i) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (ii) unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

138.     On August 21, 2017 (the "August 21 Release"), Aphria and Liberty jointly issued a press release responding to a statement made by the TMX Group (operator of the TMX exchange, on which Aphria shares are traded), which confirmed that issuers with marijuana-related activities in the U.S. are not banned from the exchange but that the organization is working with regulators on the issue.  After stating that both companies look forward to working with the TMX Group, the release stated: "*For all US based operations, both Aphria and Liberty are operating in compliance with the official guidance from both the US Treasury Department and the US Department of Justice* through banks compliant with the federal government directives. Both Aphria and Liberty will continue to work with their governmental advisors at the federal level to provide assistance to governmental officials with the ongoing US policy making initiatives related to medical cannabis in the Unities States. Aphria and Liberty will both continue to focus on their existing strategies for the medical cannabis industry in Canada and the United States, respectively. *Specifically, the focus is to supply the growing demand in both countries for reliable and affordable medical grade marijuana to improve the quality of people's lives. Each of Aphria*

*and Liberty will continue to monitor and work with its US and Canadian advisors on strategies to timely and effectively respond on behalf of its stakeholders to any new policy initiatives in both Canada and the United States within the medical cannabis industry.*"

139.     The August 21 Release again contained the statement: "Liberty's stringent investment criteria for expansion maximizes returns to shareholders, while focusing on significant near and midterm opportunities. Liberty has an extensive background in highly regulated industries[.]"

140.     The statements referenced in ¶¶ 138-139 were materially false and misleading when made because (i) they did not disclose that Liberty's "extensive background" was based on Aphria's experience and not stand-alone expertise; (ii) they did not disclose that Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C\$0.001.

141.     On September 18, 2017 (the "September 18 Release"), Liberty announced it was opening two medical cannabis dispensaries in December.  Defendant Scorsis is quoted in the release as saying: "Our goal is to ensure that the dispensaries are patient-centric, providing not only access to high-quality medical cannabis, but also comprehensive education and resources to inform patients on cannabis use as a safe alternative to treat symptoms related to several medical ailments. *Aphria products will be available for purchase at our dispensary locations*."

142.     The September 18 Release again contained the statement: "Liberty's stringent investment criteria for expansion maximizes returns to shareholders, while focusing on significant

near and midterm opportunities. Liberty has an extensive background in highly regulated industries[.]"

143.    The statements referenced in ¶¶ 141-142 were materially false and misleading when made because (i) while stating that Aphria products would be available at Liberty dispensary locations, the statements failed to disclose the full extent of Liberty's relationship with Aphria and its insiders; (ii) they did not disclose that Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) they did not disclose that unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

144.    On September 29, 2017 (the "September 29 Release"), Liberty announced that the Florida Department of Health, Office of Medical Marijuana Use, approved the transfer of the license to cultivate, process and dispense medical marijuana in the State from Chestnut to Liberty, effective September 28, 2017.  Defendant Scorsis is quoted in the release as saying: "We look forward to continuing to help patients in the State of Florida improve the quality of their lives. ***The agreements we've established with Aphria allow us to employ their industry leading and proven cultivation and processing techniques, while offering a full array of Aphria products to the citizens of Florida via home delivery and at our forthcoming Medical Cannabis Education Centers***."

145.    The September 29 Release again contained the statement: "Liberty's stringent investment criteria for expansion maximizes returns to shareholders, while focusing on significant near and midterm opportunities.  Liberty has an extensive background in highly regulated industries[.]"

146.    The statements referenced in ¶¶ 144-145 were materially false and misleading when made because (i) while stating that Liberty had agreements with Aphria, the statements failed to disclose the full extent of Liberty's relationship with Aphria and its insiders; (ii) they did not disclose that Liberty's "extensive background" was based on Aphria's experience and not stand-alone expertise; (iii) they did not disclose that Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iv) they did not disclose that, unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

147.    On October 11, 2017 (the "October 11 Release"), Liberty announced an exclusive partnership with Resolve Digital Health Inc. ("Resolve"), a developer of medical cannabis delivery systems and devices, to distribute Resolve's devices in Florida.  Defendant Scorsis is quoted in the release as saying:  "Our partnership with Resolve further supports our commitment to being industry leaders in the medical cannabis space by offering our patients innovative and safe methods to inhale cannabis. The Aphria brand is dedicated to patient well-being which makes the Resolve inhaler a perfect addition to our product portfolio."

148.    However, what the October 11 Release did not say was that Resolve was also negotiating a deal with Aphria.  Twenty days later, Resolve announced it had entered into an agreement with Aphria in which "Aphria will provide cannabis products to fill Resolve's proprietary delivery pods and cartridges for sale to the Canadian medical cannabis market."  Defendant Neufeld is quoted as CEO of Aphria and Chairman of the Board for Liberty and the Liberty/Resolve arrangement is mentioned.

149.    The statements referenced in ¶¶ 148-149 were materially false and misleading when made because they did not disclose to investors (i) that this agreement was an aspect of a larger deal with Aphria, as many Liberty deals were; (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) that, unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

150.    On October 14, 2017 Defendant Scorsis presented at the New West Summit in Oakland, California ("New West Talk"), video of which was only later made available online. While not disclosing the full relationship between the entities, Defendant Scorsis said he "[could] speak on Aphria's behalf."

151.    During the New West Talk, Defendant Scorsis also said: "Aphria is cultivators, their expertise lies in 3 generation of greenhouse growing. . . Three generations of expertise that was transitioned to cannabis. They've been successful in the Canadian marketplace and we thought to extend that into the American marketplace.  Vic Neufeld, which is the CEO of Aphria, is the Chairman of our team. And that really talks about *the fingerprint of Aphria on our business*, with Jon Cervini, one of the co-founders, also being part of it."

152.    The statements referenced in ¶¶ 150-151 were materially false and misleading when made because while Defendant Scorsis technically only had a title at Liberty, he was clearly working on behalf of both entities and their insiders and yet he did not disclose (i) the full interrelationship between the companies; (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) that, unbeknownst to investors, Aphria and Liberty insiders were even more

involved in Liberty than disclosed, as many had by participated in an unannounced round of
Liberty financing for C$0.001.

153.    On October 20, 2017, Liberty released Management's Discussion & Analysis (the
"October 2017 MD&A") for the period from May 1, 2017 through August 31, 2017.  The October
2017 MD&A stated that Aphria and Liberty entered into the following agreements:

> (a) Know-How License Agreement.  Pursuant to this agreement, Liberty obtained
> a license to use any know-how (including knowledge, methodologies and
> techniques) made available by Aphria to Liberty related to the production of
> medical marijuana for the purposes of cultivating, distributing and selling medical
> marijuana in the State of Florida.   In exchange for such license, Aphria had
> 64,133,333 Common Shares of Liberty (post-consolidation) and was to pay Aphria
> an annual license fee of $10,000 plus applicable taxes.

