**5.**          **Meetings**

5.1.          The quorum for a meeting of the Committee is a majority of the members of the Committee who are not officers or employees of the Corporation or of an affiliate of the Corporation, present in person or by telephone or other telecommunication device that permits all persons participating in the meeting to speak to and hear each other.

5.2.          The members of the Committee may determine their own procedures.

5.3.          The Committee may establish its own schedule that it will provide to the Board of Directors in advance.

5.4.          The external auditor is entitled to receive reasonable notice of every meeting of the Committee and to attend and be heard thereat.

5.5.          A member of the Committee or the external auditor may call a meeting of the Committee.

5.6.          The Committee will meet separately with the President and separately with the Chief Financial Officer of the Corporation at least annually to review the financial affairs of the Corporation.

5.7.          The Committee will meet with the external auditor of the Corporation at least once each year, at such time(s) as it deems appropriate, to review the external auditor's examination and report.

5.8.          The chair of the Committee must convene a meeting of the Committee at the request of the external auditor, to consider any matter that the auditor believes should be brought to the attention of the Board of Directors or the shareholders.

**6.**          **Reports**

6.1.          The Committee will record its recommendations to the Board in written form which will be incorporated as a part of the minutes of the Board of Directors' meeting at which those recommendations are presented.

**7.**          **Minutes**

7.1.          The Committee will maintain written minutes of its meetings, which minutes will be filed with the minutes of the meetings of the Board of Directors.

**SCHEDULE "E"**
**REPORTING PACKAGE ON CHANGE OF AUDITOR**

SECURECOM MOBILE INC.
**NOTICE OF CHANGE OF AUDITORS**
PURSUANT TO NATIONAL INSTRUMENT 51-102 ("NI 51-102")

October 3, 2016

TO:          Charlton & Company Chartered Accountants

AND TO:     MNP LLP

AND TO:     British Columbia Securities Commission
            Alberta Securities Commission
            Ontario Securities Commission

Dear Sirs/Mesdames:

**Re:    Notice Regarding Proposed Change of Auditor Pursuant to NI 51-102**

Notice is hereby given that on October 3, 2016, the Board of Directors of SecureCom Mobile Inc. (the "**Company**") determined:

1.       to accept the resignation, at the request of the Company, dated September 30, 2016, of Charlton & Company Chartered Accountants (the "**Former Auditor**"), as auditor of the Company; and

2.       to engage MNP LLP (the "**Successor Auditor**"), as auditor of the Company, effective September 30, 2016.

There have been no modified opinions in the Former Auditor's reports on any of the Company's financial statements for the two most recently completed fiscal years nor for any period subsequent to the most recently completed fiscal year.

In the opinion of the Company, prior to the resignation, and as at the date hereof, there were no reportable events as defined in NI 51-102 (Part 4.11).

The contents of this Notice and the termination of the Former Auditor and the proposed appointment of the Successor Auditor were approved by the Audit Committee and the Board of Directors of the Company.

**DATED** at Toronto, Ontario this 3rd day of October, 2016.

**BY ORDER OF THE BOARD OF DIRECTORS OF**
**SECURECOM MOBILE INC.**

*"Arvin Ramos" (Signed)*

Arvin Ramos
Chief Financial Officer



p | 604.683.3277
f | 604.684.8464

SUITE 1735, TWO BENTALL CENTRE
555 BURRARD STREET
BOX 243
VANCOUVER, BC  V7X 1M9

charlton & company
CHARTERED PROFESSIONAL ACCOUNTANTS

October 3, 2016

British Columbia Securities Commission
Alberta Securities Commission
Ontario Securities Commission

Dear Sirs/Mesdames:

**Re:     SecureCom Mobile Inc. (the "Company")
          Change of Auditor of Reporting Issuer**

---

We acknowledge receipt of a Notice of Change of Auditor (the "**Notice**") dated October 3, 2016 delivered to us by the Company in respect of the change of auditor of the Company.

Pursuant to National Instrument 51-102 of the Canadian Securities Administrators, please accept this letter as confirmation by Charlton & Company Chartered Professional Accountants, that we have reviewed the Notice and, based on our knowledge as at the time of receipt of the Notice, we agree with each of the statements therein.

I trust the foregoing is satisfactory.

Yours very truly,

*Charlton & Company*

**Charlton & Company, Chartered Professional Accountants**

Licensed Public Accountants
Chartered Professional Accountants

*cc:     Board of Directors of SecureCom Mobile Inc.*



October 3, 2016

British Columbia Securities Commission
Alberta Securities Commission
Ontario Securities Commission

Dear Sirs/Mesdames:

**Re:    SecureCom Mobile Inc. (the "Company")**
**Change of Auditor of Reporting Issuer**

We acknowledge receipt of a Notice of Change of Auditor (the "**Notice**") dated October 3, 2016 delivered to us by the Company.

We hereby advise that we have read the Notice of Change of Auditor of the Company, dated October 3, 2016, and we agree with each of the statements, except for the Company's reference to reportable events as defined in NI-51-102 (Part 4.11), for which we have no basis to agree or disagree.

Yours very truly,

*MNP LLP*

Chartered Accountants
Licensed Public Accountants

 

ACCOUNTING  ›  CONSULTING  ›  TAX
SUITE 300, 111 RICHMOND STREET W, TORONTO ON, M5H 2G4
1.877.251.2922   T: 416.596.1711   F: 416.596.7894   **MNP.ca**

**SCHEDULE "F"**
**FINANCIAL STATEMENTS**

# DFMMJ INVESTMENTS LTD.

AUDITED CONSOLIDATED FINANCIAL STATEMENTS
FOR THE PERIOD FROM THE DATE OF INCORPORATION (MARCH 20, 2017) TO APRIL 30, 2017
*(Expressed in Canadian Dollars)*

The accompanying notes are an integral part of these consolidated financial statements

1

UNIT 114B (2nd Floor)
8988 FRASERTON COURT
BURNABY, BC V5J 5H8

T: **604.239.0868**
F: **604.239.0866**



**A CHAN AND COMPANY LLP**
**CHARTERED PROFESSIONAL ACCOUNTANTS**

## INDEPENDENT AUDITORS' REPORT

To:     the Shareholders of
        DFMMJ Investments Ltd.

We have audited the accompanying consolidated financial statements of DFMMJ Investments Ltd. (the "Company"), which comprise the consolidated statement of financial position as at April 30, 2017, and the consolidated statement of income and comprehensive income, consolidated statement of cash flows and consolidated statement of changes in shareholders' equity for the period from date of incorporation March 20, 2017 to April 30, 2017, and a summary of significant accounting policies and other explanatory information.

**Management's Responsibility for the Consolidated Financial Statements**
Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**
Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with Canadian generally accepted auditing standards. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation  of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**
In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as at April 30, 2017, and its financial performance and its cash flow for the period from date of incorporation March 20, 2017 to April 30, 2017 in accordance with International Financial Reporting Standards.

*"A Chan & Company LLP"*
Chartered Professional Accountants

Burnaby, British Columbia
June 16, 2017

The accompanying notes are an integral part of these consolidated financial statements

**DFMMJ Investments Ltd.**
**Consolidated Statement of Financial Position**
(*Expressed in Canadian Dollars*)

| | Note | April 30, 2017 |
|---|---|---|
| ASSETS | | |
| Current assets | | |
| Cash | 9 | $ 26,365,123 |
| Deposit in trust | 4 & 9 | 4,453,160 |
| | | 30,818,283 |
| | | |
| Intangible assets | 5 | 5,000,000 |
| | | $ 35,818,283 |
| | | |
| LIABILITY | | |
| Current liability | | |
| Accounts payable and accrued liabilities | | $ 719,324 |
| Due to SecureCom Mobile Inc. | 6 & 9 | 4,453,160 |
| | | 5,172,484 |
| | | |
| Shareholders' equity | | |
| Share capital | 7 | 30,167,601 |
| Retained earnings | | 478,198 |
| | | 30,645,799 |
| | | $ 35,818,283 |

Approved on behalf of the Board

"Brady Cobb"
Signed:  Director

The accompanying notes are an integral part of these consolidated financial statements

**DFMMJ Investments Ltd.**
**Consolidated Statement of Loss and Comprehensive Loss**
(*Expressed in Canadian Dollars*)

| | Note | For the period from the date of Incorporation March 20, 2017 to April 30, 2017 |
|---|---|---|
| Revenue | | $ -- |
| | | |
| Operating expenses: | | |
| Professional fees | | 204,060 |
| Unrealized gain on foreign exchange | 9 | (682,258) |
| | | (478,198) |
| | | |
| Net Income and Comprehensive Income | | $ 478,198 |
| | | |
| Weighted average number of common shares – basic and diluted | | 168,865,573 |
| | | |
| Earnings per share – basic and diluted | | $ 0.003 |

The accompanying notes are an integral part of these consolidated financial statements

4

**DFMMJ Investments Ltd.**
**Consolidated Statement of Changes in Equity**
**(***Expressed in Canadian Dollars)*

| | Number of common shares | Share capital (Note 7) | Retained earnings | Total |
|---|---|---|---|---|
| Balance at March 20, 2017 (date of incorporation) | 1 | $ 1 | $ -- | $ 1 |
| Share issuance – cash, net of issuance costs | 365,436,538 | 25,167,600 | -- | 25,167,600 |
| Share issuance – intangible asset acquisition | 192,400,000 | 5,000,000 | -- | 5,000,000 |
| Net income for the period | -- | -- | 478,198 | 478,198 |
| Balance at April 30, 2017 | 557,836,539 | $ 30,167,601 | $ 478,198 | $ 30,645,799 |

F-6

The accompanying notes are an integral part of these consolidated financial statements

5

**DFMMJ Investments Ltd.**
**Consolidated Statement of Cash Flows**
*(Expressed in Canadian Dollars)*

|  | Note | For the period from the date of Incorporation March 20, 2017 to April 30, 2017 |
|---|---|---|
| **Cash used in operating activities:** |  |  |
| Net income |  | $ 478,198 |
| Change in non-cash working capital |  | 719,324 |
|  |  | 1,197,522 |
|  |  |  |
| **Cash provided by financing activities:** |  |  |
| Share capital issued for cash, net of cash issuance costs | 7 | 25,167,601 |
| Due to SecureCom Mobile Inc. | 6 | 4,453,160 |
|  |  | 29,620,761 |
|  |  |  |
| **Cash used in investing activities:** |  |  |
| Deposit in trust | 4 | (4,453,160) |
|  |  | (4,453,160) |
|  |  |  |
| **Increase in cash and cash equivalents** |  | 26,365,123 |
|  |  |  |
| Cash, beginning of period |  | -- |
|  |  |  |
| **Cash, end of period** |  | $ 26,365,123 |
|  |  |  |
| Supplemental information |  |  |
| Shares issued to acquire intangible assets |  | $ 5,000,000 |

The accompanying notes are an integral part of these consolidated financial statements

**DFMMJ Investments Ltd.**
Notes to the Consolidated Financial Statements
For the period from the date of incorporation March 20, 2017 to April 30, 2017

1.    Nature of operations

DFMMJ Ltd. (the "Company") was incorporated on March 20, 2017 under the laws of British Columbia. The head office and principal office of the Company is located at Suite 1600, 100 King St. W., Toronto, Ontario, Canada.

The Company was created to complete the Business Combination and Acquisition as described in Note 11.

These consolidated financial statements were approved by the Company's Board of Directors on June 16, 2017.

2.    Basis of preparation

(a)    Basis of presentation

These consolidated financial statements have been prepared on an accrual basis and are on a historical cost basis. These consolidated financial statements are prepared in Canadian dollars.  The functional currency of the Company is Canadian dollars.

(b)    Basis of consolidation

There is one wholly owned subsidiary controlled by the Company. Control exists when the Company has the power, directly and indirectly, to govern the financial and operating policies of an entity and be exposed to the variable returns from its activities. The financial statements of the wholly owned subsidiary are included in the consolidated financial statements from the date that control commences until the date that control ceases.

| Wholly owned subsidiary | Jurisdiction of incorporation |
| --- | --- |
| DFMMJ LLC | Florida, USA |

Intragroup balances, and any unrealized gains and losses or income and expenses arising from gains arising from transactions with jointly controlled entities are eliminated to the extent of the Company's interest in the entity.

3.    Significant accounting policies

The significant accounting policies used by the Company are as follows:

a.    Cash and cash equivalents

Cash and cash equivalents are comprised of cash and highly liquid investments that are readily convertible into known amounts of cash with original maturities of three months or less.

b.    Intangible assets

Intangible asset is comprised of licensed intellectual property, recorded at cost less accumulated amortization. Amortization is to be recorded on a straight-line basis over the estimated useful life of the asset and will be applied once the asset is in use.

7

**DFMMJ Investments Ltd.**
Notes to the Consolidated Financial Statements
For the period from the date of incorporation March 20, 2017 to April 30, 2017

c.    Impairment of non-financial assets

Long-term non-financial assets are tested for impairment when events or changes in circumstances indicate that the carrying amount may exceed its recoverable amount. For the purpose of testing impairment, assets are grouped at the lowest levels for which there are separately identifiable cash flows (cash-generating unit, or "CGU"). An impairment loss is recognized for the amount, if any, by which the asset's carrying amount exceeds its recoverable amount. The recoverable amount is the higher of the asset's fair value less cost to sell and the value in use (being the present value of expected future cash flows of the asset or CGU). Where an impairment loss subsequently reverses, the carrying amount of the asset is increased to the lesser of the revised estimate of recoverable amount and the carrying amount that would have been recorded had no impairment loss been previously recognized.

d.    Income taxes

Income tax expense consisting of current and deferred tax expense is recognized in the consolidated statements of income and comprehensive income. Current tax expense is the expected tax payable on the taxable income for the year, using tax rates enacted or substantively enacted at year end, adjusted for amendments to tax payable with regards to previous years.

Deferred tax assets and liabilities and the related deferred income tax expense or recovery are recognized for deferred tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using the enacted or substantively enacted tax rates expected to apply when the asset is realized or the liability settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that substantive enactment occurs.

A deferred tax asset is recognized to the extent that it is probable that future taxable income will be available against which the asset can be utilized.

Deferred tax assets and liabilities are offset when there is a legally enforceable right to set off current tax assets against current tax liabilities and when they relate to income taxes levied by the same taxation authority and the Company intends to settle its current tax assets and liabilities on a net basis.

e.    Earnings (loss) per share

Basic earnings (loss) per share is calculated using the weighted average number of common shares outstanding during the year. The dilutive effect on earnings per share would be calculated presuming the exercise of outstanding options, warrants and similar instruments. It assumes that the proceeds of such exercise would be used to repurchase common shares at the average market price during the year. However, the calculation of diluted loss per share excludes the effects of various conversions and exercise of options and warrants that would be anti-dilutive.

DFMMJ **Investments** Ltd.
Notes to the Consolidated Financial Statements
For the period from the date of incorporation March 20, 2017 to April 30, 2017

f.    Financial instruments

Financial assets are classified into one of four categories:
- fair value through profit or loss ("FVTPL");
- held-to-maturity ("HTM");
- available for sale ("AFS"); and
- loans and receivables.

(i)    FVTPL financial assets

Financial assets are classified as FVTPL when the financial asset is held for trading or it is designated as FVTPL. Financial assets classified as FVTPL are stated at fair value with any resulting gain or loss recognized in the consolidated statements of income and comprehensive income. Transaction costs are expensed as incurred.

(ii)    Loans and receivables

Loans and receivables are financial assets having fixed or determinable payments that are not quoted in an active market. They are initially recognized at the transaction value and subsequently carried at amortized cost less, when material, a discount to reduce the loans and receivables to fair value.

(iii)    Impairment of financial assets

Financial assets, other than those at FVTPL, are assessed for indicators of impairment at the end of each reporting period. Financial assets are impaired when there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the investment have been impacted.

The carrying amount of all financial assets, excluding trade receivables, is directly reduced by the impairment loss. The carrying amount of trade receivables is reduced through the use of an allowance account. When a trade receivable is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited against the allowance account. Changes in the carrying amount of the allowance account are recognized in the consolidated statements of income and comprehensive income. With the exception of AFS equity instruments, if, in a subsequent period, the amount of the impairment loss decreases and the decrease relates to an event occurring after the impairment was recognized; the previously recognized impairment loss is reversed through the consolidated statements of income and comprehensive income. On the date of impairment reversal, the carrying amount of the financial asset cannot exceed its amortized cost had impairment not been recognized.

(iv)    Financial liabilities and other financial liabilities

Financial liabilities are classified as either financial liabilities at FVTPL or other financial liabilities. Financial liabilities at FVTPL are stated at fair value, with changes being recognized through the consolidated statements of income and comprehensive income. Other financial liabilities are initially measured at fair value, net of transaction costs, and are subsequently measured at amortized cost using the effective interest method, with interest expense recognized on an effective yield basis.

9

DFMMJ **Investments** Ltd.
Notes to the Consolidated Financial Statements
For the period from the date of incorporation March 20, 2017 to April 30, 2017

(v)    Classification of financial instruments

Cash and cash equivalents – FVTPL
Deposit in trust – FVTPL
Accounts payable and accrued liabilities – other financial liabilities
Due to SecureCom Mobile Inc. – other financial liabilities

g.    Critical accounting estimates and judgements

The preparation of the consolidated financial statements require management to make estimates and assumptions that affect the reported amount of assets and liabilities at the date of the consolidated financial statements and reported amounts of expenses during the reporting period.  Actual outcomes could differ from these estimates. In particular, information about significant areas of estimation uncertainty and judgment considered by management in preparing the consolidated financial statements includes:

*Estimated useful lives, amortization and recoverability of capital and intangible assets*

Amortization of capital and intangible assets is dependent upon estimates of useful lives based on management's judgment. The recoverability of the carrying value of the intellectual property is dependent on the successful development and commercialization of the intellectual property in order to generate revenues. The carrying value of these assets is reviewed by management when events or circumstances indicate that its carrying value may not be recovered. If impairment is determined to exist, an impairment loss is recognized to the extent that the carrying amount exceeds the recoverable amount.

h.    New standards and interpretations issued but not yet adopted

A number of new standards, amendments to standards and interpretations are not yet effective for the period ended April 30, 2017 and have not been applied in preparing these consolidated financial statements.

Amendments to IAS 16 - Property Plant and Equipment and IAS 41 - Agriculture - The amendments bring bearer plants, which are used solely to grow produce, into the scope of IAS 16 so that they are accounted for in the same way as property, plant and equipment. The amendments are effective for annual periods beginning on or after January 1, 2017, with earlier application being permitted.

IFRS 9 - Financial Instruments: Classification and Measurement, effective for annual periods beginning on or after January 1, 2018, with early adoption permitted, introduces new requirements for the classification and measurement of financial instruments.

IFRS 15 - Revenue from Contracts with Customers, effective for annual periods beginning on or after January 1, 2018, with early adoption permitted, specifies how and when to recognize revenue and enhances relevant disclosures to be applied to all contracts with customers.

The Company is assessing the impact of these revised standards.

10

**DFMMJ Investments Ltd.**
Notes to the Consolidated Financial Statements
For the period from the date of incorporation March 20, 2017 to April 30, 2017

### 4. Deposit in trust

A cash deposit of $4,453,161 (US$3,260,000) was made as a down payment on the Acquisition and was held in trust as at April 30, 2017 (See Note 10).

