Case 1:19-cv-00161-MKV-SLC     Document 55-6     Filed 04/24/20     Page 1 of 34

# Exhibit 5

**LIBERTY HEALTH SCIENCES INC.**
**(FORMERLY SECURECOM MOBILE INC.)**
**MANAGEMENT'S DISCUSSION & ANALYSIS**

*This management discussion and analysis ("MD&A") of the financial condition and results of operations of Liberty Health Sciences Inc., (the "Company" or "Liberty") (formerly SecureCom Mobile Inc.), is for the three and six month period ended August 31, 2018. It is supplemental to, and should be read in conjunction with the Company's unaudited interim condensed consolidated financial statements and the accompanying notes for the three and six month period ended August 31, 2018 (the "Q2 Financials"), as well as the audited consolidated financial statements for the period from May 1, 2017 to February 28, 2018. The Company's financial statements are prepared in accordance with International Financial Reporting Standards ("IFRS").*

*This MD&A has been prepared by reference to the MD&A disclosure requirements established under National Instrument 51-102 "Continuous Disclosure Obligations" ("NI 51-102") of the Canadian Securities Administrators. Additional information regarding Liberty Health Sciences Inc. is available on our website at www.libertyhealthsciences.com or through the SEDAR website at www.sedar.com.*

*In this MD&A, reference is made to adjusted gross profit, adjusted gross margin and adjusted earnings before interest, tax, depreciation and amortization ("EBITDA"), which are not measures of financial performance under IFRS and may not be comparable to similarly titled measures used by other companies. The Company calculates each as follows:*

- *Adjusted gross profit is equal to gross profit less the non-cash increase in the fair value on harvest, less the non-cash increase in the fair value on cost of goods sold, less certain costs of goods sold and less non-cash depreciation, if any. Management believes this measure provides useful information as it removes non-cash adjustments required by IFRS and certain costs of goods sold adjustments to provide greater comparability.*
- *Adjusted gross margin is adjusted gross profit divided by revenue. Management believes this measure provides useful information as it represents the gross profit based on the Company's cost to produce inventory sold and removes fair value metrics required by IFRS.*
- *Adjusted EBITDA is net income (loss), plus (minus) income taxes (recovery), plus (minus) foreign exchange loss (gain), plus (minus) change in fair value of embedded derivative, plus interest accretion, plus share-based compensation, plus depreciation, plus interest expense, plus change in fair value of biological assets, plus change in fair value in cost of goods sold, and certain one-time non-operating expenses, as determined by management. Management believes this measure provides useful information as it is a commonly used measure in the capital markets and as it is a close proxy for repeatable cash generated by operations.*

*All amounts in this MD&A are expressed in Canadian dollars, unless otherwise indicated.*

*This MD&A is prepared as of October 29, 2018.*

## COMPANY OVERVIEW

Liberty Health Sciences Inc. is a producer and retailer of cannabis products aimed at improving the quality of peoples' lives. Liberty's focus is solely on the United States market where it produces high-quality products at a low-cost. Through its wholly-owned subsidiary, DFMMJ Investments, LLC (d/b/a Liberty Health Sciences Florida Ltd.) ("Liberty Florida"), Liberty is licensed to produce and sell medical cannabis products in Florida. The Company is also focused on acquiring other cannabis businesses and expanding its operations throughout the United States, including an investment in a Massachusetts-based business holding a medical cannabis license. Liberty was also recently awarded a dispensary license and a processing license in Ohio and is developing operational plans with its joint venture partner.

Liberty's common shares (the "Common Shares") are listed under the symbol "LHS" on the Canadian Securities Exchange ("CSE") and the OTC Markets OTCQX Best Market ("OTCQX") in the United States under the symbol "LHSIF".

Liberty was incorporated under the Business Corporations Act (British Columbia) (the "BCBCA") on November 9, 2011 as SecureCom Mobile Inc. ("SecureCom"). On July 20, 2017, 1006397 B.C. Ltd. ("Subco"), a British Columbia company and wholly-owned subsidiary of SecureCom, completed a business combination (the "Business Combination") with DFMMJ Investments, Ltd. ("Holdco") whereby SecureCom acquired all of the issued and outstanding shares of Holdco by way of a three-cornered amalgamation. Holdco amalgamated with Subco under the BCBCA to form a wholly-owned subsidiary of SecureCom named "Liberty Health Sciences USA Ltd.". Concurrently with the Business Combination, SecureCom changed its name to "Liberty Health Sciences Inc.".



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

## STRATEGY AND OUTLOOK

Liberty's business strategy is to acquire and operate vertically-integrated cannabis operations in the United States in those states that are heavily populated with limited licenses. Liberty has the know-how and expertise to transform targeted investments into low-cost operations that produce high quality cannabis products while delivering value to its shareholders. Liberty has established strong relationships with producers of topicals, transdermal products and edibles in Florida and will transfer these arrangements to other states where possible.

In its inaugural fiscal year which ended February 28, 2018, Liberty, through its wholly-owned subsidiary, Liberty Health Sciences Florida Ltd., purchased land, offices, processing facilities and approximately 12,000 square feet of greenhouses from Chestnut Hill Tree Farm LLC ("Chestnut"). An expansion was completed in January 2018 which doubled the greenhouse capacity to approximately 1,600 kgs of product per year. Given the rapidly growing demand for product in Florida, in February 2018, Liberty acquired a 387-acre site in Gainesville which was previously owned by Alico Citrus Nursery, LLC ("Alico"). Liberty is in the process of retrofitting the Alico property and in the meantime, continues to operate out of the expanded Chestnut facility (the "Chestnut Facility"). The Alico location has been re-branded as the Liberty 360 Innovation Campus ("Liberty 360 Campus") and is expected to reach commercial production by early 2019. The combined production capacity of the Chestnut Facility and the Liberty 360 Campus will be approximately 14,600 kgs annually.

Liberty is also executing on its dispensary expansion plans, opening up four dispensaries throughout the State of Florida between January and August 2018. Another three dispensaries were opened in October 2018, subsequent to quarter end, and the Company has lease agreements in place for another four locations. The Company plans to open ten to twelve dispensaries across the state by the end of February 2019. To better serve Florida's expanding patient base, Liberty has also invested in expanding its delivery abilities, providing customers with door-to-door services and creating major delivery hubs in Ft. Lauderdale, St. Petersburg, Tallahassee, Ft. Myers, Orlando and Gainesville.

Liberty was awarded a dispensary license in Dayton, Ohio and a provisional processing license in the State of Ohio and is currently developing operational plans with their joint venture partner. The Company has also signed an agreement to acquire an interest in a provisional medical cannabis license in the Commonwealth of Massachusetts and is in the process of developing a strategy for the state.

## QUARTERLY HIGHLIGHTS

### *Good Manufacturing Practices ("GMP") Certification Received*

In June 2018, the Company received its GMP certification from SAI Global, an international standards compliance business, for its Chestnut greenhouse and processing facilities. The certification was achieved in advance of the State of Florida's required deadline for its processing facilities. Liberty is currently working on its GMP certification at its soon to be opened Liberty 360 Innovation Campus.

### *Share Issuance – July 2018*

On July 4, 2018, the Company issued 10,092,583 Common Shares at a price of $0.782 per share to settle US$6,000,000 of outstanding payables to Thermo Energy Systems Inc. Outstanding invoices to Thermo Energy Systems Inc. were in respect of ongoing retrofitting and construction services performed at the Company's Liberty 360 Campus.

### *Rollout of Cannabis Education Centers*

Liberty Florida is licensed to operate as a Medical Marijuana Treatment Center ("MMTC") under applicable Florida law and to possess, cultivate, process, dispense and sell medical marijuana in the State of Florida pursuant to the terms of the license (the "Florida License") issued by the Florida Department of Health, Office of Medical Marijuana Use (the "Florida Department") under the provisions of the *Senate Bill 8A, Fla. Stat. 381.986 et seq* (the "Florida Legislation"). Under the Florida License, the Company is entitled to open



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

up to 30 dispensaries across the State of Florida, which the Company is currently rolling out under its branding of Cannabis Education Centers to better serve its patient base. The Company opened its inaugural dispensary in January 2018 in the Villages community in north central Florida and has opened dispensaries in South Tampa, St. Petersburg and Port St. Lucie. Subsequent to quarter end, Liberty also opened dispensaries in Winter Haven, Merritt Island and Palm Harbor in October 2018. The Company has also signed leases for dispensary locations in Gainesville, Boca Raton, Miami Beach and a second location in Tampa. The Company plans to open ten to twelve dispensaries by the end of fiscal 2019 and have between sixteen to eighteen open by the end of fiscal 2020, all subject to local municipal permitting and approval by the Florida Department.

## Patient Growth

The medical cannabis marketplace in Florida is in its infancy, which is evidenced by the fact that approximately 180,000 patients have been added to the Medical Marijuana Use Registry as of October 2018 statewide. With over 20 million residents, Florida's potential patient base is vast. The patient registration volume has grown significantly in recent months as more supply has become available and as access to the growing number of physicians who are qualified to recommend medical cannabis has expanded, which has resulted in more than a 100% increase in registered patients since the beginning of 2018. There are now over 1,700 qualified physicians in the State of Florida who can access medical cannabis for their patients. Patient volume is expected to continue increasing at a rapid pace in light of the expanded medical uses as well as the broad availability of high THC products. With expanded production capabilities, a primary goal of the business moving forward is the acquisition of qualified patients.

## Product Offerings

Liberty announced a number of licensing and distributing agreements through fiscal 2018 and 2019, including the following:

In October 2017, the Company announced an exclusive licensing agreement for the state of Florida with MM Technology Holdings, LLC, which owns the award-winning Mary's Medicinal brand. Mary's products include cannabis infused transdermal patches, ointments and creams. The Company expanded this agreement to include exclusive licensing for the Commonwealth of Massachusetts in May 2018. Beginning at the end of July 2018, Mary's products were made available in all stores in the State of Florida.

In January 2018, the Company also announced an exclusive licensing arrangement with MC Brands LLC whereby the Company would produce on an exclusive basis, edible products under the *Incredibles* brand in the State of Florida.

The Company announced in May 2018 that an amended licensing agreement was signed with Aphria to add Solei Sungrown Cannabis to the Company's growing list of brands in both the states of Florida and Massachusetts. In August 2018, the Florida Department of Health approved the Solei line of products for sale.

In September 2018, Liberty announced that it had signed an exclusive agreement with PAX Labs Inc. to be the exclusive distributor of the award-winning PAX Era cannabis oil vaporizer. A variety of strains will be released under Liberty's licensed brands for use in the PAX Era device.

Certain of these offerings may be subject to approval by state authorities. The Company continues to round out its product line, offering THC and CBD products in a number of consumable formats.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

## Recent Business and Other Agreements

### Ohio Processing License

In October 2018, the State of Ohio Department of Commerce issued a provisional processing licence to Schottenstein Aphria II LLC, of which Liberty owns 50.1% of, with the Schottenstein Group owning the remaining 49.9%. This follows the awarding of a dispensary licence in Dayton, Ohio to Liberty and the Schottenstein Group, announced in June 2018. Liberty will be working on an operational business plan over the next several months with its joint venture partner.

### Relationship with Aphria

Concurrently with the completion of the Business Combination, Liberty and Aphria entered into the following commercial agreements:

### Know-How License Agreement

On April 25, 2017, Holdco entered into a know-how license agreement (the "Know-How License") with Aphria pursuant to which Holdco obtained a license to use any know-how (including knowledge, methodologies and techniques) made available by Aphria to Holdco related to the production of medical cannabis (the "Know-How") for the purposes of cultivating, distributing and selling medical cannabis in the State of Florida. To the extent Holdco makes any improvement or enhancement to the Know-How (an "Improvement"), such Improvement will be wholly owned by Aphria. Following the completion of the Business Combination, Holdco has made available such Know-How directly to Liberty Florida, which has in turn been relayed to assist with the control and operation of the day-to-day cannabis business of Chestnut.

In exchange for such license, Holdco issued to Aphria 192,400,000 Holdco Shares and has agreed to pay Aphria an annual license fee of $10,000 plus applicable taxes. Following the Business Combination and related consolidation, such Holdco Shares were consolidated and converted into 64,133,333 Common Shares in the capital of Liberty.

The Know-How License has no defined term but will immediately terminate in the event Holdco experiences a change of control, except to the extent Aphria provides its prior written consent thereto (which consent was provided by Aphria in respect of the Business Combination).

### Investor Rights Agreement

Concurrently with the completion of the Business Combination, Liberty entered into an investor rights agreement (the "Investor Rights Agreement") pursuant to which, among other things, Aphria is be entitled to certain director nomination and pre-emptive rights. In particular, Aphria has the right to designate two director nominees for election to the Board for so long as Aphria beneficially owns, directly or indirectly, in the aggregate, 10% or more of the issued and outstanding Common Shares (on a non-diluted basis). Such nomination rights will terminate in the event that Aphria's ownership interest in the Company falls below 10%.

The Investor Rights Agreement also includes customary pre-emptive rights in favour of Aphria pursuant to which in the event of a proposed distribution or issuance of Common Shares or other securities convertible or exchangeable into Common Shares (other than stock options or other securities issued under security based compensation arrangements), the Company will grant Aphria the right to subscribe for that number of Common Shares, or, as the case may be, for securities convertible or exchangeable into Common Shares, on the same terms and conditions, including the same subscription or exercise price, as applicable, in order that Aphria may continue to maintain its pro rata equity ownership interest in the Company.