> (b) Investor Rights Agreement. "Concurrently with the completion of the Business
> Combination, Liberty entered into an investor rights agreement (the "Investor
> Rights Agreement") pursuant to which, among other things, Aphria is be entitled
> to certain director nomination and pre-emptive rights."

> (c) Trademark License Agreement. "Liberty entered into a trademark license
> agreement (the "Trademark License") with Aphria pursuant to which Liberty and
> its subsidiaries (including AcquireCo) obtained a license to use Aphria's
> trademarks identified therein (the "Trademarks") for the purposes of marketing,
> distributing and selling medical marijuana in the State of Florida."

> (d) Registration Rights Agreement. "Liberty entered into a registration rights
> agreement (the "Registration Rights Agreement") pursuant to which, among other
> things, Aphria will be provided with customary demand and "piggy back"
> registration rights[.]"

> (e) "Liberty has entered into agreements with third parties for hardware, software,
> telecommunications and other information technology ("IT") services in
> connection with its operations, including the use of Aphria's IT group for support
> and systems work."

154.    In Certifications of Interim Filings accompanying the October 2017 MD&A,
Defendants Gulliver and Scorsis each separately certified:

> No misrepresentations: Based on my knowledge, having exercised reasonable
> diligence, the interim filings do not contain any untrue statement of a material fact
> or omit to state a material fact required to be stated or that is necessary to make a

statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

155.    The statements referenced in ¶¶ 153-154 were materially false and misleading when made because they only disclosed to investors select agreements between Liberty and Aphria and did not disclose (i) the full interrelationship between the companies; (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

156.    On November 6, 2017, SecureCom released its Management's Discussion & Analysis (the "November 2017 MD&A") for the year ending June 30, 2017.  (Because Liberty did not officially exist as Liberty until July, the business was still SecureCom as of the fiscal year closing date.)  The November 2017 MD&A stated: "The Company, through DFMMJ, is also party to certain licensing agreements with Aphria Inc., relating to the use of certain intellectual property of Aphria Inc. This intellectual property includes a trademark license of the Aphria trademark in certain permitted state jurisdictions in the United States and a nonexclusive license of the Aphria "system" in respect to certain "know-how" and other related intellectual property in connection with certain authorized medical marijuana sites."

157.    The November 2017 MD&A also stated various things about Aphria's monetary investment in Liberty, including: "In connection with the Business Combination, Aphria Inc. (TSX: APH) ("Aphria") will subscribe for 120,192,308 common shares in the capital of Holdco (each a "Holdco Share") for aggregate gross proceeds of $25 million (the "Aphria Investment")."

158.    The November 2017 MD&A also reported certain "Related Party Balances and Transactions."  These were:

During the year ended June 30, 2017, the Company received consulting services from Sterling-Grant Capital, a company controlled by the Company's former CEO, in the amount of $Nil (2016 - $60,000). During the year ended June 30, 2017, the Company received consulting services in the amount of $60,000 (2016 - $47,981) from its former CEO and director. As at June 30, 2017, an amount of $Nil (June 30, 2016 - $32,420) is included in accounts payable and accrued liabilities. During the year ended June 30, 2017, the Company received consulting services from its former CFO in the amount of $73,000 (2016 - $6,500). As at June 30, 2017, an amount of $11,526 (June 30, 2016 - $Nil) is included in accounts payable and accrued liabilities. During the year ended June 30, 2017, the Company received consulting services from FTL Networks, a company controlled by the Company's former President and CTO, in the amount of $Nil (2016 - $40,236). As at June 30, 2017, the Company had an amount of $Nil (June 30, 2016 - $85,291) included in accounts payable and accrued liabilities. During the year ended June 30, 2017, the Company incurred expenses of $23,622 (2016 - $Nil) related to travel by key management. As at June 30, 2017, the Company had an amount of $Nil (June 30, 2016 - $Nil) included in accounts payable and accrued liabilities. During the year ended June 30, 2017, the Company recorded $101,816 (2016 - $11,100) in stock-based compensation related to stock options granted to directors and officers of the Company. The Company incurred legal fees during the year ended June 30, 2017 of $267,090 (2016 - $Nil) to a firm in which a director of the Company was a partner. Of this amount, $64,154 was related to debenture issuance costs. As at June 30, 2017, included in accounts payable and accrued liabilities is $87,317 (June 30, 2016 - $Nil).

159.     In Certifications of Interim Filings accompanying the November 2017 MD&A, Defendants Gulliver and Scorsis each separately certified:

> No misrepresentations: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

160.     The statements referenced in ¶¶ 156-159 were materially false and misleading when made because they only disclosed to investors certain agreements between Liberty and Aphria and failed to disclose (i) the full interrelationship between the companies, including the amount of related parties that were involved in the business combination; (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and Liberty insiders

were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

161.    Defendant Scorsis did an interview on Midas Letter Live that was published on January 8, 2018. In that interview, Defendant Scorsis was asked about the relationship between Liberty and Aphria.  This exchange occurred as part of that interview:

> **James West (Midas Letter Host):** What is the percentage ownership that Aphria has of Liberty Health Sciences?
> **Defendant Scorsis:** 37%.
> **West:** 37%. So this is in effect an Aphria subsidiary, not entirely owned.
> **Defendant Scorsis:** Not entirely owned.

162.    The statements referenced in ¶ 161 were materially false and misleading when made because Defendant Scorsis did not disclose (i) the full interrelationship between the companies, including how many Aphria insiders had a stake in Liberty; (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

163.    On January 29, 2018, Liberty released Management's Discussion & Analysis (the "January 2018 MD&A") for the period from May 1, 2017 to November 30, 2017.  The October 2017 MD&A stated that Aphria and Liberty entered into the following agreements:

> (a) Know-How License Agreement.  Pursuant to this agreement, Liberty obtained a license to use any know-how (including knowledge, methodologies and techniques) made available by Aphria to Liberty related to the production of medical marijuana for the purposes of cultivating, distributing and selling medical marijuana in the State of Florida.  In exchange for such license, Aphria had 64,133,333 Common Shares of Liberty (post-consolidation) and was to pay Aphria an annual license fee of $10,000 plus applicable taxes.

> (b) Investor Rights Agreement. "Concurrently with the completion of the Business Combination, Liberty entered into an investor rights agreement (the "Investor

Rights Agreement") pursuant to which, among other things, Aphria is be entitled to certain director nomination and pre-emptive rights."

(c) Trademark License Agreement. "Liberty entered into a trademark license agreement (the "Trademark License") with Aphria pursuant to which Liberty and its subsidiaries (including AcquireCo) obtained a license to use Aphria's trademarks identified therein (the "Trademarks") for the purposes of marketing, distributing and selling medical marijuana in the State of Florida."

(d) Registration Rights Agreement. "Liberty entered into a registration rights agreement (the "Registration Rights Agreement") pursuant to which, among other things, Aphria will be provided with customary demand and "piggy back" registration rights[.]"