### 5. Intangible Assets

In April 2017, a third-party investor licensed its intellectual property to the Company in exchange for common shares. The intellectual property relates to its expertise in growing, harvesting and producing marijuana as well as processing automation and other operational improvements. The Company valued the purchase price for intellectual property at $5,000,000, which the Company estimates to be its fair value. Since the company has not yet began operating and has not yet implemented the intellectual property, the asset is not yet considered in use and therefore no depreciation has been recorded in the current period.

### 6. Due to SecureCom Mobile Inc.

The Company borrowed $4,453,161 (US $3,260,000) from SecureCom Mobile Inc. which was used to fund the deposit for the Acquisition (See Note 10). The loan will be repaid upon the closing of the Acquisition and the Offering of subscription receipts (See Note 7). The liability is non-interest bearing, and is unsecured.

### 7. Share capital

The Company is authorized to issue an unlimited number of common shares.  As at April 30, 2017, the Company has issued 557,836,539 shares.

| Common Shares | Number of Shares |
| --- | --- |
| Balance at March 20, 2017 (date of incorporation) | 1 |
| Share issuance – cash | 365,436,538 |
| Share issuance – in exchange for intangible asset | 192,400,000 |
| **Balance at April 30, 2017** | **557,836,539** |

a) In April 2017, the Company issued 365,436,538 shares for total gross cash proceeds of $25,792,600. Cash commission of $625,000 was paid.

b) In April 2017, the Company issued 192,400,000 shares to purchase intellectual property valued at $5,000,000 (See Note 5).

c) In April 2017, the Company entered into an agency agreement with an agent whereby the Company offers to issue up to 168,269,231 subscription receipts ("Offering") for gross proceeds of $35,000,000 through private placements. The Company will pay a 6% cash commission on the Offering (excepting those gross proceeds from up to a maximum of 14,423,077 subscription receipts sold under a president's list, in respect of which the applicable commission shall be nil) and will issue the agent such number of non-transferable broker warrants as is equal to 6% of the total number of subscription receipts sold under the Offering (excepting that number of subscription receipts, not to exceed 14,423,077 subscription receipts, which are sold under a president's list, in respect of which the broker warrants shall be nil). Each of these subscription receipts sold under the Offering will be automatically exchanged for one common share of the Company upon satisfactory of conditions precedent to the business combination with SecureCom Mobile Inc. ("SecureCom"). Upon completing the business combination with SecureCom, each share of the Company exchanged from the subscription receipt will then be automatically exchanged into one common share of SecureCom. The Company completed the Offering and closed the acquisition of Chestnut Hill Tree Farm LLC ("Chestnut") in May 2017 (See Note 10).

11

**DFMMJ Investments Ltd.**
Notes to the Consolidated Financial Statements
For the period from the date of incorporation March 20, 2017 to April 30, 2017

### 8.      Earnings (loss) per share

The calculation of earnings per share for the period ended April 30, 2017 was based on the net income attributable to common shareholders of $478,198 and a weighted average number of common shares outstanding of 223,338,338 calculated as follows:

|  | 2017 |
|---|---|
| **Basic earnings per share:** | |
| Net income for the period | $       478,198 |
| Average number of common shares outstanding during the period | 168,865,573 |
| **Earnings per share** | $          0.003 |

### 9.      Financial risk management and financial instruments

#### Financial instruments

The Company has classified its cash and deposit in trust as fair value. The carrying values of due to SecureCom Mobile Inc. and accounts payable and accrued liabilities are at fair values due to their short term in nature.

#### Fair value hierarchy

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. Cash and deposit in trust are Level 1. The hierarchy is summarized as follows:

| Level 1 | quoted prices (unadjusted) in active markets for identical assets and liabilities |
|---|---|
| Level 2 | inputs that are observable for the asset or liability, either directly (prices) or indirectly (derived from prices) from observable market data |
| Level 3 | inputs for assets and liabilities not based upon observable market data |

|  | Level 1 | Level 2 | Level 3 | April 30, 2017 |
|---|---|---|---|---|
| **Financial assets at FVTPL** | | | | |
| Cash | $ 26,365,123 | $ -- | $ -- | $ 26,365,123 |
| Deposit in trust | 4,453,160 | -- | -- | 4,453,160 |
|  | $ 30,818,283 | $ -- | $ -- | $ 30,818,283 |
| **Financial liability at amortized cost** | | | | |
| Accounts payable and accrued liabilities | $     719,324 | $ -- | $ -- | $     719,324 |
| Due to SecureCom Mobile Inc. | 4,453,160 | $ -- | $ -- | $ 4,453,160 |
|  | $ 5,172,484 | $ -- | $ -- | $ 5,172,484 |

#### Financial risk management

The Company has exposure to the following risks:

(a)      Business risk

The Company operates in the medical cannabis business in the United States. Cannabis is categorized by the US Federal Government as a Schedule 1 narcotic and as such, an illegal substance. The US Federal government has announced that they will allow each individual state to decide the legality of cannabis within their own state and has committed not to prosecute federally individuals who operate in the cannabis business.

12

**DFMMJ Investments Ltd.**
Notes to the Consolidated Financial Statements
For the period from the date of incorporation March 20, 2017 to April 30, 2017

(b)     Foreign exchange risk

The Company has maintained significant amount of cash in USD foreign currency, USD$18,340,842, as of April 30, 2017. As a result, the Company's operation will be subject to variations from fluctuation on the foreign exchange rate. Foreign exchange gain of $682,258 was recognized on the cash deposit as of April 30, 2017 and was included in the consolidated statement of income and comprehensive income for the period ended April 30, 2017. A 5% change in the foreign exchange rate may result a gain/loss of $1,252,863 on the foreign currency cash. The Company also has a due to SecureCom Mobile Inc. and deposit in trust in the same amount of USD$3,260,000 as of April 30, 2017. Any fluctuation on the foreign exchange rate will not result in any material effect to its operation from the due to SecureCom Mobile Inc. and the deposit in trust due to their offsetting effect against each other. The Company does not maintain any contract to hedge against any fluctuation on foreign exchange rate.

(c)     Credit risk

The maximum credit exposure at April 30, 2017 is the carrying amount of cash and deposit in trust. The Company does not have significant credit risk with respect to customers. All cash and cash equivalents are placed with locally established financial institutions.

(d)     Liquidity risk

As at April 30, 2017, the Company's financial liabilities consist of accounts payable and accrued liabilities and due to SecureCom Mobile Inc. Due to SecureCom Mobile Inc. has no fixed repayment terms. The Company manages its liquidity risk by reviewing its capital requirements on an ongoing basis. Based on the Company's working capital position at April 30, 2017, management regards liquidity risk to be low.

(e)     Capital management

The Company's objectives when managing its capital are to safeguard its ability to continue as a going concern, to meet its capital expenditures for its continued operations, and to maintain a flexible capital structure which optimizes the cost of capital within a framework of acceptable risk. The Company will manage its capital structure and adjusts it in light of changes in economic conditions and the risk characteristics of the underlying assets.  To maintain or adjust its capital structure, the Company may issue new shares, issue new debt, or acquire or dispose of assets. The Company is not subject to externally imposed capital requirements. Management will review its capital management approach on an ongoing basis.

10.    Acquisition and Subsequent event

The Company entered into a definitive arm's length transaction agreement (the "Agreement") dated April 4, 2017 with SecureCom Mobile Inc. ("SecureCom"), a publically traded company on the Canadian Stock Exchange, incorporated under the laws of British Columbia whereby the Company will amalgamate with a wholly-owned subsidiary of SecureCom to become a direct, wholly-owned subsidiary of SecureCom ("Business Combination"). SecureCom will remain as the resulting issuer (the "Resulting Issuer").

Upon completion of the Business Combination, the Resulting Issuer will conduct its business under the new name "Liberty Health Sciences Inc." (the "Name Change") . It is expected that the Resulting Issuer will, upon completion of the Business Combination, have its common shares listed and posted for trading on the Canadian Stock Exchange (the "Exchange" or the "CSE"). The Business Combination is expected to close in July 2017 and is subject to the approval of SecureCom shareholders.

**DFMMJ Investments Ltd.**
Notes to the Consolidated Financial Statements
For the period from the date of incorporation March 20, 2017 to April 30, 2017

The proceeds from the subscription receipts (See Note 7) together with existing cash will be used to fund the acquisition (the "Acquisition") by DFMMJ Investments, LLC, of all or substantially all of the assets of Chestnut Hill Tree Farm LLC ("Chestnut"), a limited liability company existing under the laws of the State of Florida for a purchase price of US$40,000,000. The Acquisition was subject to the terms of a definitive asset purchase agreement dated March 30, 2017, which included customary closing conditions as well as the completion of due diligence investigations to the satisfaction of the Company. A cash deposit of $4,453,161 (US$3,260,000) was made as a down payment on the Acquisition and was held in trust as at April 30, 2017. The Acquisition was closed on May 23, 2017.

On April 27, 2017, the Company issued 164,182,679 subscription receipts at $0.208 per subscription receipt raising gross proceeds of approximately $34,150,000.  On May 19, 2017, approximately $25,000,000 of the proceeds from the issuance of the subscription receipts was agreed to be released from escrow in order to finance the acquisition of Chestnut.

## 11.    Income tax

A reconciliation of income taxes at the statutory rate with the reported taxes follows:

|  | 2017 ($) |
|---|---|
| Income for the period | 478,198 |
| Income tax payable at statutory rate of 26% | 124,331 |
| Deductible & non-deductible items | (177,387) |
| Current and prior tax attributes not recognized | 53,056 |
|  | - |

Details of deferred tax assets are as follows:

|  | 2017 ($) |
|---|---|
| Deferred tax assets |  |
| Non-capital losses | 53,056 |
| Unrecognized deferred tax assets | (53,056) |
|  | - |

At April 30, 2017, the Company has non-capital losses carried forward for Canadian income tax purposes totalling approximately $204,000, expiring through to 2037.

At April 30, 2017, the net amount which would give rise to a deferred income tax asset has not been recognized as it is not probable that such benefit will be utilized in the future years.

# Chestnut Hill Tree Farm LLC

AUDITED CONSOLIDATED FINANCIAL STATEMENTS
FOR THE PERIOD FROM THE DATE OF LICENSE APPROVAL (NOVEMBER 23, 2015) TO
SEPTEMBER 30, 2016
*(Expressed in United States Dollars)*

The accompanying notes are an integral part of these consolidated financial statements

UNIT 114B (2nd Floor)
8988 FRASERTON COURT
BURNABY, BC V5J 5H8

T: **604.239.0868**
F: **604.239.0866**



**A CHAN AND COMPANY LLP**
**CHARTERED PROFESSIONAL ACCOUNTANTS**

## INDEPENDENT AUDITORS' REPORT

To:      the Shareholders of
         Chestnut Hill Tree Farm, LLC

We have audited the accompanying consolidated financial statements of Chestnut Hill Tree Farm, LLC (the "Company"), which comprise the consolidated statement of financial position as at September 30, 2016, and the consolidated statement of loss and comprehensive loss, consolidated statement of cash flows and consolidated statement of changes in shareholders' equity for the period from date of license approval November 23, 2015 to September 30, 2016, and a summary of significant accounting policies and other explanatory information.

**Management's Responsibility for the Consolidated Financial Statements**
Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**
Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with Canadian generally accepted auditing standards. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained in our audits is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**
In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as at September 30, 2016, and its financial performance and its cash flow for the period from date of license approval November 23, 2015 to September 30, 2016 in accordance with International Financial Reporting Standards.

*"A Chan & Company LLP"*
Chartered Professional Accountants

Burnaby, British Columbia
June 15, 2017

The accompanying notes are an integral part of these consolidated financial statements

**Chestnut Hill Tree Farm LLC**
**Consolidated Statement of Financial Position**
(*Expressed in United States Dollars*)

| | Note | September 30, 2016 |
|---|---|---|
| ASSETS | | |
| Current assets | | |
| Cash and cash equivalents | | $ 2,696,046 |
| Surety bond refundable deposit | 1 | 3,000,000 |
| Biological assets | 4 | 95,756 |
| | | 5,791,802 |
| | | |
| Capital assets | 5 | 1,274,693 |
| | | $ 7,066,495 |
| | | |
| LIABILITIES | | |
| Current liabilities | | |
| Accounts payable and accrued liabilities | | $ 139,286 |
| Due to related parties | 8 | 907,493 |
| Current portion of finance lease | 6 | 53,931 |
| | | 1,100,710 |
| | | |
| Long-term liabilities | | |
| Finance lease | 6 | 63,430 |
| Convertible promissory note | 7 | 2,547,758 |
| Secured promissory note | 7 | 5,000,000 |
| | | 7,611,188 |
| | | |
| Members' equity | | |
| Capital account | 9 | 300,000 |
| Contributed surplus | 7 | 162,740 |
| Deficit | | (2,108,143) |
| | | (1,645,403) |
| | | $ 7,066,495 |

Nature of operations (Note 1)
Commitments (Note 12)
Subsequent events (Note 14)

Approved on behalf of the Company:

*"Rene Gulliver"*

Signed:  Representative

The accompanying notes are an integral part of these consolidated financial statements

**Chestnut Hill Tree Farm LLC**
**Consolidated Statement of Loss and Comprehensive Loss**
(*Expressed in United States Dollars*)

| | Note | For the period from the date of License approval (November 23, 2015) to September 30, 2016 |
|---|---|---|
| Revenue | | $ -- |
| | | |
| Cost of sales: | | |
| Cost of goods sold | | 35,595 |
| Amortization | 5 | 19,447 |
| Net effect of unrealized changes in fair value of biological assets | 4 | (95,756) |
| | | (40,714) |
| | | |
| Gross Profit | | 40,714 |
| | | |
| Expenses: | | |
| General and administrative | 10 | 2,082,745 |
| Amortization | 5 | 3,455 |
| | | 2,086,200 |
| | | |
| Income (loss) from operations | | (2,045,486) |
| | | |
| Accretion expense | 7 | 13,532 |
| Finance expenses | | 49,125 |
| | | |
| Net Loss and Comprehensive Loss | | $ (2,108,143) |
| | | |
| Weighted average number of member units | | 5,700 |
| Loss per unit | | $ (370) |

The accompanying notes are an integral part of these consolidated financial statements

**Chestnut Hill Tree Farm LLC**
**Consolidated Statement of Changes in Equity**
(*Expressed in United States Dollars)*

| | Capital account (Note 9) | Convertible notes/ Contributed surplus (Note 7) | Deficit | Total |
|---|---|---|---|---|
| Balance at November 23, 2015 | $ -- | $ -- | $ -- | $ -- |
| Membership Units issued, Emerald | 300,000 | -- | -- | 300,000 |
| Contributed surplus on issuance of Convertible Note | -- | 162,740 | -- | 162,740 |
| Net loss for the period | -- | -- | (2,108,143) | (2,108,143) |
| Balance at September 30, 2016 | $ 300,000 | $ 162,740 | $ (2,108,143) | $ (1,645,403) |

The accompanying notes are an integral part of these consolidated financial statements

F-20

Chestnut Hill Tree Farm LLC
**Consolidated Statement of Cash Flows**
*(Expressed in United States Dollars)*

| | Note | For the period from the date of License approval (November 23, 2015) to September 30, 2016 |
|---|---|---|
| **Cash used in operating activities:** | | |
| Net loss | | $ (2,108,143) |
| Change in fair value of biological assets | 4 | (95,756) |
| Amortization | 5 | 22,902 |
| Accretion expense, net of accrued interest | | 10,498 |
| Change in non-cash working capital | | 139,286 |
| | | (2,031,213) |
| | | |
| **Cash provided by financing activities:** | | |
| Proceeds into capital account, Emerald | 9 | 300,000 |
| Proceeds from convertible note issued | 7 | 2,700,000 |
| Proceeds from note issued | 7 | 5,000,000 |
| Proceeds from finance lease, net of repayments | 6 | 117,361 |
| Advances from related parties, net | 8 | 907,493 |
| | | 9,024,854 |
| | | |
| **Cash used in investing activities:** | | |
| Investment in capital assets | 5 | (1,297,595) |
| Issuance of collateral bond deposit | 1 | (3,000,000) |
| | | (4,297,595) |
| | | |
| **Increase in cash and cash equivalents** | | 2,696,046 |
| | | |
| Cash, beginning of period | | -- |
| | | |
| **Cash, end of period** | | $ 2,696,046 |
| | | |
| Supplemental information | | |
| Interest paid | | $ -- |
| Taxes paid | | $ -- |

The accompanying notes are an integral part of these consolidated financial statements

6

Chestnut Hill Tree Farm LLC
Notes to the Consolidated Financial Statements
For the period from the date of License approval (November 23, 2015) to September 30, 2016

## 1.    Nature of operations

On Sept 16, 2005, Chestnut Hill Investments Inc. merged with Chestnut Hill Investments LLC and the surviving entity was Chestnut Hill Tree Farm LLC (the "Company").  The Company has been operating in the business of legacy nursery or cultivating non-cannabis products. On November 23, 2015, the Company was approved by the State of Florida to be a low-THC Cannabis Dispensing Organization for the Northeast Region in Florida. On June 21, 2016, the Company received the authority to cultivate low-THC cannabis and medical cannabis and has since started planting its first crop. On Dec. 21, 2016, the Company received the authority to process and dispense medical low-THC cannabis and medical cannabis products. CHT Medical LLC was formed on September 1, 2016 and is owned 100% by Chestnut Hill Tree Farm LLC.  CHT Medical was formed to house the dispensary side of the medical cannabis operations. The Company has since separated the legacy nursery from the cannabis business.

One of the conditions on receiving the license to be a Dispensing Organization is the requirement that the Company needs to post a performance bond of $5,000,000 with the Florida Department of Health. The Company posted this performance bond through an insurance company and purchased a surety bond insurance of $5,000,000.  Due to the nature of this new industry, insurance company can only issue such bond insurance provided that the Company would make a refundable deposit of $3,000,000 with the insurance and pay for a premium of $450,000 to cover a period of 24 months. This deposit is non-interest bearing and is refundable upon the Company meeting certain conditions with respect to the license.  The Company made a deposit of $3,000,000 with the insurance company during the period and paid for the premium of $450,000 through a finance program. After the Company has commenced it dispensing operation, it was determined that this deposit was no longer required and refunded back to the Company in March of 2017.

These consolidated financial statements were approved by the Company's Representative on June 15, 2017.

## 2.    Basis of preparation

(a)    Statement of compliance

The policies applied in this consolidated financial statements are based on International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and Interpretations of the IFRS Interpretations Committee ("IFRIC").

(b)    Basis of measurement

These consolidated financial statements have been prepared on the historical cost basis except for certain financial instruments that are measured at fair value and biological assets that are measured at fair value less costs to sell, as detailed in the Company's accounting policies.

(c)    Functional currency

The Company's functional currency, as determined by management is United States dollars. These consolidated financial statements are presented in United States dollars.

(d)    Consolidation

The consolidated financial statements of the Company consolidate the accounts of Chestnut Hill Tree Farm LLC and its wholly owned subsidiary, CHT Medical LLC. All intercompany transactions, balances and unrealized gains and losses from intercompany transactions are eliminated on consolidation.

Subsidiaries are those entities which the Company controls by having the power to govern the financial and operating policies.