### Trademark License Agreement

Concurrently with the completion of the Business Combination, Liberty entered into a trademark license agreement (the "Trademark License") with Aphria pursuant to which Liberty and its subsidiaries (including Liberty Florida) obtained a license to use Aphria's trademarks identified therein (the "Trademarks") for the



LIBERTY HEALTH SCIENCES INC.
## MANAGEMENT'S DISCUSSION & ANALYSIS

purposes of marketing, distributing and selling medical cannabis in the State of Florida. The Trademark License was subsequently amended and restated to allow Liberty and its subsidiaries to use the Trademarks in Massachusetts and to provide a right of first refusal in other states. The Trademark License superseded the terms of an interim trademark license agreement which was in effect between Aphria and Holdco, which was implemented on a temporary basis following the acquisition of Chestnut Hill Tree Farm LLC.

In exchange for such license, Liberty will pay Aphria a royalty of 3% on sales of each product that is sold or otherwise supplied by Liberty or any of its subsidiaries to another person under Aphria's name (excluding, for greater clarity, any costs of packing, insurance, transport, delivery and consumption taxes).

Subject to each party's termination rights therein, the Trademark License will remain in effect for an initial term of ten (10) years, automatically renewing for successive sixty (60) month periods unless a party provides the other party with notice of non-renewal. The Trademark License will automatically terminate 120 days after Liberty experiences a change of control, except to the extent Aphria provides its prior written consent thereto. In addition, Aphria has the right to immediately terminate the Trademark License in the event: (a) Liberty commits a material breach of the Trademark License (subject to a thirty (30) day cure period); (b) Liberty or any of its subsidiaries goes bankrupt becomes insolvent or suspends or ceases, or threatens to suspend or cease, to carry on all or a substantial part of its business; (c) Aphria owns more than 10% of Liberty's issued and outstanding shares and its representatives constitute less than 40% of the board of directors of Liberty, (d) Liberty's business competes with Aphria outside of the approved territories (subject to a thirty (30) day cure period), or (e) the Know-How License is terminated. Liberty may also terminate the agreement with thirty (30) days prior written notice.

### *Registration Rights Agreement*

Concurrently with the completion of the Business Combination, Liberty entered into a registration rights agreement (the "Registration Rights Agreement") pursuant to which, among other things, Aphria will be provided with customary demand and "piggy back" registration rights, as further described below.

Under the terms of the Registration Rights Agreement, Aphria may at any time and from time to time (but in no event more than 3 times per calendar year), require the Company to file a prospectus under applicable securities laws and take such other steps as may be necessary to facilitate a secondary offering in Canada of all or any portion of the Common Shares held by Aphria, by giving written notice of such request to the Company. Subject to certain conditions set out in the Registration Rights Agreement, the Company shall use commercially reasonable efforts to as expeditiously as possible, but in any event no more than 60 days after the Company's receipt of such notice, prepare and file a preliminary Prospectus under applicable securities laws and promptly thereafter take such other steps as may be necessary in order to effect the distribution in Canada of all or any portion of the Common Shares held by Aphria as may be requested.

Additionally, if at any time and from time to time from and after the Effective Date, the Company proposes to make a distribution for its own account, the Company will, at that time, promptly provide Aphria with notice of such proposed distribution. Upon the written request of Aphria to the Company that Aphria wishes to include a specified number of its Common Shares in the distribution, the Company will cause such Common Shares held by Aphria to be included in the distribution.

### *Sale of Aphria's Position*

On February 5, 2018, it was announced that a group of buyers led by members of the Serruya family (the "Group") had entered into a purchase and sale agreement with Aphria to purchase all of the Common Shares in the Company owned by Aphria that are not subject to CSE escrow requirements over the course of the next two and a half years. Following the initial purchase, Aphria retained an ownership position of 26.4% of the issued and outstanding Common Shares. The transaction also includes a call / put option agreement for the remainder of the Common Shares in the Company owned by Aphria, which are currently subject to the CSE mandatory escrow requirements. The Company will continue to utilize the Aphria brand



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

name and the Aphria know-how in perpetuity pursuant to the Trademark License and Know-How License between the Company and Aphria. On July 23, 2018 it was announced that Aphria had entered into a lock-up agreement with the Group, preventing them from selling the next tranche of Liberty shares owned by Aphria that will become freely trading on July 26, 2018 for a period of 18 months. On September 6, 2018, it was announced that Aphria had sold its outstanding shares Liberty, totaling 64,118,462 shares to a group of buyers. In exchange, Aphria received a five-year promissory note bearing 12% interest for $59.1 million. Aphria has also secured an irrevocable option to repurchase these shares for the value of the promissory note, together with any interest thereon and pursuant to a Note Purchase Agreement.

## SELECTED OPERATIONAL AND FINANCIAL RESULTS

|  | Three months ended August 31, | | Six months ended August 31, | From May 1, 2017 to August 31, |
| --- | --- | --- | --- | --- |
|  | 2018 | 2017 | 2018 | 2017 |
| **Operating performance** | | | | |
| Grams harvested | **191,644** | 18,303 | **393,397** | 18,348 |
| Equivalent grams sold | **135,939** | 1,701 | **207,266** | 1,781 |
| Average realized price per gram | **16.33** | 27.64 | **16.21** | 29.09 |
| Active registered patients | **9,681** | 128 | **9,681** | 128 |
| **Financial performance** | | | | |
| Revenue | **2,219,290** | 47,024 | **3,360,408** | 51,817 |
| Adjusted gross profit (defined below) | **1,322,410** | (94,219) | **1,922,895** | (95,698) |
| Adjusted gross margin (defined below) | **59.6%** | (200.4%) | **57.2%** | (184.7%) |
| Net loss | **(5,605,355)** | (22,678,195) | **(8,779,787)** | (23,697,649) |
| Net loss per share | **(0.02)** | (0.09) | **(0.03)** | (0.10) |
| Adjusted EBITDA (defined below) | **(3,139,219)** | (1,574,943) | **(5,192,189)** | (1,709,096) |
| Cash and term deposits | **26,105,351** | 11,427,292 | **26,105,351** | 11,427,292 |
| Capital assets | **43,562,402** | 2,372,733 | **43,562,402** | 2,372,733 |
| Shareholders' equity | **113,772,848** | 62,948,651 | **113,772,848** | 62,948,651 |

## RESULTS OF OPERATIONS

### *Revenue*

Revenue for the three and six months ended August 31, 2018 was $2,219,290 and $3,360,408, respectively, compared with $47,024 and $51,817 for the three months ended August 31, 2017 and period from May 1 to August 31, 2017, respectively. The significant year-over-year increase in revenue was driven by the Company's progress in developing its brand and the opening of the Company's first four dispensaries during 2018, as well as the increase in the registered patient base on the Medical Marijuana Use Registry in Florida.

### *Gross profit and gross margin*

Gross profit for the three and six months ended August 31, 2018 was $1,714,497 and $2,320,675, respectively, compared with $113,799 and $108,682 for the three months ended August 31, 2017 and period from May 1 to August 31, 2017, respectively. Included in gross profit for the three and six months ended August 31, 2018 were unrealized gains in fair value of biological assets of $1,201,835 and $1,669,965, respectively, which are non-cash fair value adjustments required by IFRS.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

The gross profit for the Company is outlined below for the following periods:

| | Three months ended August 31, | | Six months ended August 31, | From May 1, 2017 to August 31, |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| **Revenue** | | | | |
| Sales | **2,219,290** | 47,024 | **3,360,408** | 51,817 |
| Total revenue | **2,219,290** | 47,024 | **3,360,408** | 51,817 |
| | | | | |
| Costs of sales | | | | |
| Cost of goods sold | **1,449,554** | 141,243 | **2,275,852** | 147,515 |
| Depreciation | **257,074** | 63,049 | **433,846** | 67,859 |
| Change in fair value of biological assets | **(1,201,835)** | (271,067) | **(1,669,965)** | (272,239) |
| Total costs of sales | **504,793** | (66,775) | **1,039,733** | (56,865) |
| | | | | |
| **Gross profit** | **1,714,497** | 113,799 | **2,320,675** | 108,682 |

Cost of sales currently consist of three main categories: (i) cost of goods sold; (ii) depreciation and, (iii) change in fair value of biological assets.

(i) Cost of goods sold include the direct cost of materials and labour related to the medical cannabis sold. This includes the costs of any purchased medical cannabis in the event of an acquisition of a existing license, growing, cultivation and harvesting costs, quality assurance and quality control, cannabis oil processing costs, packaging, labelling, and maintenance and repairs of production equipment and greenhouse infrastructure utilized in the production of medical cannabis.

(ii) Depreciation relates to production equipment and greenhouse infrastructure utilized in the production of medical cannabis.

(iii) Fair value adjustment of biological assets is part of the Company's cost of sales using IFRS reporting standards relating to agriculture and biological assets (i.e. living plants). This line item represents the effect of the non-cash fair value adjustment of biological assets (medical cannabis) produced in the period.

Management believes that the use of non-cash IFRS adjustments in calculating gross profit and gross margin does not represent the true underlying economics of the business due to the large value of non-cash fair value adjustments required. Accordingly, management believes the use of an adjusted gross profit and adjusted gross margin provides better representation of performance by excluding non-cash adjustments required by IFRS, and certain cost of goods sold adjustments.

Adjusted gross profit and adjusted gross margin are non-GAAP financial measures that do not have any standardized meaning prescribed by IFRS and may not be comparable to similar measures presented by other companies.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

The below is the Company's adjusted gross profit and adjusted gross margin for the following periods:

| | Three months ended August 31, | | Six months ended August 31, | From May 1, 2017 to August 31, |
| | 2018 | 2017 | 2018 | 2017 |
|---|---|---|---|---|
| **Gross Profit** | **1,714,497** | 113,799 | **2,320,675** | 108,682 |
| **Add back:** | | | | |
| Adjustments to cost of goods sold | **(552,674)** | - | **(838,339)** | - |
| Depreciation | **(257,074)** | (63,049) | **(433,846)** | (67,859) |
| Change in fair value of biological assets | **1,201,835** | 271,067 | **1,669,965** | 272,239 |
| Subtotal | **392,087** | 208,018 | **397,780** | 204,380 |
| | | | | |
| **Adjusted gross profit** | **1,322,410** | (94,219) | **1,922,895** | (95,698) |
| **Adjusted gross margin** | **59.6%** | (200.4%) | **57.2%** | (184.7%) |

The positive adjusted gross profit for the three and six months ended August 31, 2018 compared to prior periods reflects the increase in revenue from higher sales, slightly offset by higher production costs realized in the quarter.

## *Operating expenses*

| | Three months ended August 31, | | Six months ended August 31, | From May 1, 2017 to August 31, |
| | 2018 | 2017 | 2018 | 2017 |
|---|---|---|---|---|
| **Operating items** | | | | |
| Professional fees | **833,485** | 411,081 | **1,346,177** | 411,380 |
| Employee and staff costs | **633,413** | 323,409 | **1,298,295** | 335,126 |
| Office and general | **359,573** | 69,910 | **597,888** | 80,807 |
| Consulting fees | **-** | 151,886 | **45,940** | 203,644 |
| Travel and entertainment | **196,911** | 108,172 | **363,401** | 127,342 |
| Interest expense | **472,266** | - | **935,819** | - |
| Advertising and marketing | **453,732** | 102,056 | **664,327** | 145,297 |
| Insurance | **50,131** | 99,059 | **311,713** | 99,059 |
| Selling costs | **519,981** | 17,083 | **867,787** | 17,083 |
| Facilities expenses and leases | **402,191** | - | **816,266** | - |
| Royalty | **117,760** | - | **151,994** | - |
| Depreciation | **475,327** | 417,067 | **933,938** | 453,597 |
| Share-based compensation | **1,241,344** | 646,334 | **2,379,277** | 646,334 |
| **Total operating items** | **5,756,114** | 2,346,057 | **10,712,822** | 2,519,669 |

Operating expenses for the three and six months ended August 31, 2018 were $5,756,114 and $10,712,822, respectively, compared with $2,346,057 and $2,519,669 for the three months ended August 31, 2017 and period from May 1 to August 31, 2017. The primary drivers of operating costs for the three months ended August 31, 2018 were i) non-cash share-based compensation expense from options issued; ii) professional fees consisting primarily of legal, lobbying and advisory fees that are expected to decrease as Liberty stabilizes its business; iii) employee and staff costs relating to executive and administrative personnel; iv) selling costs driven by retail and delivery costs, including labor; v) advertising and marketing costs; vi) interest expense from the Company's issued convertible debentures; and vii) depreciation on Liberty's intangible assets and office equipment. The year-over-year increase in Liberty's operating expenses reflects the growth of Liberty's business, including the opening of dispensaries and delivery hubs across Florida, the increase of Liberty's delivery service to patients, the hiring of sufficient employees to



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

support Liberty's activities and the related overhead.