(e) "Liberty has entered into agreements with third parties for hardware, software, telecommunications and other information technology ("IT") services in connection with its operations, including the use of Aphria's IT group for support and systems work."

164.    The January 2018 MD&A also included a section on Related Party Balances and

Transactions, which disclosed only employee costs and consulting fees.

165.    In Certifications of Interim Filings accompanying the January 2018 MD&A,

Defendants Gulliver and Scorsis each separately certified:

No misrepresentations: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

166.    The statements referenced in ¶¶ 163-165 were materially false and misleading when

made because they only disclosed to investors select agreements between Liberty and Aphria and

did not disclose (i) the full interrelationship between the companies; (ii) Aphria and Liberty were

involved in an overarching scheme to provide undue benefits to both companies' insiders, which

was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and Liberty insiders

were even more involved in Liberty than disclosed, as many had by participated in an unannounced

round of Liberty financing for C$0.001.

167.    On February 2, 2018 (the "February 2 Release"), Aphria and Liberty issued a joint press release concerning Liberty's acquisition of Aphria's minority membership interests in Copperstate Farms, LLC and Copperstate Farms Investors, LLC (collectively "Copperstate"), which owned greenhouses in Arizona, to Liberty for a purchase price of $20 million.

168.    In the February 2 Release, Defendant Neufeld, who is only listed as "Chief Executive Officer of Aphria" without any mention of his Liberty involvement, is quoted as saying the transaction was related to Aphria's "continued efforts to work collaboratively with the TSX and Canadian securities regulatory authorities regarding the divestiture of our direct investment in a US cannabis business."

169.    In the February 2 Release, Defendant Neufeld is quoted as saying: "This acquisition further demonstrates Liberty's commitment to expanding its leadership position in the U.S. medical cannabis industry. The Copperstate team has strong operational expertise and we look forward to a productive collaboration to enhance the experience of Arizona patients."

170.    The February 2 Release reports that both Aphria and Liberty received reports from "independent financial advisors" regarding the arrangement.   Liberty also established an independent special committee of the Board to approve the deal. Liberty's independent opinion came from Clarus, which had handled Liberty offerings in the past, including the original private placement.  Except the February 2 Release failed to mention that the supposedly "independent" Clarus had provided strategic advice to Aphria numerous times in the past, including on another deal the week prior, and Clarus was close with DeFrancesco, including sponsoring his son's racing career.

171.    The statements referenced in ¶¶ 167-170 were materially false and misleading when made because they did not disclose (i) the full interrelationship between the companies; (ii) Aphria

42

and Liberty were involved in an overarching scheme to provide undue benefits to both companies'

insiders, which was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and

Liberty insiders were even more involved in Liberty than disclosed, as many had by participated

in an unannounced round of Liberty financing for C$0.001.

172.    On February 5, 2018, both Aphria and Liberty issued separate releases concerning

Aphria's divesture of Liberty assets.  Liberty's press release (the "February 5 Release") stated the

following:

> [A] group of buyers led by members of the Serruya family (the "Group") has
> entered into a purchase and sale agreement with Aphria Inc. ("Aphria") to purchase
> all of Aphria's shares in the Company that were not subject to Canadian Securities
> Exchange ("CSE") escrow requirements (the "Transaction) over the course of the
> next two and a half years. In the initial phase of the Transaction, Michael Serruya,
> Simon Serruya and Jack Serruya collectively are purchasing 80% of all transferred
> shares from Aphria individually or through an affiliate. The remaining 20% is being
> purchased by an affiliate of Delavaco Capital. After the initial phase of the
> Transaction, due to the escrow requirements, Aphria will retain an ownership
> position of 28.1% of the issued and outstanding shares of Liberty. The Transaction
> also includes a call / put option agreement for the remainder of Aphria's shares in
> Liberty, which are currently subject to the CSE mandatory escrow requirements.
> Each purchaser will also sign a promissory note, which guarantees such purchaser's
> obligations under on the exercise of the applicable call or put option, as the case
> may be, under the option agreement. Under the CSE escrow requirements, the
> escrow conditions will be removed in intervals and will be completely removed by
> the middle of 2020. Once all of the escrowed shares are divested, Michael Serruya,
> Simon Serruya and Jack Serruya, directly or through their affiliates will own 80%
> of the divested shares, and 20% will be owned by affiliates of Delavaco Capital.
>
> ***The Transaction strengthens Liberty's aggressive growth plans in the U.S.
> cannabis market by welcoming the Serruya family as new strategic partners with
> significant U.S. retail and cannabis industry experience. Liberty will benefit from
> the Serruya's family's interest in the Company and the long-term strategic
> partnership with Aphria, while at the same time enabling Aphria to satisfy the
> opinions of the Toronto Stock Exchange regarding its investments in the U.S.
> Liberty's operations and business plans will continue at full steam in
> collaboration with Aphria's founders, and with the Company's Intellectual
> Property and Standard Operating Procedures fully intact.***

173.    In the February 5 Release, Defendant Scorsis states that Liberty co-founder Cacciavillani will serve as a strategic advisor on Liberty's cultivation operations.  Defendant Neufeld and Cervini were announced to stay on the Board.

174.    The February 5 Release reported that the Delavaco Group had been appointed as a "special advisor" to Liberty in conjunction with the transaction, with of course involved affiliates of Delavaco Capital.

175.    The February 5 Release stated that Liberty "would continue to utilize the Aphria brand name and the Aphria Know-How System royalty-free and in perpetuity pursuant to the binding agreements between [Liberty] and Aphria. Retaining access to Aphria's industry-leading IP and low-cost cultivation processes secures Liberty's position as a market leader in the cultivation and processing of high-quality, safe and pure medical cannabis to scale, an integral part of Liberty's aggressive growth strategy."

176.    Defendant Neufeld is quoted in the February 5 Release as saying: "Liberty remains very well positioned to capitalize on opportunities in the U.S. medical cannabis market. Their success is a testament to its hard work and strong management team and I look forward to watching their continued success as they forge ahead with aggressive growth plans in the U.S."

177.    The February 5 Release again contained the statement: "Liberty's stringent investment criteria for expansion maximizes returns to shareholders, while focusing on significant near and midterm opportunities. Liberty has an extensive background in highly regulated industries[.]"

178.    The statements referenced in ¶¶ 172-177 were materially false and misleading when made because they did not disclose that (i) Liberty was not focused on "maximiz[ing] returns to shareholders" but rather Aphria and Liberty were involved in an overarching scheme to provide

undue benefits to both companies' insiders, including Liberty's "special advisor" the Delavaco Group (aka DeFrancesco), and that scheme was detrimental to shareholders; and (ii) unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

179.    On June 28, 2018, Liberty released Management's Discussion & Analysis (the "June 2018 MD&A") for the period from May 1, 2017 to February 28, 2018.  The June 2018 MD&A disclosed that the Copperstate transaction first announced to investors in February would not be completed because "[t]he existing Copperstate shareholders had a right of first offer which they exercised in May 2018."