7

Chestnut Hill Tree Farm LLC
**Notes to the Consolidated Financial Statements**
For the period from the date of License approval (November 23, 2015) to September 30, 2016

_____

3.       Significant accounting policies
_____

The significant accounting policies used by the Company are as follows:

a.       Revenue

Revenue is recognized at the fair value of consideration received or receivable. Revenue from the sale of goods is recognized when all the following conditions have been satisfied, which are generally met once the products are shipped to customers.

- The Company has transferred the significant risks and rewards of ownership of the goods to the purchaser;
- The Company retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;
- The amount of revenue can be measured reliably;
- It is probable that the economic benefits associated with the transaction will flow to the entity; and
- The costs incurred or to be incurred in respect of the transaction can be measured reliably.

b.       Cash and cash equivalents

Cash and cash equivalents are comprised of cash and highly liquid investments that are readily convertible into known amounts of cash with original maturities of three months or less.

c.       Inventory

Inventory is valued at the lower of cost and net realizable value. Cost is determined using the weighted average method. Inventories of harvested cannabis are transferred from biological assets into inventory at their fair value at harvest less costs to sell, which is deemed to be their cost. Any subsequent post-harvest costs are capitalized to inventory to the extent that cost is less than net realizable value. Net realizable value is determined as the estimated selling price in the ordinary course of business less estimated costs to sell.

d.       Biological assets

The Company's biological assets consist of medical cannabis plants. These biological assets are measured at fair value less costs to sell and costs to complete. At the point of harvest, the biological assets are transferred to inventory at fair value less costs to sell and costs to complete.

Gains or losses arising from changes in fair value less cost to sell are included in the results of operations of the related period.

e.       Capital assets

Capital assets are stated at cost, net of accumulated amortization and accumulated impairment losses, if any.

Chestnut Hill Tree Farm LLC
**Notes to the Consolidated Financial Statements**
For the period from the date of License approval (November 23, 2015) to September 30, 2016

Amortization is calculated using the following terms and methods:

| | | |
|---|---|---|
| Production equipment | Straight-line | 5 years |
| Office equipment | Straight-line | 5 years |
| Software & computer equipment | Straight-line | 100% |
| Greenhouse and facility | Straight-line | 15 years |
| Construction in progress | Not amortized | |

An item of equipment is derecognized upon disposal or when no future economic benefits are expected from its use. Any gain or loss arising on de-recognition of the asset (calculated as the difference between the net disposal proceeds and the carrying value of the asset) is included in the statements of income and comprehensive income in the year the asset is derecognized. Depreciation is recognised in profit or loss, unless the amount is included in the carrying amount of another asset. Leased assets are depreciated over the shorter of the lease term and their useful lives, unless it is reasonably certain that the Company will obtain ownership by the end of the lease term.

The assets' residual values, useful lives and methods of depreciation are reviewed at each financial year end, and adjusted prospectively if appropriate.

f.    Impairment of non-financial assets

Long-term non-financial assets are tested for impairment when events or changes in circumstances indicate that the carrying amount may exceed its recoverable amount. For the purpose of testing impairment, assets are grouped at the lowest levels for which there are separately identifiable cash flows (cash-generating unit, or "CGU"). An impairment loss is recognized for the amount, if any, by which the asset's carrying amount exceeds its recoverable amount. The recoverable amount is the higher of the asset's fair value less cost to sell and the value in use (being the present value of expected future cash flows of the asset or CGU). Where an impairment loss subsequently reverses, the carrying amount of the asset is increased to the lesser of the revised estimate of recoverable amount and the carrying amount that would have been recorded had no impairment loss been previously recognized.

g.    Leases

(i)    Leased assets

Assets held by the Company under leases which transfer to the Company substantially all of the risks and rewards of ownership are classified as finance leases. On initial recognition, the leased asset is measured at an amount equal to the lower of its fair value and the present value of the minimum lease payments. Subsequent to initial recognition, the asset is accounted for in accordance with the accounting policy applicable to that asset.

Assets held under other leases are classified as operating leases and are not recognised in the Company's statement of financial position.

(ii)    Lease payments

Minimum lease payments made under finance leases are apportioned between the finance expense and the reduction of the outstanding liability. The finance expense is allocated each period during the lease term so as to produce a constant periodic rate of interest on the remaining balance of the liability.

Payments made under operating leases are recognised in profit or loss on a straight-line basis over the term of the lease. Lease incentives received are recognised as an integral part of the total lease expense, over the term of the lease.

9

Chestnut Hill Tree Farm LLC
Notes to the Consolidated Financial Statements
For the period from the date of License approval (November 23, 2015) to September 30, 2016

(iii) Determining whether an arrangement contains a lease

At inception of an arrangement, the Company determined whether such an arrangement is or contains a lease. This will be the case if the following criteria are met:

- The fulfilment of the arrangement is dependent on the use of a specific asset or assets; and
- The arrangement contains a right to use the asset(s)

At inception or on reassessment of the arrangement, the Company separates payments and other consideration required by such an arrangement into those for the lease and those for other elements on the basis of their relative fair value. If the Company concludes for a finance lease that it is impracticable to separate the payments reliably, then an asset and a liability are recognised at an amount equal to the fair value of the underlying asset. Subsequently the liability is reduced as payments are made and an imputed finance cost on the liability is recognised using the Company's incremental borrowing rate.

h.    Income taxes

Income tax expense consisting of current and deferred tax expense is recognized in the statements of income and comprehensive income. Current tax expense is the expected tax payable on the taxable income for the year, using tax rates enacted or substantively enacted at year end, adjusted for amendments to tax payable with regards to previous years.

Deferred tax assets and liabilities and the related deferred income tax expense or recovery are recognized for deferred tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using the enacted or substantively enacted tax rates expected to apply when the asset is realized or the liability settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that substantive enactment occurs.

A deferred tax asset is recognized to the extent that it is probable that future taxable income will be available against which the asset can be utilized.

Deferred tax assets and liabilities are offset when there is a legally enforceable right to set off current tax assets against current tax liabilities and when they relate to income taxes levied by the same taxation authority and the Company intends to settle its current tax assets and liabilities on a net basis.

i.    Financial instruments

Financial assets are classified into one of four categories:
- fair value through profit or loss ("FVTPL");
- held-to-maturity ("HTM");
- available for sale ("AFS"); and
- loans and receivables.

10

Chestnut Hill Tree Farm LLC
Notes to the Consolidated Financial Statements
For the period from the date of License approval (November 23, 2015) to September 30, 2016

(iv) FVTPL financial assets

Financial assets are classified as FVTPL when the financial asset is held for trading or it is designated as FVTPL. Financial assets classified as FVTPL are stated at fair value with any resulting gain or loss recognized in the statements of income and comprehensive income. Transaction costs are expensed as incurred.

(v) HTM investments

HTM investments are recognized on a trade-date basis and are initially measured at fair value, including transaction costs and subsequently at amortized cost.

(vi) AFS financial assets

AFS financial assets are those non-derivative financial assets that are designated as available for sale or are not classified in any of the other categories. Gains and losses arising from changes in fair value are recognized in other comprehensive income.

(vii) Loans and receivables

Loans and receivables are financial assets having fixed or determinable payments that are not quoted in an active market. They are initially recognized at the transaction value and subsequently carried at amortized cost less, when material, a discount to reduce the loans and receivables to fair value.

(viii) Impairment of financial assets

Financial assets, other than those at FVTPL, are assessed for indicators of impairment at the end of each reporting period. Financial assets are impaired when there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the investment have been impacted.

The carrying amount of all financial assets, excluding trade receivables, is directly reduced by the impairment loss. The carrying amount of trade receivables is reduced through the use of an allowance account. When a trade receivable is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited against the allowance account. Changes in the carrying amount of the allowance account are recognized in the statements of income and comprehensive income. With the exception of AFS equity instruments, if, in a subsequent period, the amount of the impairment loss decreases and the decrease relates to an event occurring after the impairment was recognized; the previously recognized impairment loss is reversed through the statements of income and comprehensive income. On the date of impairment reversal, the carrying amount of the financial asset cannot exceed its amortized cost had impairment not been recognized.

(ix) Financial liabilities and other financial liabilities

Financial liabilities are classified as either financial liabilities at FVTPL or other financial liabilities. Financial liabilities at FVTPL are stated at fair value, with changes being recognized through the statements of income and comprehensive income. Other financial liabilities are initially measured at fair value, net of transaction costs, and are subsequently measured at amortized cost using the effective interest method, with interest expense recognized on an effective yield basis.

11

Chestnut Hill Tree Farm LLC
**Notes to the Consolidated Financial Statements**
For the period from the date of License approval (November 23, 2015) to September 30, 2016

    (x)   Classification of financial instruments

        Cash and cash equivalents – FVTPL
        Biological assets – FVTPL
        Refundable deposits – loans and receivables
        Accounts receivables – loans and receivables
        Other receivables – loans and receivables
        Accounts payable and accrued liabilities – other financial liabilities
        Due to related parties – other financial liabilities
        Finance lease – other financial liabilities
        Convertible note – other financial liabilities
        Promissory note – other financial liabilities

j.      Critical accounting estimates and judgments

The preparation of consolidated financial statements requires management to make judgments, estimates and assumptions that affect the application of policies and reported amounts of assets and liabilities, and revenue and expenses. Actual results may differ from these estimates. The estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognized in the period in which the estimate is revised if the revision affects only that period or in the period of the revision and future periods if the review affects both current and future periods.

*Biological assets and inventory*

Management is required to make a number of estimates in calculating the fair value of biological assets and harvested cannabis inventory. These estimates include a number of assumptions such as estimating the stage of growth of the cannabis, harvesting costs, sales price, and expected yields.

*Estimated useful lives and amortization of capital and intangible assets*

Amortization of capital and intangible assets is dependent upon estimates of useful lives based on management's judgment.

k.      New standards and interpretations issued but not yet adopted

A number of new standards, amendments to standards and interpretations are not yet effective for the period ended September 30, 2016 and have not been applied in preparing these consolidated financial statements.

Amendments to IAS 16 - Property Plant and Equipment and IAS 41 - Agriculture - The amendments bring bearer plants, which are used solely to grow produce, into the scope of IAS 16 so that they are accounted for in the same way as property, plant and equipment. The amendments are effective for annual periods beginning on or after January 1, 2016, with earlier application being permitted.

IFRS 9 - Financial Instruments: Classification and Measurement, effective for annual periods beginning on or after January 1, 2018, with early adoption permitted, introduces new requirements for the classification and measurement of financial instruments.

IFRS 15 - Revenue from Contracts with Customers, effective for annual periods beginning on or after January 1, 2018, with early adoption permitted, specifies how and when to recognize revenue and enhances relevant disclosures to be applied to all contracts with customers.

The Company is assessing the impact of these revised standards.

Chestnut Hill Tree Farm LLC
**Notes to the Consolidated Financial Statements**
For the period from the date of License approval (November 23, 2015) to September 30, 2016

4.      Biological assets

Biological assets are comprised of:

|  | Amount |
|---|---|
| Balance as at November 23, 2015 | $ -- |
| Costs incurred until harvest | - |
| Net effect of unrealized changes in fair value of biological assets | **95,756** |
| Transferred to inventory upon harvest | -- |
| Transferred to capital assets | -- |
| **Balance as at September 30, 2016** | **$  95,756** |

The Company values medical cannabis plants at cost from the date of initial clipping from mother plants until the end of the eighth week of its growing cycle.  Measurement of the biological asset at fair value less costs to sell and costs to complete begins at the eighth week until harvest. The Company has determined the fair value less costs to sell to be $0.06 per active milligram, upon harvest.

The net effect of the fair value less cost to sell over and above historical cost was an increase in non-cash value of inventory of $95,756 during the period ended September 30, 2016. In determining the fair value of biological assets, management is required to make several estimates, including: the expected cost required to grow the cannabis up to the point of harvest; harvesting costs; selling costs; sales price; and, expected yields for the cannabis plant. These estimates are subject to volatility in market prices and several uncontrollable factors, which could significantly affect the fair value of biological assets in future periods.

The fair value of medical cannabis plants is considered to be Level 3 in the fair value hierarchy and the significant assumptions used in determining the fair value of medical cannabis plants are as follows:
- yield by plant; and,
- percentage of costs incurred for each stage of plant growth.
- fair value less costs to sell of the harvested product

5.      Capital assets

|  | Furniture & equipment | Software | Construction in process | Total capital assets |
|---|---|---|---|---|
| **Cost** | | | | |
| At Nov 23, 2015 | $ -- | $ -- | $ -- | **$ --** |
| Additions | 237,073 | 6,183 | 1,054,339 | **1,297,595** |
| Transfers | -- | -- | -- | **--** |
| Disposals | -- | -- | -- | **--** |
| **At Sept 30, 2016** | **$ 237,073** | **$ 6,183** | **$ 1,054,339** | **$ 1,297,595** |

|  | Furniture & equipment | Software | Construction in process | Total capital assets |
|---|---|---|---|---|
| **Accumulated amortization** | | | | |
| At Nov 23, 2015 | $ -- | $ -- | $ -- | **$ --** |
| Amortization | 19,810 | 3,092 | -- | **22,902** |
| Disposals | -- | -- | -- | **--** |
| **At Sept 30, 2016** | **$ 19,810** | **$ 3,092** | **$ --** | **$ 22,902** |

13

Chestnut Hill Tree Farm LLC
Notes to the Consolidated Financial Statements
For the period from the date of License approval (November 23, 2015) to September 30, 2016

| | Furniture & equipment | Software | Construction in process | Total capital assets |
|---|---|---|---|---|
| **Net book value** | | | | |
| At Nov 23, 2015 | -- | -- | -- | -- |
| **At Sept. 30, 2016** | **$ 217,263** | **$ 3,091** | **$ 1,054,339** | **$ 1,274,693** |

During the reporting period, the Company acquired leased assets of $ 157,686. The Company leases production equipment under a finance lease agreement, where the lease provides the Company the option to purchase the equipment at a price below its fair value at the end of the contract. The leased equipment secures lease obligations. As at September 30, 2016, the net carrying amount of leased equipment was $144,509.

## 6.    Finance lease liabilities

Finance lease liabilities are payable as follows:

| | Future Minimum Lease Payments | Interest | Present Value of minimum lease payments |
|---|---|---|---|
| Less than one year | $ 60,722 | $ 6,791 | $ 53, 931 |
| Between one and five years | 66,244 | 2,814 | 63,430 |
| More than five years | -- | -- | -- |
| | $ 126,966 | $ 9,605 | $ 117,361 |

In August 2016, the Company entered into a finance lease agreement related to a production equipment transaction totalling $156,486, of which a down payment was made totalling $39,125. The finance lease is repayable over a 2-year period expiring October 2018.

## 7.    Convertible note and secured promissory note

| | CBD Equity LLC | HSTM Equity, LLC | Total |
|---|---|---|---|
| Balance, November 23, 2015 | -- | -- | -- |
| Issued | 5,000,000 | 2,700,000 | 7,700,000 |
| Equity portion | -- | (162,740) | (162,740) |
| Financing fees | -- | -- | -- |
| Accretion | -- | 13,532 | 13,532 |
| Accrued Interest, included as accrued liability | 49,125 | (3,034) | 46,091 |
| **Balance as at September 30, 2016** | **$  5,049,125** | **$  2,547,758** | **$  7,596,883** |

In July 2015, the Company issued a secured promissory note for the aggregate gross proceeds of $5,000,000 to CBD Equity LLC ("CBD"), secured by a general security agreement against the Company's tangible assets. The note had a term of four years at an interest rate based on the US 5-year Bond Yield. Prior to the maturity date, no payments of principal shall be required and interest payments shall be paid in arrears during the term of the note on a monthly basis. The Company also entered into an option agreement ("Option Agreement") with CBD whereby CBD was granted the option to purchase 50% of the outstanding issued Class A Membership Units issued to Robert Wallace and Deborah Gaw for $5,000,000, where the outstanding principal amount due on the note will be classified as new contributed capital on the books of the company as of the date of exercising the option. In consideration for the option granted, CBD agreed to pay the Company a $300,000 option fee upon execution of the Option Agreement. In lieu of paying the option fee, CBD agree to fund certain organization costs on behalf of the company. As a result, the

14

Chestnut Hill Tree Farm LLC
Notes to the Consolidated Financial Statements
For the period from the date of License approval (November 23, 2015) to September 30, 2016

option fee receivable was written off in the period. On October 6, 2016, CBD exercised its option and purchased and received 2,821.5 membership units. The accrued interest on the note was waived at the time of exercise of the option.

In September 2016, the Company issued a non-secured convertible note for the aggregate gross proceeds of $2,700,000 to HSTM Equity, LLC ("HSTM"). The principal and accrued interest will be due in payable by the Company at any time on or after the first anniversary of the date of issuance, with interest accruing at a rate of 1.7% compounded monthly. No payments of principal and accrued interest shall be paid without the consent of HSTM. Under the convertible note, HSTM has the right to exercise the conversion feature to purchase 513 newly issued Class A Membership Units for $2,700,000, where the outstanding principal amount due on the note will be classified as new contributed capital on the books of the company as of the date of conversion.

The liability component of the convertible debentures was valued using Company-specific risk-adjusted interest rates assuming no conversion features existed. The debt component is accreted to its fair value over the term to maturity as a non-cash interest charge and the equity component is presented in convertible notes reserve as a separate component of members' equity.

## 8.   Related party transactions

In addition to the debt proceeds received during the period, the Company funded operations through the support of related parties. The balance owing to related parties as at September 30, 2016 was $907,493. These parties are related as they are corporations that are controlled by certain officers and directors of the Company. The amounts are non-interest bearing and unsecured with no fixed repayment date or terms.

## 9.   Capital accounts

|  | Share Class | Membership Units | Capital Contribution |
|---|---|---|---|
| Chestnut Hill Holdings LLC | Class A | 5,643 | $ -- |
| HSTM Equity, LLC | Class A | -- | -- |
| 420 Emerald Coast, LLC | Class A | 57 | 300,000 |
| CBD Equity, LLC | Class A | -- | -- |
| **Balance as at September 30, 2016** | | 5,700 | $ 300,000 |

a) In August 2005, the Company issued 500 Class A Membership units to Robert Wallace.

b) In August 2005, the Company issued 500 Class A Membership units to Deborah Gaw.

c) In August 2016, Deborah Gaw and Robert Wallace entered into a Contribution Agreement whereas the original members contributed all their respective shares to Chestnut Hill Holdings, LLC ("Holdings"), a Florida limited liability company in exchange for all the membership units of Holdings. At that time, the number of membership units issued was increased to 5,700.

d) In September 2016, the Company issued 57 Class A Membership Units to 420 Emerald Coast, LLC ("Emerald") in exchange for cash in the amount of $300,000. The Company as a result has cancelled the original 5,700 Class A Membership Units issued to Holdings and reissued 5,643 Units to Holdings.

15

Chestnut Hill Tree Farm LLC
Notes to the Consolidated Financial Statements
For the period from the date of License approval (November 23, 2015) to September 30, 2016

10. General and administrative expenses

|  | For the period ended September 30, 2016 |
|---|---|
| Consulting fees | $ 695,776 |
| Professional fees | 556,957 |
| Write off of option fee | 300,000 |
| Insurance | 242,650 |
| Office and general | 287,362 |
|  | $2,082,745 |

11. Financial risk management and financial instruments

Financial instruments

The Company's financial instruments consists of cash and cash equivalents, surety bond refundable deposit, biological assets, accounts payable and accrued liabilities, convertible promissory note payable, secured promissory note payable, due to related parties and finance lease.