## Non-operating items

| | Three months ended August 31, | | Six months ended August 31, | From May 1, 2017 to August 31, |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| Non-operating items | | | | |
| Other loss (income) | 463,682 | (10,304) | (48,372) | (14,712) |
| Investor relations and filing fees | 176,274 | 208,372 | 445,172 | 208,372 |
| Application costs | 254,496 | - | 254,496 | - |
| Transaction costs | 286,869 | 20,158,030 | 534,137 | 20,593,585 |
| Interest accretion | 497,642 | - | 961,393 | - |
| Change in fair value of embedded derivative | (48,752) | - | (1,625,925) | - |
| Foreign exchange (gain) loss | (66,473) | 89,839 | (133,261) | 499,417 |
| Total non-operating items | 1,563,738 | 20,445,937 | 387,640 | 21,286,662 |

The Company's non-operating items for the three and six months ended August 31, 2018 were $1,563,738 and $387,640, respectively, compared with $20,445,937 and $21,286,662 for the three months ended August 31, 2017 and the period from May 1 to August 31, 2017, respectively. During the three months ended August 31, 2018, Liberty incurred non-operating costs primarily in respect of i) other losses primarily consisting of fair value losses on Liberty's investment in Isodiol; ii) interest accretion with respect to the interest charge on the convertible debentures issued by Liberty in November 2017, and iii) transaction costs incurred for due diligence activities. Compared with the three months ended August 31, 2017, Liberty had significantly lower non-operating costs due to the transaction costs incurred in 2017 as a result of the reverse takeover transaction creating Liberty.

## Other comprehensive gain (loss)

The Company recorded other comprehensive gain for the three and six months ended August 31, 2018 of $529,637 and $1,007,934, respectively, compared with other comprehensive loss for the three months ended August 31, 2017 and the period from May 1 to August 31, 2017 of $3,545,596 and $3,508,898, respectively. The other comprehensive gain for the three and six months ended August 31, 2018 is a result of the Company's wholly-owned subsidiary Liberty Florida using the United States dollar as its functional currency and the changes in the US dollar to Canadian dollar exchange rate during the period. The closing foreign exchange rate (United States dollar stated in Canadian dollars) were as follows: August 31, 2018 – 1.3055, May 31, 2018 – 1.2948, February 28, 2018 – 1.2809, August 31, 2017 – 1.2536.

## Net loss

The Company recorded a net loss for the three and six months ended August 31, 2018 of $5,605,355 or $0.017 per share and $8,779,787 or $0.026 per share, respectively, compared with $22,678,195 or $0.090 and $22,697,946 or $0.099 per share for the three months ended August 31, 2017 and period from May 1 to August 31, 2017, respectively. The improvement in net income was due primarily to the ramp-up in sales revenues at the Company's operations in Florida as described above as well as the significant one-time transaction costs incurred in 2017.

## Adjusted EBITDA

Adjusted EBITDA is a non-GAAP financial measure that does not have any standardized meaning prescribed by IFRS and may not be comparable to similar measures presented by other companies. The Company calculates EBITDA as net income (loss), plus (minus) income taxes (recovery), plus (minus) foreign exchange loss (gain), plus (minus) change in fair value of embedded derivative, plus interest accretion, plus share-based compensation, plus depreciation, plus interest expense, plus change in fair value of biological assets, plus changes in fair value in cost of goods sold and certain one-time non-



**LIBERTY HEALTH SCIENCES INC.**
**MANAGEMENT'S DISCUSSION & ANALYSIS**

operating expenses, as determined by management, all as follows:

| | Three months ended August 31, | | Six months ended August 31, | From May 1, 2017 to August 31, |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| **Net loss** | **(5,605,355)** | (22,678,195) | **(8,779,787)** | (23,697,649) |
| **Adjustments** | | | | |
| Foreign exchange (gain) loss | **(66,473)** | 89,839 | **(133,261)** | 499,417 |
| Change in fair value of embedded derivative | **(48,752)** | - | **(1,625,925)** | - |
| Interest accretion | **497,642** | - | **961,393** | - |
| Transaction costs | **286,869** | 20,158,030 | **534,137** | 20,593,585 |
| Share-based compensation | **1,241,344** | 646,334 | **2,379,277** | 646,334 |
| Depreciation | **732,401** | 480,116 | **1,367,784** | 521,456 |
| Interest expense | **472,266** | - | **935,819** | - |
| Change in fair value of biological assets | **(1,201,835)** | (271,067) | **(1,669,965)** | (272,239) |
| Adjustments to cost of goods sold | **552,674** | - | **838,339** | - |
| **Adjusted EBITDA** | **(3,139,219)** | (1,574,943) | **(5,192,189)** | (1,709,096) |

## SELECTED QUARTERLY RESULTS

The following table sets out certain financial information for each of the fiscal quarters from May 1, 2017 up to and including the second quarter of fiscal 2019, ended August 31, 2018.

| | Three months ended August 31, 2018 | Three months ended May 31, 2018 | Three months ended February 28, 2018 | Three months ended November 30, 2017 |
| --- | --- | --- | --- | --- |
| Revenue | 2,219,290 | 1,141,118 | 432,249 | 121,207 |
| Net loss | (5,605,355) | (3,174,432) | (4,035,254) | (1,112,603) |
| Net comprehensive loss | (5,075,718) | (2,696,135) | (4,363,247) | 274,558 |
| Loss per share – basic & diluted | (0.017) | (0.010) | (0.014) | (0.004) |
| | Three months ended August 31, 2017 | From May 1, 2017 to May 31, 2017 | | |
| Revenue | 47,024 | 4,793 | | |
| Net loss | (22,678,195) | (1,019,454) | | |
| Net comprehensive loss | (26,223,791) | (982,756) | | |
| Loss per share – basic & diluted | (0.090) | (0.005) | | |

## LIQUIDITY AND CAPITAL RESOURCES

The Company monitors its capital structure and manages its cash flows to assess the liquidity necessary to fund its operations and activities. As at August 31, 2018, Liberty maintained $26,105,351 of cash and term deposits on hand, compared to $26,145,379 in cash and term deposits at February 28, 2018.

For the six months ended August 31, 2018, cash used in operational activities was $6,258,188, primarily due to the continued ramp-up of the Company's Florida operations, while cash used in investing activities of $22,943,832 consisted of the purchase and construction of capital assets at Liberty 360, the issuance of a promissory note related to the acquisition of the Massachusetts business, and various investments in cannabis-related businesses. To support these activities, Liberty raised $29,161,992 in cash generated from financing activities from its Bought Deal Offering in May 2018 and its issuance of shares to satisfy certain debts in respect of Liberty's capital expenditures.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

Working capital is a common measure of a Company's short-term financial health and its ability to meet its upcoming operational and capital requirements. As at August 31, 2018, the Company maintained working capital of $17,419,243. Management believes that it will have sufficient positive operating cash flow and funds available on hand to meet its stated operational goals over the next fiscal year, including i) completing the retrofit of the Alico facilities and opening up the Liberty 360 Campus; ii) constructing and opening up to ten to twelve dispensaries (seven open currently) prior to the end of fiscal 2019; and iii) initiating any planned construction for Liberty's operations in Massachusetts during fiscal 2019. Although the Company anticipates that it will have positive cash flow from operating activities in future periods, to the extent that the Company has negative cash flow in any future period, the Company may be required to take additional measures to increase its liquidity and capital resources, including obtaining additional equity or debt financing.

## COMMITMENTS

As part of the acquisition of Chestnut Hill Tree Farm LLC, the Company acquired a finance lease obligation for production equipment. The finance lease is repayable over a one-year period ending October 2018.

Except as disclosed elsewhere in this MD&A, there have been no material changes with respect to the contractual obligations of the Company during the period.

## SHARE CAPITAL

Liberty has the following securities issued and outstanding, as at the date of this MD&A:

|  | Presently outstanding | Exercisable | Exercisable & in-the-money* | Fully diluted |
|---|---|---|---|---|
| Common shares | 339,006,806 | n/a | n/a | 339,006,806 |
| Warrants | 39,492,080 | 39,492,080 | 30,084,419 | 30,084,419 |
| Stock options | 10,449,832 | 3,034,831 | 1,719,833 | 1,486,667 |
| **Fully diluted** |  |  |  | **370,577,892** |

*Based on closing price on October 26, 2018*

## RELATED PARTY BALANCES AND TRANSACTIONS

Key management personnel are those persons that have the authority and responsibility for planning, directing and controlling the activities of the Company directly and indirectly. Key management personnel include the Company's directors and members of the senior management group. Included in employee and staff costs for the three and six months ended August 31, 2018 are $245,038 and $394,929, respectively paid to key management personnel. Share-based compensation expense for key management personnel for the three and six months ended August 31, 2018 was $1,128,049 and $2,232,322, respectively.

Under a trademark license agreement, Liberty accrued $119,535 of royalty expenses payable to a related company as at August 31, 2018 in respect of sales of products licensed by the same related company.

## ISSUERS WITH U.S. CANNABIS-RELATED ACTIVITIES

On February 8, 2018, the Canadian Securities Administrators revised their previously released Staff Notice 51-352 *Issuers with U.S. Marijuana-Related Activities* (the "Staff Notice") which provides specific disclosure expectations for issuers that currently have, or are in the process of developing, cannabis-related activities in the United States as permitted within a particular state's regulatory framework. All issuers with United States cannabis-related activities are expected to clearly and prominently disclose certain prescribed information in prospectus filings and other required disclosure documents.

As a result of the Company's existing operations and recent acquisitions in the United States, Liberty is



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

properly subject to the Staff Notice and accordingly provides the following disclosure:

### *Nature of Involvement*

As of August 31, 2018, the date of the Q2 Financials, all of the Company's business was directly derived from US cannabis-related activities, based on the existing operations of the Company in Florida. As such, the Company's balance sheet and operating statement exposure to US cannabis-related activities is 100%.

#### *Florida*

The Company is licensed to operate as a "medical marijuana treatment center" under applicable Florida law pursuant to the terms of the License issued by the Florida Department of Health, Office of Compassionate Use under the provisions of the *Compassionate Medical Cannabis Act of 2014*. The Company operates the 36-acre Chestnut property in Alachua, Florida where the Company cultivates and sells medical cannabis. The Chestnut Facility currently employs or has under contract approximately 90 full or part time staff, including lab technicians, horticulturalists, operations, sales, marketing and security personnel. The Company anticipates that it will begin full production at the Liberty 360 Campus in Gainesville in early 2019. The Company has received approval from the Florida Department to open seven dispensaries to date, and has signed leases to open a further four locations.

#### *Massachusetts*

On March 27, 2018, the Company announced that it had agreed to acquire a 75% ownership interest in Massachusetts-based William Noyes Webster Foundation, Inc. ("WNWF") for US$16.0 million, pursuant to a binding term sheet. WNWF owns an integrated medical cannabis license in the Commonwealth of Massachusetts and has a cultivation facility and dispensary location both of which are partially completed. This acquisition is expected to give Liberty the opportunity to tap into the growing Massachusetts medical cannabis marketplace which currently has a total population of nearly seven million people. With a integrated medical license, the Company would also have priority to receive three new adult-use licenses, one for cultivation, one for processing and one for a dispensary. The WNWF acquisition is subject to the receipt of all required governmental approvals from the Commonwealth of Massachusetts, Medical Use of Marijuana Program or the Massachusetts Cannabis Control Commission. The Company is developing a strategy as it relates to Massachusetts now that the state has legalized recreational marijuana use.

#### *Ohio*

On June 4, 2018, the State of Ohio Board of Pharmacy awarded a dispensary license for the southwest portion of the state to Schottenstein Aphria III LLC, of which Liberty holds a 50.1% ownership interest. Over 375 applications were submitted for 56 licenses in Ohio. On October 18, 2018, the State of Ohio Department of Commerce awarded a processing license to Schottenstein Aphria II LLC, of which Liberty holds a 50.1% ownership interest. The Company is developing its operational plans with its joint venture partner, the Schottenstein Group, including securing a Certificate of Operation.

### *Enforcement of United States Federal Laws*

In the United States, cannabis is largely regulated at the state level. To the Company's knowledge, there are to date a total of 30 states, plus the District of Columbia, Puerto Rico and Guam that have legalized cannabis in some form, including Florida and Massachusetts. Nine states and Washington D.C. have legalized recreational cannabis in some form, including Massachusetts. Notwithstanding the permissive regulatory environment of medical cannabis at the state level, and the increasing number of states with legal recreational frameworks, cannabis continues to be categorized as a Schedule I controlled substance under the CSA and as such, violates federal law in the United States. Senators Elizabeth Warren and Cory Gardner have introduced a bipartisan Senate bill titled "Strengthening the Tenth Amendment Through Entrusting States (STATES) Act" that would lift the Controlled Substance Act's restrictions on cannabis in states that have written their own laws. However, there can be no assurances as to when this bill will pass,



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

or if it will pass at all.

As a result of the conflicting views between state legislatures and the United States federal government regarding cannabis, investments in cannabis businesses in the United States are subject to inconsistent legislation and regulation. The response to this inconsistency was addressed in August 2013 when then Deputy Attorney General, James Cole, authored a memorandum (the "Cole Memorandum") addressed to all United States district attorneys acknowledging that notwithstanding the designation of cannabis as a controlled substance at the federal level in the United States, several US states have enacted laws relating to cannabis for medical and recreational purposes.