180.    The June 2018 MD&A stated that Aphria and Liberty entered into the following agreements:

(a) Know-How License Agreement.  Pursuant to this agreement, Liberty obtained a license to use any know-how (including knowledge, methodologies and techniques) made available by Aphria to Liberty related to the production of medical marijuana for the purposes of cultivating, distributing and selling medical marijuana in the State of Florida.  In exchange for such license, Aphria had 64,133,333 Common Shares of Liberty (post-consolidation) and was to pay Aphria an annual license fee of $10,000 plus applicable taxes.

(b) Investor Rights Agreement. "Concurrently with the completion of the Business Combination, Liberty entered into an investor rights agreement (the "Investor Rights Agreement") pursuant to which, among other things, Aphria is be entitled to certain director nomination and pre-emptive rights."

(c) Trademark License Agreement. "Liberty entered into a trademark license agreement (the "Trademark License") with Aphria pursuant to which Liberty and its subsidiaries (including AcquireCo) obtained a license to use Aphria's trademarks identified therein (the "Trademarks") for the purposes of marketing, distributing and selling medical marijuana in the State of Florida."

(d) Registration Rights Agreement. "Liberty entered into a registration rights agreement (the "Registration Rights Agreement") pursuant to which, among other things, Aphria will be provided with customary demand and "piggy back" registration rights[.]"

(e) "Liberty has entered into agreements with third parties for hardware, software, telecommunications and other information technology ("IT") services in connection with its operations, including the use of Aphria's IT group for support and systems work."

181.    The June 2018 MD&A also included a disclosure about Aphria's divesture: "On February 5, 2018, it was announced that a group of buyers led by members of the Serruya family had entered into a purchase and sale agreement with Aphria to purchase all of the Common Shares in the Company owned by Aphria that are not subject to CSE escrow requirements over the course of the next two and a half years. Following the initial purchase, Aphria retained an ownership position of 26.4% of the issued and outstanding Common Shares. The transaction also includes a call / put option agreement for the remainder of the Common Shares in the Company owned by Aphria, which are currently subject to the CSE mandatory escrow requirements. The Company will continue to utilize the Aphria brand name and the Aphria know-how in perpetuity pursuant to the Trademark License and Know-How License between the Company and Aphria."

182.    The June 2018 MD&A also included a Related Party Balances and Transactions section that included only general statements about such matters, including: "Included in employee and staff costs, consulting fees and share-based compensation are $400,866, $71,317 and $2,227,914, respectively, for the period from May 1, 2017 to February 28, 2018 paid to key management personnel. Officers, directors and directors of a related company participated in the convertible debt financing in November 2017 for a combined principal of US$3,550,000 ($4,533,700). The Company recognized accretion interest of $136,433, foreign exchange gain of $13,127, gain on change in fair value on the embedded derivative of $1,187,456, and interest expense of US$115,967 ($156,448) on these related party convertible notes payable."

183.    In Certifications of Interim Filings accompanying the June 2018 MD&A, Defendants Gulliver and Scorsis each separately certified:

No misrepresentations: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

184.    The statements referenced in ¶¶ 179-183 were materially false and misleading when made because they only disclosed to investors select agreements between Liberty and Aphria and did not disclose (i) the full interrelationship between the companies; (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

185.    On July 23, 2018 (the "July 23 Release"), Liberty issued another release regarding Liberty's divesture.  The July 23 release stated that Aphria had "entered into an 18 month lock-up or stand-still agreement with the purchasers of Aphria's shares in Liberty. The divestiture of Liberty stock by Aphria was originally announced on February 5, 2018 as part of Aphria's commitment to the Toronto Stock Exchange. A group of buyers led by members of the Serruya family ("Group") had entered into a purchase and sale agreement with Aphria to purchase all of Aphria's shares in the Company that are not subject to Canadian Securities Exchange escrow requirements over the course of a two and a half year period. Under the CSE escrow requirements, the shares will be released from escrow in six month intervals and will be completely released by the middle of 2020. The new agreement prevents the Group from selling the next tranche of Liberty shares owned by Aphria that will become freely trading on July 26, 2018 for a period of 18 months and provides Aphria with the ability to purchase the shares back if U.S. federal laws change,

subject to certain conditions including consent of the Toronto Stock Exchange. Aphria's current ownership position is 23.6% of the issued and outstanding shares of Liberty."

186.     In the July 23 Release, Defendant Scorsis was quoted as saying: "We are extremely pleased that Aphria entered into the lock-up agreement with the Group. There is no question that this action **will remove any uncertainty in the market surrounding the Group's purchase of the shares and their long term commitment and endorsement of Liberty**."

187.     The July 23 Release again contained the statement: "Liberty's stringent investment criteria for expansion maximizes returns to shareholders, while focusing on significant near and midterm opportunities. Liberty has an extensive background in highly regulated industries[.]"

188.     The statements referenced in ¶¶ 185-187 were materially false and misleading when made because it failed to disclose (i) all the interrelations between Aphria and Liberty that led to that "long term commitment;" (ii) Liberty was in fact not focused on "maximize[ing] returns to shareholders" and instead Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

189.     On July 26, 2018, Liberty released Management's Discussion & Analysis (the "July 2018 MD&A") for the three month period ending May 31, 2018.

190.     The July 2018 MD&A stated that Aphria and Liberty entered into the following agreements:

> (a) Know-How License Agreement.  Pursuant to this agreement, Liberty obtained a license to use any know-how (including knowledge, methodologies and techniques) made available by Aphria to Liberty related to the production of medical marijuana for the purposes of cultivating, distributing and selling medical marijuana in the State of Florida.  In exchange for such license, Aphria had

64,133,333 Common Shares of Liberty (post-consolidation) and was to pay Aphria an annual license fee of $10,000 plus applicable taxes.

(b) Investor Rights Agreement. "Concurrently with the completion of the Business Combination, Liberty entered into an investor rights agreement (the "Investor Rights Agreement") pursuant to which, among other things, Aphria is be entitled to certain director nomination and pre-emptive rights."

(c) Trademark License Agreement. "Liberty entered into a trademark license agreement (the "Trademark License") with Aphria pursuant to which Liberty and its subsidiaries (including AcquireCo) obtained a license to use Aphria's trademarks identified therein (the "Trademarks") for the purposes of marketing, distributing and selling medical marijuana in the State of Florida."

(d) Registration Rights Agreement. "Liberty entered into a registration rights agreement (the "Registration Rights Agreement") pursuant to which, among other things, Aphria will be provided with customary demand and "piggy back" registration rights[.]"

(e) "Liberty has entered into agreements with third parties for hardware, software, telecommunications and other information technology ("IT") services in connection with its operations, including the use of Aphria's IT group for support and systems work."