The carrying values of accounts payable and accrued liabilities and due to related parties approximate their fair values due to their short periods to maturity.

Fair value hierarchy

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. Cash and cash equivalents are Level 1. The hierarchy is summarized as follows:

| Level 1 | quoted prices (unadjusted) in active markets for identical assets and liabilities |
|---|---|
| Level 2 | inputs that are observable for the asset or liability, either directly (prices) or indirectly (derived from prices) from observable market data |
| Level 3 | inputs for assets and liabilities not based upon observable market data |

|  | Level 1 | Level 2 | Level 3 | September 30, 2016 |
|---|---|---|---|---|
| **Financial assets at FVTPL** |  |  |  |  |
| Cash and cash equivalents | $2,696,046 | $ -- | $ -- | $ 2,696,046 |
| Refundable deposit | 3,000,000 | -- | -- | 3,000,000 |
| Biological assets | -- | -- | 95,756 | 95,756 |
|  | $ 5,696,046 | $ -- | $ 95,756 | $ 5,791,802 |
| **Financial liabilities at amortized cost** |  |  |  |  |
| Accounts payable and accrued liabilities | $ 139,286 | $ -- | $ -- | $ 139,286 |
| Current portion of finance lease | 53,931 | -- | -- | 53,931 |
| Finance lease | 63,430 | -- | -- | 63,430 |
| Secured promissory note | 5,000,000 | -- | -- | 5,000,000 |
| Convertible notes | 2,547,758 | -- | -- | 2,547,758 |
|  | $ 7,801,405 | $ -- | $ -- | $ 7,801,405 |

16

Chestnut Hill Tree Farm LLC
Notes to the Consolidated Financial Statements
For the period from the date of License approval (November 23, 2015) to September 30, 2016

### Financial risk management

The Company has exposure to the following risks from its use of financial instruments:  credit risk; liquidity; and, interest rate price risk.

(a)  Credit risk

The maximum credit exposure at September 30, 2016 is the carrying amount of cash and cash equivalents and refundable deposit. All cash and cash equivalents are placed with local established financial institutions.

(b)  Liquidity risk

As at September 30, 2016, the Company's financial liabilities consist of accounts payable and accrued liabilities and a finance lease which have contractual maturity dates within one year and promissory notes payable, which have contractual maturities over the next four years. Amounts due to related parties have no fixed repayment terms. The Company manages its liquidity risk by reviewing its capital requirements on an ongoing basis. Based on the Company's working capital position at September 30, 2016, management regards liquidity risk to be low.

(c)  Capital management

The Company's objectives when managing its capital are to safeguard its ability to continue as a going concern, to meet its capital expenditures for its continued operations, and to maintain a flexible capital structure which optimizes the cost of capital within a framework of acceptable risk. The Company manages its capital structure and adjusts it in light of changes in economic conditions and the risk characteristics of the underlying assets.  To maintain or adjust its capital structure, the Company may issue new shares, issue new debt, or acquire or dispose of assets. The Company is not subject to externally imposed capital requirements.

Management reviews its capital management approach on an ongoing basis and believes that this approach, given the relative size of the Company, is reasonable. There have been no changes to the Company's capital management approach in the period. The Company considers its cash and cash equivalents as capital.

## 12.  Commitments

The Company has a lease commitment until November 2025 related to land rent at $2,500 per month. Minimum payments payable over the next five years are as follows:

|  | Periods ending September 30, |
|---|---|
| 2017 | $  30,000 |
| 2018 | 30,000 |
| 2019 | 30,000 |
| 2020 | 30,000 |
| 2021 | 30,000 |
|  | $  150,000 |

17

Chestnut Hill Tree Farm LLC
Notes to the Consolidated Financial Statements
For the period from the date of License approval (November 23, 2015) to September 30, 2016

## 13. Income tax

(a)  Federal and State income taxes

The Company is a LLC, incorporated in the State of Florida, USA and the Company has originally elected to be a disregarded entity with a sole owner. As a disregarded entity, LLC's activities are reflected on its owner's federal tax return whereby, all the profits/losses are passed on directly to the owner of the Company.  After the Company has introduced additional shareholders into the Company, the Company has become a partnership and each partner reports its own share of the profit/losses on its own federal tax return. Accordingly, the Company is not required to pay corporate income tax on the profits of the company.  In addition, the Company does not pay state tax because the State of Florida has no state tax.

(b)  Distributions
The Company makes distributions of profits to the shareholders.  The Company must allocate profits and losses to the shareholders every year so the amounts can be taxed at the individual level, but the LLC is not required to actually distribute the profits.  Accordingly, LLC shareholders pay tax on all income earned by the LLC when it is earned, regardless of whether it was received as a distribution. Accordingly, no provision has been made in these consolidated financial statements for income taxes which may or may not be payable by the shareholders of the Company.

## 14. Subsequent events

On October 6, 2016, CBD exercised its conversion option to exchange its $5,000,000 convertible note for 2,821.5 newly issued Class A Membership Units. Upon receipt of the shares, CBD forgave the interest balance owing from the Company of $49,125.

On December 9, 2016, JBMM Group LLC acquired 178 newly issued Class A Membership Units by paying $935,163 to the Company to reduce the amounts it owed to related parties.

On March 30, 2017, the Company entered into a definitive asset sale agreement to sell substantially all of the medical cannabis assets to DFMMJ Investments, LLC (the "Buyer") for $40,000,000. The sale was conditional on the Buyer completing satisfactory due diligence as well as the transfer of the medical cannabis license issued by the State of Florida. Pending final approval of the license transfer by the State of Florida, the Company entered into a management agreement dated May 12, 2017 that transferred all of the economic benefits associated with the license to the Buyer effective on the closing date.  The State of Florida approved the management agreement while they finalize the license transfer regulations. The Company has already commenced the license transfer process with the State of Florida and is waiting for the final approval to transfer the license to the Buyer.  The 1st stage sale transaction closed on May 23, 2017 and the 2nd stage will be closed once the license transfer has been approved by the State of Florida.

18

# Chestnut Hill Tree Farm LLC

CONDENSED INTERIM CONSOLIDATED FINANCIAL STATEMENTS
FOR THE SIX MONTHS ENDED MARCH 31, 2017

(Unaudited, expressed in United States Dollars, unless otherwise noted)

**Chestnut Tree Hill Farm LLC**
Condensed Interim Consolidated Statements of Financial Position
(Unaudited)

|  | Note | March 31, 2017 | September 30, 2016 |
|---|---|---|---|
| ASSETS |  |  |  |
| Current assets |  |  |  |
| Cash and cash equivalents |  | $ 3,893,347 | $ 2,696,046 |
| Surety bond refundable deposit |  | -- | 3,000,000 |
| Inventory | 4 | 135,214 | -- |
| Biological assets | 5 | 435,821 | 95,756 |
| Prepaid assets |  | 15,272 | -- |
|  |  | 4,479,654 | 5,791,802 |
|  |  |  |  |
| Capital assets | 6 | 1,694,943 | 1,274,693 |
|  |  | $ 6,174,597 | $ 7,066,495 |
|  |  |  |  |
| LIABILITIES |  |  |  |
| Current liabilities |  |  |  |
| Accounts payable and accrued liabilities |  | $ 177,673 | $ 139,286 |
| Current portion of finance lease | 7 | 59,786 | 53,931 |
| Due to related parties | 9 | -- | 907,493 |
|  |  | 237,459 | 1,100,710 |
|  |  |  |  |
| Long-term liabilities |  |  |  |
| Finance lease | 7 | 48,044 | 63,430 |
| Convertible promissory note | 8 | 2,628,202 | 2,547,758 |
| Secured promissory note | 8 | -- | 5,000,000 |
|  |  | 2,676,246 | 7,611,188 |
|  |  |  |  |
| Members' equity |  |  |  |
| Capital Accounts | 10 | 6,229,993 | 300,000 |
| Contributed Surplus | 8 | 162,740 | 162,740 |
| Deficit |  | (3,131,841) | (2,108,143) |
|  |  | 3,260,892 | (1,645,403) |
|  |  | $ 6,174,597 | $ 7,066,495 |

Nature of operations (Note 1)
Commitments (Note 13)
Subsequent event (Note 14)

Approved on behalf of the Company:


*"Rene Gulliver"*
Signed:  Representative


The accompanying notes are an integral part of these condensed interim consolidated financial statements

2

Chestnut Hill Tree Farm LLC
Condensed Interim Consolidated Statements of Income (Loss) and Comprehensive Income (Loss)
(Unaudited)

| | Note | For the three months ended March 31 2017 | For the three months ended March 31 2016 | For the six months ended March 31 2017 | For the period from Nov 23, 2015 to March 31 2016 |
|---|---|---|---|---|---|
| Revenue | | $ 10,694 | $ -- | $ 10,694 | $ -- |
| | | | | | |
| Cost of sales: | | | | | |
| Cost of goods sold | | 112,077 | -- | 146,588 | -- |
| Amortization | 6 | 44,625 | -- | 44,625 | -- |
| Net effect of unrealized changes in fair value of biological assets | 5 | (346,235) | -- | (442,780) | -- |
| | | (189,533) | -- | (251,567) | -- |
| | | | | | |
| Gross profit | | 200,227 | -- | 262,261 | -- |
| | | | | | |
| Expenses: | | | | | |
| General and administrative | 11 | 689,533 | 297,023 | 1,186,088 | 635,818 |
| Selling, marketing and promotion | | 27,980 | 27,475 | 36,364 | 27,475 |
| Amortization | 6 | 4,241 | -- | 4,241 | -- |
| | | 721,754 | 324,498 | 1,226,693 | 663,293 |
| | | | | | |
| Income (loss) from operations | | (521,527) | (324,498) | (964,432) | (663,293) |
| | | | | | |
| Accretion expense | 8 | 103,350 | -- | 103,350 | -- |
| Forgiveness of accrued interest on secured promissory note | 8 | (50,145) | -- | (50,145) | -- |
| Finance expenses (net) | | 4,886 | 20,107 | 6,061 | 20,143 |
| | | | | | |
| Net income (loss) and comprehensive income (loss) | | $ (579,618) | $ (344,605) | $ (1,023,698) | $ (683,436) |
| | | | | | |
| Weighted average number of member units | | 5,700 | 5,700 | 5,700 | 5,700 |
| Loss per unit | | $ (102) | $ (60) | $ (180) | $ (120) |

The accompanying notes are an integral part of these condensed interim consolidated financial statements

## Chestnut Hill Tree Farm LLC
Condensed Interim Consolidated Statements of Changes in Members' Equity
(Unaudited)

| | Capital account (Note 10) | Contributed surplus (Note 8) | Deficit | Total |
|---|---|---|---|---|
| Balance at November 23, 2015 | $ -- | $ -- | $ -- | $ -- |
| Net loss for the period | -- | -- | (683,436) | (683,436) |
| Balance at March 31, 2016 | $ -- | $ -- | $ (683,436) | $(683,436) |

| | Capital account (Note 10) | Contributed surplus (Note 8) | Deficit | Total |
|---|---|---|---|---|
| Balance at September 30, 2016 | $300,000 | $ 162,740 | $ (2,108,143) | $ (1,645,403) |
| Contributed capital on exercised conversion option, CBD | 5,000,000 | -- | -- | 5,000,000 |
| Invested Capital, JBMM | 929,993 | -- | -- | 929,993 |
| Net loss for the period | -- | -- | (1,023,698) | (1,023,698) |
| Balance at March 31, 2017 | $ 6,229,993 | $ 162,740 | $ (3,131,841) | $ 3,260,892 |

The accompanying notes are an integral part of these condensed interim consolidated financial statements

Chestnut Hill Tree Farm LLC
Condensed Interim Consolidated Statements of Cash Flows
(Unaudited)

| | Note | Six months Ended March 31, 2017 | For period ended from November 23, 2015 to March 31, 2016 |
|---|---|---|---|
| **Cash provided by (used in) operating activities:** | | | |
| Net income(loss) for the period | | $ (1,023,698) | $ (683,436) |
| Adjustments for: | | | |
| Change in fair value of biological assets | 5 | (442,780) | -- |
| Depreciation and amortization | 6 | 48,866 | -- |
| Accretion expenses, net of accrued interest | | 80,444 | -- |
| Forgiveness of accrued interest on secured note | 8 | (50,145) | |
| Change in non-cash working capital | | 40,760 | 31,814 |
| | | (1,346,553) | (651,622) |
| | | | |
| **Cash provided by financing activities:** | | | |
| Proceeds into capital account, JBMM | 10 | 929,993 | -- |
| Proceeds from secured note issued | 8 | -- | 4,405,984 |
| Repayment of amounts due to related parties | 9 | (907,493) | -- |
| | | 22,500 | 4,405,984 |
| | | | |
| **Cash used in investing activities:** | | | |
| Investment in capital assets | 6 | (478,646) | (749,989) |
| Refund of collateral bond deposit | 1 | 3,000,000 | -- |
| Issuance of collateral bond deposit | 1 | -- | (3,000,000) |
| | | 2,521,354 | (3,749,989) |
| | | | |
| **Increase in cash and cash equivalents** | | 1,197,301 | 4,373 |
| | | | |
| Cash and cash equivalents, beginning of period | | 2,696,046 | -- |
| | | | |
| **Cash and cash equivalents, end of period** | | $ 3,893,347 | $ 4,373 |
| | | | |
| Supplemental information | | | |
| Interest paid | | $      -- | $      -- |
| Taxes paid | | $      -- | $      -- |
| Exercise of option by CBD and converted secured note into capital | | $ 5,000,000 | $      -- |

The accompanying notes are an integral part of these condensed interim consolidated financial statements

Chestnut Hill Tree Farm LLC
Notes to the Condensed Interim Consolidated Financial Statements
For the six months ended March 31, 2017
(Unaudited)

## 1. Nature of operations

On Sept 16, 2005, Chestnut Hill Investments Inc. merged with Chestnut Hill Investments LLC and the surviving entity was Chestnut Hill Tree Farm LLC (the "Company"). The Company has been operating in the business of legacy nursery or cultivating non-cannabis products. On November 23, 2015, the Company was approved by the State of Florida to be a low-THC Cannabis Dispensing Organization for the Northeast Region in Florida. On June 21, 2016, the Company received the authority to cultivate low-THC cannabis and medical cannabis and has since started planting its first crop. On Dec. 21, 2016, the Company received the authority to process and dispense medical low-THC cannabis and medical cannabis products. CHT Medical LLC was formed on September 1, 2016 and is owned 100% by Chestnut Hill Tree Farm LLC. CHT Medical was formed to house the dispensary side of the medical cannabis operations. The Company has since separated the legacy nursery from the cannabis business.

One of the conditions on receiving the license to be a Dispensing Organization is the requirement that the Company needs to provide a surety bond insurance of $5,000,000. Due to the nature of this new industry, insurance company can only issue such bond insurance provided that the Company would make a refundable deposit of $3,000,000 with the insurance and pay for a premium of $450,000 to cover a period of 24 months. This deposit is non-interest bearing and is refundable upon the Company meeting certain conditions with respect to the license. The Company made a deposit of $3,000,000 with the insurance company during the period and paid for the premium of $450,000 through a finance program. After the Company has commenced it dispensing operation, it was determined that this deposit was no longer required and refunded back to the Company in March of 2017.

These consolidated financial statements were approved by the Company's Representative on June 15, 2017.

## 2. Basis of preparation

(a) Statement of compliance

The policies applied in this condensed interim consolidated financial statements are based on International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and Interpretations of the IFRS Interpretations Committee ("IFRIC") and are prepared in accordance with IAS 34 Interim Financial Reporting.

(b) Basis of measurement

These condensed interim consolidated financial statements have been prepared on the historical cost basis except for certain financial instruments that are measured at fair value and biological assets that are measured at fair value less costs to sell, as detailed in the Company's accounting policies.

(c) Functional currency

The Company's functional currency, as determined by management is United States dollars. These condensed interim consolidated financial statements are presented in United States dollars.

(d) Consolidation

The condensed interim consolidated financial statements of the Company consolidate the accounts of Chestnut Hill Tree Farm LLC and its wholly owned subsidiary, CHT Medical LLC. All intercompany transactions, balances and unrealized gains and losses from intercompany transactions are eliminated on consolidation.

Subsidiaries are those entities which the Company controls by having the power to govern the financial and operating policies.

6

Chestnut Hill Tree Farm LLC
Notes to the Condensed Interim Consolidated Financial Statements
For the six months ended March 31, 2017
(Unaudited)

## 3.    Significant accounting policies

These condensed interim consolidated financial statements have been prepared following the same accounting policies used in the preparation of the audited financial statements of the Company for the period ended September 30, 2016.

*New standards and interpretations issued but not yet adopted*

Several new standards, amendments to standards and interpretations are not yet effective and have not been applied in preparing these condensed interim consolidated financial statements.

IFRS 2 – Share-based Payment, effective January 1, 2018, with early adoption permitted, introduces new requirements for the classification and measurement of share-based payment transactions.

IFRS 9 - Financial Instruments, effective for annual periods beginning on or after January 1, 2018, with early adoption permitted, introduces new requirements for the classification and measurement of financial instruments.

IFRS 15 - Revenue from Contracts with Customers, effective for annual periods beginning on or after January 1, 2018, with early adoption permitted, specifies how and when to recognize revenue and enhances relevant disclosures to be applied to all contracts with customers.

IFRS 16 – Leases, in January 2016, the IASB issued IFRS 16, which specifies how an IFRS reporter will recognise, measure, present and disclose leases. The standard provides a single lessee accounting model, requiring lessees to recognise assets and liabilities for all leases unless the lease term is 12 months or less or the underlying asset has a low value. Lessors continue to classify leases as operating or finance, with IFRS 16's approach to lessor accounting substantially unchanged from its predecessor, IAS 17. IFRS 16 is effective for annual reporting periods beginning on or after January 1, 2019, and a lessee shall either apply IFRS 16 with full retrospective effect or alternatively not restate comparative information but recognise the cumulative effect of initially applying IFRS 16 as an adjustment to opening equity at the date of initial application. Early adoption is permitted if IFRS 15 has also been adopted. The Company is assessing the potential impact of IFRS 16.

IAS 7 – Statement of Cash Flow, effective for annual periods beginning on or after January 1, 2017, with early adoption permitted, amended to improve information provided to users of financial statements about an entity's financial activities by making the following changes:
- The following changes in liabilities arising from financing activities are disclosed (to the extent necessary): (i) changes from financing cash flows; (ii) changes arising from obtaining or losing control of subsidiaries or other businesses; (iii) the effect of changes in foreign exchange rates; (iv) changes in fair values; and (v) other changes;
- The International Accounting Standards Board ("IASB") defines liabilities arising from financing activities as liabilities "for which cash flows were, or future cash flows will be, classified in the statement of cash flows as cash flows from financing activities". It also stresses that the new disclosure requirements also relate to changes in financial assets if they meet the same definition; and
- Changes in liabilities arising from financing activities must be disclosed separately from changes in other assets and liabilities.