The Cole Memorandum outlined certain priorities for the Department of Justice relating to the prosecution of cannabis offenses. In particular, the Cole Memorandum noted that in jurisdictions that have enacted laws legalizing cannabis in some form and that have also implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale and possession of cannabis, conduct in compliance with those laws and regulations is less likely to be a priority at the federal level. Notably, however, the Department of Justice has never provided specific guidelines for what regulatory and enforcement systems it deems sufficient under the Cole Memorandum standard.

In light of limited investigative and prosecutorial resources, the Cole Memorandum concluded that the Department of Justice should be focused on addressing only the most significant threats related to cannabis. States where medical cannabis had been legalized were not characterized as a high priority. In March 2017, newly appointed Attorney General Jeff Sessions again noted limited federal resources and acknowledged that much of the Cole Memorandum had merit; however, he disagreed that it had been implemented effectively and, on January 4, 2017, Attorney General Jeff Sessions issued a memorandum (the "Sessions Memorandum") that rescinded the Cole Memorandum. The Sessions Memorandum rescinded previous nationwide guidance specific to the prosecutorial authority of United States Attorneys relative to cannabis enforcement on the basis that they are unnecessary, given the well-established principles governing federal prosecution that are already in place. Those principles are included in chapter 9.27.000 of the United States Attorneys' Manual and require federal prosecutors deciding which cases to prosecute to weigh all relevant considerations, including federal law enforcement priorities set by the Attorney General, the seriousness of the crime, the deterrent effect of criminal prosecution, and the cumulative impact of particular crimes on the community. Andrew Lelling, newly appointed as the United States Attorney for the District of Massachusetts, has stated publicly that while marijuana is illegal under federal law, the ''number one enforcement priority'' for his office is ''the opioid crisis''. Massachusetts Governor Charlie Baker also stated, "We have two laws in Massachusetts: one that was passed by voters several years ago around the establishment of medical marijuana dispensaries, which are regulated and overseen by the commonwealth, and another law that was passed by the voters in 2016 that requires the state to create a legal infrastructure for recreational marijuana. Those are the laws that state and local law enforcement officials are bound to uphold and that's what they're going to do." Following the issuance of the Sessions Memorandum, each of the United States Attorneys for the State of Ohio stated it would not change their approach to prosecuting marijuana cases. To the knowledge of management of the Company, there have not been any additional statements or guidance made by federal authorities or prosecutors regarding the risk of enforcement action in Florida.

As a result of the Sessions Memorandum, federal prosecutors will now be free to utilize their prosecutorial discretion to decide whether to prosecute cannabis activities despite the existence of state-level laws that may be inconsistent with federal prohibitions. No direction was given to federal prosecutors in the Sessions Memorandum as to the priority they should ascribe to such cannabis activities, and resultantly it is uncertain how actively federal prosecutors will be in relation to such activities. Furthermore, the Sessions Memorandum did not discuss the treatment of medical cannabis by federal prosecutors. Medical cannabis is currently protected against enforcement by enacted legislation from United States Congress in the form of the Rohrabacher-Blumenauer Amendment (as defined herein) which similarly prevents federal prosecutors from using federal funds to impede the implementation of medical cannabis laws enacted at the state level, subject to Congress restoring such funding. See "*United States Enforcement Proceedings*". Due to the ambiguity of the Sessions Memorandum in relation to medical cannabis, there can be no



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

assurance that the federal government will not seek to prosecute cases involving cannabis businesses that are otherwise compliant with state law. See "*Industry Trends and Risks*".

Such potential proceedings could involve significant restrictions being imposed upon the Company or third parties, and also divert the attention of key executives. Such proceedings could have a material adverse effect on the Company's business, revenues, operating results and financial condition as well as the Company's reputation, even if such proceedings were concluded successfully in favor of the Company. See "*Industry Trends and Risks*".

Additionally, under U.S. federal law it may potentially be a violation of federal money laundering statutes for financial institutions to accept any proceeds from cannabis sales or any other Schedule I narcotics. Canadian banks are similarly reluctant to transact with cannabis companies, due to the uncertain legal and regulatory framework characterizing the industry at present. Banks and other financial institutions could be prosecuted and possibly convicted of money laundering for providing services to cannabis businesses. Under U.S. federal law, banks or other financial institutions that provide a cannabis business with a checking account, debit or credit card, small business loan, or any other service could be found guilty of money laundering or conspiracy. Despite these laws, in February 2014, the Financial Crimes Enforcement Network ("FCEN") of the Treasury Department issued a memorandum (the "FCEN Memo") providing instructions to banks seeking to provide services to cannabis-related businesses. The FCEN Memo states that in some circumstances, it is permissible for banks to provide services to cannabis-related businesses without risking prosecution for violation of federal money laundering laws. It refers to supplementary guidance that Deputy Attorney General Cole issued to federal prosecutors relating to the prosecution of money laundering offenses predicated on cannabis-related violations of the CSA. It is unclear at this time whether the current administration will follow the guidelines of the FCEN Memo. See "*Industry Trends and Risks*".

For the reasons set forth above, the Company's existing operations in the United States, and any future operations or investments the Company may engage in, may become the subject of heightened scrutiny by regulators, stock exchanges and other authorities in Canada. As a result, the Company may be subject to significant direct and indirect interaction with public officials. There can be no assurance that this heightened scrutiny will not in turn lead to the imposition of certain restrictions on the Company's ability to operate in the United States or any other jurisdiction. See "*Industry Trends and Risks*".

Government policy changes or public opinion may also result in a significant influence over the regulation of the cannabis industry in the United States or elsewhere. A negative shift in the public's perception of medical cannabis in the United States or any other applicable jurisdiction could affect future legislation or regulation. Among other things, such a shift could cause state jurisdictions to abandon initiatives or proposals to legalize medical cannabis, thereby limiting the number of new state jurisdictions into which the Company could expand. Additionally, due to the uncertain regulatory landscape, the Company's third-party suppliers, manufacturers and contractors may elect, at any time, to decline or withdraw services necessary for the Company's operations. Any inability to fully implement the Company's expansion strategy may have a material adverse effect on the Company's business, financial condition and results of operations. See "*Industry Trends and Risks*".

Further, violations of any federal laws and regulations could result in significant fines, penalties, administrative sanctions, convictions or settlements arising from civil proceedings conducted by either the federal government or private citizens, or criminal charges, including, but not limited to, disgorgement of profits, cessation of business activities or divestiture. This could have a material adverse effect on the Company, including its reputation and ability to conduct business, its holding (directly or indirectly) of medical cannabis licenses in the United States, the listing of its securities on various stock exchanges, its financial position, operating results, profitability or liquidity or the market price of its publicly traded shares. In addition, it is difficult for the Company to estimate the time or resources that would be needed for the investigation of any such matters or its final resolution because, in part, the time and resources that may be needed are dependent on the nature and extent of any information requested by the applicable authorities involved, and such time or resources could be substantial. See "*Industry Trends and Risks*".



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

### *United States Enforcement Proceedings*

The United States Congress has passed appropriations bills each of the last three years that included the Rohrabacher Amendment Title: H.R.2578 — Commerce, Justice, Science, and Related Agencies Appropriations Act, 2016 ("Rohrabacher-Blumenauer Amendment"), which by its terms does not appropriate any federal funds to the United States Department of Justice for the prosecution of medical cannabis offenses of individuals who are in compliance with state medical cannabis laws. Subsequent to the issuance of the Sessions Memorandum on January 4, 2018, the United States Congress passed its omnibus appropriations bill, SJ 1662, which for the fourth consecutive year contained the Rohrabacher-Blumenauer Amendment language (referred to in 2018 as the "Rohrabacher-Leahy Amendment") and continued the protections for the medical cannabis marketplace and its lawful participants from interference by the Department of Justice up and through the 2018 appropriations deadline of September 30, 2018. These protections were subsequently extended through December 7, 2018 as part of a short-term continuation of appropriations. American courts have construed these appropriations bills to prevent the federal government from prosecuting individuals when those individuals comply with state law. However, because this conduct continues to violate federal law, American courts have observed that should Congress at any time choose to appropriate funds to fully prosecute the CSA, any individual or business—even those that have fully complied with state law—could be prosecuted for violations of federal law. If Congress restores funding, the United States government will have the authority to prosecute individuals for violations of the law before it lacked funding under the CSA's five-year statute of limitations.

### *Ability to Access Public and Private Capital*

The Company has historically, and continues to have, access to both public and private capital in Canada in order to support its continuing operations. The Company has had cannabis-related activities in the United States since its inception in July 2017 when the CSE approved the Business Combination and the resulting reverse takeover and listing of the Company's Common Shares. In addition, the Company has had success completing private offerings in the past, including the May 2018 Bought Deal Offering which raised $21.4 million of net proceeds for the Company, and has an ongoing banking relationship with WFCU Credit Union, a Canadian credit union based out of Windsor, Ontario ("WFCU") and Partner Colorado Credit Union based out of Denver, Colorado. Although the Company has accessed private financing in the past, there is neither a broad nor deep pool of institutional capital that is available to cannabis license holders and license applicants. There can be no assurance that additional financing, if raised privately, will be available to the Company when needed or on terms which are acceptable. The Company has never needed to access public equity capital in the United States.

### *Regulation of Medical Cannabis in Florida*

Liberty is licensed to produce and sell medical cannabis in the State of Florida through the Florida Department under the provisions of the Florida Legislation. The Florida Department of Health issued the License to Chestnut on November 23, 2015 and Liberty acquired the rights to the License on May 23, 2017 via the exclusive management agreement entered into between Liberty and Chestnut. On September 28, 2017, the Florida Department approved the transfer of the License to Liberty Florida, the wholly-owned subsidiary of Liberty, which now solely owns and is entitled to utilize the License in Florida.

The License permits the sale of low-THC cannabis (now grandfathered to produce and sell high-THC cannabis) and medical cannabis to treat a number of medical conditions in the State of Florida which are delineated in Florida Statutes section 381.986. Under the terms of the License, Liberty is permitted to sell medical cannabis only to qualified medical patients that are registered with the state. Only certified physicians who have successfully completed a medical cannabis educational program can register patients and their medical cannabis orders on the Florida Office of Compassionate Use Registry. Liberty maintains an open and collaborative relationship with the Florida Department of Health and Liberty's operations are in full compliance with all laws and regulations.

Under the Liberty License, Liberty can operate up to 30 dispensaries statewide. Currently, the dispensaries



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

can be in any geographic location within the state as long as the local municipality's zoning regulations authorize such a use and/or the proposed site is zoned for a pharmacy use and is not within 500 feet of a church or school. In the State of Florida, only cannabis that is grown in the state can be sold in the state. As Florida is a vertically integrated system, Liberty (and other licensees) is required to cultivate, harvest, process and sell/dispense/deliver its own medical cannabis products. The State also allows Liberty to make a wholesale purchase of medical cannabis from, or a distribution of medical cannabis to, another licensed dispensing organization within the state under certain circumstances such as crop failure. At the present time, Liberty's principal products include cannabis oil in capsule, oral solution, sublingual solution and vaporizer forms. The sale of dry flower in the State is prohibited.

## Regulatory Framework

The State of Florida Statutes 381.986(8)(a) provides a regulatory framework that requires licensed producers, which are statutorily defined as "Medical Marijuana Treatment Centers," to both cultivate, process and dispense medical cannabis in a vertically integrated marketplace.

## Licensing Requirements

Licenses issued by the Florida Department are renewed biennially so long as the licensee meets requirements of the law and pays a renewal fee. License holders can only own one license and MMTC's can operate up to a maximum of 30 dispensaries throughout the State of Florida.

Applicants must demonstrate (and licensed MMTC's must maintain) that: (i) they have been registered to do business in the State of Florida for the previous five years, (ii) they possess a valid certificate of registration issued by the Florida Department of Agriculture, (iii) they have the technical and technological ability to cultivate and produce cannabis, including, but not limited to, low-THC cannabis, (iv) they have the ability to secure the premises, resources, and personnel necessary to operate as an MMTC, (v) they have the ability to maintain accountability of all raw materials, finished products, and any byproducts to prevent diversion or unlawful access to or possession of these substances, (vi) they have an infrastructure reasonably located to dispense cannabis to registered qualified patients statewide or regionally as determined by the Department, (vii) they have the financial ability to maintain operations for the duration of the two-year approval cycle, including the provision of certified financial statements to the Department, (viii) all owners, officers, board members and managers have passed a Level II background screening, inclusive of fingerprinting, and ensure that a medical director is employed to supervise the activities of the MMTC, and (ix) they have a diversity plan and veterans plan accompanied by a contractual process for establishing business relationships with veterans and minority contractors and/or employees.

Upon approval of the application by the Department, the applicant must post a performance bond of up to US$5,000,000, which may be reduced by meeting certain criteria such as a minimum patient count.