191.     The July 2018 MD&A also included a disclosure about Aphria's divesture:

On February 5, 2018, it was announced that a group of buyers led by members of the Serruya family (the "Group") had entered into a purchase and sale agreement with Aphria to purchase all of the Common Shares in the Company owned by Aphria that are not subject to CSE escrow requirements over the course of the next two and a half years. Following the initial purchase, Aphria retained an ownership position of 26.4% of the issued and outstanding Common Shares. The transaction also includes a call / put option agreement for the remainder of the Common Shares in the Company owned by Aphria, which are currently subject to the CSE mandatory escrow requirements. The Company will continue to utilize the Aphria brand name and the Aphria know-how in perpetuity pursuant to the Trademark License and Know-How License between the Company and Aphria. On July 23, 2018 it was announced that Aphria had entered into a lock-up agreement with the Group, preventing them from selling the next tranche of Liberty shares owned by Aphria that will become freely trading on July 26, 2018 for a period of 18 months.

192.     The July 2018 MD&A also included a Related Party Balances and Transactions section that included only general statements about such matters, including: "Included in employee and staff costs and share-based compensation are $149,891 and $1,104,273, respectively, for the

49

three months ended May 31, 2018 paid to key management personnel. Under the Trademark

License Agreement, Liberty accrued $53,154 of royalty expenses payable to Aphria as at May 31,

2018 in respect of sales of products licensed by Aphria."

193.    In Certifications of Interim Filings accompanying the July 2018 MD&A,

Defendants Gulliver and Scorsis each separately certified:

> No misrepresentations: Based on my knowledge, having exercised reasonable
> diligence, the interim filings do not contain any untrue statement of a material fact
> or omit to state a material fact required to be stated or that is necessary to make a
> statement not misleading in light of the circumstances under which it was made,
> with respect to the period covered by the interim filings.

194.    The statements referenced in ¶¶ 189-193 were materially false and misleading when

made because they only disclosed to investors select agreements between Liberty and Aphria and

did not disclose (i) the full interrelationship between the companies; (ii) Aphria and Liberty were

involved in an overarching scheme to provide undue benefits to both companies' insiders, which

was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and Liberty insiders

were even more involved in Liberty than disclosed, as many had by participated in an unannounced

round of Liberty financing for C$0.001.

195.    On October 15, 2018, SmallCap Power put up an interview with Defendant Scorsis

where he said: "Liberty Health Sciences is not a roll-up company, we don't go and just buy

licenses. What we actually do is we expand through operations."

196.    The statements referenced in ¶ 195 were materially false and misleading when

made because it failed to disclose to investors that (i) Aphria and Liberty were involved in an

overarching scheme to provide undue benefits to both companies' insiders, which was detrimental

to shareholders; and (ii) Liberty's so-called expansion often benefited these insiders directly.

197.    On October 29, 2018, Liberty released Management's Discussion & Analysis (the "October 2018 MD&A") for the three month period ending August 31, 2018.

198.    The October 2018 MD&A stated that Aphria and Liberty entered into the following agreements:

(a) Know-How License Agreement.  Pursuant to this agreement, Liberty obtained a license to use any know-how (including knowledge, methodologies and techniques) made available by Aphria to Liberty related to the production of medical marijuana for the purposes of cultivating, distributing and selling medical marijuana in the State of Florida.  In exchange for such license, Aphria had 64,133,333 Common Shares of Liberty (post-consolidation) and was to pay Aphria an annual license fee of $10,000 plus applicable taxes.

(b) Investor Rights Agreement. "Concurrently with the completion of the Business Combination, Liberty entered into an investor rights agreement (the "Investor Rights Agreement") pursuant to which, among other things, Aphria is be entitled to certain director nomination and pre-emptive rights."

(c) Trademark License Agreement. "Liberty entered into a trademark license agreement (the "Trademark License") with Aphria pursuant to which Liberty and its subsidiaries (including AcquireCo) obtained a license to use Aphria's trademarks identified therein (the "Trademarks") for the purposes of marketing, distributing and selling medical marijuana in the State of Florida."

(d) Registration Rights Agreement. "Liberty entered into a registration rights agreement (the "Registration Rights Agreement") pursuant to which, among other things, Aphria will be provided with customary demand and "piggy back" registration rights[.]"

(e) "Liberty has entered into agreements with third parties for hardware, software, telecommunications and other information technology ("IT") services in connection with its operations, including the use of Aphria's IT group for support and systems work."

199.    The October 2018 MD&A also included a disclosure about Aphria's divesture: "On February 5, 2018, it was announced that a group of buyers led by members of the Serruya family (the "Group") had entered into a purchase and sale agreement with Aphria to purchase all of the Common Shares in the Company owned by Aphria that are not subject to CSE escrow requirements over the course of the next two and a half years. Following the initial purchase,

Aphria retained an ownership position of 26.4% of the issued and outstanding Common Shares. The transaction also includes a call / put option agreement for the remainder of the Common Shares in the Company owned by Aphria, which are currently subject to the CSE mandatory escrow requirements. The Company will continue to utilize the Aphria brand name and the Aphria know-how in perpetuity pursuant to the Trademark License and Know-How License between the Company and Aphria. On July 23, 2018 it was announced that Aphria had entered into a lockup agreement with the Group, preventing them from selling the next tranche of Liberty shares owned by Aphria that will become freely trading on July 26, 2018 for a period of 18 months. On September 6, 2018, it was announced that Aphria had sold its outstanding shares Liberty, totaling 64,118,462 shares to a group of buyers. In exchange, Aphria received a five-year promissory note bearing 12% interest for $59.1 million. Aphria has also secured an irrevocable option to repurchase these shares for the value of the promissory note, together with any interest thereon and pursuant to a Note Purchase Agreement."

200.    The October 2018 MD&A also included a Related Party Balances and Transactions section that included only general statements about such matters, including: "Included in employee and staff costs for the three and six months ended August 31, 2018 are $245,038 and $394,929, respectively paid to key management personnel. Share-based compensation expense for key management personnel for the three and six months ended August 31, 2018 was $1,128,049 and $2,232,322, respectively. Under a trademark license agreement, Liberty accrued $119,535 of royalty expenses payable to a related company as at August 31, 2018 in respect of sales of products licensed by the same related company."

201.    In Certifications of Interim Filings accompanying the October 2018 MD&A, Defendants Gulliver and Scorsis each separately certified:

No misrepresentations: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

202.     The statements referenced in ¶¶ 197-201 were materially false and misleading when made because they only disclosed to investors select agreements between Liberty and Aphria and failed to disclose (i) the full interrelationship between the companies; and (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders; and (iii) unbeknownst to investors, Aphria and Liberty insiders were even more involved in Liberty than disclosed, as many had by participated in an unannounced round of Liberty financing for C$0.001.