Chestnut Hill Tree Farm LLC
Notes to the Condensed Interim Consolidated Financial Statements
For the six months ended March 31, 2017
(Unaudited)

IAS 12 – Income Taxes, effective for annual periods beginning on or after January 1, 2017, with early adoption permitted, amended to clarify the following aspects:

- Unrealized losses on debt instruments measured at fair value and measured at cost for tax purposes give rise to a deductible temporary difference regardless of whether the debt instrument's holder expects to recover the carrying amount of the debt instrument by sale or by use;
- The carrying amount of an asset does not limit the estimation of probable future taxable profits;
- Estimates for future taxable profits exclude tax deductions resulting from the reversal of deductible temporary differences; and
- An entity assesses a deferred tax asset in combination with other deferred tax assets. Where tax law restricts the utilisation of tax losses, an entity would assess a deferred tax asset in combination with other deferred tax assets of the same type.

IAS 16 - Property Plant and Equipment and IAS 41 - Agriculture - The amendments bring bearer plants, which are used solely to grow produce, into the scope of IAS 16 so that they are accounted for in the same way as property, plant and equipment. The amendments were effective for annual periods beginning on or after January 1, 2016, with earlier application being permitted.  These amendments did not require any significant changes to the Company`s accounting practices

The Company is assessing the impact of these new and revised standards.

4.    Inventory

Inventory is comprised of:

|  | March 31, 2017 | September 30, 2016 |
|---|---|---|
| Harvested cannabis | $  134,294 | $  -- |
| Cannabis oil, capsules | 920 | -- |
| Packaging and supplies | -- | -- |
|  | $  135,214 | $  -- |

Cost of inventory is recognized as expense and included in cost of sales. The Company holds 10,635  grams of harvested cannabis (2016 – nil gram), 1,780 grams of pure bulk cannabis oil (2016 – nil gram), and 1,560 capsules of cannabis oils or 23.4 grams of equivalent cannabis oil (2016 – nil capsules) at March 31, 2017.

5.    Biological assets

Biological assets are comprised of:

|  | Amount |
|---|---|
| Balance as at September 30, 2016 | $  95,756 |
| Costs incurred until harvest | -- |
| Net effect of unrealized changes in fair value of biological assets | 442,780 |
| Transferred to inventory upon harvest | (102,715) |
| Transferred to capital assets | -- |
| Balance as at March 31, 2017 | $  435,821 |

8

Chestnut Hill Tree Farm LLC
Notes to the Condensed Interim Consolidated Financial Statements
For the six months ended March 31, 2017
(Unaudited)

The Company values medical cannabis plants at cost from the date of initial clipping from mother plants until the end of the eighth week of its growing cycle.  Measurement of the biological asset at fair value less costs to sell and costs to complete begins at the eighth week until harvest. The Company has determined the fair value less costs to sell to be $0.06 per active milligram, upon harvest.

The net effect of the fair value less cost to sell over and above historical cost was an increase in non-cash value of biological assets of $340,065 during the period ended March 31, 2017 (September 30, 2016 - $95,756). In determining the fair value of biological assets, management is required to make several estimates, including: the expected cost required to grow the cannabis up to the point of harvest; harvesting costs; selling costs; sales price; and, expected yields for the cannabis plant. These estimates are subject to volatility in market prices and several uncontrollable factors, which could significantly affect the fair value of biological assets in future periods.

The fair value of medical cannabis plants is considered to be Level 3 in the fair value hierarchy and the significant assumptions used in determining the fair value of medical cannabis plants are as follows:
- yield by plant; and,
- percentage of costs incurred for each stage of plant growth.
- fair value less costs to sell of the harvested product

6. Capital assets

|  | Greenhouse | Vehicle | Furniture & equipment | Software | Construction in process | Total capital assets |
|---|---|---|---|---|---|---|
| **Cost** | | | | | | |
| At March 31, 2016 | $ -- | $ -- | $ -- | $ 3,000 | $ 746,989 | **$ 749,989** |
| Additions | -- | -- | 237,073 | 3,183 | 307,350 | **547,606** |
| Transfers | -- | -- | -- | -- | -- | **--** |
| Disposals | -- | -- | -- | -- | -- | **--** |
| At September 30, 2016 | -- | -- | 237,073 | 6,183 | 1,054,339 | **1,297,595** |
| Additions | -- | 23,000 | 199,705 | -- | 246,411 | **469,116** |
| Transfers | 1,300,750 | -- | -- | -- | (1,300,750) | **--** |
| Disposals | -- | -- | -- | -- | -- | **--** |
| **At March 31, 2017** | **$ 1,300,750** | **$ 23,000** | **$ 436,778** | **$ 6,183** | **$ --** | **$ 1,766,711** |

|  | Greenhouse | Vehicle | Furniture & equipment | Software | Construction in process | Total capital assets |
|---|---|---|---|---|---|---|
| **Accumulated amortization** | | | | | | |
| At March 31, 2016 | $ -- | $ -- | $ -- | $ -- | $ -- | **$ --** |
| Amortization | -- | -- | 19,810 | 3,092 | -- | **22,902** |
| Disposals | -- | -- | -- | -- | -- | **--** |
| At September 30, 2016 | -- | -- | 19,810 | 3,092 | -- | **22,902** |
| Amortization | 10,840 | 1,150 | 33,785 | 3,091 | -- | **48,866** |
| Transfers | -- | -- | -- | -- | -- | **--** |
| Disposals | -- | -- | -- | -- | -- | **--** |
| **At March 31, 2017** | **$ 10,840** | **$ 1,150** | **$ 53,595** | **$ 6,183** | **$ --** | **$ 71,768** |

|  | Greenhouse | Vehicle | Furniture & equipment | Software | Construction in process | Total capital assets |
|---|---|---|---|---|---|---|
| **Net book value** | | | | | | |
| At March 31, 2016 | $ -- | $ -- | $ -- | $ 3,000 | $ 746,989 | $ 749,989 |
| At September 31, 2016 | -- | -- | 217,263 | 3,091 | 1,054,339 | 1,274,693 |
| **At March 31, 2017** | **$ 1,289,910** | **$ 21,850** | **$ 383,183** | **$ --** | **$ --** | **$ 1,694,943** |

9

Chestnut Hill Tree Farm LLC
Notes to the Condensed Interim Consolidated Financial Statements
For the six months ended March 31, 2017
(Unaudited)

During the reporting period, the Company acquired leased assets of $ 157,686. The Company leases production equipment under a finance lease agreement, where the lease provides the Company the option to purchase the equipment at a price below its fair value at the end of the contract. The leased equipment secures lease obligations. As at March 31, 2017, the net carrying amount of leased equipment was $128,698.

7.  Finance lease

Finance lease liabilities are payable as follows:

|  | Future Minimum Lease Payments | Interest | Present Value of minimum lease payments |
|---|---|---|---|
| Less than one year | $ 66,243 | $ 6,457 | $ 59,786 |
| Between one and five years | 49,682 | 1,638 | 48,044 |
| More than five years | -- | -- | -- |
|  | $ 115,925 | $ 8,095 | $ 107,830 |

In August 2016, the Company entered into a finance lease agreement related to a production equipment transaction totalling $156,486, of which a down payment was made totalling $39,125. The finance lease is repayable over a 2-year period expiring October 2018.

8.  Convertible note and secured promissory note

|  | CBD Equity LLC | HSTM Equity, LLC | Total |
|---|---|---|---|
| Balance, November 23, 2015 | $ -- | $ -- | $ -- |
| Issued | 5,000,000 | 2,700,000 | 7,700,000 |
| Equity portion | -- | (162,740) | (162,740) |
| Accretion | -- | 13,532 | 13,532 |
| Accrued Interest, included as accrued liability | 49,125 | (3,034) | 46,091 |
| Balance, September 30, 2016 | 5,049,125 | 2,547,758 | 7,596,883 |
| Issued | -- | -- | -- |
| Equity portion | -- | -- | -- |
| Accretion | -- | 103,350 | 103,350 |
| Accrued Interest, included as accrued liability | 1,020 | (22,906) | (21,886) |
| Conversion option exercised | (5,000,000) | -- | (5,000,000) |
| Interest forgiven | (50,145) | -- | (50,145) |
| Balance as at March 31, 2017 | $ -- | $ 2,628,202 | $ 2,628,202 |

In July 2015, the Company issued a secured promissory note for the aggregate gross proceeds of $5,000,000 to CBD Equity LLC ("CBD"), secured by a general security agreement against the Company's tangible assets. The note had a term of four years at an interest rate based on the US 5-year Bond Yield. Prior to the maturity date, no payments of principal shall be required and interest payments shall be paid in arrears during the term of the note on a monthly basis. The Company also entered into an option agreement ("Option Agreement") with CBD whereby CBD was granted the option to purchase 50% of the outstanding issued Class A Membership Units issued to Robert Wallace and Deborah Gaw for $5,000,000, where the outstanding principal amount due on the note will be classified as new contributed capital on the books of the company as of the date of exercising the option. In consideration for the option granted, CBD agreed to pay the

10

Chestnut Hill Tree Farm LLC
Notes to the Condensed Interim Consolidated Financial Statements
For the six months ended March 31, 2017
(Unaudited)

Company a $300,000 option fee upon execution of the Option Agreement. In lieu of paying the option fee, CBD agree to fund certain organization costs on behalf of the company. As a result, the option fee receivable was written off in the period. On October 6, 2016, CBD exercised its option and purchased and received 2,821.5 membership units. The accrued interest on the note was waived at the time of exercise of the option.

In September 2016, the Company issued a secured convertible note for the aggregate gross proceeds of $2,700,000 to HSTM Equity, LLC ("HSTM"). The principal and accrued interest will be due in payable by the Company at any time on or after the first anniversary of the date of issuance, with Interest accruing at a rate of 1.7% compounded monthly. No payments of principal and accrued interest shall be paid without the consent of HSTM. Upon issuance of the Company's license related to the production and sale of legalized marijuana products in the State of Florida, HSTM was granted the option to purchase 513 newly issued Class A Membership Units for $2,700,000, where the outstanding principal amount due on the note will be classified as new contributed capital on the books of the company as of the date of conversion.

The liability component of the convertible debentures were valued using Company-specific interest rates assuming no conversion features existed. The debt component is accreted to its fair value over the term to maturity as a non-cash interest charge and the equity component is presented in convertible notes reserve as a separate component of members' equity.

9.    Related party transactions

In addition to the debt proceeds received during the period, the Company funded operations through the support of related parties. The balance owing to related parties as at March 31, 2017 was $ nil (September 30, 2016 - $907,493). These parties are related as they are corporations that are controlled by certain officers and directors of the Company. The amounts are non-interest bearing and unsecured with no fixed repayment date or terms.

10.  Capital Accounts

|  | Share Class | Membership Units | Capital Contribution |
|---|---|---|---|
| Chestnut Hill Holdings LLC | Class A | 2,732.5 | $ -- |
| 420 Emerald Coast, LLC | Class A | 57 | 300,000 |
| CBD Equity, LLC | Class A | 2,732.5 | 5,000,000 |
| JBMM | Class A | 178 | 929,993 |
| Balance as at March 31, 2017 | | 5,700 | $ 6,229,993 |

a)   In August 2005, the Company issued 500 Class A Membership units to Robert Wallace

b)   In August 2005, the Company issued 500 Class A Membership units to Deborah Gaw

c)   In August 2016, Deborah Gaw and Robert Wallace entered into a Contribution Agreement whereas the original members contributed all their respective shares to Chestnut Hill Holdings, LLC ("Holdings"), a Florida limited liability company in exchange for all the membership units of Holdings. At that time, the number of membership units issued was increased to 5,700.

11

Chestnut Hill Tree Farm LLC
Notes to the Condensed Interim Consolidated Financial Statements
For the six months ended March 31, 2017
(Unaudited)

d) In September 2016, the Company issued 57 Class A Membership Units to 420 Emerald Coast, LLC ("Emerald") in exchange for cash in the amount of $300,000. The Company as a result has cancelled the original 5,700 Class A Membership Units issued to Holdings and reissued 5,643 Units to Holdings.

e) In October 2016, CBD exercised its convertible note in exchange for 2,732.5 Class A Membership Units. The Company as a result has cancelled the original 5,643 Class A Membership Units issued to Holdings and reissued 2,732.5 Units to Holdings.

f) In December 2016, JBMM Group LLC ("JBMM") exchanged its $929,993 balance owing from the Company in exchange for 178 newly issued Class A Membership units.

## 11. General and administrative expenses

|  | For the six months period ended March 31, 2017 | For the period ended from November 23, 2016 to March 31, 2016 |
|---|---|---|
| Consulting fees | $ 550,903 | $ 394,935 |
| Office and general | 245,753 | 23,844 |
| Professional fees | 157,401 | 114,107 |
| Salaries and wages | 78,721 | -- |
| Insurance | 153,310 | 102,932 |
|  | $ 1,186,088 | $ 635,818 |

## 12. Financial risk management and financial instruments

### Financial instruments

The Company's financial instruments consists of cash and cash equivalents, surety bond refundable deposit, biological assets and accounts payable and accrued liabilities, convertible promissory note payable, secured promissory note payable, due to related parties and finance lease.

The carrying values of accounts payable and accrued liabilities and due to related parties approximate their fair values due to their short periods to maturity.

### Fair value hierarchy

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. Cash and cash equivalents are Level 1. The hierarchy is summarized as follows:

Level 1    quoted prices (unadjusted) in active markets for identical assets and liabilities
Level 2    inputs that are observable for the asset or liability, either directly (prices) or indirectly (derived from prices) from observable market data
Level 3    inputs for assets and liabilities not based upon observable market data

|  | Level 1 | Level 2 | Level 3 | March 31, 2017 |
|---|---|---|---|---|
| **Financial assets at FVTPL** |  |  |  |  |
| Cash and cash equivalents | $ 3,893,347 | $ -- | $ -- | $ 3,893,347 |
| Biological assets | -- | -- | 435,821 | 435,821 |
|  | $ 3,893,347 | $ -- | $ 435,821 | $ 4,329,168 |

12

Chestnut Hill Tree Farm LLC
Notes to the Condensed Interim Consolidated Financial Statements
For the six months ended March 31, 2017
(Unaudited)

| | | | |
|---|---|---|---|
| **Financial liabilities at amortized cost** | | | |
| Accounts payable and accrued liabilities | 177,673 | $ -- | $ -- | $ 177,673 |
| Current portion of finance lease | 59,786 | -- | -- | 59,786 |
| Finance lease | 48,044 | -- | -- | 48,044 |
| Convertible note | 2,628,202 | -- | -- | 2,628,202 |
| | $ 2,913,705 | $ -- | $ -- | $ 2,913,705 |

| | Level 1 | Level 2 | Level 3 | September 30, 2016 |
|---|---|---|---|---|
| **Financial assets at FVTPL** | | | | |
| Cash and cash equivalents | $2,696,046 | $ -- | $ -- | $ 2,696,046 |
| Refundable deposit | 3,000,000 | -- | -- | 3,000,000 |
| Biological assets | -- | -- | 95,756 | 95,756 |
| | $ 5,696,046 | $ -- | $ 95,756 | $ 5,791,802 |
| **Financial liabilities at amortized cost** | | | | |
| Accounts payable and accrued liabilities | $ 139,286 | $ -- | $ -- | $ 139,286 |
| Current portion of finance lease | 53,931 | -- | -- | 53,931 |
| Finance lease | 63,430 | -- | -- | 63,430 |
| Secured promissory note | 5,000,000 | -- | -- | 5,000,000 |
| Convertible notes | 2,547,758 | -- | -- | 2,547,758 |
| | $ 7,801,405 | $ -- | $ -- | $ 7,801,405 |

**Financial risk management**

The Company has exposure to the following risks from its use of financial instruments:  credit risk; liquidity; and, interest rate price risk.

(a)    Credit risk

The maximum credit exposure at March 31, 2017 is the carrying amount of cash and cash equivalents, accounts receivable and other receivables. The Company does not have significant credit risk with respect to customers. All cash and cash equivalents are placed with locally established financial institutions.

(b)    Liquidity risk

As at March 31, 2017, the Company's financial liabilities consist of accounts payable and accrued liabilities and a finance lease which have contractual maturity dates within one year and promissory notes payable, which have contractual maturities over the next four years. Amounts due to related parties have no fixed repayment terms. The Company manages its liquidity risk by reviewing its capital requirements on an ongoing basis. Based on the Company's working capital position at March 31, 2017, management regards liquidity risk to be low.

(c)    Capital management

The Company's objectives when managing its capital are to safeguard its ability to continue as a going concern, to meet its capital expenditures for its continued operations, and to maintain a flexible capital structure which optimizes the cost of capital within a framework of acceptable risk. The Company manages its capital structure and adjusts it in light of changes in economic conditions and the risk characteristics of the underlying assets.  To maintain or adjust its capital structure, the Company may issue new shares, issue new debt, or acquire or dispose of assets. The Company is not subject to externally imposed capital requirements.

Chestnut Hill Tree Farm LLC
Notes to the Condensed Interim Consolidated Financial Statements
For the six months ended March 31, 2017
(Unaudited)

Management reviews its capital management approach on an ongoing basis and believes that this approach, given the relative size of the Company, is reasonable. There have been no changes to the Company's capital management approach in the period. The Company considers its cash and cash equivalents and marketable securities as capital.

## 13.  Commitments

The Company has a lease commitment until November 2025 related to land rent at $2,500 per month. Minimum payments payable over the next five years are as follows:

|  | Periods ending March 31, |
|---|---|
| 2018 | $  30,000 |
| 2019 | 30,000 |
| 2020 | 30,000 |
| 2021 | 30,000 |
| 2022 | 30,000 |
|  | $  150,000 |

## 14.  Subsequent event

On March 30, 2017, the Company entered into a definitive asset sale agreement to sell substantially all of the medical cannabis assets to DFMMJ Investments, LLC (the "Buyer") for $40,000,000. The sale was conditional on the Buyer completing satisfactory due diligence as well as the transfer of the medical cannabis license issued by the State of Florida. Pending final approval of the license transfer by the State of Florida, the Company entered into a management agreement dated May 12, 2017 that transferred all of the economic benefits associated with the license to the Buyer effective on the closing date.  The State of Florida approved the management agreement while they finalize the license transfer regulations. The Company has already commenced the license transfer process with the State of Florida and is waiting for the final approval to transfer the license to the Buyer.  The 1st stage sale transaction closed on May 23, 2017 and the 2nd stage will be closed once the license transfer has been approved by the State of Florida.