## Dispensary Requirements

An MMTC may not dispense more than a 70-day supply of cannabis. The MMTC employee who dispenses the cannabis must enter into the registry his or her name or unique employee identifier. The MMTC must verify that: (i) the qualified patient and the caregiver, if applicable, each has an active registration in the registry and active and valid medical cannabis use registry identification card, (ii) the amount and type of cannabis dispensed matches the physician certification in the registry for the qualified patient, and (iii) the physician certification has not already been filled. An MMTC may not dispense to a qualified patient younger than 18 years of age, only to such patient's caregiver. An MMTC may not dispense or sell any other type of cannabis, alcohol, or illicit drug-related product, except a cannabis delivery device as specified in the physician certification. An MMTC must, upon dispensing, record in the registry: (i) the date, time, quantity and form of cannabis dispensed, (ii) the type of cannabis delivery device dispensed, and (iii) the name and registry identification number of the qualified patient or caregiver to whom the cannabis delivery device was dispensed. An MMTC must ensure that patient records are not visible to anyone other than the patient, caregiver, and MMTC employees.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

*Security Requirements for Cultivation, Processing and Dispensing Facilities*

With respect to security requirements for cultivation, processing and dispensing facilities, an MMTC must maintain a fully operational alarm system that secures all entry points and perimeter windows, and is equipped with motion detectors, pressure switches, and duress, panic and hold-up alarms. The MMTC must also have a 24-hour video surveillance system with specified features. MMTCs must retain video surveillance recordings for at least 45 days, or longer upon the request of law enforcement. An MMTC's outdoor premises must have sufficient lighting from dusk until dawn.

An MMTC's dispensing facilities must include a waiting area with sufficient space and seating to accommodate qualified patients and caregivers and at least one private consultation area and such facilities may not display products or dispense cannabis or cannabis delivery devices in the waiting area and may not dispense cannabis from its premises between the hours of 9:00 p.m. and 7:00 a.m. but may perform all other operations and deliver cannabis to qualified patients 24-hours a day.

*Transportation and Storage Requirements*

Cannabis must be stored in a secured, locked room or a vault. An MMTC must have at least two employees, or two employees of a security agency, on the premises at all times where cultivation, processing, or storing of cannabis occurs. MMTC employees must wear an identification badge and visitors must wear a visitor pass at all times on the premises. An MMTC must report to law enforcement within 24 hours after the MMTC is notified of or becomes aware of the theft, diversion or loss of cannabis. A cannabis transportation manifest must be maintained in any vehicle transporting cannabis or a cannabis delivery device. The manifest must be generated from the MMTC's seed-to-sale tracking system and must include the: (i) departure date and time, (ii) name, address, and license number of the originating MMTC, (iii) name and address of the recipient, (iv) quantity and form of any cannabis or cannabis delivery device being transported, (v) arrival date and time, (vi) delivery vehicle make and model and license plate number; and (vii) name and signature of the MMTC employees delivering the product. Further, a copy of the transportation manifest must be provided to each individual, MMTC that receives a delivery. MMTCs must retain copies of all cannabis transportation manifests for at least three years. Cannabis and cannabis delivery devices must be locked in a separate compartment or container within the vehicle and employees transporting cannabis or cannabis delivery devices must have their employee identification on them at all times. Lastly, at least two people must be in a vehicle transporting cannabis or cannabis delivery devices, and at least one person must remain in the vehicle while the cannabis or cannabis delivery device is being delivered.

*Department Inspections*

The Florida Department shall conduct announced or unannounced inspections of MMTCs to determine compliance with the laws and rules. The Florida Department shall inspect an MMTC upon receiving a complaint or notice that the MMTC has dispensed cannabis containing mold, bacteria, or other contaminants that may cause an adverse effect to humans or the environment. The Florida Department shall conduct at least a biennial inspection of each MMTC to evaluate the MMTC's records, personnel, equipment, security, sanitation practices, and quality assurance practices.

## *Regulation of Medical Cannabis in Massachusetts*

The Medical Use of Marijuana Program (the "Program") registers qualifying patients, personal caregivers, Registered Marijuana Dispensaries ("RMD"), and RMD agents. The Program was established by Chapter 369 of the Acts of 2012, "An Act for the Humanitarian Medical Use of Marijuana," following the passage of Ballot Question 3 in the 2012 general election. Registered Marijuana Dispensary certifications are vertically integrated licenses in that each RMD license entitles a license holder to one cultivation facility, one processing facility and one dispensary location, and there is a limit of three RMD licenses per person/entity. Currently, there are over 20 medical licenses outstanding in either provisional or final status.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

### *Regulatory Framework*

The Commonwealth of Massachusetts Department of Health regulations 105 CMR 725.000 et seq. provide a regulatory framework that requires licensed producers, which are statutorily defined as "Registered Marijuana Dispensaries", to cultivate, process, transport and dispense medical cannabis in a vertically integrated marketplace. Patients with debilitating medical conditions qualify to participate in the program, including conditions such as cancer, glaucoma, positive status for human immunodeficiency virus (HIV), acquired immune deficiency virus (AIDS), hepatitis C, amyotrophic lateral sclerosis (ALS), Crohn's disease, Parkinson's disease, and multiple sclerosis (MS) when such diseases are debilitating, and other debilitating conditions as determined in writing by a qualifying patient's healthcare provider.

### *Licensing Requirements*

The Commonwealth of Massachusetts Department of Health (the "Massachusetts Department") regulations 105 CMR 725.100 (the "Massachusetts Regulations") delineates the licensing requirements for RMD's in Massachusetts. Licensed entities must demonstrate the following: (a) they are licensed and in good standing with the Secretary of the Commonwealth of Massachusetts; (b) no executive, member or any entity owned or controlled by such executive or member directly or indirectly controls more than three RMD licenses; (c) vaporizers must be made available for sale; (d) a RMD may not cultivate and dispense medical cannabis from more than two locations statewide; (e) all dispensary agents must be registered with the Massachusetts Department; (f) a RMD must have a program to provide reduced cost or free marijuana to patients with documented verifiable financial hardships; (g) one executive of a RMD must register with the Massachusetts Department of Criminal Justice Information Services on behalf of the entity as an organization user of iCORI; (h) the RMD applicant has at least $500,000 in its control as evidenced by bank statements, lines of credit or equivalent; and (i) payment of the required application fee. In a RMD application, an applicant must also demonstrate or include: (A) name, address date of birth and resumes of each executive of the applicant and of the members of the entity; (B) proof of liability insurance coverage in compliance with statutes; (C) detailed summary of the business plan for the RMD; (D) an operational plan for the cultivation of marijuana including a detailed summary of all policies and procedures; and (E) a detailed summary of the operating policies and procedures for the operations of the RMD including security, prevention of diversion, storage of marijuana, transportation of marijuana, inventory procedures, procedures for quality control and testing of product for potential contaminants, procedures for maintaining confidentiality as required by law, personnel policies, dispensing procedures, record keeping procedures, plans for patient education and any plans for patient or personal caregiver home delivery. A RMD applicant must also demonstrate that it has (i) a successful track record of running a business; (ii) a history of providing healthcare services or services providing marijuana for medical purposes in or outside of Massachusetts; (iii) proof of compliance with the laws of the Commonwealth of Massachusetts; (iv) complied with all laws and orders of the Commonwealth of Massachusetts; and (v) a satisfactory criminal and civil background. Upon the determination by the Massachusetts Department that a RMD applicant has responded to the application requirements in a satisfactory fashion, the RMD applicant is required to pay the applicable registration fee and shall be issued a provisional certificate of registration. Thereafter, the Massachusetts Department shall review architectural plans for the building of the RMD's cultivation facility and/or dispensing facilities, and shall either approve, modify or deny the same. Once approved, the RMD provisional license holder shall construct its facilities in conformance with the requirements of the Massachusetts Regulations. Once the Massachusetts Department completes all inspections and issues approval for a RMD of its facilities, the Massachusetts Department shall issue a final certificate of registration to the RMD applicant. RMD final certificates of registration are valid for one year, and shall be renewed by filing the required renewal application no later than sixty days prior to the expiration of the certificate of registration.

### *Dispensary Requirements*

A RMD shall follow its written and approved operation procedures in the operation of its dispensary locations. Operating procedures shall include (a) security measures in compliance with the Massachusetts



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

Regulations; (b) employee security policies including personal safety and crime prevention techniques; (c) hours of operation and after-hours contact information; (d) a price list for marijuana; (e) storage protocols in compliance with state law; (f) a description of the various strains of marijuana that will be cultivated and dispensed, and the forms that will be dispensed; (g) procedures to ensure accurate recordkeeping including inventory protocols; (h) plans for quality control; (i) a staffing plan and staffing records; (j) diversion identification and reporting protocols; and (k) policies and procedures for the handling of cash on RMD premises including storage, collection frequency and transport to financial institutions. The siting of dispensary locations is expressly subject to local/municipal approvals pursuant to state law, and municipalities control the permitting application process that a RMD must comply with. More specifically, a RMD shall comply with all local requirements regarding siting, provided however that if no local requirements exist, a RMD shall not be sited within a radius of five hundred feet of a school, daycare center, or any facility in which children commonly congregate. The 500 foot distance under this section is measured in a straight line from the nearest point of the facility in question to the nearest point of the proposed RMD. There is no specified numeric maximum amount that a RMD may have on its premises. The Massachusetts Regulations require that RMDs must limit their inventory of seeds, plants, and useable marijuana to reflect the projected needs of registered qualifying patients. A RMD shall only dispense to a registered qualifying patient who has a current valid certification.

*Security Requirements*

A RMD shall implement sufficient security measures to deter and prevent unauthorized entrance into areas containing marijuana and theft of marijuana at the RMD. These measures must include: (a) allowing only registered qualifying patients, caregivers, dispensary agents, authorized persons, or approved outside contractors access to the RMD facility; (b) preventing individuals from remaining on the premises of a RMD if they are not engaging in activities that are permitted; (c) disposing of marijuana or byproducts in compliance with law; (d) establishing limited access areas accessible only to authorized personnel; (e) storing all finished marijuana in a secure locked safe or vault; (f) keeping all equipment, safes, vaults or secured areas securely locked at all times; (g) ensuring that the outside perimeter of the RMD is sufficiently lit to facilitate surveillance; and (h) ensuring that all landscaping or foliage outside of the RMD does not allow a person to conceal themselves. A RMD shall also utilize a security/alarm system that (A) monitors all entry and exit points and windows and doors, (B) includes a panic/duress alarm, (C) includes system failure notifications, (D) includes 24 hour video surveillance of all safes, vaults, sales areas, areas where marijuana is cultivated, processed or dispensed, and (E) includes date and time stamping of all records and the ability to produce a clear, color still photo. The video surveillance system shall have the capacity to remain operational during a power outage. The RMD shall also maintain a backup alarm system with all of the capabilities of the primary system, and both systems shall be in good working order at all times and shall be inspected and tested on regular intervals.

*Transportation Requirements*

Marijuana or marijuana-infused products ("MIPs") may only be transported by Dispensary Agents on behalf of a RMD (a) between separately-owned RMDs in compliance with 725.105(B)(2) of the Massachusetts Regulations; (b) between RMD sites owned by the same non-profit entity; (c) between a RMD and a testing laboratory; (d) from the RMD to the destruction or disposal site; or (e) from a RMD to the primary residences of registered qualifying patients. A RMD shall staff all transport vehicles with a minimum of two Dispensary Agents. At least one Dispensary Agent shall remain with the vehicle at all times that the vehicle contains marijuana or MIPs. Prior to leaving the origination location, a RMD must weigh, inventory, and account for, on video, all marijuana to be transported.

Marijuana must be packaged in sealed, labeled, and tamper-proof packaging prior to and during transportation. In the case of an emergency stop, a log must be maintained describing the reason for the stop, the duration, the location, and any activities of personnel exiting the vehicle. A RMD shall ensure that all delivery times and routes are randomized. Each Dispensary Agent shall carry his or her Massachusetts Department-issued Program ID Card at all times when transporting marijuana or MIPs and shall produce it to Massachusetts Department representatives or law enforcement officials upon request. Where



LIBERTY HEALTH SCIENCES INC.
## MANAGEMENT'S DISCUSSION & ANALYSIS

videotaping is required when weighing, inventorying, and accounting of marijuana before transportation or after receipt, the video must show each product being weighed, the weight, and the manifest. A RMD must document and report any unusual discrepancy in weight or inventory to the Massachusetts Department and local law enforcement within 24 hours. A RMD shall report to the Massachusetts Department and local law enforcement any vehicle accidents, diversions, losses, or other reportable incidents that occur during transport, within 24 hours. A RMD shall retain all transportation manifests for no less than one year and make them available to the Massachusetts Department upon request. Any cash received from a qualifying patient or personal caregiver must be transported to a RMD immediately upon completion of the scheduled deliveries. Vehicles used in transportation must be owned, leased or rented by the RMD, be properly registered, and contain a GPS system that is monitored by the RMD during transport of marijuana and said vehicle must be inspected and approved by the Massachusetts Department prior to use.

During transit, a RMD shall ensure that (a) marijuana or MIPs are transported in a secure, locked storage compartment that is part of the vehicle transporting the marijuana or MIPs; (b) the storage compartment cannot be easily removed (for example, bolts, fittings, straps or other types of fasteners may not be easily accessible and not capable of being manipulated with commonly available tools); (c) marijuana or MIPs are not visible from outside the vehicle; and (d) all product is transported in a vehicle that bears no markings indicating that the vehicle is being used to transport marijuana or MIPs and does not indicate the name of the RMD. Each Dispensary Agent transporting marijuana or MIPs shall have access to a secure form of communication with personnel at the origination location at all times that the vehicle contains marijuana or MIPs.