**Materially False and Misleading Statements Concerning Liberty's Purchase of the 242 Cannabis Shares**

203.     On January 4, 2018 (the "January 4 Release"), Liberty announced that it had entered into a binding term sheet to acquire the 242 Shares.  In the January 4 Release, Liberty stated that the wholly-owned subsidiary of 242 Cannabis Canada Ltd., 242 Cannabis, LLC, had agreed to purchase a 387 acre parcel of land, the Property, in Gainesville, Florida.  Scorsis said of the acquisition: "This acquisition of nearly 400 acres of property shows Liberty's commitment to provide patients with a consistent supply of high-quality cannabis to meet their medical needs."

204.     The January 4 Release also stated: "***The proposed acquisition will be completed through a series of transactions.*** The Company expects 242 Cannabis, LLC's purchase of the Property and the subsequent purchase by the Company of the 242 Shares to close on or prior to February 9, 2018, and closing is subject to standard due diligence including title, environmental assessments and surveys as well as the satisfaction of conditions precedent in accordance with the purchase and sale contract. As consideration for the 242 Shares, the Company will issue

18,815,322 units of the Company, with each unit being comprised of one common share of the Company and one-half common share purchase warrant, with each whole warrant exercisable at $2.07 for a period of three years from the closing date."

205.     The statements referenced in ¶¶ 203-204 were materially false and misleading when made because they did not disclose that (i) DeFrancesco and other insiders were behind 242 Cannabis Canada Ltd. and the "series of transactions" would benefit these insiders at the expense of retail shareholders because Liberty would pay millions more for the Property than 242 Cannabis, LLC paid six days prior; and (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders and which this transaction was part of.

206.     On January 4, 2018, Liberty filed a Form 9 (the "January Form 9"), dated that day, with the CSE regarding which stated that a "binding letter of intent dated December 29, 2017 was signed between the Issuer and 242 Cannabis Canada Ltd."  The total consideration in Canadian dollars was listed as $31 million.  In the line of the January Form 9 that asks the filer to "[s]tate how the purchase or sale price was determined (e.g. arm's-length negotiation, independent committee of the Board, third party valuation etc)," Liberty stated it was an "Arm's length negotiation."

207.     The January Form 9 did not disclose who would be getting shares of Liberty as a result of the transaction, stating it was "[t]o be confirmed prior to closing."

208.     Defendant Gulliver signed the January Form 9 as CFO.

209.     The statements referenced in ¶¶ 206-208 were materially false and misleading when made because they did not disclose that (i) DeFrancesco and other insiders were behind 242 Cannabis Canada Ltd. and the transaction would benefit these insiders at the expense of retail

shareholders because Liberty would pay millions more for the Property than 242 Cannabis, LLC paid six days prior; and (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders and which this transaction was part of.

210.   The January 2018 MD&A reported the following regarding the Property: "Subsequent to quarter-end the Company entered into a binding term sheet to acquire all the issued and outstanding shares of 242 Cannabis Canada Ltd., whose wholly owned subsidiary, 242 Cannabis, LLC, has agreed to purchase a 387 acre parcel of land in Gainesville, Florida from Alico Citrus Nursery, LLC, in exchange for 18,815,322 units of the Company (the "Alico Acquisition"). Each unit issued as part of the Alico Acquisition purchase price is to be comprised of one common share and one-half common share purchase warrant, with each whole warrant exercisable at a price of $2.07 for a period of three years from the closing of the Alico Acquisition."

211.   The statements referenced in ¶ 210 were materially false and misleading when made because they did not disclose that (i) DeFrancesco and other insiders were behind 242 Cannabis Canada Ltd. and the transaction would benefit these insiders at the expense of retail shareholders because Liberty would pay millions more for the Property than 242 Cannabis, LLC paid six days prior; and (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders and which this transaction was part of.

212.   On January 31, 2018, Liberty announced that it had entered into a definitive share purchase agreement with 242 Cannabis Canada Ltd. to acquire all of the issued and outstanding shares of its wholly-owned subsidiary, 242 Cannabis, LLC, a Florida limited liability company, which included a 387-acre parcel of land in Gainesville, Florida.

213.     The Company announced that, as consideration for the 242 Shares, the Company would issue 18,815,322 units of the Company, with each unit being comprised of one common share of the Company issued at a common share price of $1.6476 and one-half common share purchase warrant, with each whole warrant exercisable into common shares of the Company at an exercise price of $2.07 per common share for a period of three years from the closing date of the acquisition. The Company received conditional approval from the CSE for the issuance of such securities in respect of the transactions contemplated under the agreement.  An integral part of the proposed acquisition of the purchased shares, the Company would receive a cash balance of up to $17.3 million in 242 Cannabis, LLC.

214.     The statements referenced in ¶¶ 212-213 were materially false and misleading when made because they did not disclose that (i) DeFrancesco and other insiders were behind 242 Cannabis Canada Ltd. and the transaction would benefit these insiders at the expense of retail shareholders because Liberty would pay millions more for the Property than 242 Cannabis, LLC paid six days prior; and (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders and which this transaction was part of.

215.     On February 16, 2018 (the "February 16 Release"), Liberty announced that "it has closed the acquisition of a 387-acre parcel of land in Gainesville, Florida, previously owned by Alico Citrus Nursery, LLC. The property will become the home of the new Liberty 360° Innovation Campus, with state-of-the-art greenhouses and processing facilities that firmly establishes Liberty as one of the leading medical cannabis providers in Florida."

216.     The February 16 Release quoted Defendant Scorsis as saying: "We're thrilled to establish the Liberty 360 campus as our innovation hub for the cultivation, production and

processing of high-quality, pharmaceutical-grade medical cannabis for the rapidly expanding patient demand in Florida."

217.    The February 16 Release again contained the statement: "Liberty's stringent investment criteria for expansion maximizes returns to shareholders, while focusing on significant near and midterm opportunities. Liberty has an extensive background in highly regulated industries[.]"

218.    The statements referenced in ¶¶ 215-217 were materially false and misleading when made because (i) Liberty was in fact not concerned with "maximiz[ing] returns to shareholders," nor had it bought the property directly; (ii) DeFrancesco and other insiders were behind 242 Cannabis Canada Ltd. and its entity had purchased the Property for millions less than Liberty paid it; and (iii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders and which this transaction was part of.

219.    On March 2, 2018, Liberty filed a Form 9 (the "March Form 9"), dated February 14, 2018, with the CSE regarding which stated that Liberty entered "a share purchase agreement whereby its wholly-owned subsidiary, Liberty Health Sciences USA Ltd., will acquire all of the issued and outstanding shares of 242 Cannabis, LLC (the "242 Shares"), an entity that has recently purchased a 387 acre parcel of land in Gainesville, Florida (the "Property"). The Property includes over 200,000 square feet of state-of-art greenhouses, head houses, tissue culture lab and processing facilities."

220.    The total consideration in Canadian dollars was listed as $31 million.  In the line of the March Form 9 that asks the filer to "[s]tate how the purchase or sale price was determined (e.g.

arm's-length negotiation, independent committee of the Board, third party valuation etc)," Liberty stated it was an "Arm's length negotiation."