14

# Securecom Mobile Inc.

UNAUDITED PRO FORMA CONSOLIDATED STATEMENT OF
FINANCIAL POSITION AS AT MARCH 31, 2017

(Unaudited, expressed in Canadian Dollars, unless otherwise noted)

# Securecom Mobile Inc.

Unaudited pro forma consolidated statement of financial position as at March 31, 2017
(Expressed in Canadian Dollars)

| | Securecom Mobile Inc. | DFMMJ Investments Ltd. | Note 5 | Adjustments | Total |
|---|---|---|---|---|---|
| | $ | $ | | $ | $ |
| **ASSETS** | | | | | |
| *Current assets* | | | | | |
| Cash | 2,644,171 | 26,365,123 | (a) | 5,000,000 | |
| | | | (b) | 1 | |
| | | | (c) | (4,453,160) | |
| | | | (g) | 34,150,000 | |
| | | | (g) | (2,000,000) | |
| | | | (i) | (300,000) | |
| | | | (j) | (49,715,460) | 11,690,675 |
| Amounts receivable | 23,099 | -- | | | 23,099 |
| Deposit in trust | -- | 4,453,160 | (j) | (4,453,160) | -- |
| Due from DFMMJ Investments Ltd. | -- | -- | (c) | 4,453,160 | |
| | | | (h) | (4,453,160) | -- |
| Prepaid expenses | 8,995 | -- | | | 8,995 |
| Total current assets | 2,676,265 | 30,818,283 | | (21,771,779) | 11,722,769 |
| | | | | | |
| Property and equipment | 6,587 | -- | | | 6,587 |
| Unallocated purchase price - Florida | -- | -- | (j) | 54,168,620 | 54,168,620 |
| Intellectual property | 1 | 5,000,000 | (b) | (1) | 5,000,000 |
| | 2,682,853 | 35,818,283 | | 32,396,840 | 70,897,976 |
| | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| *Current liabilities* | | | | | |
| Due to Securecom Mobile Inc. | -- | 4,453,160 | (h) | (4,453,160) | -- |
| Accounts payable | 140,580 | 719,324 | | | 859,904 |
| Total current liabilities | 140,580 | 5,172,484 | | (4,453,160) | 859,904 |
| | | | | | |
| Convertible debentures | 2,295,781 | -- | (a) | (2,295,781) | -- |
| Total liabilities | 2,436,361 | 5,172,484 | | (6,748,941) | 859,904 |
| | | | | | |
| *Shareholders' equity* | | | | | |
| Share capital | 3,398,558 | 30,167,601 | (a) | 2,783,695 | |
| | | | (a) | 5,000,000 | |
| | | | (d) | (11,182,253) | |
| | | | (g) | 34,150,000 | |
| | | | (g) | (2,000,000) | |
| | | | (g) | (763,526) | |
| | | | (h) | 27,049,245 | 88,603,320 |
| Stock option reserve | 1,617,647 | -- | (e) | (1,617,647) | |
| | | | (h) | 15,034 | 15,034 |
| Warrant reserve | -- | -- | (g) | 763,526 | 763,526 |
| Equity component of convertible debentures | 487,914 | -- | (a) | (487,914) | -- |
| Retained Earnings (Deficit) | (5,257,627) | 478,198 | (f) | 5,257,627 | |
| | | | (h) | (19,522,006) | |
| | | | (i) | (300,000) | (19,343,808) |
| Total shareholders' equity | 246,492 | 30,645,799 | | 39,145,781 | 70,038,072 |
| | 2,682,853 | 35,818,283 | | 32,396,840 | 70,897,976 |

*See accompanying notes to the unaudited pro forma financial statements*

# Securecom Mobile Inc.
Notes to Unaudited Pro Forma Consolidated Financial Statement
March 31, 2017

### 1.    Basis of presentation

The unaudited pro forma consolidated statement of financial position of Securecom Mobile Inc. (the "Company") as at March 31, 2017, (the "Pro Forma Financial Statements"), has been prepared by management based on historical financial statements prepared in accordance with International Financial Reporting Standards ("IFRS"), for illustrative purposes only, after giving effect to the proposed transaction between the Company and DFMMJ Investments Ltd. ("DFMMJ") on the basis of the assumptions and adjustments described in notes 2, 3, 4, and 5.

The unaudited pro forma consolidated statement of financial position has been derived from:
   a.    The unaudited statement of financial position of the Company as at March 31, 2017;
   b.    The audited statement of financial position of DFMMJ as at April 30, 2017; and,
   c.    Unless otherwise noted, the unaudited pro forma consolidated statements of financial position and its accompanying notes are presented in Canadian dollars.

It is management's opinion that the unaudited Pro Forma Financial Statements, include all adjustments necessary for the fair presentation, in all material respects, of the transactions described in notes 3 and 4 in accordance with IFRS, applied on a basis consistent with DFMMJ's accounting policies, except as otherwise noted.  The unaudited Pro Forma Financial Statements are not necessarily indicative of the financial position that would have resulted if the combination had actually occurred on March 31, 2017.

The unaudited Pro Forma Financial Statements should be read in conjunction with the historical financial statements and notes thereto of the Company and DFMMJ, included elsewhere in this Information Circular.

### 2.    Significant accounting policies

The unaudited Pro Forma Financial Statements have been compiled using the significant accounting policies, as set out in the audited consolidated financial statements of DFMMJ as at and for the period ended March 31, 2017. Management has determined that no material pro forma adjustments are necessary to conform the Company's accounting policies to the accounting policies used by DFMMJ in the preparation of its audited financial statements.

### 3.    The transaction

   a.    The Company and DFMMJ have entered into an agreement pursuant to which the Company will acquire all the issued and outstanding shares of DFMMJ in consideration for securities of the Company.
   b.    The Company will consolidate its shares on a 3 pre-consolidated shares for 1 post-consolidation share basis as the final step of the transaction.
   c.    DFMMJ completed a private placement raising gross proceeds of $60,000,000 through the sale of 288,461,538 subscription receipts at $0.208 per subscription receipt, on a pre-consolidation basis.  Each subscription receipt will be converted into one common share upon satisfaction of various conditions as part of the transaction.
   d.    DFMMJ will complete the acquisition of the license issued by the Florida Department of Health from Chestnut Hill Tree Farm, LLC, as well as related ancillary assets (the "Chestnut Assets") for USD$40,000,000.
   e.    DFMMJ and a subsidiary of the Company will amalgamate and continue as one corporation.  Former DFMMJ securityholders shall receive replacement common shares of the Company in exchange for common shares of DFMMJ.
   f.    Upon completion of the transaction, the former shareholders of DFMMJ will become the controlling shareholders of the Company.  This type of share exchange, referred to as a reverse acquisition ("RTO"), deems DFMMJ to be the acquirer for accounting purposes.
   g.    The acquisition is subject, but not limited, to regulatory and shareholder approvals.

### 4.    Accounting for RTO

The transaction has been accounted for in accordance with IFRS 2, which results in the following:

   ●    DFMMJ is deemed to be the acquirer and the Company is deemed to be the acquiree for accounting purposes;
   ●    Accordingly, DFMMJ's balances are accounted for at cost and the Company is accounted for at fair value;
   ●    Since the Company's operations do not constitute a business, the transaction has been accounted for as a reverse acquisition that is not a business combination;

# Securecom Mobile Inc.
Notes to Unaudited Pro Forma Consolidated Financial Statement
March 31, 2017

- Therefore, the Company's share capital, deficit and contributed surplus will be eliminated, the consideration transferred by the Company will be allocated to share capital and transaction costs will be expensed; and,
- The capital structure recognized in the consolidated financial statements will be that of the Company, but the dollar amount of the issued share capital in the unaudited pro forma consolidated statement of financial position immediately prior to acquisition will be that of DFMMJ, plus the value of shares issued by the Company to acquire DFMMJ, plus any shares issued by the Company prior to or as part of the transaction.

## 5.    Pro forma assumptions and adjustments

The unaudited pro forma consolidated statement of financial position reflects the following assumptions and adjustments:

a.    A reduction in convertible debentures of $2,295,781 and equity component of convertible debentures of $487,914, and an increase in share capital of $2,783,695 representing the conversion of the convertible debentures.  As the convertible debentures converted into units, all the warrants issued related to the convertible debentures were also exercised resulting in an increase in cash of $5,000,000 and an increase in share capital of $5,000,000.

b.    An increase in cash of $1 and a reduction of intellectual property of $1 relating to the disposition of the Company's security technology.

c.    An increase in due from DFMMJ of $4,453,160 (US$3,260,000) and a decrease in cash of $4,453,160 representing the advance from the Company to DFMMJ.

d.    A reduction in share capital of $11,182,253 to eliminate the Company's historical share capital, which includes the conversion of convertible debentures and exercise of warrants in note 5(a).

e.    An adjustment of $1,617,647 to eliminate the Company's historical stock option reserve.

f.    An adjustment of $5,257,627 to eliminate the Company's deficit.

g.    An increase in cash and a corresponding increase in share capital of $34,150,000, less transaction costs of approximately $2,000,000, representing the issuance of 164,182,679 subscription receipts at $0.208 per subscription receipt. As part of the issuance of the subscription receipts, 8,985,577 broker warrants were issued resulting in an increase in warrants, and a corresponding decrease in share capital of $763,526.  The broker warrants were valued using the Black-Scholes Option Pricing Model with a share price of $0.208, volatility of 75%, risk free rate of 0.74%, expected life of two years and a dividend yield of 0%.

h.    Since the Company's operations do not constitute a business, the consideration transferred by the Company will be allocated to share capital and transaction costs will be expensed.  An increase in share capital of $27,049,245 and an increase in deficit of $19,623,792 has been allocated based on the following:

| Consideration transferred: | |
| --- | --- |
| 130,044,447 shares at a price of $0.208 per share | $ 27,049,245 |
| 770,000 stock options (1) | 15,034 |
| Total | $ 27,064,279 |

| | |
| --- | --- |
| Cash and cash equivalents (2) | $   3,191,011 |
| Amounts receivable | 23,099 |
| Prepaid expenses | 8,995 |
| Due from DFMMJ (2) | 4,453,160 |
| Property and equipment | 6,587 |
| Intellectual property | 1 |
| Accounts payable | (140,580) |
| Transaction costs | 19,522,006 |
| | $ 27,064,279 |

(1)    Valued using the Black-Scholes Option Pricing Model using volatility of 75%, strike price of $0.40 to $0.95, risk free rate of 0.74%, expected life of 0.42-1.00 years and dividend yield of 0%.

(2)    Per note 5(c), the Company advanced $4,453,160 to DFMMJ prior to the transaction, which eliminated on consolidation.

**Securecom Mobile Inc.**
Notes to Unaudited Pro Forma Consolidated Financial Statement
March 31, 2017

    i.    A decrease in cash and a corresponding increase in deficit in the amount of $300,000 representing estimated costs incurred related to the transaction.

    j.    A decrease in cash of $49,715,460, a decrease in deposits in trust of $4,453,160 and an increase in investment in Unallocated Purchase Price - Florida of $54,168,620 (USD$ 40,000,000) paid to acquire the Chestnut Assets.

### 6.  Pro forma convertible debentures

|  | Amount |
|---|---|
| The Company's convertible debentures – March 31, 2017 | 2,295,781 |
| Conversion of the Company's convertible debentures – (note 5(a)) | (2,295,781) |
| Pro forma convertible debentures – March 31, 2017 | -- |

### 7.  Pro forma share capital

|  | Number | Amount |
|---|---|---|
| The Company's common shares outstanding – March 31, 2017 | 12,362,627 | 3,398,558 |
| Common shares issued on convertible debt conversion – (note 5(a)) | 55,181,820 | 2,783,695 |
| Common shares issued on warrant conversion – (note 5(a)) | 62,500,000 | 5,000,000 |
| Reverse takeover adjustment – the Company's common shares (note 5 (d)) | (130,044,447) | (11,182,253) |
| Consideration transferred to shareholders of the Company (note 5 (h)) | 130,044,447 | 27,049,245 |
| DFMMJ shares issued and outstanding | 557,836,539 | 30,167,601 |
| Issuance of shares under subscription receipts, net of costs (note 5(g)) | 164,182,679 | 32,150,000 |
| Allocation of consideration to broker warrants (note 5(k)) | -- | (763,526) |
| 1 for 3 consolidation of the Company's shares | (568,042,444) | -- |
| Pro forma share capital – March 31, 2017 | 284,021,221 | 88,603,320 |

### 8.  Pro forma stock options reserve

|  | Amount |
|---|---|
| The Company's stock options reserve – March 31, 2017 | 1,617,647 |
| Elimination of the Company's stock options reserve – (note 5(e)) | (1,617,647) |
| Establish the Company's surviving stock options reserve – (note 5(h)) | 15,034 |
| Pro forma stock options reserve – March 31, 2017 | 15,034 |

The stock option details of the Company are as follows:

|  | Expiry date | Number of options | Weighted average price |
|---|---|---|---|
| Stock options | February 29, 2018 | 20,000 | $ 0.95 |
| Stock options | February 16, 2022 | 750,000 | $ 0.40 |
| Balance at March 31, 2017 |  | 770,000 | $ 0.41 |
| Balance after 1 for 3 consolidation |  | 256,667 | $ 1.23 |

# Securecom Mobile Inc.
Notes to Unaudited Pro Forma Consolidated Financial Statement
March 31, 2017

## 9.    Pro forma warrants

| | Amount |
|---|---|
| Warrants – March 31, 2017 | -- |
| Issuance of broker warrants [1] | $ 763,526 |
| Warrants – March 31, 2017 | $ 763,526 |

(1) Valued using the Black-Scholes Option Pricing Model using volatility of 75%, strike price of $0.208, risk free rate of 0.74%, expected life of 2 years and dividend yield of 0%.

The warrant details of the Company are as follows:

| Type of warrant | Expiry date | Number of warrants | Weighted average price | Amount |
|---|---|---|---|---|
| Broker warrant | April 27, 2019 | 8,985,577 | $ 0.208 | $ 763,526 |
| Balance at March 31, 2017 | | 8,985,577 | $ 0.208 | $ 763,526 |
| Balance after 1 for 3 consolidation | | 2,995,192 | $ 0.624 | $ 763,526 |

## 10.    Pro forma equity component of convertible debentures

| | Amount |
|---|---|
| The Company's equity component of convertible debentures – Mar. 31, 2017 | 487,914 |
| Conversion of the Company's convertible debentures – note 5 (a)) | (487,914) |
| Pro forma share capital – March 31, 2017 | -- |

## 11.    Pro forma deficit

| | Amount |
|---|---|
| The Company's deficit – March 31, 2017 | 5,257,627 |
| DFMMJ's retained earnings | (478,198) |
| Elimination of the Company's deficit – (note 5(f)) | (5,257,627) |
| Additional transaction costs – (note 5 (g)) | 19,522,006 |
| Additional transaction costs – (note 5(k)) | 300,000 |
| Pro forma deficit – March 31, 2017 | 19,343,808 |

## 12.    Pro forma income taxes

The Company expects to have an effective pro forma income tax rate of 26%.

**SCHEDULE "G"**
**ADVANCE NOTICE BY-LAW**
**Article 1**

**NOMINATION OF DIRECTORS**

**Section 1.1**    Only persons who are nominated in accordance with the procedures set out in this Advance Notice By-Law (the "**By-Law**") shall be eligible for election as directors to the board of directors (the "**Board**") of SecureCom Mobile Inc. (the "**Company**"). Nominations of persons for election to the Board may only be made at an annual meeting of shareholders, or at a special meeting of shareholders called for any purpose which includes the election of directors to the Board, as follows:

(a)    by or at the direction of the Board or an authorized officer of the Company, including pursuant to a notice of meeting;

(b)    by or at the direction or request of one or more shareholders pursuant to a proposal made in accordance with the provisions of the Business Corporations Act (British Columbia) (the "**Act**") or a requisition of shareholders made in accordance with the provisions of the Act; or

(c)    by any person entitled to vote at such meeting (a "**Nominating Shareholder**"), who: (A) is, at the close of business on the date of giving notice provided for in Section 1.3 below and on the record date for notice of such meeting, either entered in the securities register of the Company as a holder of one or more shares carrying the right to vote at such meeting or who beneficially owns shares that are entitled to be voted at such meeting; and (B) has given timely notice in proper written form as set forth in this By-Law.

**Section 1.2**    For the avoidance of doubt, the foregoing Section 1.1 shall be the exclusive means for any person to bring nominations for election to the Board before any annual or special meeting of shareholders of the Company, provided, however, that nothing in this By-Law shall be deemed to preclude discussion by a shareholder (as distinct from the nomination for election to the Board) at a meeting of shareholders of any matter that is properly brought before such meeting pursuant to the provisions of the Act.

**Section 1.3**    For a nomination made by a Nominating Shareholder to be accepted as timely notice (a "**Timely Notice**"), the Nominating Shareholder's notice must be received by the corporate secretary of the Company at the principal executive offices of the Company:

(a)    in the case of an annual meeting of shareholders, not later than the close of business on the 30th day and not earlier than the opening of business on the 65th day before the date of the meeting: provided, however, if the first public announcement made by the Company of the date of the annual meeting is less than 50 days prior to the meeting date, not later than the close of business on the 10th day following the day on which the first public announcement of the date of such annual meeting is made by the Company; and

(b)    in the case of a special meeting (which is not also an annual meeting) of shareholders called for any purpose which includes the election of directors to the board, not later than the close of business on the 15th day following the day on which the first public announcement of the date of the special meeting is made by the Company.

-8-

G-1

**Section 1.4**     The time periods for giving of a Timely Notice shall in all cases be determined based on the original date of the annual meeting or the first public announcement of the annual or special meeting, as applicable. In no event shall an adjournment or postponement of an annual meeting or special meeting of shareholders or any announcement thereof commence a new time period for the giving of a Timely Notice.

**Section 1.5**     To be in proper written form, a Nominating Shareholder's notice to the corporate secretary must comply with all the provisions of this Section 1.5 and:

(a)     disclose or include, as applicable, as to each person whom the Nominating Shareholder proposes to nominate for election as a director (a "**Proposed Nominee**"):

(i)     their name, age, business and residential address, principal occupation or employment for the past five years, status as a "resident Canadian" (as such term is defined in the Act);

(ii)     their direct or indirect beneficial ownership in, or control or direction over, any class or series of securities of the Company, including the number or principal amount and the date (s) on which such securities were acquired;

(iii)     any relationships, agreements or arrangements, including financial, compensation and indemnity related relationships, agreements or arrangements, between the Proposed Nominee or any affiliates or associates of, or any person or entity acting jointly or in concert with, the Proposed Nominee or the Nominating Shareholder;

(iv)     any other information that would be required to be disclosed in a dissident proxy circular or other filings required to be made in connection with the solicitation of proxies for election of directors pursuant to the Act or applicable securities law; and

(v)     a duly completed personal information form in respect of the Proposed Nominee in the form prescribed by the principal stock exchange on which the securities of the Company are then listed for trading; and

(b)     disclose or include, as applicable, as to each Nominating Shareholder giving the notice and each beneficial owner, if any, on whose behalf the nomination is made:

(i)     their name, business and residential address and direct or indirect beneficial ownership in, or control or direction over, any class or series of securities of the Company, including the number or principal amount and the date(s) on which such securities were acquired;

(ii)     their  interests in, or rights or obligations associated with, an agreement, arrangement or understanding, the purpose or effect of which is to alter, directly or indirectly, the person's economic interest in a security of the Company or the person's economic exposure to the Company;

(iii)     any relationships, agreements or arrangements, including financial, compensation and indemnity related relationships, agreements or arrangements, between the Nominating Shareholder or any affiliates or

-9-

G-2

associates of, or any person or entity acting jointly or in concert with, the Nominating Shareholder and any Proposed Nominee;

(iv)    any proxy, contract, arrangement, agreement or understanding pursuant to which such person, or any of its affiliates or associates, or any person acting jointly or in concert with such person, has any interests, rights or obligations relating to the voting of any securities of the Company or the nomination of directors to the board;

(v)    a representation and evidence that the Nominating Shareholder is a holder of record of securities of the Company, or a beneficial owner, entitled to vote at such meeting, and intends to appear in person or by proxy at the meeting to propose such nomination;

(vi)    a representation as to whether such person intends to deliver a proxy circular and/or form of proxy to any shareholder of the Company in connection with such nomination or otherwise solicit proxies or votes from shareholders of the Company in support of such nomination; and

(vii)    any other information relating to such person that would be required to be included in a dissident proxy circular or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to the Act or as required by applicable securities law; and

(c)    be accompanied by a questionnaire, representation and agreement as required by Section 1.6 below, duly completed and signed, and a written consent duly signed by each Proposed Nominee to being named as a nominee and to serve as a director of the Company, if elected.