### _Department Inspections_

The Massachusetts Department or its agents may inspect a RMD and affiliated vehicles at any time without prior notice. A RMD shall immediately upon request make available to the Massachusetts Department all information that may be relevant to a Massachusetts Department inspection, and the Massachusetts Department may direct a RMD to test marijuana for contaminants. Any violations found will be noted in a deficiency statement that will be provided to the RMD, and the RMD shall thereafter submit a Plan of Correction to the Massachusetts Department outlining with particularity each deficiency and the timetable and steps to remediate the same. The Massachusetts Department shall have the authority to suspend or revoke a certificate of registration in accordance with 105 CMR 725.405 of the Regulation of Adult Use Cannabis in Massachusetts. Adult-use cannabis "Marijuana Establishments" are regulated in Massachusetts by the Cannabis Control Commission pursuant to 935 CMR 500.000 et seq. Pursuant to section 500.101(2), RMDs that have received a provisional or final certificate of registration are authorized to apply for a vertically integrated Marijuana Establishment license on a priority basis over new applicants without a RMD certification. The same application requirements exist for a Marijuana Establishment license as a RMD application, and each owner, officer or member must undergo background checks and fingerprinting with the Cannabis Control Commission. Applicants must submit the location and identification of each site, and must establish a property interest in the same, and the applicant and the local municipality must have entered into a host agreement authorizing the location of the adult-use Marijuana Establishment within the municipality, and said agreement must be included in the application. Applicants must include disclosure of any and all regulatory actions against it by the Commonwealth of Massachusetts, as well as the civil and criminal history of the applicant and all owners, officers, principals or members. The application must include the RMD applicant's plans for separating medical and recreational operations, proposed timeline for achieving operations, liability insurance, business plan, and a detailed summary describing and/or updating or modifying the RMD's existing medical marijuana operating policies and procedures for adult-use including security, prevention of diversion, storage, transportation, inventory procedures, quality control, dispensing procedures, personnel policies, record keeping, maintenance of financial records and employee training protocols.

The recreational use license application process commenced on April 1, 2018 for existing RMD license holders, and will commence for all non RMD license holders on July 1, 2018. Existing RMD license holders that timely applied for a recreational license on or before April 1, 2018 are eligible to receive three recreational licenses per medical RMD license. Namely, one integrated RMD medical license is eligible, if



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

awarded by the Cannabis Control Commission, to receive three recreational licenses as follows: one for cultivation, one for processing and one for dispensary. Additionally, there is a 100,000 square foot cultivation canopy for recreational licenses; however there is no canopy restriction for RMD license holders relative to their cultivation facility.

## *Regulation of Medical Cannabis in Ohio*

### *Regulatory Framework*

The State of Ohio Administrative Code Chapter 3796 provides a regulatory framework for medical marijuana dispensaries, statutorily defined as a "Medical Marijuana Entity." Chapter 3796 also provides the framework for Administration & Enforcement and Forms & Methods of Administration.

### *Licensing Requirements*

A dispensary's certificate of operation expires on the date provided on its certificate of operation. A dispensary will receive notification ninety (90) days prior to the expiration of its certificate of operation. However, at least forty-five (45) days prior to the expiration of the certificate of operation, the dispensary is required to submit the following: (1) A medical marijuana dispensary renewal application; (2) A roster that includes all the dispensary's dispensary employees' names and dispensary employee license number; (3) The applicable fees; and (4) Any additional information required by the State Board of Pharmacy (the "State Board") in the licensing process.

If the premises on which the dispensary operates are leased, the renewal application must include an attestation that the premises identified on the application have been leased for the following two-year licensing term and is not subject to any contractual restrictions that would prevent it from operating in compliance with Chapter 3796.

Upon receipt of a renewal application, the State Board will consider: (1) The dispensary's history of compliance; (2) The number and severity of any violations; (3) The correction of violations, penalties, or other enforcement actions; and (4) Any additional criteria deemed necessary by the State Board. If the dispensary is operated in compliance with Chapter 3796, and the renewal fee is paid, the State Board must renew the certificate of operation within forty-five (45) days after the renewal application is received.
If a dispensary certificate of operation is allowed to lapse longer than thirty (30) days, the State Board will not renew the certificate of operation, and the dispensary will be required to cease operation and file for a new license.

### *Security Requirements*

*Dispensary Employee Supervision*

A licensed dispensary key employee (statutorily defined as an administrator or other person responsible for the daily operation of the dispensary) shall provide personal supervision of the medical marijuana and medical marijuana products, order forms, all records relating to the dispensing of medical marijuana and medical marijuana products, unless the State Board has provided written approval to a dispensary allowing for the storage of records off-site. Whenever personal supervision of medical marijuana and medical marijuana products is not provided by a licensed dispensary key employee, physical or electronic security of such items must be provided according to the following requirements: (a) The dispensary department, restricted access areas and stock of medical marijuana must each be secured by a physical barrier with suitable locks and an electronic barrier to detect entry at a time when licensed dispensary employees are not present (the physical barrier shall be constructed from floor to ceiling to separate the public entry area from the dispensary department). Such a barrier, before being put into use, must be approved by the State Board; (b) A restricted access area within the dispensary department must contain all medical marijuana, and if maintained on the licensed premises, all records relating to the dispensing of medical marijuana, and any other items required to be under personal supervision of a licensed dispensary employee; (c) A



Page | 21

LIBERTY HEALTH SCIENCES INC.
## MANAGEMENT'S DISCUSSION & ANALYSIS

dispensary maintaining records at a location other than the premises licensed by the State Board or via a computerized recordkeeping system shall maintain an executed agreement with the company possessing or storing the records authorizing an agent of the State Board with access to the records maintained in accordance with Chapter 3796 within three (3) business days, excluding weekends and holidays; and (d) No item, product, record, or equipment that must be accessible to anyone other than a licensed dispensary employee may be stored in restricted access areas.

*Policies & Procedures*

Licensed dispensaries are required to develop, implement, and maintain security policies and procedures. These policies and procedures include without limitation: (1) A security plan with protocols for patient, caregiver, and employee safety and management and security of medical marijuana and currency; (2) Restricted access to the areas in the dispensary that contain medical marijuana to authorized employees; (3) Identification of authorized employees through means including current employee identification card in the employee's immediate possession whenever the employee is present at the dispensary; (4) Controlled access and prevention of loitering both inside and outside of the facility; (5) Conducting electronic monitoring; (6) Use of a panic button; and (7) Prepares for, protects against, and addresses how to handle any crisis that affects the security or operation of a dispensary in the event of strike, fire, flood or other natural disaster, or other situations of local, state or national emergency.

*Security System*

Licensed dispensaries are required to have an operable security system, which uses commercial grade equipment, at all times. The aforementioned security system must include: (1) A perimeter alarm; (2) Motion detectors; (3) Video cameras in all areas, unless prohibited by law, including all points of entry and exit from the dispensary, the dispensary department, and restricted access areas which shall be appropriate for the normal lighting conditions of the area under surveillance, so as to allow for the capture of clear and certain identification of any person located in the surveillance area; (4) A video camera or cameras recording at each point of sale location allowing for the identification of the dispensary employee dispensing the medical marijuana and any patient or caregiver purchasing the medical marijuana. The camera or cameras shall capture the sale, the individuals and the computer monitors used for the sale; (5) Constant streaming from all video cameras during hours when a dispensary is closed; and (6) Recording from all video cameras during hours of operation, which the dispensary shall make available for immediate viewing by the State Board or the State Board's authorized representative upon request and shall be retained for at least six (6) months; (7) A duress alarm, meaning a silent security alarm system signal generated by the entry of a designated code into an arming station to signal that the alarm user is being forced to turn off the system; (8) A panic alarm, meaning an audible security alarm system signal generated by the manual activation of a device intended to signal a life threatening or emergency requiring law enforcement response; (9) A holdup alarm, meaning a silent alarm signal generated by the manual activation of a device intended to signal a robbery in progress; (10) An automatic voice dialer, meaning any electrical, electronic, mechanical, or other device capable of being programmed to send a prerecorded voice message, when activated, over a telephone line, radio or other communication system, to a law enforcement, public safety or emergency services agency requesting dispatch; (11) A failure notification system that provides an audible, text or visual notification of any failure in the surveillance system. The failure notification system shall provide an alert to the dispensary within five minutes of the failure, either by telephone, email, or text message; (12) The ability to immediately produce a clear color still photo that is a minimum of ninety-six hundred (9600) dpi from any camera image, either live or recorded. All cameras shall be capable of capturing at least thirty (30) frames per second; (13) A date and time stamp embedded on all recordings. The date and time shall be synchronized and set correctly and shall not significantly obscure the picture; (14) The ability to remain operational during a power outage and ensure that all access doors are not solely controlled by an electronic access panel to ensure that locks are not released during a power outage; and (15) All video surveillance equipment shall allow for the exporting of still images in an industry standard image format, including .jpg, .bmp, and .gif. Exported video shall have the ability to be archived in a proprietary format that ensures authentication of the video and guarantees that no alteration of the recorded image has taken place. Exported video shall also have the ability to be in an industry standard file format that can be played on a



LIBERTY HEALTH SCIENCES INC.
## MANAGEMENT'S DISCUSSION & ANALYSIS

standard computer operating system. All recordings shall be erased or destroyed prior to disposal.

The State Board can request or approve alternate security measures that it determines are an adequate substitute for a security measure specified in Chapter 3796.

### Storage Requirements

Medical marijuana is required to be stored on the licensed premises of the dispensary, and the medical marijuana must be stored in restricted access areas and tracked in the inventory tracking system. A dispensary is required to maintain adequate lighting, ventilation, temperature, humidity control, and equipment. Required equipment includes, but is not limited to, adequate personal protective equipment for employees.

The dispensary must be maintained in a clean and orderly condition. Furthermore, medical marijuana shall be stored at appropriate temperatures and under appropriate conditions to help ensure that its identity, strength, quality and purity are not adversely affected. Containers storing expired, damaged, deteriorated, misbranded, adulterated or opened medical marijuana shall be separated from other medical marijuana until they are destroyed in accordance with the dispensary's destruction policy. Expired, damaged, deteriorated, misbranded, or adulterated medical marijuana shall not be stored at the licensed dispensary for more than one (1) week.

If a dispensary has reason to believe that an actual loss, theft, or diversion of medical marijuana has occurred, the dispensary is required to immediately notify the Ohio Department of Commerce ("ODOC") and law enforcement, within twenty-four (24) hours after the discovery of the event.

### Transportation Requirements

*Process and Procedure*
Prior to transporting any medical marijuana, regardless of form, a medical marijuana entity is required to maintain a transportation log, in writing, that contains the following information: (1) The names and addresses of the medical marijuana entities sending and receiving the shipment; (2) The names and registration numbers of the registered employees transporting the medical marijuana or the products containing medical marijuana; (3) The license plate number and vehicle type that will transport the shipment; (4) The time of departure and estimated time of arrival; (5) The specific delivery route, which includes street names and distances; and (6) The total weight of the shipment and a description of each individual package that is part of the shipment, and the total number of individual packages.

The medical marijuana entity transporting medical marijuana must transmit a copy of the transportation log to the receiving medical marijuana entity before the close of business the day prior to transport. The medical marijuana entity must enter the information required in the inventory tracking.

Before accepting a delivery of medical marijuana, a dispensary key employee must inspect and acknowledge that the delivery meets relevant packaging and labeling requirements. The delivery of any medical marijuana failing to adhere to relevant packaging and labeling requirements must not be accepted by a dispensary and must be immediately returned to the processor or cultivator holding a plant-only processor designation.

*The Transportation Vehicle*

The vehicle transporting the medical marijuana must drive directly to its intended location(s), with limited exceptions for stops at other medical marijuana entities on transportation log, to refuel the vehicle, or to notify the medical marijuana entities, law enforcement, or ODOC of an emergency. The vehicle transporting the medical marijuana or any product containing medical marijuana shall meet the following requirements: (1) Be insured as required by law; (2) Store the medical marijuana and any product containing medical marijuana in a locked, safe, and secure storage compartment that is part of the motor vehicle, or in a locked



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

storage container that has a separate key or combination pad; (3) Ensure any medical marijuana or product containing medical marijuana is not visible from the outside of the vehicle; (4) Be staffed with a minimum of two employees registered with ODOC, with at least one employee remaining with the vehicle at all times that the vehicle contains medical marijuana; (5) Have access to a secure form of communication with personnel at the medical marijuana entity and the ability to contact law enforcement through the 911 emergency system at all times that the vehicle contains medical marijuana, unless notification is impractical under the circumstances; and (6) Not contain any marks, logos, brands, or other illustrations on the exterior of the vehicle, other than those affixed to the vehicle by the vehicle manufacturer or dealership.

*Transportation Employee*

A registered employee transporting medical marijuana shall do the following: (1) Display his or her ODOC issued employee identification card at all times when transporting or delivering medical marijuana and shall produce it for ODOC or ODOC's authorized representative or law enforcement official upon request; (2) Ensure delivery times vary and routes are randomized; (3) Report any vehicle accident that occurs during the transportation to a person designated by the transporting medical marijuana entity to receive such reports within two hours after the accident occurs; (4) Report any loss or theft of medical marijuana that occurs during the transportation of medical marijuana; (5) Carry a copy of the completed transportation log; and (6) Notify the medical marijuana entity when the delivery has been completed.