221.    The March Form 9, dated weeks prior to its filing, finally disclosed who would be getting shares of Liberty as a result of the transaction, aka the owners of 242 Cannabis Canada Ltd.

222.    Defendant Scorsis signed the March Form 9 as CEO.

223.    The statements referenced in ¶¶ 219-223 were materially false and misleading when made because they did not disclose that (i) DeFrancesco and the other insiders behind 242 Cannabis Canada Ltd. benefited at the expense of retail shareholders because Liberty paid millions more for the Property than 242 Cannabis, LLC paid six days prior to the transaction closing; and (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders and which this transaction was part of.

224.    The June 2018 MD&A contained a disclosure about the Property.  It stated: "In February 2018, the Company closed the acquisition of 242 Cannabis, LLC, which owns a 387-acre parcel of land in Gainesville, Florida, in exchange for 18,815,322 units of the Company (the "Alico Acquisition"). Each unit issued as part of the Alico Acquisition purchase price was comprised of one common share and one-half common share purchase warrant, with each whole warrant exercisable at a price of $2.07 for a period of three years from the closing of the Alico Acquisition. The acquisition included over 200,000 square feet of state-of-the-art greenhouses, head houses, a tissue culture lab and processing facilities."

225.    The statements referenced in ¶ 224 were materially false and misleading when made because they did not disclose that (i) DeFrancesco and the other insiders behind 242

Cannabis Canada Ltd. benefited at the expense of retail shareholders because Liberty paid millions more for the Property than 242 Cannabis, LLC paid six days prior to the transaction closing; and (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders and which this transaction was part of.

226.    The July 2018 MD&A dropped any mention of 242 Cannabis, LLC, instead stating: "Given the rapidly growing demand for product in Florida, in February 2018, Liberty acquired a 387-acre site in Gainesville which was previously owned by Alico Citrus Nursery, LLC ("Alico"). Liberty is in the process of retrofitting the Alico property and in the meantime, continues to operate out of the expanded Chestnut facility (the "Chestnut Facility"). The Alico location has been re-branded as the Liberty 360 Innovation Campus ("Liberty 360 Campus") and is expected to reach commercial production by early 2019."

227.    The statements referenced in ¶ 226 were materially false and misleading when made because they did not disclose that Liberty did not purchase the Property directly but rather through 242 Cannabis Canada Ltd. and (i) DeFrancesco and the other insiders behind 242 Cannabis Canada Ltd. benefited at the expense of retail shareholders because Liberty paid millions more for the Property than 242 Cannabis, LLC paid six days prior to the transaction closing; and (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders and which this transaction was part of.

228.    The October 2018 MD&A also did not contain any mention of 242 Cannabis, LLC, instead stating: "Given the rapidly growing demand for product in Florida, in February 2018, Liberty acquired a 387-acre site in Gainesville which was previously owned by Alico Citrus Nursery, LLC ("Alico"). Liberty is in the process of retrofitting the Alico property and in the

meantime, continues to operate out of the expanded Chestnut facility (the "Chestnut Facility"). The Alico location has been re-branded as the Liberty 360 Innovation Campus ("Liberty 360 Campus") and is expected to reach commercial production by early 2019."

229.    The statements referenced in ¶ 228 were materially false and misleading when made because they did not disclose that Liberty did not purchase the Property directly but rather through 242 Cannabis Canada Ltd. and (i) DeFrancesco and the other insiders behind 242 Cannabis Canada Ltd. benefited at the expense of retail shareholders because Liberty paid millions more for the Property than 242 Cannabis, LLC paid six days prior to the transaction closing; and (ii) Aphria and Liberty were involved in an overarching scheme to provide undue benefits to both companies' insiders, which was detrimental to shareholders and which this transaction was part of.

## ADDITIONAL SCIENTER ALLEGATIONS

230.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  For example, Defendants knew or easily could have uncovered that insiders were making a quick profit off of the C$0.001 round of financing or the 242 Shares.

231.    Defendants were culpable participants in the fraudulent scheme alleged herein. They were part of the larger network of companies that consistently profited hidden middlemen.

232.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential

proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

233.   Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent activity alleged herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the officers at the highest levels of the Company.

234.   In addition, the fraud alleged herein relates to the core business and operations of Liberty so knowledge of the fraud may be imputed to Defendants. As explained herein, the entire business model of Liberty centered on acquisitions and expansion in Florida.

**LOSS CAUSATION/ECONOMIC LOSS**

235.   During the Class Period, as detailed above, Liberty and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and set a course of conduct that artificially inflated the prices of Liberty's securities, and operated as a fraud or deceit on Class Period purchasers of Liberty securities by omitting information regarding the Company's ownership, control and acquisitions.   Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Liberty's securities declined as the prior artificial inflation came out of the price over time.  As a result of their purchases of Liberty securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

236.   At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs and other members of the Class.  Those statements were materially false and misleading through their

failure to disclose the degree of control of insiders and numerous conflicts of interest, as alleged herein.

237.    As alleged in more detail *supra* at ¶¶ 102-111, on December 3, 2018, QCM and Hindenburg issued the Hindenburg Report, entitled "Aphria: A Shell Game with a Cannabis Business on the Side," which discussed Aphria overpaying for entities, with proceeds being pocketed by DeFrancesco and other insiders.

238.    As many of the individuals mentioned in the Hindenburg Report were also involved in Liberty, including DeFrancesco and Neufeld, Liberty's stock also took a sharp hit.  Liberty's stock fell $0.36, or nearly 34%, over the next two trading days to close at $0.70 on December 4, 2018.

239.    As alleged in more detail *supra* at ¶¶ 112-117, on December 6, 2018, Hindenburg issued the Liberty Report.  Hindenburg urged readers to note the connection between the fraud alleged in the Liberty Report and the Hindenburg Report as both "involved Neufeld & DeFrancesco, intermediary shell entities placed between acquisitions, and presumed quick profits for the holders of those shell entities at the direct expense of public shareholders."

240.    A Bloomberg article noted that Liberty shares tumbled following the Liberty Report, but rebounded, on a day when Aphria ended up 30% (likely thanks to the announcement of the special committee).  The Bloomberg article included this depiction:



241.    While Liberty had a slight bump on December 6, 2018, the following day it returned to its slide.  Liberty's stock fell approximately $0.05 per share, or 7.09%, to close at $0.66 per share on December 7, 2018.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

242.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the Company's stock traded in an efficient market; the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and
- Plaintiffs and other members of the Class purchased Liberty common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

243.     The market for Liberty securities promptly digested current information regarding Liberty from publicly available sources and reflected such information in the prices of Liberty's securities. Under these circumstances, all purchasers of Liberty securities during the Class Period suffered similar injury through their purchase of Liberty securities at artificially inflated prices and the presumption of reliance applies.