**Section 1.6**    A completed questionnaire as required by Section 1.5(c) shall be in the form provided by the corporate secretary (upon written request of the Nominating Shareholder), and shall include:

(a)    information regarding the background, independence and qualification of each Proposed Nominee and the background of each Nominating Shareholder; and

(b)    a written representation and agreement (in the form provided by the corporate secretary upon written request of the Nominating Shareholder) confirming, among other things, that such Proposed Nominee is not and will not become a party to any agreement, arrangement or understanding with, or has not given any commitment or assurance to, any person, as to how such person, if elected as a director of the Company, will act or vote on any issue or question, or with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director of the Company, that has not been disclosed to the Company.

**Section 1.7**    All information to be provided in a Timely Notice pursuant to Section 1.5 shall be provided as of the date of such notice. If requested by the Company, the Nominating Shareholder shall update such information forthwith so that it is true and correct in all material respects as of the date that is ten (10) business days prior to the date of the meeting, or any adjournment or postponement thereof.

**Section 1.8**    If requested by the Company, a Proposed Nominee shall furnish any other information as may reasonably be required by the Company to determine the eligibility of such Proposed Nominee to serve as a director of the Company or a member of any committee of the Board, with respect to independence or any other relevant criteria for eligibility, or that could be material to a shareholder's understanding of the independence or eligibility, or lack thereof, of such Proposed Nominee, including but not limited to an affidavit confirming eligibility serve as a director under the Act.

**Section 1.9**    Any notice, or other document or information required to be given to the corporate secretary pursuant to this By-Law may only be given by personal delivery or facsimile transmission, and shall be deemed to have been given and made only at the time it is served by personal delivery to the corporate secretary at the address of the principal executive offices of the Company, or sent by facsimile transmission (provided that receipt of confirmation of such transmission has been received); provided that if such delivery or facsimile transmission is made on a day which is a not a business day or later than 5:00 p.m. (Toronto time) on a day which is a business day, then such delivery or facsimile transmission shall be deemed to have been made on the next following day that is a business day.

**Section 1.10**  Additional Matters

(a)    The chair of any meeting of shareholders of the Company shall have the power to determine whether any proposed nomination is made in accordance with the provisions of this By-Law, and if any proposed nomination is not in compliance with such provisions, must declare that such defective nomination shall not be considered at any meeting of shareholders.

(b)    Despite any other provision of this By-Law, if the Nominating Shareholder (or a qualified representative of the Nominating Shareholder) does not appear at the meeting of shareholders of the Company to present the nomination of the Proposed Nominee, such nomination shall be disregarded, notwithstanding that proxies in respect of such nomination may have been received by the Company.

(c)    Nothing in this By-Law shall obligate the Company or the Board to include in any proxy statement or other shareholder communication distributed by or on behalf of the Company or the Board any information with respect to any proposed nomination or any Nominating Shareholder or Proposed Nominee.

(d)    The Board may, in its sole discretion, waive any requirement of this By-Law.

(e)    For the purposes of this By-Law, "public announcement" means disclosure in a press release disseminated by the Company through a national news service in Canada, or in a document filed by the Company for public access under its profile on the System of Electronic Document Analysis and Retrieval at www.sedar.com.

-11-

**SCHEDULE "J"**
**OPTION PLAN (AS AMENDED)**

**STOCK OPTION PLAN – SECURECOM MOBILE INC.**

**ARTICLE 1**
**PURPOSE OF PLAN**

1.1    The purpose of the stock option plan (the "**Plan**") of SecureCom Mobile Inc. (the "**Corporation**"), a corporation incorporated under the *Business Corporations Act* (British Columbia), is to advance the interests of the Corporation by encouraging the directors, employees and consultants of the Corporation of the Canadian Securities Exchange (the "**Exchange**")) and of its subsidiaries or affiliates, if any, by providing them with the opportunity, through options, to acquire common shares in the share capital of the Corporation (the  "**Shares**"), thereby increasing their proprietary interest in the Corporation, encouraging them to remain associated with the Corporation and furnishing them with additional incentive in their efforts on behalf of the Corporation in the conduct of its affairs.

**ARTICLE 2**
**ADMINISTRATION OF PLAN**

2.1    The Plan shall be administered by the board of directors of the Corporation or by a special committee of the directors appointed from time to time by the board of directors of the Corporation pursuant to rules of procedure fixed by the board of directors (such committee or, if no such committee is appointed, the board of directors of the Corporation is hereinafter referred to as the "**Board**"). A majority of the Board shall constitute a quorum and the acts of a majority of the directors present at any meeting at which a quorum is present, or acts unanimously by consent in writing, shall be the acts of the directors.

2.2    Subject to the provisions of the Plan, the Board shall have authority to construe and interpret the Plan and all option agreements entered into thereunder, to define the terms used in the Plan and in all option agreements entered into thereunder, to prescribe, amend and rescind rules and regulations relating to the Plan and to make all other determinations necessary or advisable for the administration of the Plan. All determinations and interpretations made by the Board shall be binding and conclusive on all Optionees (as defined herein) under the Plan and on their legal personal representatives and beneficiaries.

2.3    Each option to purchase Shares (an "**Option**") granted hereunder may be evidenced by an agreement in writing, signed on behalf of the Corporation and by the Optionee (as defined herein), in such form as the Board shall approve. Each such agreement shall recite that it is subject to the provisions of this Plan.

**ARTICLE 3**
**STOCK EXCHANGE RULES**

3.1    All Options granted pursuant to this Plan shall be subject to rules and policies of the Exchange and any stock exchange or exchanges on which the Shares are then listed and any other regulatory body having jurisdiction hereinafter.

**ARTICLE 4**
**SHARES SUBJECT TO PLAN**

4.1    Subject to adjustment as provided in Article 16 hereof, the Shares to be offered under the Plan shall consist of authorized but unissued Shares of the Corporation. The aggregate number of Shares issuable upon the exercise of all Options granted under the Plan shall not exceed 10% of the issued and outstanding Shares of the Corporation from time to time. If any Option granted hereunder shall expire or terminate for any reason in accordance with the terms of the Plan without being exercised, the Shares subject to such unexercised Option shall again be available for the purpose of this Plan.

-12-

**ARTICLE 5**
**MAINTENANCE OF SUFFICIENT CAPITAL**

5.1    The Corporation shall at all times during the term of the Plan keep available such numbers of Common Shares as will be sufficient to satisfy the requirements of the Plan.

**ARTICLE 6**
**ELIGIBILITY AND PARTICIPATION**

6.1    Directors, consultants and employees (and any other person that the Board wishes to grant stock options to) of the Corporation or any of its subsidiaries and employees of a person or company which provides management services to the Corporation or any of its subsidiaries ("**Management Company Employees**") shall be eligible for selection to participate in the Plan (collectively, the "**Optionees**" and individually, an "**Optionee**"). Subject to compliance with applicable requirements of the Exchange, Optionees may elect to hold Options granted to them in an incorporated entity wholly owned by them and such entity shall be bound by the Plan in the same manner as if the Options were held by the Optionee.

6.2    Subject to the terms hereof, the Board shall determine to whom Options shall be granted, the terms and provisions of the respective option agreements, the time or times at which such Options shall be granted and vested, and the number of Common Shares to be subject to each option.

6.3    The Corporation represents that, in the event that the Corporation wishes to grant Options under the Plan to employees, consultants or Management Company Employees, it will only grant such Options to Optionees who are bona fide employees, consultants or Management Company Employees, as the case may be.

6.4    An Optionee who has been granted an Option may, if such Optionee is otherwise eligible, and if permitted under the policies of the Exchange, be granted an additional Option or Options if the Board shall so determine.

**ARTICLE 7**
**EXERCISE PRICE**

7.1

   (a)    The exercise price of the Common Shares shall be determined by the Board, subject to applicable Exchange approval, at the time any Option is granted. In no event shall such exercise price be lower than the exercise price permitted by the Exchange.

   (b)    Once the exercise price has been determined by the Board and accepted by the Exchange and the Option has been granted, the exercise price of an Option may be reduced upon receipt of Board approval and in compliance with the rules and policies of the Exchange.

**ARTICLE 8**
**NUMBER OF OPTIONED SHARES**

8.1

   (a)    The number of Common Shares subject to an option granted to any one Optionee shall be determined by the Board, but no one Optionee shall be granted an Option which exceeds the maximum number permitted by the Exchange.

   (b)    No single Optionee may be granted Options to purchase a number of Shares equaling more than 5% of the issued Shares of the Corporation in any twelve-month period, unless the Corporation has obtained disinterested shareholder approval in respect of such grant and meets applicable Exchange requirements.

(c)    Options shall not be granted if the exercise thereof would result in the issuance of more than 2% of the issued Shares of the Corporation in any twelve-month period to any one consultant of the Corporation (or any of its subsidiaries).

(d)    Options shall not be granted if the exercise thereof would result in the issuance of more than 2% of the issued Shares of the Corporation in any twelve-month period to Employees conducting Investor Relations Activities (as such term is defined in the policies of the Exchange). Options granted to persons performing Investor Relations Activities will contain vesting provisions such that vesting occurs over at least twelve months with no more than ¼ of the Options vesting in any three-month period.

**ARTICLE 9**
**DURATION OF OPTION**

9.1    Each Option and all rights thereunder shall be expressed to expire on the date set out in the option agreement and shall be subject to earlier termination as provided in Articles 11 and 12 hereof, provided that in no circumstances shall the duration of an Option exceed the maximum term permitted by the Exchange. For greater certainty, if the Corporation is listed on the Exchange, the maximum term may not exceed 5 years from the date of grant.

**ARTICLE 10**
**OPTION PERIOD, CONSIDERATION AND PAYMENT**

10.1

(a)    The Option period shall be a period of time fixed by the Board not to exceed the maximum term permitted by the Exchange, provided that the Option period shall be reduced with respect to any Option as provided in Articles 11 and 12 covering cessation as a director, consultant, employee or Management Company Employee of the Corporation or any of its subsidiaries or death of the Optionee.

(b)    Subject to any vesting restrictions imposed by the Exchange, the Board may, in its sole discretion, determine the time during which Options shall vest and the method of vesting, or that no vesting restriction shall exist.

(c)    Subject to any vesting restrictions imposed by the Board, Options may be exercised in whole or in part at any time and from time to time during the Option period. To the extent required by the Exchange, no Options may be exercised under this Plan until this Plan has been approved by a resolution duly passed by the shareholders of the Corporation.

(d)    Except as set forth in Articles 11 and 12, no Option may be exercised unless the Optionee is at the time of such exercise a director, consultant, or employee of the Corporation or any of its subsidiaries or a Management Company Employee of the Corporation or any of its subsidiaries.

(e)    The exercise of any Option will be contingent upon receipt by the Corporation at its head office of a written notice of exercise, addressed to the chief executive officer of the Corporation, specifying the number of Shares with respect to which the Option is being exercised, accompanied by cash payment, certified cheque or bank draft for the full purchase price of such Shares with respect to which the Option is exercised. Certificates for such Shares shall be issued and delivered to the Optionee within a reasonable time following the receipt of such notice and payment. Neither the Optionee nor his legal representatives, legatees or distributees will be, or will be deemed to be, a holder of any Shares of the Corporation unless and until the certificates for the Common Shares issuable pursuant to Options under the Plan are issued to him or them under the terms of the Plan.

(f)    Notwithstanding any of the provisions contained in this Plan or in any Option, any and all obligations of the Corporation whatsoever to issue Shares to an Optionee pursuant to the exercise of an Option and/or this Plan shall at all times be subject to:

-14-

(i)  completion of such registration or other qualification of such Shares or obtaining approval of such governmental authority as the Corporation shall determine to be necessary or advisable in connection with the authorization, issuance or sale thereof;

(ii)  the Corporation being satisfied that the issuance of such Shares shall not (whether with notice or the passage of time or both) breach, violate or be contrary to any of its constating documents, partnership agreements, applicable laws, regulations, stock exchange rules and policies and agreements to which it is a party;

(iii)  the admission of such Shares to listing on any stock exchange on which the Shares may then be listed; and

(iv)  the receipt from the Optionee of such representations, agreements and undertakings, including as to future dealings in such Shares, as the Corporation or its counsel determines to be necessary or advisable in order to safeguard against the violation of the securities laws of any jurisdiction.

In connection therewith, the Corporation shall, to the extent necessary, take all reasonable steps to obtain such approvals, registrations and qualifications as may be necessary for the issuance of such Common Shares in compliance with applicable securities laws and for the listing of such Common Shares on any stock exchange on which the Common Shares are then listed.

## ARTICLE 11
## CEASING TO BE A DIRECTOR, OFFICER, CONSULTANT OR EMPLOYEE

11.1    Subject to Section 11.2, if an Optionee ceases to be a director, employee, consultant or Management Company Employee of the Corporation or any of its subsidiaries as a result of having been dismissed from any such position for cause, all unexercised Option rights of that Optionee under the Plan shall immediately become terminated and shall lapse, notwithstanding the original term of the Option granted to such Optionee under the Plan.

11.2    If an Optionee ceases to be either a director, employee, consultant or Management Company Employee of the Corporation or any of its subsidiaries for any reason other than as a result of having been dismissed for cause as provided in Section 11.1 or as a result of the Optionee's death, such Optionee shall have the right for a period of twelve (12) months (or until the normal expiry date of the Option rights of such Optionee if earlier) from the date of ceasing to be either a director, employee, consultant or Management Company Employee to exercise his Option under the Plan to the extent that the Optionee was entitled to exercise it on the date of ceasing to be either a director, employee, consultant or Management Company Employee. Upon the expiration of such twelve (12) month period all unexercised Option rights of that Optionee shall immediately become terminated and shall lapse, notwithstanding the original term of the Option granted to such Optionee under the Plan.

11.3    If an Optionee engaged in providing Investor Relations Activities to the Corporation ceases to be employed in providing such Investor Relations Activities, such Optionee shall have the right for a period of thirty (30) days (or until the normal expiry date of the Option rights of such Optionee if earlier) from the date of ceasing to provide such Investor Relations Activities to exercise his Option under the Plan to the extent that the Optionee was entitled to exercise it on the date of ceasing to provide such Investor Relations Activities. Upon the expiration of such thirty (30) day period all unexercised Option rights of that Optionee shall immediately become terminated and shall lapse, notwithstanding the original term of the Option granted to such Optionee under the Plan.

11.4    Nothing contained in the Plan, nor in any Option granted pursuant to the Plan, shall as such confer upon any Optionee any right with respect to continuance as a director, consultant, employee or Management Company Employee of the Corporation or of any of its subsidiaries.

11.5    Options shall not be affected by any change of employment of any director, employee, consultant or Management Company Employee.

-15-

G-8

## ARTICLE 12
## DEATH OF OPTIONEE

12.1    In the event of the death of any Optionee, the legal representatives of the deceased Optionee shall have the right for a period of one year (or until the normal expiry date of the Option rights of such Optionee if earlier) from the date of death of the deceased Optionee to exercise the deceased Optionee's Option under the Plan to the extent that it was exercisable on the date of death. Upon the expiration of such period all unexercised Option rights of the deceased Optionee shall immediately become terminated and shall lapse, notwithstanding the original term of the Option granted to the deceased Optionee under the Plan.

## ARTICLE 13
## RIGHTS OF OPTIONEE

13.1    No person entitled to exercise any Option granted under the Plan shall have any of the rights or privileges of a shareholder of the Corporation in respect of any Shares issuable upon exercise of such Option until certificates representing such Shares shall have been issued and delivered.

## ARTICLE 14
## HOLD PERIOD

14.1    Any Shares issued upon the exercise of an Option shall be subject to a hold period, as required by the Exchange, and may not be traded for a period of four (4) months from the date of grant. Any Shares issued upon the exercise of an Option may also be subject to any hold periods that may be required by applicable securities legislation.

## ARTICLE 15
## PROCEEDS FROM SALE OF SHARES

15.1    The proceeds from the sale of Shares issued upon the exercise of Options shall be added to the general funds of the Corporation and shall thereafter be used from time to time for such corporate purposes as the Board may determine.

## ARTICLE 16
## ADJUSTMENTS

16.1    If the outstanding Shares of the Corporation are increased, decreased, changed into or exchanged for a different number or kind of shares or securities of the Corporation through re-organization, merger, re-capitalization, re-classification, stock dividend, subdivision or consolidation or other similar transaction, an appropriate and proportionate adjustment shall be made by the Board in its discretion in the number or kind of Shares optioned and the exercise price per Share, as regards previously granted and unexercised Options or portions thereof, and as regards Options which may be granted subsequent to any such change in the Corporation's capital.

Adjustments under this Article shall be made by the Board whose determination as to what adjustments shall be made, and the extent thereof, shall be final, binding and conclusive.  No fractional shares shall be required to be issued under the Plan on any such adjustment.

16.2    Upon the liquidation or dissolution of the Corporation, the Plan shall terminate, and any Options theretofore granted hereunder shall terminate. In the event of a re-organization, merger or consolidation of the Corporation with one or more corporations as a result of which the Corporation is not the surviving corporation, or upon the sale of substantially all of the property or more than eighty (80%) percent of the then outstanding Shares of the Corporation to another corporation (a "**Change of Control**") all Options granted which have not yet vested shall immediately vest without consideration as to time or any other vesting provision set forth in the Plan or stock option agreement governing such Options, provided that such vesting is not in violation of the then current policies of the Exchange, if applicable, and all Optionees then entitled to exercise Options then

-16-

outstanding shall have the right at such time immediately prior to consummation of the Change of Control to exercise their Options to the full extent not theretofore exercised. Upon consummation of the Change of Control, the Plan shall terminate and any Options theretofore granted hereunder that remain unexercised upon termination shall also terminate.

## ARTICLE 17
## TRANSFERABILITY

17.1    All benefits, rights and Options accruing to any Optionee in accordance with the terms and conditions of the Plan shall not be transferable or assignable unless specifically provided herein or to the extent, if any, permitted by the Exchange. During the lifetime of an Optionee any benefits, rights and Options may only be exercised by the Optionee.

## ARTICLE 18
## AMENDMENT AND TERMINATION OF PLAN

18.1    Subject to applicable approval of the Exchange, the Board may, at any time, suspend or terminate the Plan. Subject to applicable approval of the Exchange, the Board may also at any time amend or revise the terms of the Plan, provided that no such amendment or revision shall alter the terms of any Options theretofore granted under the Plan, unless shareholder approval, or disinterested shareholder approval, as the case may be, is obtained for such amendment or revision.

## ARTICLE 19
## NECESSARY APPROVALS

19.1    The ability of an Optionee to exercise Options and the obligation of the Corporation to issue and deliver Common Shares in accordance with the Plan is subject to any approvals which may be required from shareholders of the Corporation and any regulatory authority or stock exchange having jurisdiction over the securities of the Corporation. If any Common Shares cannot be issued to any Optionee for whatever reason, the obligation of the Corporation to issue such Common Shares shall terminate and any Option exercise price paid to the Corporation will be returned to the Optionee.