## Inspections and Enforcement

Dispensaries are subject to random and unannounced dispensary inspections and medical marijuana testing by the State Board. The State Board and its authorized representatives are allowed to: (1) Enter any place, including a vehicle, in which medical marijuana is held, stored, dispensed, sold, produced, delivered, transported, manufactured, or disposed of; (2) Inspect in a reasonable manner, the place and all pertinent equipment, containers, and labeling and all things including records, files, financial data, sales data, shipping data, pricing data, personnel data, research, papers, processes, controls, and facility, and inventory of any stock of medical marijuana; and (3) Obtain any medical marijuana or medical marijuana product, any labels or containers for medical marijuana, or paraphernalia.

Every person charged with preparation, obtaining or keeping records, logs, reports or other documents in connection with Chapter 3796, and every person in charge, or having custody of those documents shall, upon request by the State Board, make the documents immediately available for inspection and copying by the State Board, the State Board's authorized representative or others authorized by law to review the documents.

The State Board may investigate a licensed dispensary, principal officer, dispensary employee, third-party vendor, or any other party associated with a dispensary for an alleged violation of Chapter 3796. The State Board may require a dispensary to produce documents, records, or any other material pertinent to the investigation of an alleged violation of Chapter 3796. Failure to provide the required material may be grounds for discipline.

Any dispensary that does not store medical marijuana in compliance with this division, or that stores medical marijuana at a location other than that for which the dispensary license was issued, may have its license suspended or revoked. In such a case, all medical marijuana under the dispensary's control will be subject to being placed under seal by the State Board.

## Compliance of United States Operations

Liberty is in compliance with applicable licensing requirements and the regulatory framework enacted by the State of Florida. As further detailed above, Liberty is licensed to operate as a MMTC under applicable Florida law pursuant to the terms of the Florida License. The Florida License grants Liberty the authority to possess, cultivate, process, dispense and sell medical cannabis in the State of Florida. Liberty has not experienced any non-compliance nor has been subject to any notices of violation by the Department.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

Although the Company's state chartered bank, First Green Bank, has recently ceased its line of business servicing businesses in the cannabis industry, the business was taken up by Safe Harbor Private Banking ("Safe Harbor") from Colorado, which is now providing banking services to the Company in Florida. Liberty also maintains a banking relationship with WFCU and is capable of lawfully paying all expenses and managing its operations and assets in full compliance with all federal statutes and regulations. The Company also engages armored car services as a custodian of cash and deposits, which are delivered to the Federal Reserve Bank on behalf of the Company and then reflected in the Company's Safe Harbor bank account. The armored car services picks up cash from the dispensaries as well as from the cultivation facility for home deliveries from that site.

WNWF is in compliance with applicable licensing requirements and the regulatory framework enacted by the Commonwealth of Massachusetts, and maintains RMD licenses in provisional status that will be made final once the statutory and regulatory requirements are satisfied relative to the completion of construction and related regulatory requirements for final registration. WNWF has not experienced any non-compliance nor has been subject to any notices of violation by the Commonwealth of Massachusetts.

The Company has a full time Compliance Officer on staff in Florida whose responsibilities are to monitor the day to day activities of staff, including ensuring that the established standard operating procedures are being adhered to at each stage of the cultivation, processing and distribution cycle, to identify any non-compliance matters and to put in place the necessary modifications to ensure compliance. The Compliance Officer performs monthly, unannounced audits against the Company's established standard operating procedures and state regulations. Each employee is provided with an employee handbook outlining the standard operating procedures and state regulations upon hiring, and is then provided with one on one quality and regulatory training by the Compliance Officer. The Company has 24-hour surveillance of every room, including greenhouses, in which cannabis is cultivated, processed, and stored. This footage is kept for at least 45 days as per the requirements of the Department. Security officers also perform a walk through every four hours to check each room and look for unusual activity. The Company also utilizes state approved software for tracking cannabis inventory from seed to sale. The Compliance Officer's duties also include ongoing education of staff on the state regulations. State inspections to date have not resulted in any non-compliance issues.

The Company will appoint a separate Compliance Officer in Massachusetts with the same responsibilities once the business becomes operational.

The Company has worked with its legal advisors in Florida to implement, and will work with legal advisors in Massachusetts and Ohio, to ensure that WNWF, Schottenstein Aphria II LLC and Schottenstein Aphria III LLC implement measures designed to ensure compliance with applicable state laws in the United States on an ongoing basis, including:
- weekly correspondence and updates with advisors;
- development of standard operating procedures with respect to cultivation, processing and distribution;
- ongoing monitoring of compliance with operating procedures and regulations by on-site management;
- appropriate employee training for all standard operating procedures; and
- subscription to monitoring programs to ensure compliance with the FCEN Memo (as defined herein).

While the Company's business activities are compliant with applicable state and local law, such activities remain illegal under United States federal law. See "*Industry Trends and Risks*".

## INDUSTRY TRENDS AND RISKS

The Company's overall performance and results of operations are subject to a number of risks and uncertainties, of which the below are considered to be the Company's principal risks. For a more detailed and complete discussion of economic, industry and risk factors of the Company, please see the "Risk



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

Factors" section in our most recent Annual Information Form, dated June 28, 2018.

## *Risk Factors Related to the United States*

***While cannabis is legal in many US state jurisdictions, it continues to be a controlled substance under the United States federal Controlled Substances Act.***

Investors are cautioned that in the United States, cannabis is largely regulated at the state level. To the Company's knowledge, there are to date a total of 30 states, plus the District of Columbia, Puerto Rico and Guam that have legalized cannabis in some form, including Florida, Massachusetts and Ohio. Nine states and Washington D.C. have legalized recreational cannabis in some form, including Massachusetts. Notwithstanding the permissive regulatory environment of medical cannabis at the state level, and the increasing number of states with legal recreational frameworks, cannabis continues to be categorized as a Schedule I controlled substance under the CSA and as such, violates federal law in the United States. Senators Elizabeth Warren and Cory Gardner have introduced a bipartisan Senate bill titled "Strengthening the Tenth Amendment Through Entrusting States (STATES) Act" that would lift the Controlled Substance Act's restrictions on cannabis in states that have written their own laws. However, there can be no assurances as to when this bill will pass, or if it will pass at all.

The United States Congress has passed appropriations bills in 2018 and each of the last three years that have not appropriated funds for prosecution of cannabis offenses of individuals who are in compliance with state medical cannabis laws. American courts have construed these appropriations bills to prevent the federal government from prosecuting individuals when those individuals comply with state law. However, because this conduct continues to violate federal law, American courts have observed that should Congress at any time choose to appropriate funds to fully prosecute the CSA, any individual or business—even those that have fully complied with state law—could be prosecuted for violations of federal law. And if Congress restores funding, the government will have the authority to prosecute individuals for violations of the law before it lacked funding under the CSA's five-year statute of limitations.

Violations of any federal laws and regulations could result in significant fines, penalties, administrative sanctions, convictions or settlements arising from civil proceedings conducted by either the federal government or private citizens, or criminal charges, including, but not limited to, disgorgement of profits, cessation of business activities or divestiture. This could have a material adverse effect on the Company, including its reputation and ability to conduct business, its holding (directly or indirectly) of medical cannabis licenses in the United States, the listing of its securities on various stock exchanges, its financial position, operating results, profitability or liquidity or the market price of its publicly traded shares. In addition, it is difficult for the Company to estimate the time or resources that would be needed for the investigation of any such matters or its final resolution because, in part, the time and resources that may be needed are dependent on the nature and extent of any information requested by the applicable authorities involved, and such time or resources could be substantial.

Liberty derives 100% of its revenues from the cannabis industry in certain states of the United States, which industry is illegal under United States federal law. While the Company's business activities are compliant with applicable state and local law, such activities remain illegal under United States federal law. The enforcement of relevant laws is a significant risk.

***The approach to the enforcement of cannabis laws may be subject to change or may not proceed as previously outlined.***

As a result of the conflicting views between state legislatures and the federal government regarding cannabis, investments in cannabis businesses in the United States are subject to inconsistent legislation and regulation. The response to this inconsistency was addressed in the Cole Memorandum addressed to all United States district attorneys acknowledging that notwithstanding the designation of cannabis as a controlled substance at the federal level in the United States, several US states have enacted laws relating to cannabis for medical purposes.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

The Cole Memorandum outlined certain priorities for the Department of Justice relating to the prosecution of cannabis offenses. In particular, the Cole Memorandum noted that in jurisdictions that have enacted laws legalizing cannabis in some form and that have also implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale and possession of cannabis, conduct in compliance with those laws and regulations is less likely to be a priority at the federal level. Notably, however, the Department of Justice has never provided specific guidelines for what regulatory and enforcement systems it deems sufficient under the Cole Memorandum standard.

In light of limited investigative and prosecutorial resources, the Cole Memorandum concluded that the Department of Justice should be focused on addressing only the most significant threats related to cannabis. States where medical cannabis had been legalized were not characterized as a high priority. In March 2017, newly appointed Attorney General Jeff Sessions again noted limited federal resources and acknowledged that much of the Cole Memorandum had merit; however, he disagreed that it had been implemented effectively and, on January 4, 2018, Attorney General Jeff Sessions issued the Sessions Memorandum, which rescinded the Cole Memorandum. The Sessions Memorandum rescinded previous nationwide guidance specific to the prosecutorial authority of United States Attorneys relative to cannabis enforcement on the basis that they are unnecessary, given the well-established principles governing federal prosecution that are already in place. Those principles are included in chapter 9.27.000 of the United States Attorneys' Manual and require federal prosecutors deciding which cases to prosecute to weigh all relevant considerations, including federal law enforcement priorities set by the Attorney General, the seriousness of the crime, the deterrent effect of criminal prosecution, and the cumulative impact of particular crimes on the community.

As a result of the Sessions Memorandum, federal prosecutors will now be free to utilize their prosecutorial discretion to decide whether to prosecute cannabis activities despite the existence of state-level laws that may be inconsistent with federal prohibitions. No direction was given to federal prosecutors in the Sessions Memorandum as to the priority they should ascribe to such cannabis activities, and resultantly it is uncertain how active federal prosecutors will be in relation to such activities. Furthermore, the Sessions Memorandum did not discuss the treatment of medical cannabis by federal prosecutors.

Medical cannabis is currently protected against enforcement by enacted legislation from United States Congress in the form of the Rohrabacher-Blumenauer Amendment which similarly prevents federal prosecutors from using federal funds to impede the implementation of medical cannabis laws enacted at the state level, subject to Congress restoring such funding. Subsequent to the issuance of the Sessions Memorandum on January 4, 2018, the United States Congress passed its omnibus appropriations bill, SJ 1662, which for the fourth consecutive year contained the Rohrabacher-Blumenauer Amendment language (referred to in 2018 as the Rohrabacher-Leahy Amendment) and continued the protections for the medical cannabis marketplace and its lawful participants from interference by the Department of Justice up and through the 2018 appropriations deadline of September 30, 2018. These protections were subsequently extended through December 7, 2018 as part of a short-term continuation of appropriations. See "*United States Enforcement Proceedings*". Due to the ambiguity of the Sessions Memorandum in relation to medical cannabis, there can be no assurance that the federal government will not seek to prosecute cases involving cannabis businesses that are otherwise compliant with state law.

Such potential proceedings could involve significant restrictions being imposed upon the Company or third parties, while diverting the attention of key executives. Such proceedings could have a material adverse effect on the Company's business, revenues, operating results and financial condition as well as the Company's reputation, even if such proceedings were concluded successfully in favour of the Company. In the extreme case, such proceedings could ultimately involve the prosecution of key executives of the Company or the seizure of corporate assets; however as of the date hereof, the Company believes and has obtained legal advice in respect thereof that proceedings of this nature are remote.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

***The Company's investments in the United States are subject to applicable anti-money laundering laws and regulations.***

The Company is subject to a variety of laws and regulations domestically and in the United States that involve money laundering, financial recordkeeping and proceeds of crime, including the *Currency and Foreign Transactions Reporting Act of 1970* (commonly known as the *Bank Secrecy Act*), as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada)*, as amended and the rules and regulations thereunder, the *Criminal Code* (Canada) and any related or similar rules, regulations or guidelines, issued, administered or enforced by governmental authorities in the United States and Canada.

In February 2014, the FCEN issued the FCEN Memo providing instructions to banks seeking to provide services to cannabis-related businesses. The FCEN Memo states that in some circumstances, it is permissible for banks to provide services to cannabis-related businesses without risking prosecution for violation of federal money laundering laws. It refers to supplementary guidance that Deputy Attorney General Cole issued to federal prosecutors relating to the prosecution of money laundering offenses predicated on cannabis-related violations of the CSA. It is unclear at this time whether the current administration will follow the guidelines of the FCEN Memo.