244.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

245.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Liberty securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

246.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Liberty securities were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Liberty or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

247.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

248.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

249.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Liberty;

- whether the Individual Defendants caused Liberty to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Liberty securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

250.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

## COUNT I

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

251.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

252.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

253.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Liberty securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Liberty securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

254.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEDAR filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Liberty securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Liberty finances and business prospects.

255.    By virtue of their positions at Liberty , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

256.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Liberty, the Individual Defendants had knowledge of the details of Liberty internal affairs.

257.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Liberty. As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Liberty businesses, operations, future financial condition and future prospects. As a result of the dissemination of the

aforementioned false and misleading reports, releases and public statements, the market price of Liberty securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Liberty business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Liberty securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

258.    During the Class Period, Liberty securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Liberty securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Liberty securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Liberty securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

259.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

260.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

261.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

262.   During the Class Period, the Individual Defendants participated in the operation and management of Liberty, and conducted and participated, directly and indirectly, in the conduct of Liberty business affairs.  Because of their senior positions, they knew the adverse non-public information about Liberty's agreements, financing arragements and the extent of insider involvement.

263.   As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Liberty financial condition and results of operations, and to correct promptly any public statements issued by Liberty which had become materially false or misleading.

264.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Liberty disseminated in the marketplace during the Class Period concerning Liberty results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Liberty to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Liberty within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Liberty securities.

265.    Each of the Individual Defendants, therefore, acted as a controlling person of Liberty.  By reason of their senior management positions and/or being directors of Liberty, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Liberty to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Liberty and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

266.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Liberty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.


Dated: January 21, 2020                    Respectfully submitted,

                                           **POMERANTZ LLP**

                                           */s/ Jeremy A. Lieberman*
                                           Jeremy A. Lieberman

Cara David
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
cdavid@pomlaw.com
jlindenfeld@pomlaw.com


**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiffs*

### CERTIFICATION PURSUANT
### TO FEDERAL SECURITIES LAWS

1.   I, __Gilbert Lee Silverbird_____, make this

declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities

Litigation Reform Act of 1995.

    2.   I have reviewed a Complaint against Liberty Health Sciences Inc. ("Liberty Health" or the

"Company") and, authorize the filing of a motion on my behalf for appointment as lead plaintiff.

    3.   I did not purchase or acquire Liberty Health securities at the direction of plaintiffs counsel, or in

order to participate in any private action arising under the Securities Act or Exchange Act.

    4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired Liberty Health securities during the class period, including providing testimony at deposition and

trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this

action.

    5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Liberty

Health securities during the Class Period as specified in the Complaint.

    6.   During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

    7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

Executed ___2·21·19_____

(Date)

_____

(Signature)

__Gilbert Lee Silverbird__

(Type or Print Name)

**Liberty Health Sciences Inc. (LHSIF)**                                    **Silverbird, Gilbert Lee**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 1/26/2018 | Purchase | 1,550 | $1.3590 |
| 1/26/2018 | Purchase | 201 | $1.3590 |
| 1/26/2018 | Purchase | 445 | $1.3893 |
| 3/26/2018 | Purchase | 1,000 | $0.8139 |
| 4/10/2018 | Purchase | 1,000 | $0.5700 |
| 4/11/2018 | Purchase | 1,000 | $0.6416 |
| 5/10/2018 | Purchase | 3,750 | $0.6653 |
| 5/21/2018 | Purchase | 250 | $0.7550 |
| 9/28/2018 | Purchase | 6,000 | $1.0599 |
| 10/24/2018 | Purchase | 12,900 | $1.0000 |
| 10/24/2018 | Purchase | 10,000 | $0.9862 |
| 10/24/2018 | Purchase | 10,000 | $0.9950 |
| 10/24/2018 | Purchase | 2,500 | $0.9868 |
| 10/24/2018 | Purchase | 433 | $0.9662 |
| 10/24/2018 | Purchase | 300 | $0.9890 |
| 10/24/2018 | Purchase | 300 | $0.9960 |
| 10/31/2018 | Purchase | 26,735 | $0.9600 |
| 10/31/2018 | Purchase | 3,050 | $0.9400 |
| 10/31/2018 | Purchase | 567 | $0.9500 |
| 10/31/2018 | Purchase | 215 | $0.9642 |
| 10/31/2018 | Purchase | 30 | $0.9600 |
| 11/1/2018 | Purchase | 28,195 | $1.0389 |
| 11/1/2018 | Purchase | 1,254 | $1.0300 |
| 11/1/2018 | Purchase | 811 | $1.0295 |
| 11/1/2018 | Purchase | 46 | $1.0317 |
| 11/5/2018 | Purchase | 32 | $1.1200 |
| 11/8/2018 | Purchase | 29,253 | $1.1500 |
| 11/8/2018 | Purchase | 1,955 | $1.1300 |
| 11/8/2018 | Purchase | 1,000 | $1.1495 |
| 11/19/2018 | Purchase | 28,641 | $1.0300 |
| 11/19/2018 | Purchase | 254 | $1.0200 |
| 12/3/2018 | Purchase | 2,015 | $1.0098 |
| 12/3/2018 | Purchase | 16 | $0.9889 |
| 2/13/2018 | Sale | (196) | $1.1600 |
| 6/29/2018 | Sale | (2,000) | $0.7153 |
| 6/29/2018 | Sale | (1,000) | $0.7100 |
| 9/26/2018 | Sale | (105) | $1.0802 |
| 9/26/2018 | Sale | (895) | $1.0800 |
| 9/26/2018 | Sale | (1,000) | $1.0800 |
| 10/8/2018 | Sale | (200) | $1.0900 |
| 10/8/2018 | Sale | (1,000) | $1.1100 |
| 10/8/2018 | Sale | (1,168) | $1.0790 |
| 10/8/2018 | Sale | (3,400) | $1.0800 |
| 10/8/2018 | Sale | (4,232) | $1.0700 |
| 10/29/2018 | Sale | (2,450) | $0.9100 |
| 10/30/2018 | Sale | (33,983) | $0.8400 |
| 10/31/2018 | Sale | (100) | $0.9700 |
| 10/31/2018 | Sale | (30,479) | $0.9701 |
| 11/5/2018 | Sale | (324) | $1.1119 |
| 11/8/2018 | Sale | (1,850) | $1.2000 |

**Liberty Health Sciences Inc. (LHSIF)**                                    **Silverbird, Gilbert Lee**

**List of Purchases and Sales**

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 11/8/2018 | Sale | (4,884) | $1.1605 |
| 11/8/2018 | Sale | (10,000) | $1.1605 |
| 11/8/2018 | Sale | (15,253) | $1.1500 |
| 11/15/2018 | Sale | (6,812) | $0.9611 |
| 11/15/2018 | Sale | (23,441) | $0.9697 |
| 11/26/2018 | Sale | (200) | $1.0800 |
| 11/26/2018 | Sale | (695) | $1.0805 |