## ARTICLE 20
## EFFECTIVE DATE OF PLAN

20.1    The Plan has been adopted by the Board subject to the approval of the Exchange and the shareholders of the Corporation, and, if so approved, subject to the discretion of the Board, the Plan shall become effective upon such approvals being obtained.

## ARTICLE 21
## INTERPRETATION

21.1    The Plan will be governed by and construed in accordance with the laws of the Province of British Columbia and the applicable Federal laws of Canada therein.

21.2    Nothing in this Plan or in any Option shall confer upon any director, employee, consultant or Management Company Employee any right to continue in the employ of the Corporation or any of its subsidiaries or affect in any way the right of the Corporation or any of its subsidiaries to terminate his employment at any time. Nor shall anything in this Plan or in any Option be deemed or construed to constitute an agreement, or an expression of intent, on the part of the Corporation or any of its subsidiaries to extend the employment of any Optionee beyond the time that he or she would normally be retired pursuant to the provisions of any present or future retirement plan of the Corporation or any of its subsidiaries or beyond the time at which he or she would otherwise be retired pursuant to the provisions of any contract of employment with the Corporation or any of its subsidiaries.

-17-

21.3     Nothing in this Plan or any Option shall confer on any Optionee any right to continue providing ongoing services to the Corporation or affect in any way the right of the Corporation or any such entity to terminate his, her or its contract at any time. Nor shall anything in this Plan or any Option be deemed or construed as an agreement, or an expression of intent, on the part of the Corporation or any such entity to extend the time for the performance of the ongoing services beyond the time specified in the contract with any such entity.

21.4     References herein to any gender include all genders.

**SCHEDULE "H"**
**OPTION PLAN (AS AMENDED)**

**STOCK OPTION PLAN – SECURECOM MOBILE INC.**

**ARTICLE 1**
**PURPOSE OF PLAN**

1.1     The purpose of the stock option plan (the "**Plan**") of SecureCom Mobile Inc. (the "**Corporation**"), a corporation incorporated under the *Business Corporations Act* (British Columbia), is to advance the interests of the Corporation by encouraging the directors, employees and consultants of the Corporation of the Canadian Securities Exchange (the "**Exchange**")) and of its subsidiaries or affiliates, if any, by providing them with the opportunity, through options, to acquire common shares in the share capital of the Corporation (the "**Shares**"), thereby increasing their proprietary interest in the Corporation, encouraging them to remain associated with the Corporation and furnishing them with additional incentive in their efforts on behalf of the Corporation in the conduct of its affairs.

**ARTICLE 2**
**ADMINISTRATION OF PLAN**

2.1     The Plan shall be administered by the board of directors of the Corporation or by a special committee of the directors appointed from time to time by the board of directors of the Corporation pursuant to rules of procedure fixed by the board of directors (such committee or, if no such committee is appointed, the board of directors of the Corporation is hereinafter referred to as the "**Board**"). A majority of the Board shall constitute a quorum and the acts of a majority of the directors present at any meeting at which a quorum is present, or acts unanimously by consent in writing, shall be the acts of the directors.

2.2     Subject to the provisions of the Plan, the Board shall have authority to construe and interpret the Plan and all option agreements entered into thereunder, to define the terms used in the Plan and in all option agreements entered into thereunder, to prescribe, amend and rescind rules and regulations relating to the Plan and to make all other determinations necessary or advisable for the administration of the Plan. All determinations and interpretations made by the Board shall be binding and conclusive on all Optionees (as defined herein) under the Plan and on their legal personal representatives and beneficiaries.

2.3     Each option to purchase Shares (an "**Option**") granted hereunder may be evidenced by an agreement in writing, signed on behalf of the Corporation and by the Optionee (as defined herein), in such form as the Board shall approve. Each such agreement shall recite that it is subject to the provisions of this Plan.

**ARTICLE 3**
**STOCK EXCHANGE RULES**

3.1     All Options granted pursuant to this Plan shall be subject to rules and policies of the Exchange and any stock exchange or exchanges on which the Shares are then listed and any other regulatory body having jurisdiction hereinafter.

**ARTICLE 4**
**SHARES SUBJECT TO PLAN**

4.1     Subject to adjustment as provided in Article 16 hereof, the Shares to be offered under the Plan shall consist of authorized but unissued Shares of the Corporation. The aggregate number of Shares issuable upon the exercise of all Options granted under the Plan shall not exceed 10% of the issued and outstanding Shares of the Corporation from time to time. If any Option granted hereunder shall expire or terminate for any reason in accordance with the terms of the Plan without being exercised, the Shares subject to such unexercised Option shall again be available for the purpose of this Plan.

-12-

**ARTICLE 5**
**MAINTENANCE OF SUFFICIENT CAPITAL**

5.1     The Corporation shall at all times during the term of the Plan keep available such numbers of Common Shares as will be sufficient to satisfy the requirements of the Plan.

**ARTICLE 6**
**ELIGIBILITY AND PARTICIPATION**

6.1     Directors, consultants and employees (and any other person that the Board wishes to grant stock options to) of the Corporation or any of its subsidiaries and employees of a person or company which provides management services to the Corporation or any of its subsidiaries ("**Management Company Employees**") shall be eligible for selection to participate in the Plan (collectively, the "**Optionees**" and individually, an "**Optionee**"). Subject to compliance with applicable requirements of the Exchange, Optionees may elect to hold Options granted to them in an incorporated entity wholly owned by them and such entity shall be bound by the Plan in the same manner as if the Options were held by the Optionee.

6.2     Subject to the terms hereof, the Board shall determine to whom Options shall be granted, the terms and provisions of the respective option agreements, the time or times at which such Options shall be granted and vested, and the number of Common Shares to be subject to each option.

6.3     The Corporation represents that, in the event that the Corporation wishes to grant Options under the Plan to employees, consultants or Management Company Employees, it will only grant such Options to Optionees who are bona fide employees, consultants or Management Company Employees, as the case may be.

6.4     An Optionee who has been granted an Option may, if such Optionee is otherwise eligible, and if permitted under the policies of the Exchange, be granted an additional Option or Options if the Board shall so determine.

**ARTICLE 7**
**EXERCISE PRICE**

7.1

(a)     The exercise price of the Common Shares shall be determined by the Board, subject to applicable Exchange approval, at the time any Option is granted. In no event shall such exercise price be lower than the exercise price permitted by the Exchange.

(b)     Once the exercise price has been determined by the Board and accepted by the Exchange and the Option has been granted, the exercise price of an Option may be reduced upon receipt of Board approval and in compliance with the rules and policies of the Exchange.

**ARTICLE 8**
**NUMBER OF OPTIONED SHARES**

8.1

(a)     The number of Common Shares subject to an option granted to any one Optionee shall be determined by the Board, but no one Optionee shall be granted an Option which exceeds the maximum number permitted by the Exchange.

(b)     No single Optionee may be granted Options to purchase a number of Shares equaling more than 5% of the issued Shares of the Corporation in any twelve-month period, unless the Corporation has obtained disinterested shareholder approval in respect of such grant and meets applicable Exchange requirements.

-13-

(c)      Options shall not be granted if the exercise thereof would result in the issuance of more than 2% of the issued Shares of the Corporation in any twelve-month period to any one consultant of the Corporation (or any of its subsidiaries).

(d)      Options shall not be granted if the exercise thereof would result in the issuance of more than 2% of the issued Shares of the Corporation in any twelve-month period to Employees conducting Investor Relations Activities (as such term is defined in the policies of the Exchange). Options granted to persons performing Investor Relations Activities will contain vesting provisions such that vesting occurs over at least twelve months with no more than ¼ of the Options vesting in any three-month period.

## ARTICLE 9
## DURATION OF OPTION

9.1      Each Option and all rights thereunder shall be expressed to expire on the date set out in the option agreement and shall be subject to earlier termination as provided in Articles 11 and 12 hereof, provided that in no circumstances shall the duration of an Option exceed the maximum term permitted by the Exchange. For greater certainty, if the Corporation is listed on the Exchange, the maximum term may not exceed 5 years from the date of grant.

## ARTICLE 10
## OPTION PERIOD, CONSIDERATION AND PAYMENT

10.1

(a)      The Option period shall be a period of time fixed by the Board not to exceed the maximum term permitted by the Exchange, provided that the Option period shall be reduced with respect to any Option as provided in Articles 11 and 12 covering cessation as a director, consultant, employee or Management Company Employee of the Corporation or any of its subsidiaries or death of the Optionee.

(b)      Subject to any vesting restrictions imposed by the Exchange, the Board may, in its sole discretion, determine the time during which Options shall vest and the method of vesting, or that no vesting restriction shall exist.

(c)      Subject to any vesting restrictions imposed by the Board, Options may be exercised in whole or in part at any time and from time to time during the Option period. To the extent required by the Exchange, no Options may be exercised under this Plan until this Plan has been approved by a resolution duly passed by the shareholders of the Corporation.

(d)      Except as set forth in Articles 11 and 12, no Option may be exercised unless the Optionee is at the time of such exercise a director, consultant, or employee of the Corporation or any of its subsidiaries or a Management Company Employee of the Corporation or any of its subsidiaries.

(e)      The exercise of any Option will be contingent upon receipt by the Corporation at its head office of a written notice of exercise, addressed to the chief executive officer of the Corporation, specifying the number of Shares with respect to which the Option is being exercised, accompanied by cash payment, certified cheque or bank draft for the full purchase price of such Shares with respect to which the Option is exercised. Certificates for such Shares shall be issued and delivered to the Optionee within a reasonable time following the receipt of such notice and payment. Neither the Optionee nor his legal representatives, legatees or distributees will be, or will be deemed to be, a holder of any Shares of the Corporation unless and until the certificates for the Common Shares issuable pursuant to Options under the Plan are issued to him or them under the terms of the Plan.

(f)      Notwithstanding any of the provisions contained in this Plan or in any Option, any and all obligations of the Corporation whatsoever to issue Shares to an Optionee pursuant to the exercise of an Option and/or this Plan shall at all times be subject to:

-14-

(i)    completion of such registration or other qualification of such Shares or obtaining approval of such governmental authority as the Corporation shall determine to be necessary or advisable in connection with the authorization, issuance or sale thereof;

(ii)    the Corporation being satisfied that the issuance of such Shares shall not (whether with notice or the passage of time or both) breach, violate or be contrary to any of its constating documents, partnership agreements, applicable laws, regulations, stock exchange rules and policies and agreements to which it is a party;

(iii)    the admission of such Shares to listing on any stock exchange on which the Shares may then be listed; and

(iv)    the receipt from the Optionee of such representations, agreements and undertakings, including as to future dealings in such Shares, as the Corporation or its counsel determines to be necessary or advisable in order to safeguard against the violation of the securities laws of any jurisdiction.

In connection therewith, the Corporation shall, to the extent necessary, take all reasonable steps to obtain such approvals, registrations and qualifications as may be necessary for the issuance of such Common Shares in compliance with applicable securities laws and for the listing of such Common Shares on any stock exchange on which the Common Shares are then listed.

## ARTICLE 11
### CEASING TO BE A DIRECTOR, OFFICER, CONSULTANT OR EMPLOYEE

11.1    Subject to Section 11.2, if an Optionee ceases to be a director, employee, consultant or Management Company Employee of the Corporation or any of its subsidiaries as a result of having been dismissed from any such position for cause, all unexercised Option rights of that Optionee under the Plan shall immediately become terminated and shall lapse, notwithstanding the original term of the Option granted to such Optionee under the Plan.

11.2    If an Optionee ceases to be either a director, employee, consultant or Management Company Employee of the Corporation or any of its subsidiaries for any reason other than as a result of having been dismissed for cause as provided in Section 11.1 or as a result of the Optionee's death, such Optionee shall have the right for a period of twelve (12) months (or until the normal expiry date of the Option rights of such Optionee if earlier) from the date of ceasing to be either a director, employee, consultant or Management Company Employee to exercise his Option under the Plan to the extent that the Optionee was entitled to exercise it on the date of ceasing to be either a director, employee, consultant or Management Company Employee. Upon the expiration of such twelve (12) month period all unexercised Option rights of that Optionee shall immediately become terminated and shall lapse, notwithstanding the original term of the Option granted to such Optionee under the Plan.

11.3    If an Optionee engaged in providing Investor Relations Activities to the Corporation ceases to be employed in providing such Investor Relations Activities, such Optionee shall have the right for a period of thirty (30) days (or until the normal expiry date of the Option rights of such Optionee if earlier) from the date of ceasing to provide such Investor Relations Activities to exercise his Option under the Plan to the extent that the Optionee was entitled to exercise it on the date of ceasing to provide such Investor Relations Activities. Upon the expiration of such thirty (30) day period all unexercised Option rights of that Optionee shall immediately become terminated and shall lapse, notwithstanding the original term of the Option granted to such Optionee under the Plan.

11.4    Nothing contained in the Plan, nor in any Option granted pursuant to the Plan, shall as such confer upon any Optionee any right with respect to continuance as a director, consultant, employee or Management Company Employee of the Corporation or of any of its subsidiaries.

11.5    Options shall not be affected by any change of employment of any director, employee, consultant or Management Company Employee.

-15-

## ARTICLE 12
## DEATH OF OPTIONEE

12.1     In the event of the death of any Optionee, the legal representatives of the deceased Optionee shall have the right for a period of one year (or until the normal expiry date of the Option rights of such Optionee if earlier) from the date of death of the deceased Optionee to exercise the deceased Optionee's Option under the Plan to the extent that it was exercisable on the date of death. Upon the expiration of such period all unexercised Option rights of the deceased Optionee shall immediately become terminated and shall lapse, notwithstanding the original term of the Option granted to the deceased Optionee under the Plan.

## ARTICLE 13
## RIGHTS OF OPTIONEE

13.1     No person entitled to exercise any Option granted under the Plan shall have any of the rights or privileges of a shareholder of the Corporation in respect of any Shares issuable upon exercise of such Option until certificates representing such Shares shall have been issued and delivered.

## ARTICLE 14
## HOLD PERIOD

14.1     Any Shares issued upon the exercise of an Option shall be subject to a hold period, as required by the Exchange, and may not be traded for a period of four (4) months from the date of grant. Any Shares issued upon the exercise of an Option may also be subject to any hold periods that may be required by applicable securities legislation.

## ARTICLE 15
## PROCEEDS FROM SALE OF SHARES

15.1     The proceeds from the sale of Shares issued upon the exercise of Options shall be added to the general funds of the Corporation and shall thereafter be used from time to time for such corporate purposes as the Board may determine.

## ARTICLE 16
## ADJUSTMENTS

16.1     If the outstanding Shares of the Corporation are increased, decreased, changed into or exchanged for a different number or kind of shares or securities of the Corporation through re-organization, merger, re-capitalization, re-classification, stock dividend, subdivision or consolidation or other similar transaction, an appropriate and proportionate adjustment shall be made by the Board in its discretion in the number or kind of Shares optioned and the exercise price per Share, as regards previously granted and unexercised Options or portions thereof, and as regards Options which may be granted subsequent to any such change in the Corporation's capital.

Adjustments under this Article shall be made by the Board whose determination as to what adjustments shall be made, and the extent thereof, shall be final, binding and conclusive.  No fractional shares shall be required to be issued under the Plan on any such adjustment.

16.2     Upon the liquidation or dissolution of the Corporation, the Plan shall terminate, and any Options theretofore granted hereunder shall terminate. In the event of a re-organization, merger or consolidation of the Corporation with one or more corporations as a result of which the Corporation is not the surviving corporation, or upon the sale of substantially all of the property or more than eighty (80%) percent of the then outstanding Shares of the Corporation to another corporation (a "**Change of Control**") all Options granted which have not yet vested shall immediately vest without consideration as to time or any other vesting provision set forth in the Plan or stock option agreement governing such Options, provided that such vesting is not in violation of the then current policies of the Exchange, if applicable, and all Optionees then entitled to exercise Options then

-16-

H-5

outstanding shall have the right at such time immediately prior to consummation of the Change of Control to exercise their Options to the full extent not theretofore exercised. Upon consummation of the Change of Control, the Plan shall terminate and any Options theretofore granted hereunder that remain unexercised upon termination shall also terminate.

## ARTICLE 17
## TRANSFERABILITY

17.1    All benefits, rights and Options accruing to any Optionee in accordance with the terms and conditions of the Plan shall not be transferable or assignable unless specifically provided herein or to the extent, if any, permitted by the Exchange. During the lifetime of an Optionee any benefits, rights and Options may only be exercised by the Optionee.

## ARTICLE 18
## AMENDMENT AND TERMINATION OF PLAN

18.1    Subject to applicable approval of the Exchange, the Board may, at any time, suspend or terminate the Plan. Subject to applicable approval of the Exchange, the Board may also at any time amend or revise the terms of the Plan, provided that no such amendment or revision shall alter the terms of any Options theretofore granted under the Plan, unless shareholder approval, or disinterested shareholder approval, as the case may be, is obtained for such amendment or revision.

## ARTICLE 19
## NECESSARY APPROVALS

19.1    The ability of an Optionee to exercise Options and the obligation of the Corporation to issue and deliver Common Shares in accordance with the Plan is subject to any approvals which may be required from shareholders of the Corporation and any regulatory authority or stock exchange having jurisdiction over the securities of the Corporation. If any Common Shares cannot be issued to any Optionee for whatever reason, the obligation of the Corporation to issue such Common Shares shall terminate and any Option exercise price paid to the Corporation will be returned to the Optionee.

## ARTICLE 20
## EFFECTIVE DATE OF PLAN

20.1    The Plan has been adopted by the Board subject to the approval of the Exchange and the shareholders of the Corporation, and, if so approved, subject to the discretion of the Board, the Plan shall become effective upon such approvals being obtained.

## ARTICLE 21
## INTERPRETATION

21.1    The Plan will be governed by and construed in accordance with the laws of the Province of British Columbia and the applicable Federal laws of Canada therein.

21.2    Nothing in this Plan or in any Option shall confer upon any director, employee, consultant or Management Company Employee any right to continue in the employ of the Corporation or any of its subsidiaries or affect in any way the right of the Corporation or any of its subsidiaries to terminate his employment at any time. Nor shall anything in this Plan or in any Option be deemed or construed to constitute an agreement, or an expression of intent, on the part of the Corporation or any of its subsidiaries to extend the employment of any Optionee beyond the time that he or she would normally be retired pursuant to the provisions of any present or future retirement plan of the Corporation or any of its subsidiaries or beyond the time at which he or she would otherwise be retired pursuant to the provisions of any contract of employment with the Corporation or any of its subsidiaries.

-17-

21.3     Nothing in this Plan or any Option shall confer on any Optionee any right to continue providing ongoing services to the Corporation or affect in any way the right of the Corporation or any such entity to terminate his, her or its contract at any time. Nor shall anything in this Plan or any Option be deemed or construed as an agreement, or an expression of intent, on the part of the Corporation or any such entity to extend the time for the performance of the ongoing services beyond the time specified in the contract with any such entity.

21.4     References herein to any gender include all genders.

-18-

H-7



**MERRILL**CORPORATION
Printed in Canada | 17-15391