In the event that any of the Company's operations, or any proceeds thereof, any dividends or distributions therefrom, or any profits or revenues accruing from such operations in the United States were found to be in violation of money laundering legislation or otherwise, such transactions may be viewed as proceeds of crime under one or more of the statutes noted above or any other applicable legislation. This could restrict or otherwise jeopardize the ability of the Company to declare or pay dividends, effect other distributions or subsequently repatriate such funds back to Canada. Furthermore, while the Company has no current intention to declare or pay dividends on its Common Shares in the foreseeable future, in the event that a determination was made that the Company's proceeds from operations (or any future operations or investments in the United States) could reasonably be shown to constitute proceeds of crime, the Company may decide or be required to suspend declaring or paying dividends without advance notice and for an indefinite period of time.

***The Company's investments in the United States may be subject to heightened scrutiny.***

For the reasons set forth above, the Company's existing operations in the United States, and any future operations or investments, may become the subject of heightened scrutiny by regulators, stock exchanges and other authorities in Canada. As a result, the Company may be subject to significant direct and indirect interaction with public officials. There can be no assurance that this heightened scrutiny will not in turn lead to the imposition of certain restrictions on the Company's ability to operate or invest in the United States or any other jurisdiction, in addition to those described herein.

Given the heightened risk profile associated with cannabis in the United States, CDS may implement procedures or protocols that would prohibit or significantly curtail the ability of CDS to settle trades for cannabis companies that have cannabis businesses or assets in the United States. On February 8, 2018, following discussions with the Canadian Securities Administrators and recognized Canadian securities exchanges, the TMX Group announced the signing of a Memorandum of Understanding ("TMX MOU") with Aequitas NEO Exchange Inc., the CSE, the Toronto Stock Exchange and the TSX Venture Exchange. The TMX MOU outlines the parties' understanding of Canada's regulatory framework applicable to the rules, procedures and regulatory oversight of the exchanges and CDS as it relates to issuers with cannabis-related activities in the United States. The TMX MOU confirms, with respect to the clearing of listed securities, that CDS relies on the exchanges to review the conduct of listed issuers. As a result, there is no CDS ban on the clearing of securities of issuers with cannabis-related activities in the United States. However, there can be no guarantee that this approach to regulation will continue in the future. If such a ban were to be implemented, it would have a material adverse effect on the ability of holders of Common Shares to make and settle trades. In particular, the Common Shares would become highly illiquid as until



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

an alternative was implemented, investors would have no ability to effect a trade of the Common Shares through the facilities of a stock exchange.

In light of the political and regulatory uncertainty surrounding the treatment of U.S. cannabis-related activities, including the rescission of the Cole Memorandum discussed above, on February 8, 2018, the Canadian Securities Administrators revised their previously released Staff Notice setting out their disclosure expectations for specific risks facing issuers with cannabis-related activities in the United States. The Staff Notice confirms that a disclosure-based approach remains appropriate for issuers with U.S. cannabis-related activities. The Staff Notice includes additional disclosure expectations that apply to all issuers with U.S. cannabis-related activities, including those with direct and indirect involvement in the cultivation and distribution of cannabis, as well as issuers that provide goods and services to third parties involved in the U.S. cannabis industry. The Company views the Staff Notice favourably, as it provides increased transparency and greater certainty regarding the views of its exchange and its regulator of existing operations and strategic business plan as well as the Company's ability to pursue further investment and opportunities in the United States.

Government policy changes or public opinion may also result in a significant influence over the regulation of the cannabis industry in Canada, the United States or elsewhere. A negative shift in the public's perception of medical cannabis in the United States or any other applicable jurisdiction could affect future legislation or regulation. Among other things, such a shift could cause state jurisdictions to abandon initiatives or proposals to legalize medical cannabis, thereby limiting the number of new state jurisdictions into which the Company could expand. Any inability to fully implement the Company's expansion strategy may have a material adverse effect on the Company's business, financial condition and results of operations.

### *Regulatory risks*

The activities of the Company are subject to regulation by governmental authorities. The Company's business objectives are contingent upon, in part, compliance with regulatory requirements enacted by these governmental authorities and obtaining all regulatory approvals, where necessary, for the sale of its products in each jurisdiction in which it operates. Liberty cannot predict the time required to secure all appropriate regulatory approvals for its products, or the extent of testing and documentation that may be required by governmental authorities. Any delays in obtaining, or failure to obtain regulatory approvals would significantly delay the development of markets and products and could have a material adverse effect on the business, results of operations and financial condition of the Company. New risks may emerge, and management may not be able to predict all such risks or be able to predict how such risks may result in actual results differing from the results contained in any forward-looking statements.

Furthermore, although the operations of the Company are currently carried out in accordance with all applicable rules and regulations, no assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit or curtail the Company's ability to import, distribute or, in the future, produce cannabis. Amendments to current laws and regulations governing the importation, distribution, transportation and/or production of cannabis, or more stringent implementation thereof could have a substantial adverse impact on the Company.

Because of the conflicting views between state legislatures and the federal government of the United States regarding cannabis, investments in cannabis businesses in the United States are subject to inconsistent legislation, regulation, and enforcement. Unless and until the United States Congress amends the United States Controlled Substances Act with respect to cannabis or the Drug Enforcement Agency reschedules or de-schedules cannabis (and as to the timing or scope of any such potential amendments there can be no assurance), there is a risk that federal authorities may enforce current federal law, which would adversely affect the current and future operations of the Company in the United States. As a result of the tension between state and federal law, there are a number of significant risks associated with the Company's existing and future operations in the United States.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

### *Legislative or regulatory reform and compliance*

The Company's operations are subject to a variety of laws, regulations, guidelines and policies relating to the manufacture, import management, packaging/labelling, processing, production, advertising, sale, transportation, storage and disposal of medical cannabis, but also including laws and regulations relating to drugs, controlled substances, health and safety, relationships with health care providers, the conduct of operations and the protection of the environment.

The industry is subject to extensive controls and regulations, which may significantly affect the financial condition of market participants. The marketability of any product may be affected by numerous factors that are beyond the control of the Company's investments and which cannot be predicted, such as changes to government regulations, including those relating to taxes and other government levies which may be imposed. Changes in government levies, including taxes, could reduce the profitability of Company's operations and could make the Company's operations uneconomic. The industry is also subject to numerous legal challenges, which may significantly affect the financial condition of market participants and which cannot be reliably predicted.

The Company's also incurs ongoing costs and obligations related to regulatory compliance. Failure to comply with regulations may result in additional costs for corrective measures, penalties or in restrictions on operations. In addition, changes in regulations, more vigorous enforcement thereof or other unanticipated events could require extensive changes to operations, increased compliance costs or give rise to material liabilities, which could have a material adverse effect on the business, results of operations and financial condition of the Company's investments and, therefore, on the Company's prospective returns. Further, the Company may be subject to a variety of claims and lawsuits. Adverse outcomes in some or all of these claims may result in significant monetary damages or injunctive relief that could adversely affect our ability to conduct our business. The litigation and other claims are subject to inherent uncertainties and management's view of these matters may change in the future. A material adverse impact on our financial statements also could occur for the period in which the effect of an unfavorable final outcome becomes probable and reasonably estimable.

The commercial medical and recreational cannabis industry is in its infancy and the Company anticipates that such regulations will be subject to change as the state and federal government monitors licensed producers in action. The Company will continue to monitor compliance on an ongoing basis in accordance with all applicable internal and external policies and procedures, which can be found in the Company's initial application for licensure and in company manuals and protocols.

### *Reliance on third-party suppliers, manufacturers and contractors*

The Company intends to maintain a full supply chain for the provision of products and services to the regulated cannabis industry. Due to the uncertain regulatory landscape for regulating cannabis in Canada and the United States, the Company's third-party suppliers, manufacturers and contractors may elect, at any time, to decline or withdraw services necessary for the Company's operations. Loss of these suppliers, manufacturers and contractors may have a material adverse effect on the Company's business and operational results.

### *Banking*

Since the cultivation, distribution and possession of cannabis is currently illegal under U.S. federal law, it is possible that banks may refuse to open bank accounts for the deposit of funds from businesses involved with the cannabis industry. The inability to open bank accounts with certain institutions could materially and adversely affect the business of the Company. See *Issuers with U.S. Cannabis Related Business – Ability to Access Public and Private Capital* and *Issuers with U.S. Cannabis Related Business – Compliance of United States Operations*.

### *Operation permits and authorizations*



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

The Company's investments may not be able to obtain or maintain the necessary licenses, permits, authorizations or accreditations, or may only be able to do so at great cost, to operate their respective businesses. In addition, the Company's investments may not be able to comply fully with the wide variety of laws and regulations applicable to the cannabis industry. Failure to comply with or to obtain the necessary licenses, permits, authorizations or accreditations could result in restrictions on an investment's ability to operate in the cannabis industry, which could have a material adverse effect on the Company's business.

***Liability, enforcement complaints, etc.***

The Company's participation in the cannabis industry may lead to litigation, formal or informal complaints, enforcement actions, and inquiries by various federal, state, or local governmental authorities against the Company or its investments. Litigation, complaints, and enforcement actions involving either of the Company or its investments could consume considerable amounts of financial and other corporate resources, which could have an adverse effect on the Company's future cash flows, earnings, results of operations and financial condition.

## Reliance on License

Liberty's ability to grow, store and sell medical cannabis and cannabis oil in the State of Florida is dependent on maintaining its Florida License in good standing with the Florida Department. Failure to comply with the requirements of the Florida License, or any failure to maintain any licenses held would have a material adverse impact on the business, financial condition and operating results of the Company. The Company's licenses are currently in good standing and the Company remains fully compliant with the associated state laws and regulations.

## Risks Inherent in an Agricultural Business

Liberty's business involves the growing of medical cannabis, an agricultural product. Such business will be subject to the risks inherent in the agricultural business, such as insects, plant diseases and similar agricultural risks. Although Liberty expects that any such growing will be completed indoors under climate controlled conditions, there can be no assurance that natural elements will not have a material adverse effect on any such future production.

## Limited Operating History

Liberty has not generated significant profits or revenues in the periods covered by its most recent financial statements, and as a result, has only a very limited operating history upon which its business and future prospects may be evaluated. Liberty is therefore subject to many of the risks common to early-stage enterprises, including challenges related to laws, regulations, licensing, integrating and retaining qualified employees; making effective use of limited resources; achieving market acceptance of existing and future solutions; competing against companies with greater financial and technical resources; acquiring and retaining customers; and developing new solutions. There is no assurance that Liberty will be successful in achieving a return on shareholders' investment and the likelihood of success must be considered in light of the early stage of operations.

## Securing Additional Financing to Fund Operations and Meet Consumer Demand

There is no guarantee that the Company will be able to achieve its business objectives. The continued development of the Company may require additional financing. The failure to raise such capital could result in the delay or indefinite postponement of current business objectives or the Company ceasing to carry on business. There can be no assurance that additional capital or other types of financing will be available if needed or that, if available, the terms of such financing will be favorable to the Company. See *Issuers with U.S. Cannabis Related Businesses – Ability to Access Public and Private Capital*. In addition, from time to time, Liberty may enter into transactions to acquire assets or the shares of other corporations. These



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

transactions may be financed wholly or partially with debt, which may increase the Company's debt levels above industry standards. Any debt financing secured in the future could involve restrictive covenants relating to capital raising activities and other financial and operational matters, which may make it more difficult for the Company to obtain additional capital and to pursue business opportunities, including potential acquisitions. Debt financings may also contain provisions which, if breached, may entitle lenders or their agents to accelerate repayment of loans and/or realize upon security over the assets of the Company, and there is no assurance that the Company would be able to repay such loans in such an event or prevent the enforcement of security granted pursuant to such debt financing. The Company may require additional financing to fund its operations until positive cash flow is achieved.



LIBERTY HEALTH SCIENCES INC.
MANAGEMENT'S DISCUSSION & ANALYSIS

*This MD&A contains forward-looking statements within the meaning of applicable securities legislation with regards to expected financial performance, strategy and business conditions. We use words such as "forecast", "future", "should", "could", "enable", "potential", "contemplate", "believe", "anticipate", "estimate", "plan", "expect", "intend", "may", "project", "will", "would" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words. These statements reflect management's current beliefs with respect to future events and are based on information currently available to management. Forward-looking statements involve significant known and unknown risks and uncertainties. Many factors could cause actual results, performance or achievement to be materially different from any future forward-looking statements. Factors that may cause such differences include, but are not limited to, general economic and market conditions, investment performance, financial markets, legislative and regulatory changes, technological developments, catastrophic events and other business risks. These forward-looking statements are as of the date of this MD&A and the Company and management assume no obligation to update or revise them to reflect new events or circumstances except as required by securities laws. The Company and management caution readers not to place undue reliance on any forward-looking statements, which speak only as of the date made.*

*Some of the specific forward-looking statements in this MD&A include, but are not limited to, statements with respect to the following:*

- *the intention to grow the business and operations of the Company;*
- *the expected growth in the Company's growing capacity;*
- *the competitive conditions of the industry;*
- *any commentary related to the legalization of cannabis and the timing related thereto;*
- *the applicable laws, regulations and any amendments thereof;*
- *the competitive and business strategies of the Company;*
- *the framework for the enforcement of medical cannabis and cannabis-related offenses in the United States; and*
- *the grant and impact of any license or supplemental license to conduct activities with cannabis or any amendments thereof for each respective state in which the Company does business.*

