# Exhibit 9



LIBERTY HEALTH SCIENCES INC.

ANNUAL INFORMATION FORM

For the fiscal year ended February 28, 2019

DATED: July 1, 2019

TABLE OF CONTENTS

ANNUAL INFORMATION FORM .......................................................................................................... 3

FORWARD-LOOKING STATEMENTS ................................................................................................. 3

CORPORATE STRUCTURE ................................................................................................................. 4

GENERAL DEVELOPMENT OF THE BUSINESS .................................................................................... 5

    Business Combination and Related Agreements .......................................................................... 5

    Florida MMTC License .................................................................................................................. 9

    Expansion and Acquisitions .......................................................................................................... 9

    Regulatory Developments .......................................................................................................... 12

DESCRIPTION OF THE BUSINESS ..................................................................................................... 12

    Company Overview .................................................................................................................... 12

    License and Regulations ............................................................................................................. 13

    Reporting Requirements ............................................................................................................ 14

    Principal Products ...................................................................................................................... 14

    Distribution ............................................................................................................................... 14

    Operations ................................................................................................................................. 16

    Storage and Security .................................................................................................................. 16

    Competitive Conditions ............................................................................................................. 19

    Employees ................................................................................................................................. 19

ISSUERS WITH U.S. CANNABIS-RELATED ASSETS ........................................................................... 19

RISK FACTORS ................................................................................................................................ 30

DIVIDENDS .................................................................................................................................... 44

CAPITAL STRUCTURE ..................................................................................................................... 44

MARKET FOR SECURITIES .............................................................................................................. 45

PRIOR SALES .................................................................................................................................. 45

ESCROWED SECURITIES AND SECURITIES SUBJECT TO RESTRICTION ON TRANSFER .................... 46

DIRECTORS AND OFFICERS ............................................................................................................. 47

LEGAL PROCEEDINGS AND REGULATORY ACTIONS ....................................................................... 49

INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS ................................... 49

TRANSFER AGENT AND REGISTAR .................................................................................................. 50

MATERIAL CONTRACTS .................................................................................................................. 50

AUDIT COMMITTEE INFORMATION ............................................................................................... 50

INTERESTS OF EXPERTS .................................................................................................................. 51

ADDITIONAL INFORMATION .......................................................................................................... 51

ANNUAL INFORMATION FORM

In this annual information form ("**Annual Information Form**"), unless otherwise noted or the context indicates otherwise, the "**Company**", "Liberty", "we", "us" and "our" refer to Liberty Health Sciences Inc. and its principal **wholly-owned** subsidiary, Liberty Health Sciences USA Ltd.  All financial information in this Annual Information Form is prepared in Canadian dollars and using International Financial Reporting Standards as issued by the International Accounting Standards Board. The information contained herein is dated as of February 28, 2019, as updated to July 1, 2019, unless otherwise stated.

FORWARD-LOOKING STATEMENTS

This Annual Information Form contains certain information that may constitute "forward-looking information" and "forward-looking statements" (collectively, "**forward-looking statements**") which are based upon the Company's current internal expectations, estimates, projections, assumptions and beliefs. Such statements can be identified by the use of forward-looking terminology such as "expect," "likely", "may," "will," "should," "intend," or "anticipate", "potential", "proposed", "estimate" and other similar words, including negative and grammatical variations thereof, or statements that certain events or conditions "may" or "will" happen, or by discussions of strategy. Forward-looking statements include estimates, plans, expectations, opinions, forecasts, projections, targets, guidance, or other statements that are not statements of fact.

The forward-looking statements included in this Annual Information Form are made only as of the date of this Annual Information Form. Forward-looking statements in this Annual Information Form include, but are not limited to, statements with respect to:

- the performance of the Company's business and operations;

- the intention to grow the business and operations of the Company, including the completion of pending acquisitions and the expansion and construction of existing and future cultivation and distribution facilities;

- statements related to the effect and consequences of certain regulatory initiatives and related announcements, and the impact thereof for shareholders, industry participants and other stakeholders

- the expected growth in the amount of cannabis sold by the Company;

- the expected growth in the Company's growing capacity;

- expectations with respect to future production costs;

- expectations with respect to the renewal and/or extension of the Company's licenses;

- expectations of market size and growth in the United States and the states in which the Company operates;

- the number of grams of cannabis used by each patient;

- the methods used by the Company to deliver legal cannabis;

- the competitive conditions of the industry;

- any commentary related to the legalization of cannabis and the timing related thereto;

- the applicable laws, regulations and any amendments thereof;

- the competitive and business strategies of the Company;

- the limitations from institutional financing;

 liberty health sciences

Page | 3

- the Company's operations in the United States, the characterization and consequences of those operations under federal law, and the framework for the enforcement of medical and recreational cannabis and cannabis-related offenses in the United States;

- the grant and impact of any license or supplemental license to conduct activities with cannabis or any amendments thereof for each respective state in which the Company does business; and

- the anticipated future gross margins of the Company's operations.

The forward-looking statements and forward-looking information and other information contained herein concerning the cannabis industry and the general expectations of Liberty concerning the cannabis industry are based on estimates prepared by Liberty using data from publicly available governmental sources as well as from market research and industry analysis and on assumptions based on data and knowledge of this industry which Liberty believe to be reasonable. However, although generally indicative of relative market positions, market shares and performance characteristics, such data is inherently imprecise. While Liberty is not aware of any misstatement regarding any industry or government data presented herein, the medical marijuana industry involves risks and uncertainties that are subject to change based on various factors.

Although the Company believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to have been correct. The Company's forward-looking statements are expressly qualified in their entirety by this cautionary statement. In particular, but without limiting the foregoing, disclosure in this Annual Information Form under "*Description of the Business*" as well as statements regarding the Company's objectives, plans and goals, including future operating results, economic performance and patient acquisition efforts may make reference to or involve forward-looking statements. A number of factors could cause actual events, performance or results to differ materially from what is projected in the forward-looking statements. The purpose of forward-looking statements is to provide the reader with a description of management's expectations, and such forward-looking statements may not be appropriate for any other purpose. You should not place undue reliance on forward-looking statements contained in this Annual Information Form. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by applicable law.

## CORPORATE STRUCTURE

Liberty Health Sciences Inc. was incorporated under the *Business Corporations Act* (British Columbia) (the "**BCBCA**") on November 9, 2011 as SecureCom Mobile Inc. ("**SecureCom**").

On July 20, 2017, 1006397 B.C. Ltd. ("**Subco**"), a wholly-owned subsidiary of SecureCom, completed a business combination (the "**Business Combination**") with DFMMJ Investments, Ltd. ("**Holdco**") whereby SecureCom acquired all of the issued and outstanding shares of Holdco pursuant to a reverse takeover transaction under the policies of the Canadian Securities Exchange (the "CSE" or "Exchange"). Pursuant to the Business Combination, Holdco amalgamated with Subco under the BCBCA to form Liberty Health Sciences USA Ltd., a wholly owned subsidiary of SecureCom, and SecureCom changed its name to "Liberty Health Sciences Inc." The Company's common shares (the "**Common Shares**") are listed under the symbol "LHS" on the CSE and under the symbol "LHSIF" on the OTCQX.

The following chart (as of this date) illustrates the Company's corporate structure, together with the place of incorporation of each principal subsidiary and the percentage of voting securities beneficially owned by the Company.





The Company is licensed to produce and sell medical cannabis in the State of Florida through the Florida Department of Health, Office of Medical Marijuana Use (the "**Department**"). The Florida Department of Health issued the license (the "**License**") to Chestnut Hill Tree Farm, LLC ("**Chestnut**") on November 23, 2015 and the Company acquired the rights to the License on May 19, 2017. On September 28, 2017, the Department approved the transfer of the license to DFMMJ Investments, LLC ("**DFMMJ**"), a wholly owned subsidiary of the Company, and DFMMJ now solely owns and is entitled to utilize the License in Florida. The Company also holds an interest in a dispensary license in Ohio, through its joint venture, Schottenstein Aphria III LLC and a provisional processing license in Ohio through its joint venture, Schottenstein Aphria II LLC. For a further description of the Company's License, see *General Development of the Business – License, Description of the Business – License and Regulations* and *Regulatory Overview*.

The Company's Florida operations are located in Alachua County and Gainesville, Florida. The Company's Ohio operations are located in Dayton and Columbus, Ohio. Liberty's head and registered office is located at 425-180 John Street, Toronto, Ontario M5T 1X5. The Company's corporate website is www.libertyhealthsciences.com.

GENERAL DEVELOPMENT OF THE BUSINESS

## Business Combination and Related Agreements

On April 4, 2017, SecureCom and Holdco entered into a transaction agreement (the "**Transaction Agreement**") pursuant to which SecureCom agreed, among other things, to change its name to "Liberty Health Sciences Inc." and to effect a consolidation of the outstanding SecureCom common shares on a 3 to 1 basis. Under the agreement, SecureCom acquired all of the outstanding shares of Holdco by way of a three-cornered amalgamation on July 20, 2017.



*The Offering*

On April 27, 2017, Holdco completed an equity private placement offering (the "**Offering**") of 56,089,743 (164,182,679 pre-consolidation) subscription receipts (the "**Subscription Receipts**") of Holdco at a price of $0.624 ($0.208 pre-consolidation) per Subscription Receipt for gross proceeds of $34,149,997.23, pursuant to an agency agreement (the "**Agency Agreement**") dated April 27, 2017, between Holdco and Clarus Securities Inc. ("**Clarus**" or the "**Agent**").

Each Subscription Receipt issued under the Offering entitled the holder thereof, following the satisfaction of the Escrow Release Conditions (as defined below) without the payment of any further consideration or the undertaking of any further action by the holders thereof to receive one common share in the capital of Holdco (a "**Subscription Share**") immediately prior to the completion of the Business Combination.

Other than as described below, the gross proceeds from the Offering, less the Agent's commission, fees, and estimated costs and expenses, were held in escrow with TSX Trust Company pursuant to a subscription receipt agreement dated April 27, 2017 between TSX Trust Company, SecureCom, Holdco and Clarus (the "**Subscription Receipt Agreement**") pending the satisfaction of: (i) all conditions precedent to the Business Combination being satisfied or waived in accordance with the terms of the Agreement; and (ii) the acceptance from the CSE to list the Common Shares on the Exchange (collectively, the "**Escrow Release Conditions**").

On May 19, 2017, holders of an aggregate of approximately $25 million of Subscription Receipts agreed to waive the application of the Escrow Release Conditions in order to fund, in part, the acquisition of the assets of Chestnut. See *Acquisition Agreement*. Such holders were issued Holdco Shares in exchange for the cancellation of such Subscription Receipts. The balance of the proceeds held in escrow were released upon satisfaction of the Escrow Release Conditions on July 20, 2017.

The Holdco Shares issued upon the deemed exercise of the Subscription Receipts were exchanged for Common Shares on July 20, 2017.

Pursuant to the Agency Agreement, Holdco paid to the Agent, along with the reasonable expenses of the Agent, a cash commission of $1,869,000, equal to six percent (6%) of the gross proceeds raised in the Offering, excluding the proceeds raised in connection with the sale of Subscription Receipts to certain accredited investors introduced to the Agent by Holdco (each a "**President's List Purchaser**"). In addition, the Agent received a total of 8,985,577 broker warrants ("**Holdco Broker Warrants**") entitling them to subscribe for the number of Holdco Shares as is equal to six percent (6%) of the aggregate number of Subscription Receipts sold pursuant to the Offering. Each Holdco Broker Warrant is exercisable at a price of $0.208 for a period of 24 months following April 27, 2017. Following the Business Combination and the related consolidation, the Agents Holdco Broker Warrants were converted into 2,995,192 broker warrants of Liberty, each exercisable at a price of $0.624.

*Acquisition Agreement*

On March 30, 2017, DFMMJ and Chestnut entered into the Acquisition Agreement pursuant to which DFMMJ agreed to acquire, and Chestnut agreed to sell, all or substantially all of the assets of Chestnut, the principal asset of which consists of the License, which License permits Chestnut to operate as a "dispensing organization" under applicable Florida law and to possess, cultivate, process, dispense and sell medical marijuana in the State of Florida.

As consideration for the purchase of the License and related ancillary assets, DFMMJ agreed to pay the total sum of US$40 million. The purchase price was payable by an immediate, up-front deposit of US$3.26 million, with the balance paid on closing of the acquisition. The deposit became non-refundable after the expiration of an open due diligence period wherein DFMMJ satisfied itself of relevant due diligence investigations. A portion of the purchase price was held in escrow for a period of 12 months as a customary indemnity holdback to satisfy any indemnity claims that may be made by DFMMJ. Holders of an aggregate of approximately $25.0 million of Subscription Receipts (or



approximately US$18.4 million) from the Offering waived the application of the Escrow Release Conditions in order to fund, in part, the purchase price and the balance of the purchase price (less the non-refundable deposit) was funded by Aphria Inc. ("**Aphria**").

The Acquisition Agreement was amended to clarify certain clerical matters on April 13, 2017 and further amended on May 19, 2017 (the "**Second Amendment**"). The Second Amendment was prepared in response to a delay by the Florida legislature to enact legislation that would have clarified the transfer protocols and authority to transfer the License. Accordingly, pursuant to the terms of the Second Amendment, the purchase and sale of the assets of Chestnut has been effectuated in two stages.

The first stage of the purchase and sale, which was completed concurrent with the execution of the Second Amendment on May 19, 2017, contemplated the sale of all assets of Chestnut, other than the License, on the condition that, among other things, the parties enter into the Management Agreement (as defined below) in respect of the control and operation of Chestnut, as further described below. The second stage of the purchase and sale was to be completed upon the approval of the State of Florida to transfer the License to DFMMJ. Prior to approval by the State of Florida for the transfer of the License from Chestnut to DFMMJ in accordance with the terms of the Second Amendment, the parties agreed that the terms of the Management Agreement shall govern. Effective September 28, 2017, the state approved the transfer of the license to DFMMJ, thereby terminating the Management Agreement 30 days thereafter.

*Management Agreement*

Pursuant to the terms of the Management Agreement, DFMMJ was exclusively responsible for control and determination of the day-to-day conduct of the business activities of Chestnut as they relate to the business of growing, producing, and distributing marijuana pursuant to the License, including cultivation processes, cultivation, media relations, marketing, personnel control and personnel/employee decisions, banking, accounts payable, accounts receivable, billing procedures, collection matters, cash management policies, pricing, procurement of equipment used or useful in connection with such business, and such other matters as may be necessary or appropriate in connection with day-to-day conduct of the business.

In furtherance of DFMMJ's control and determination of the marijuana business of Chestnut, DFMMJ was authorized and empowered, without further authorization from Chestnut to, among other things, (a) establish policies and procedures with respect to all operations, marketing, banking, accounting, financial controls, and personnel activities; (b) contract for the purchase or sale of products, supplies, inventory, goods and services in connection with the ordinary course of business; (c) purchase products or property from, or sell, lease or convey products or property to, Chestnut relating to the marijuana business; and (d) open and close all bank accounts, deposit and withdraw monies and otherwise be listed as authorized signatories on all Chestnut bank accounts as related to the marijuana business.

In consideration of the services provided under the Management Agreement for the development of services that made available to Chestnut, and to recognize that DFMMJ paid Chestnut for the right to manage Chestnut's operations, DFMMJ was entitled to retain all pre-tax profits generated by the marijuana business of Chestnut during the term of the Management Agreement.

On May 22, 2017, the Florida Department of Health issued a written notice acknowledging and confirming that DFMMJ and Chestnut could proceed with their commercial arrangement pursuant to the terms of the Management Agreement. Effective September 28, 2017, the state approved the transfer of the license to DFMMJ, thereby terminating the Management Agreement.

 liberty health sciences

*Relationship with Aphria*

Concurrently with the completion of the Business Combination, Liberty and Aphria entered into the following commercial agreements, all of which were terminated in October 2018 prior to Aphria's listing on the New York Stock Exchange in November 2018. Under the terms of the termination agreement, Aphria provided for a Sell Through Period in which Liberty was able to continue selling their remaining inventory of Aphria, Solei and RIFF branded products. Liberty's products manufactured under its own house brands have now replaced products sold under the Aphria brands.

Know-How License Agreement

On April 25, 2017, Holdco entered into a know-how license agreement (the "**Know-How License**") with Aphria pursuant to which Holdco obtained a license to use any know-how (including knowledge, methodologies and techniques) made available by Aphria to Holdco related to the production of medical marijuana (the "**Know-How**") for the purposes of cultivating, distributing and selling medical marijuana in the State of Florida. The Know-How License was amended and restated as between Aphria and Liberty Health Sciences USA Ltd. on December 1, 2017. To the extent Holdco made any improvement or enhancement to the Know-How (an "**Improvement**"), such Improvement would be wholly owned by Aphria, excluding Improvements made relating to post-harvest processing. Following the completion of the Business Combination, Holdco made available such Know-How directly to DFMMJ.

In exchange for such license, Holdco issued to Aphria 192,400,000 Holdco Shares and agreed to pay Aphria an annual license fee of $10,000 plus applicable taxes (the "**Annual License Fee**"). Following the Business Combination and related consolidation, such Holdco Shares were consolidated and converted into 64,133,333 Common Shares in the capital of Liberty.

Trademark License Agreement

Concurrently with the completion of the Business Combination, Liberty entered into a trademark license agreement (the "**Trademark License**") with Aphria pursuant to which Liberty and its subsidiaries (including DFMMJ) obtained a license to use Aphria's trademarks identified therein (the "**Trademarks**") for the purposes of marketing, distributing and selling medical marijuana in the State of Florida. The Trademark License was subsequently amended and restated to allow Liberty and its subsidiaries to use the Trademarks in Massachusetts and to provide a right of first refusal for other states. The Trademark License superseded the terms of an interim trademark license agreement which was in effect between Aphria and Holdco, and implemented on a temporary basis following the Acquisition.

In exchange for such license, Liberty agreed to pay Aphria a royalty of 3% on sales of each product that was sold or otherwise supplied by Liberty or any of its subsidiaries to another person under Aphria's name (excluding, for greater clarity, any costs of packing, insurance, transport, delivery and consumption taxes).

Investor Rights Agreement

Concurrently with the completion of the Business Combination, Liberty entered into an investor rights agreement (the "**Investor Rights Agreement**") pursuant to which, among other things, Aphria was entitled to certain director nomination and pre-emptive rights. In particular, Aphria had the right to designate two director nominees for election to the Board for so long as Aphria beneficially owned, directly or indirectly, in the aggregate, 10% or more of the issued and outstanding Common Shares (on a non-diluted basis).

The Investor Rights Agreement also included customary pre-emptive rights in favour of Aphria pursuant to which in the event of a proposed distribution or issuance of Common Shares or other securities convertible or exchangeable into Common Shares (other than stock options or other securities issued under security based compensation arrangements), the Company would grant Aphria the right to subscribe for that number of Common Shares, or, as the



case may be, for securities convertible or exchangeable into Common Shares, on the same terms and conditions, including the same subscription or exercise price, as applicable, in order that Aphria may continue to maintain its pro rata equity ownership interest in the Company.

Registration Rights Agreement

Concurrently with the completion of the Business Combination, Liberty entered into a registration rights agreement (the "**Registration Rights Agreement**") pursuant to which, among other things, Aphria was provided with customary demand and "piggy back" registration rights. Under the terms of the Registration Rights Agreement, Aphria was able to require the Company to file a prospectus under applicable securities laws and take such other steps as may be necessary to facilitate a secondary offering in Canada of all or any portion of the Common Shares held by Aphria, by giving written notice of such request to the Company.

*Sale of Aphria's Position*

On February 5, 2018, it was announced that a group of buyers led by members of the Serruya family (the "**Group**") had entered into a purchase and sale agreement with Aphria to purchase all of the Common Shares in the Company owned by Aphria that are not subject to CSE escrow requirements over the course of the next two and a half years. Following the initial purchase, Aphria retained an ownership position of 26.4% of the issued and outstanding Common Shares. The transaction also included a call / put option agreement for the remainder of the Common Shares in the Company owned by Aphria, which were currently subject to the CSE mandatory escrow requirements.

On July 23, 2018 it was announced that Aphria had entered into a lock-up agreement with the Group, preventing them from selling the next tranche of Liberty shares owned by Aphria that will become freely trading on July 26, 2018 for a period of 18 months. On September 6, 2018, it was announced that Aphria had sold its outstanding Liberty shares, totaling 64,118,462 shares to a group of buyers. In exchange, Aphria received a five-year promissory note bearing 12% interest for $59.1 million. Aphria has also secured an irrevocable option to repurchase these shares for the value of the promissory note, together with any interest thereon and pursuant to a note purchase agreement.

## Florida MMTC License

Liberty is licensed to operate as a "medical marijuana treatment center" ("**MMTC**") under applicable Florida law and to possess, cultivate, process, dispense and sell medical marijuana in the State of Florida pursuant to the terms of the License issued by the Department under the provisions of the *Senate Bill 8A, Fla. Stat. 381.986 et seq*. Liberty obtained the rights to the License pursuant to the Acquisition Agreement, and the related Management Agreement, each between DFMMJ and Chestnut. With the approval by the Department, to transfer the license to DFMMJ Investments LLC on September 28, 2017, the Management Agreement was terminated thirty days thereafter. The License is issued for use at the Company's facility at Chestnut Hill Tree Farms in Alachua County, Florida near the city of Gainesville (the "**Chestnut Facility**") and applies only to such facility absent the approval of a variance from the Department. For a further description of the Acquisition Agreement and the Management Agreement, see *General Development of the Business – Business Combination and Related Agreements*. For a further description of the License see *Description Of The Business – License and Regulations* and *Regulatory Overview*.

## Expansion and Acquisitions

*Alico Facility Acquisition*

On February 16, 2018, the Company announced the closing of the acquisition of all of the issued and outstanding shares in the capital of 242 Cannabis, LLC, owner of a 387 acre parcel of land in Gainesville, Florida (the "**Property**") purchased from Alico Citrus Nursery, LLC ("**Alico**"), in exchange for 18,815,322 units of the Company (the "**Alico Acquisition**"). Each unit issued as part of the Alico Acquisition purchase price was comprised of one Common Share of



the Company and one-half common share purchase warrant, with each whole warrant exercisable at a price of $2.07 for a period of three years from the closing of the Alico Acquisition.

The Company had initially intended to pursue a phased expansion strategy at the Chestnut Facility which it acquired in May 2017. Phase 2 of the Company's previously disclosed expansion plans, which added three new greenhouses increased the Company's grow space at the Chestnut Facility from approximately 12,000 square feet to approximately 24,000 square feet, was completed in January 2018 and approval by the Department was received in February 2018. Phase 3 and Phase 4 of the expansion plans of the Chestnut Facility have been discontinued in favour of the proposed retro-fitting and upgrade of the Liberty 360 Campus (as defined below). The Alico Acquisition enables Liberty to expand its production capacity a year sooner than initially projected in order to meet the growing patient demand in Florida.

Since the completion of the Alico Acquisition, the Property has been renamed the Liberty 360 Innovation Campus (the "**Liberty 360 Campus**" or "**Liberty 360**"). The Liberty 360 Campus includes over 200,000 square feet of state-of-the-art greenhouses, a head house and processing facilities. The completion of retrofit activities subsequent to Liberty's 2019 fiscal year end added 190,000 square feet of cultivation space, adding production capacity of approximately 16,800 kgs annually of medical cannabis.

The Company is continuing construction activities, including the completion of a 12,000 square foot processing facility for the extraction and refining of cannabis oils. The Liberty 360 Campus will be equipped to produce vaporizer products, including preloaded disposable vape pens, cartridges and pods, as well as other dosage forms such as capsules, oral solutions (tinctures) and topicals. In addition, it is anticipated that the processing area will have a commercial kitchen for the production of edibles and chewable dosage forms once the state has defined the necessary regulations.

*Rollout of Additional Dispensaries*

Under the Florida License (hereinafter defined), the Company is entitled to open up to 40 dispensaries (increasing by 5 for every 100,000 registered patients in the State of Florida) across the State of Florida, which the Company is currently rolling out under its Liberty Health Sciences brand to better serve its patient base. The Company opened its inaugural dispensary in January 2018 in the Villages community in north central Florida and, during the 2019 fiscal year, opened up an additional ten dispensaries. Subsequent to Liberty's fiscal year end, a further five dispensaries were opened, bringing the Company's total dispensary count in the State of Florida to sixteen. The Company also signed leases for an additional six dispensary locations and is in negotiations for a further six. The Company expects to have a total of 30 dispensaries opened by the end of its 2020 fiscal year.

To better serve Florida's expanding patient base, Liberty also invested in expanding its delivery abilities, providing customers with door-to-door services and building six delivery hubs through the State of Florida during fiscal 2019. Subsequent to year end, the Company integrated the operations of these delivery hubs into existing dispensaries in order to reduce overhead costs. The Company now delivers statewide out of Dania Beach, St. Petersburg, Tallahassee, Bonita Springs, Merritt Island and Gainesville.

*Ohio Dispensary and Processing Licenses*

In June 2018, the State of Ohio Board of Pharmacy awarded a dispensary license for the southwest portion of the state to Schottenstein Aphria III LLC, of which Liberty holds a 50.1% ownership interest. Over 375 applications were submitted for 56 licenses in Ohio. Schottenstein Aphria III LLC opened its dispensary in June 2019 under the name Mad River Remedies in Dayton, Ohio.

Liberty, through a second joint venture entity, Schottenstein Aphria II LLC, of which Liberty also holds a 50.1% ownership interest, successfully obtained a provisional processing license in October 2018. The joint venture has also



secured a 10,000 square foot processing facility that is expected to open at the end of June 2019. The opening of the processing facility is dependent on the receipt of the required regulatory approvals.

## Other Developments

*November 2017 Convertible Debenture Offering*

On November 22, 2017, the Company completed a private placement offering (the "**November 2017 Offering**") of convertible secured debentures (the "**Notes**") for gross proceeds of US$12 million to fund its continued expansion plans in the State of Florida. The Notes bear interest of 12%, payable semi-annually, and mature on November 22, 2020. Each Note has a face value of US$1,000 and is convertible into Common Shares at maturity at a conversion price of $2.00 per Common Share. The Company has the right to redeem the Notes at a premium to principal, in whole or in part, at any time prior to maturity. The Company also has a right to force conversion of the Notes into Common Shares at par plus accrued and unpaid interest if the Common Shares trade at or above $3.00 for ten consecutive trading days, on a volume weight average basis.

*OTCQX Listing*

On December 4, 2017, the Company graduated from the OTC Pink market to the OTCQX and began trading on the OTCQX under the symbol "LHSIF".

*Massachusetts Investment*

On March 27, 2018, the Company announced that it had signed a non-binding letter of intent to acquire a 75% ownership interest in Massachusetts-based William Noyes Webster Foundation, Inc. ("**WNWF**") for US$16 million, pursuant to a term sheet (the "**WNWF Purchase**"). WNWF owns one provisional integrated medical cannabis licenses in the Commonwealth of Massachusetts and has a cultivation facility and a dispensary location, both of which are partially completed. Additionally, WNWF has applied for two additional medical licenses and intends to apply for three adult-use licenses from the Massachusetts Cannabis Control Commission over the next year. WNWF is a pre-revenue entity. The Company, in performing its due diligence, determined that the proposed acquisition, as well as renegotiations of the key terms of the acquisition, failed to create sufficient value for Liberty and its shareholders. The Company has notified WNWF of the termination of the acquisition process.

As part of the proposed acquisition, Liberty issued a promissory note for approximately US$2.3M to WNWF with an interest rate of 5% per annum, which was payable on March 27, 2019 (the "WNWF Note"). The WNWF Note is secured by the integrated medical license held by WNWF. The WNWF Note is currently in default, and the Company is in negotiations regarding the restructuring of this outstanding obligation. Although the Company intends to take appropriate steps so as to maximize its recovery of this obligation, there is no assurance that the amount owing will be repaid in whole or in part and the appropriate provision has been included in the Company's financial statements. As at February 28, 2019, the Company had taken a full accounting provision on the WNWF Note.

*May 2018 Bought Deal Offering*

On April 16, 2018, the Company announced a bought deal financing to issue 22,222,500 units at a price of $0.90 per unit, with an over-allotment option to purchase an additional 3,333,375 units at the same price. Each unit consists of one common share in the capital of the Company and one common share purchase warrant. Each warrant will entitle the holder thereof to acquire, subject to adjustment in certain circumstances, one common share in the capital of the Company at an exercise price of $1.10 for a period of 24 months after closing. On May 10, 2018, the Company closed the financing, issuing 25,555,875 units for gross proceeds of $23,000,288 (the "**May 2018 Offering**").



*July 2018 Share Issuance*

On July 4, 2018, the Company issued 10,092,583 Common Shares at a price of $0.782 per share to settle US$6,000,000 of outstanding payables to Thermo Energy Systems Inc. The outstanding payables to Thermo Energy Systems Inc. were in respect of ongoing retrofitting and construction services performed at the Company's Liberty 360 Campus.

### Regulatory Developments

In November 2016, the voters of the State of Florida overwhelmingly approved (with approximately 71% of the vote) the expansion of the uses for medical marijuana to treat a further twenty plus medical conditions as well as those conditions that a physician believes could be managed with the use of medical cannabis. Since Chestnut previously obtained its License in the State of Florida for the cultivation, production, and sale of low-THC medical cannabis, it has been grandfathered into the new broader medical cannabis framework, which now includes the ability to produce and sell high THC cannabis. In March 2019, the scope of allowable marijuana products was expanded to include smokeable whole flower products, including pre-rolled cigarettes.

The medical cannabis marketplace in Florida is in its early stages, which is evidenced by the fact that just over 300,000 patients have been added to the Medical Marijuana Use Registry as of June 2019 statewide. With a total population of over 20 million people, and with a wide range of qualifying conditions, Florida's potential patient population is vast. The patient registration volume has grown steadily in recent months as more supply has become available and as access to the growing number of physicians who are qualified to order medical cannabis has expanded. There are now over 2,300 qualified physicians in the State of Florida who can access medical cannabis for their patients. Patient volume is expected to continue increasing at a rapid pace in light of the expanded medical uses as well as the broad availability of high THC products. With expanded production capabilities, a primary goal of the business moving forward is the acquisition of qualified patients.

In the State of Ohio, Governor John Kasich signed into law House Bill 523 in June 2016, legalizing marijuana under a regulated medical marijuana program. The Ohio law prohibits smoking marijuana, but allows for oils, tinctures, edibles, topicals and plant materials to be sold in dispensaries statewide. There are over twenty qualifying conditions for the usage of medical marijuana under Ohio's regulatory program. Cultivator, processor and dispensary licenses are handled separately in the State of Ohio and granted by the Department of Commerce (cultivation, processing) and Board of Pharmacy (dispensary). Liberty, through its joint venture operations, holds a 50.1% interest in entities holding a provisional processing license and a dispensary license. As of the end of May 2019, the medical marijuana marketplace was in its infancy, with 35,000 registered patients and 500 physicians with certificates to recommend in the State of Ohio.

## DESCRIPTION OF THE BUSINESS

### Company Overview

Liberty Health Sciences Inc. is a producer and retailer of marijuana products aimed at improving the quality of peoples' lives. Liberty's focus is solely on the United States market where it produces high-quality products at a low-cost. Through its wholly-owned subsidiary, DFMMJ, Liberty is licensed to produce and sell medical marijuana products in the State of Florida. The Company is focused on acquiring other cannabis business and expanding its operations throughout the United States. Liberty was also recently awarded various cannabis licenses in Ohio and has opened a dispensary under the name Mad River Remedies in June 2019 with their joint venture partner. See *General Development of the Business*.

Liberty's business strategy is to acquire and operate vertically-integrated marijuana operations in states that are heavily populated with limited licenses in the United States. Liberty has the know-how and expertise to transform targeted investments into low-cost operations that produce high quality marijuana products while delivering value



to its shareholders. Liberty has established strong relationships with producers of vaporizers, topicals, transdermal products and edibles in Florida and will transfer these arrangements to other states where possible.

## License and Regulations

*Florida*

The License grants Liberty the authority to possess, cultivate, process, dispense and sell medical cannabis in the State of Florida. The License is issued for use at the Company's Chestnut Facility and Liberty 360 Campus and applies only to such facilities absent the approval of a variance from the Department.

The License permits the sale of derivative products produced from extracted cannabis plant oil as medical cannabis to qualified patients to treat certain medical conditions in the State of Florida which conditions are outlined in Florida Statutes section 381.986. Under the terms of the License, the Company is permitted to sell medical cannabis only to qualified medical patients that are registered with the State. Only certified physicians who have successfully completed a medical cannabis educational program can register patients and their medical cannabis orders on the Medical Marijuana Use Registry. The Company maintains an open and collaborative relationship with the Florida Department of Health and the Company's operations are in full compliance with all laws and regulations.

Under the License, the Company can operate up to 40 dispensaries statewide (increases by 5 for every 100,000 registered patients). Currently, the dispensaries can be in any geographic location within the state as long as the local municipality's zoning regulations authorize such a use and the proposed site is zoned for a pharmacy and not within 500 feet of a church or school.

In the State of Florida, only cannabis that is grown in the state can be sold in the state. As Florida is a vertically integrated system, the Company is able to cultivate, harvest, process and sell/dispense/deliver its own medical cannabis products. The State of Florida also allows the Company to make a wholesale purchase of medical cannabis from, or a distribution of medical cannabis to, another licensed dispensing organization within the state under certain circumstances such as crop failure. At the present time, the Company's principal products include cannabis oil in capsule, oral solution, sublingual solution, vaporizer, topical, dry flower and pre-rolled cigarette forms.

*Ohio*

In Ohio, as of the date of the AIF, Liberty has an interest in a dispensary license issued by the Board of Pharmacy. The dispensary license allows Liberty the authority to obtain medical marijuana from processors and may dispense or sell it to qualified patients in the State of Ohio. The dispensary license is issued for use at the Company's Dayton, Ohio dispensary, operating under the trade name Mad River Remedies.

The sale of medical marijuana products is permitted to patients that have obtained a current, valid identification card issued by the Board of Pharmacy and in accordance with a physician recommendation. Only certified physicians who have received certificates from the State Medical Board. Qualifying patient conditions are outlined in the State of Ohio Administrative Code Chapter 3796.

Under the License, the Company can operate one dispensary per license granted and is restricted to the entity and location indicated in the license. Retail dispensaries cannot be within 500 feet of a church, school, public playground, public library or public park.

Dispensaries may sell oils, tinctures, plant material, edibles, patches and other forms of medical marijuana as approved by the Board of Pharmacy. Products sold cannot be of a form or method that is considered attractive to children. Bill HB 523 does not allow smoking of cannabis for medical use, although it does permit the dispensing of whole flower.



## Reporting Requirements

*Florida*

The Florida Department of Health requires that any licensee establish, maintain, and control a computer software tracking system that traces cannabis from seed to sale and allows real-time, 24-hour access by the Florida Department of Health to data. The tracking system must allow for integration of other seed-to-sale systems and, at a minimum, include notification of when marijuana seeds are planted, when marijuana plants are harvested and destroyed, and when cannabis is transported, sold, stolen, diverted, or lost. Additionally, the Florida Department of Health also maintains a patient and physician registry and the Company must comply with all requirements and regulations relative to providing required data or proof of key events to said system.

*Ohio*

In Ohio, retail dispensaries must report to the Ohio Automated Rx Reporting System ("**OARRS**") when dispensing medical marijuana to a patient or caregiver. OARRS is a database established and maintained by the Board of Pharmacy to monitor misuse and diversion of controlled substances. In addition, the Department of Commerce is responsible for establishing and maintaining an electronic database that monitors cannabis from seed source through cultivation, processing, testing and dispensing. Dispensaries must submit to this database any information that the Department of Commerce deems necessary.

## Principal Products

Liberty's principal business strategy is to focus on the sale of medical marijuana to patients through referrals from qualified physicians throughout the states of Florida and Ohio. As a secondary business strategy, and depending on retail demand, Liberty also intends to sell medical marijuana crops at various stages of development to other licensed dispensing organizations in the wholesale marketplace pursuant to state law and regulations.

*Medical Marijuana*

Medical marijuana can be ingested in a variety of ways, including smoking, vaporizing, or consumption in the form of oil. Unlike the pharmaceutical options, individual elements within medical marijuana have not been isolated, concentrated and synthetically manipulated to deliver a specific therapeutic effect. Instead, medical marijuana addresses ailments holistically through the synergistic action of naturally occurring phytochemicals.

In Florida and Ohio, Liberty is permitted to sell whole flower, as well as derivative products produced from extracted cannabis plant oil as medical cannabis to qualified patients. Medical marijuana has been used in the treatment of a wide variety of diseases. Over 300 individually registered clinical trials in the last 10 years have studied the effects of medical marijuana. 42% of trials indicated medical marijuana helped cope with pain not only from the disease itself, but also provided relief from strong and sometimes toxic medications, such as chemotherapy. Neurological disorders, mental health, muscle and back problems, and inflammation (such as gastrointestinal disorders) also showed improvements with the use of medical marijuana in these clinical trials.

Sativa and Indica are the two main types of cannabis plants, and hybrids can be created when the genetics of each of the two plants are crossed. Within these different types of cannabis plants, there are many different varieties. Liberty's management team is currently assessing these varieties to establish which strains will best suit patients and physicians. Within each variety of medical cannabis are two key active cannabinoids, namely THC, the psychoactive ingredient, and cannabidiol, which is responsible for many of the non-psychoactive effects from medical marijuana.

*Product Offerings*

Liberty announced several licensing and distributing agreements throughout fiscal 2018 and 2019, including the



following:

In October 2017, the Company announced an exclusive licensing agreement for the state of Florida with MM Technology Holdings, LLC, which owns the award-winning Mary's Medicinal brand. Mary's products include cannabis infused transdermal patches, ointments, creams and distillate concentrates. Beginning at the end of July 2018, Mary's products were made available in all stores in the State of Florida.

In January 2018, the Company announced an exclusive licensing arrangement with MC Brands LLC whereby the Company would produce on an exclusive basis, edible products under the Incredibles brand in the State of Florida.

The Company announced in May 2018 that an amended licensing agreement was signed with Aphria to add Solei Sungrown Cannabis to the Company's growing list of brands in the state of Florida. In August 2018, the Florida Department of Health approved the Solei line of products for sale. Aphria's RIFF line of products were subsequently approved by the Florida Department of Health in October 2018. Subsequent to the termination of the Company's agreements with Aphria in October 2018, Liberty phased out its Solei and RIFF products. The Company's Aphria branded products, as well as Liberty's own house brand products, were also regrouped and rebranded under the Zentient and Pretty Pistil brand names in June 2019.

In September 2018, Liberty announced that it had signed an exclusive agreement with PAX Labs Inc. to be the exclusive distributor of the award-winning PAX Era cannabis oil vaporizer. A variety of strains have been released under Liberty's licensed brands for use in the PAX Era device, including Mary's Medicinals and RIFF.

In December 2018, the Company announced the launch of Zentient Labs, a line of premium, hemp-based CBD products. Zentient Labs will include a line of products across numerous categories including an athletic line, a wellness line, a beauty line and premium pet products.

Subsequent to fiscal year end, in June 2019, the Company announced new partnerships with Papa's Herb™ and Lemon and Grass. Papa's Herb™ is a line of accessibly priced, THC smokeable flower products, including pre-rolls and whole flower. The Lemon and Grass brand offers a portfolio of cannabis pain relief products, expanding Liberty's oral and topical product lines.

Certain of these offerings may be subject to approval by state authorities. The Company continues to round out its product line, offering THC and CBD products in several consumable formats.

## Distribution

*Florida*

Chestnut's first plantings of medical marijuana occurred in June 2016 after receiving cultivation authorization from the state, and the first harvest and extraction occurred in December 2016. Since that time, production has been increasing as the operations stabilize. Primary production has moved to the Company's 387-acre Liberty 360 Campus subsequent to the completion of retrofit activities on its greenhouse space. Liberty has an annual production capacity of 17,800 kgs annually from both the Chestnut Facility and the Liberty 360 Campus.

To distribute this production, the Company, as of the date hereof has opened up sixteen dispensaries across the State of Florida. In addition, Liberty has entered into leasing agreements to build another six dispensaries and plans to open up to a total of thirty dispensaries by February 2020. To better serve Florida's expanding patient base, Liberty also created six major delivery hubs throughout the State of Florida. Subsequent to Liberty's 2019 fiscal year end, the operations of the delivery hubs were integrated into the dispensary operations of Dania Beach, Merritt Island, Tallahassee, St. Petersburg, Bonita Springs and Gainesville. Medical marijuana patients order from the Company primarily through telephone and directly through the Company's dispensaries.

 liberty health sciences

The State of Florida does not regulate pricing under the Compassionate Use Regulations, and licensed dispensing organizations within the State of Florida are able to set their own prices for medical marijuana. Liberty's prices vary based on the market prices of other licensed dispensing organizations, but current selling prices range between US$0.12 and US$0.20 per milligram of active cannabinoid. Liberty's price per milligram will be based on operating costs, materials costs, growth time, and yield per plant from each of the varieties.

The state also allows the Company to make a wholesale purchase of medical marijuana from, or a distribution of medical marijuana to, another licensed dispensing organization within the state.

*Ohio*

In Ohio, Liberty has an interest in a dispensary license issued by the Board of Pharmacy. The dispensary license allows Liberty the authority to obtain medical marijuana from processors and may dispense or sell it to qualified patients in the State of Ohio. The dispensary license is issued for use at the Company's Dayton, Ohio dispensary, operating under the trade name Mad River Remedies, which was opened subsequent to Liberty's fiscal year end. Medical marijuana patients purchase cannabis directly from this location.

The State of Ohio does not regulate pricing, and licensed dispensing organizations are able to set their own prices for medical marijuana. Liberty's price per milligram will be based primarily on the wholesale price it is able to obtain, as well as operating costs.

## Operations

*Florida*

The Company's original production operations are located at its 36-acre facility in Alachua, Florida, near the city of Gainesville. Currently, the Chestnut Facility, through multiple expansion plans in fiscal 2018 and 2019, holds approximately 45,600 square feet of greenhouses for the purpose of cultivating medical marijuana. Primary production operations have moved to the Company's 387-acre Liberty 360 Campus, where it holds an additional 190,000 square feet of greenhouses. In total, the Company's production capacity is approximately 17,800 kgs annually. Processing operations currently occur at the Liberty 360 Campus, in a head house adjacent to the greenhouses.

Liberty currently employs or has under contract approximately 220 full or part time staff. This includes lab technicians, horticulturalists, operations, sales, marketing, dispensing and security personnel. The staff count is expected to increase in conjunction with the added growing and processing space.

*Ohio*

In Ohio, Liberty has an interest in a provisional processing license issued by the Department of Commerce. The Company expects to open its processing facility in Columbus, Ohio at the end of June 2019, pending regulatory approvals.

## Storage and Security

*Florida*

To ensure the safety and security of premises where the cultivation, processing, storing, or dispensing of medical marijuana occurs, and to maintain adequate controls against the diversion, theft, and loss of marijuana or marijuana delivery devices, the Company is required to do the following:

        (a)        maintain a fully operational security alarm system


liberty health sciences

(b)      secure all entry points and perimeter windows

(c)      equip the facility with motion detectors; pressure switches; and duress, panic, and hold-up alarms;

(d)      maintain a video surveillance system that records continuously 24 hours a day and meets the following criteria:

     (i)      Cameras are fixed in a place that allows for the clear identification of persons and activities in controlled areas of the premises. Controlled areas include grow rooms, processing rooms, storage rooms, disposal rooms or areas, and point-of-sale rooms;

     (ii)      Cameras are fixed in entrances and exits to the premises, which shall record from both indoor and outdoor, or ingress and egress, vantage points;

     (iii)      Recorded images must clearly and accurately display the time and date;

     (iv)      Retain video surveillance recordings for at least 45 days or longer upon the request of a law enforcement agency;

(e)      ensure that the facility's outdoor premises have sufficient lighting from dusk until dawn;

(f)      ensure that the indoor premises where dispensing occurs, includes a waiting area with sufficient space and seating to accommodate qualified patients and caregivers and at least one private consultation area that is isolated from the waiting area and area where dispensing occurs;

(g)      not dispense from its premises marijuana or a marijuana delivery device between the hours of 9 p.m. and 7 a.m., but may perform all other operations and deliver marijuana to qualified patients 24 hours a day;

(h)      store marijuana in a secured, locked room or a vault;

(i)      ensure at least two of its employees, or two employees of a security agency with whom it contracts, to be on the premises at all times where cultivation, processing, or storing of marijuana occurs;

(j)      report to local law enforcement within 24 hours after being notified or becomes aware of the theft, diversion, or loss of marijuana; and

(k)      to ensure the safe transport of marijuana and marijuana delivery devices to medical marijuana treatment centers, marijuana testing laboratories, or qualified patients, the licensee must maintain a marijuana transportation manifest in any vehicle transporting marijuana. The marijuana transportation manifest must be generated from the licensee's seed-to-sale tracking system and include details regarding departure time, address, recipient's name and quantity. An individual transporting marijuana or a marijuana delivery device must present a copy of the relevant marijuana transportation manifest. Only vehicles in good working order are to be used to transport marijuana and the marijuana and marijuana delivery devices must be locked in a separate compartment or container within the vehicle. Each vehicle requires at least two persons to be in a vehicle transporting marijuana or marijuana delivery devices, and at least one person to remain in the vehicle while the marijuana or marijuana delivery device is being delivered.  All employees transporting or delivering marijuana and marijuana delivery devices must receive the appropriate training in safety and security.


liberty health sciences

*Ohio*

Licensed dispensaries are required to have an operable security system, which uses commercial grade equipment, at all times. The aforementioned security system must include:

(1)  A perimeter alarm;

(2)  Motion detectors;

(3)  Video cameras in all areas, unless prohibited by law, including all points of entry and exit from the dispensary, the dispensary department, and restricted access areas which shall be appropriate for the normal lighting conditions of the area under surveillance, so as to allow for the capture of clear and certain identification of any person located in the surveillance area;

(4)  A video camera or cameras recording at each point of sale location allowing for the identification of the dispensary employee dispensing the medical marijuana and any patient or caregiver purchasing the medical marijuana. The camera or cameras shall capture the sale, the individuals and the computer monitors used for the sale;

(5)  Constant streaming from all video cameras during hours when a dispensary is closed; and

(6)  Recording from all video cameras during hours of operation, which the dispensary shall make available for immediate viewing by the State Board or the State Board's authorized representative upon request and shall be retained for at least six (6) months;

(7)  A duress alarm, meaning a silent security alarm system signal generated by the entry of a designated code into an arming station to signal that the alarm user is being forced to turn off the system;

(8)  A panic alarm, meaning an audible security alarm system signal generated by the manual activation of a device intended to signal a life threatening or emergency requiring law enforcement response;

(9)  A holdup alarm, meaning a silent alarm signal generated by the manual activation of a device intended to signal a robbery in progress;

(10) An automatic voice dialer, meaning any electrical, electronic, mechanical, or other device capable of being programmed to send a prerecorded voice message, when activated, over a telephone line, radio or other communication system, to a law enforcement, public safety or emergency services agency requesting dispatch;

(11) A failure notification system that provides an audible, text or visual notification of any failure in the surveillance system. The failure notification system shall provide an alert to the dispensary within five minutes of the failure, either by telephone, email, or text message;

(12) The ability to immediately produce a clear color still photo that is a minimum of ninety-six hundred (9600) dpi from any camera image, either live or recorded. All cameras shall be capable of capturing at least thirty (30) frames per second;

(13) A date and time stamp embedded on all recordings. The date and time shall be synchronized and set correctly and shall not significantly obscure the picture;


liberty health sciences

Page │18

(14) The ability to remain operational during a power outage and ensure that all access doors are not solely controlled by an electronic access panel to ensure that locks are not released during a power outage; and

(15) All video surveillance equipment shall allow for the exporting of still images in an industry standard image format, including .jpg, .bmp, and .gif. Exported video shall have the ability to be archived in a proprietary format that ensures authentication of the video and guarantees that no alteration of the recorded image has taken place. Exported video shall also have the ability to be in an industry standard file format that can be played on a standard computer operating system. All recordings shall be erased or destroyed prior to disposal.

The State Board can request or approve alternate security measures that it determines are an adequate substitute for a security measure specified in Chapter 3796.

### Competitive Conditions

*Florida*

In Florida, as of the date hereof, there are twenty-two licensed dispensing organizations that are authorized to cultivate, process, transport, and dispense medical cannabis pursuant to this section in the state of Florida. These twenty-two are the only businesses in Florida authorized to dispense medical marijuana to qualified patients and their legal representatives. Of these twenty-two licenses, approximately ten are in operation as of June 2019.

In Ohio, as of the date hereof, there are thirty provisional cultivation licenses, forty provisional processing licenses, and fifty-six provisional dispensary licenses that have been issued. Of these licenses, seventeen cultivation licensees, five processing licensees, and eighteen dispensary licensees have been issued certificates of operation.

The Company believes that due to the extensive regulatory restrictions and large amounts of financing required for medical marijuana operations, the number of licensed dispensing organizations will remain relatively small in the short term. However, as the demand for medical marijuana increases, the Company believes new competitors will enter the market. The principal aspects of competition between the Company and its competitors will be the price and quality of medical marijuana and client service provided to physicians and patients. While the Company will price its medical marijuana according to market demands, it anticipates a lower cost of production compared to its competitors. Additionally, the Company will strive to have better and faster service by having more trained staff than any other licensed dispensing organization, as well as strategies to outperform and outmaneuver the competition. The Company also plans to maintain a minimum level of inventory to ensure that it can continue to provide its customers with unmatched quality on a consistent basis while also acquiring new customers without supply interruptions.

### Employees

As the date hereof, Liberty employed approximately 220 full-time employees and contract workers, including the staff in Florida.

**ISSUERS WITH U.S. CANNABIS-RELATED ASSETS**

On February 8, 2018, the Canadian Securities Administrators revised their previously released Staff Notice 51-352 *Issuers with U.S. Marijuana-Related Activities* (the "**Staff Notice**") which provides specific disclosure expectations for issuers that currently have, or are in the process of developing, cannabis-related activities in the United States as permitted within a particular state's regulatory framework. All issuers with United States cannabis-related activities are expected to clearly and prominently disclose certain prescribed information in prospectus filings and other required disclosure documents.



As a result of the Company's existing operations and recent acquisitions in the United States, Liberty is properly subject to the Staff Notice and accordingly provides the following disclosure:

*Nature of Involvement*

As a result of the Company's existing operations and recent acquisitions in the United States, Liberty is properly subject to the Staff Notice and accordingly provides the following disclosure.

<u>Florida</u>

The Company is licensed to operate as a "medical marijuana treatment center" under applicable Florida law pursuant to the terms of the License issued by the Florida Department of Health, Office of Compassionate Use under the provisions of the *Compassionate Medical Cannabis Act of 2014*. See  *Description of the Business – License and Regulations*. The Company operates a 36-acre facility in Alachua, Florida and a 387-acre facility in Gainesville, Florida where the Company cultivates and processes medical cannabis. Liberty currently employs or has under contract approximately 220 full or part time staff in the State of Florida, including lab technicians, horticulturalists, operations, sales, marketing and security personnel. The Company has received approval from the Department to open sixteen dispensaries to date, and has signed leases to open a further six locations.

<u>Ohio</u>

In June 2018, the State of Ohio Board of Pharmacy awarded a dispensary license for the southwest portion of the state to Schottenstein Aphria III LLC, of which Liberty holds a 50.1% ownership interest. Over 375 applications were submitted for 56 licenses in Ohio. Schottenstein Aphria III LLC opened its dispensary in June 2019 under the name Mad River Remedies in Dayton, Ohio.

Liberty, through a second joint venture entity, Schottenstein Aphria II LLC, of which Liberty also holds a 50.1% ownership interest, successfully obtained a provisional processing license in October 2018. The joint venture has also secured a 10,000 square foot processing facility that is also expected to open at the end of June 2019. The opening of the processing facility is dependent on the receipt of the required regulatory approvals.

*Enforcement of United States Federal Laws*

In the United States, cannabis is largely regulated at the state level. To the Company's knowledge, there are to date a total of 33 states, plus the District of Columbia, Puerto Rico, Guam, the Northern Mariana Islands and the US Virgin Islands that have legalized cannabis in some form, including Florida and Ohio. Ten states, the District of Columbia and the Northern Mariana Islands have legalized recreational cannabis in some form. Notwithstanding the permissive regulatory environment of medical cannabis at the state level, and the increasing number of states with legal recreational frameworks, cannabis continues to be categorized as a Schedule I controlled substance under the CSA and as such, violates federal law in the United States. Senators Elizabeth Warren and Cory Gardner have introduced a bipartisan Senate bill titled "Strengthening the Tenth Amendment Through Entrusting States (STATES) Act" that would lift the Controlled Substance Act's restrictions on cannabis in states that have written their own laws. However, there can be no assurances as to when this bill will pass, or if it will pass at all.

As a result of the conflicting views between state legislatures and the United States federal government regarding cannabis, investments in cannabis businesses in the United States are subject to inconsistent legislation and regulation. The response to this inconsistency was addressed in August 2013 when then Deputy Attorney General, James Cole, authored a memorandum (the "**Cole Memorandum**") addressed to all United States district attorneys acknowledging that notwithstanding the designation of cannabis as a controlled substance at the federal level in the United States, several US states have enacted laws relating to cannabis for medical and recreational purposes.



The Cole Memorandum outlined certain priorities for the Department of Justice relating to the prosecution of cannabis offenses. In particular, the Cole Memorandum noted that in jurisdictions that have enacted laws legalizing cannabis in some form and that have also implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale and possession of cannabis, conduct in compliance with those laws and regulations is less likely to be a priority at the federal level. Notably, however, the Department of Justice has never provided specific guidelines for what regulatory and enforcement systems it deems sufficient under the Cole Memorandum standard.

In light of limited investigative and prosecutorial resources, the Cole Memorandum concluded that the Department of Justice should be focused on addressing only the most significant threats related to cannabis. States where medical cannabis had been legalized were not characterized as a high priority. In March 2017, newly appointed Attorney General Jeff Sessions again noted limited federal resources and acknowledged that much of the Cole Memorandum had merit; however, he disagreed that it had been implemented effectively and, on January 4, 2018, Attorney General Jeff Sessions issued a memorandum (the "**Sessions Memorandum**") that rescinded the Cole Memorandum. The Sessions Memorandum rescinded previous nationwide guidance specific to the prosecutorial authority of United States Attorneys relative to cannabis enforcement on the basis that they are unnecessary, given the well-established principles governing federal prosecution that are already in place.  Those principals are included in chapter 9.27.000 of the United States Attorneys' Manual and require federal prosecutors deciding which cases to prosecute to weigh all relevant considerations, including federal law enforcement priorities set by the Attorney General, the seriousness of the crime, the deterrent effect of criminal prosecution, and the cumulative impact of particular crimes on the community. Following the issuance of the Sessions Memorandum, each of the United States Attorneys for the State of Ohio stated it would not change their approach to prosecuting marijuana cases. To the knowledge of management of the Company, there have not been any additional statements or guidance made by federal authorities or prosecutors regarding the risk of enforcement action in Florida or Ohio.

As a result of the Sessions Memorandum, federal prosecutors will now be free to utilize their prosecutorial discretion to decide whether to prosecute marijuana activities despite the existence of state-level laws that may be inconsistent with federal prohibitions. No direction was given to federal prosecutors in the Sessions Memorandum as to the priority they should ascribe to such cannabis activities, and resultantly it is uncertain how actively federal prosecutors will be in relation to such activities. Furthermore, the Sessions Memorandum did not discuss the treatment of medical cannabis by federal prosecutors. Medical cannabis is currently protected against enforcement by enacted legislation from United States Congress in the form of the Rohrabacher-Blumenauer Amendment (also described as the Rohrabacher-Leahy Amendment, each as defined herein) which similarly prevents federal prosecutors from using federal funds to impede the implementation of medical cannabis laws enacted at the state level, subject to Congress restoring such funding. See *United States Enforcement Proceedings* below. Due to the ambiguity of the Sessions Memorandum in relation to medical cannabis, there can be no assurance that the federal government will not seek to prosecute cases involving cannabis businesses that are otherwise compliant with state law. See *Risk Factors – Risk Factors Related to the United States*.

Such potential proceedings could involve significant restrictions being imposed upon the Company or third parties, and also divert the attention of key executives. Such proceedings could have a material adverse effect on the Company's business, revenues, operating results and financial condition as well as the Company's reputation, even if such proceedings were concluded successfully in favour of the Company. See *Risk Factors – Risk Factors Related to the United States*.

Additionally, under U.S. federal law it may potentially be a violation of federal money laundering statutes for financial institutions to accept any proceeds from cannabis sales or any other Schedule I narcotics. Canadian banks are similarly reluctant to transact with cannabis companies, due to the uncertain legal and regulatory framework characterizing the industry at present. Banks and other financial institutions could be prosecuted and possibly convicted of money laundering for providing services to cannabis businesses. Under U.S. federal law, banks or other financial institutions that provide a cannabis business with a checking account, debit or credit card, small business loan, or any other service



could be found guilty of money laundering or conspiracy. Despite these laws, in February 2014, the Financial Crimes Enforcement Network ("**FCEN**") of the Treasury Department issued a memorandum (the "**FCEN Memo**") providing instructions to banks seeking to provide services to cannabis-related businesses. The FCEN Memo states that in some circumstances, it is permissible for banks to provide services to cannabis-related businesses without risking prosecution for violation of federal money laundering laws. It refers to supplementary guidance that Deputy Attorney General Cole issued to federal prosecutors relating to the prosecution of money laundering offenses predicated on cannabis-related violations of the CSA. It is unclear at this time whether the current administration will follow the guidelines of the FCEN Memo. See *Risk Factors – Risk Factors Related to the United States - The Company's investments in the United States are subject to applicable anti-money laundering laws and regulations*.

For the reasons set forth above, the Company's existing operations in the United States, and any future operations or investments the Company may engage in, may become the subject of heightened scrutiny by regulators, stock exchanges and other authorities in Canada. As a result, the Company may be subject to significant direct and indirect interaction with public officials. There can be no assurance that this heightened scrutiny will not in turn lead to the imposition of certain restrictions on the Company's ability to operate in the United States or any other jurisdiction. See *Risk Factors*.

Government policy changes or public opinion may also result in a significant influence over the regulation of the cannabis industry in the United States or elsewhere. A negative shift in the public's perception of medical cannabis in the United States or any other applicable jurisdiction could affect future legislation or regulation. Among other things, such a shift could cause state jurisdictions to abandon initiatives or proposals to legalize medical cannabis, thereby limiting the number of new state jurisdictions into which the Company could expand. Additionally, due to the uncertain regulatory landscape, the Company's third party suppliers, manufacturers and contractors may elect, at any time, to decline or withdraw services necessary for the Company's operations. Any inability to fully implement the Company's expansion strategy may have a material adverse effect on the Company's business, financial condition and results of operations. See *Risk Factors*.

Further, violations of any federal laws and regulations could result in significant fines, penalties, administrative sanctions, convictions or settlements arising from civil proceedings conducted by either the federal government or private citizens, or criminal charges, including, but not limited to, disgorgement of profits, cessation of business activities or divestiture. This could have a material adverse effect on the Company, including its reputation and ability to conduct business, its holding (directly or indirectly) of medical cannabis licenses in the United States, the listing of its securities on various stock exchanges, its financial position, operating results, profitability or liquidity or the market price of its publicly traded shares. In addition, it is difficult for the Company to estimate the time or resources that would be needed for the investigation of any such matters or its final resolution because, in part, the time and resources that may be needed are dependent on the nature and extent of any information requested by the applicable authorities involved, and such time or resources could be substantial. See *Risk Factors*.

*United States Enforcement Proceedings*

The United States Congress has passed appropriations bills each of the last three years that included the Rohrabacher Amendment Title: H.R.2578 — Commerce, Justice, Science, and Related Agencies Appropriations Act, 2016 ("**Rohrabacher-Blumenauer Amendment**"), which by its terms does not appropriate any federal funds to the United States Department of Justice for the prosecution of medical cannabis offenses of individuals who are in compliance with state medical cannabis laws. Subsequent to the issuance of the Sessions Memorandum on January 4, 2018, the United States Congress passed its omnibus appropriations bill, SJ 1662, which for the fourth consecutive year contained the Rohrabacher-Blumenauer Amendment language (referred to in 2018 as the "**Rohrabacher-Leahy Amendment**") and continued the protections for the medical cannabis marketplace and its lawful participants from interference by the Department of Justice up and through the 2018 appropriations deadline of September 30, 2018. These protections were subsequently extended through December 7, 2018 and January 25, 2019 as part of short-term continuations of appropriations. On February 15, 2019, the amendment was renewed as part of an omnibus



liberty health sciences

appropriations bill in effect until September 30, 2019. American courts have construed these appropriations bills to prevent the federal government from prosecuting individuals when those individuals comply with state law. However, because this conduct continues to violate federal law, American courts have observed that should Congress at any time choose to appropriate funds to fully prosecute the CSA, any individual or business—even those that have fully complied with state law—could be prosecuted for violations of federal law. If Congress restores funding, the United States government will have the authority to prosecute individuals for violations of the law before it lacked funding under the CSA's five-year statute of limitations.

*Ability to Access Public and Private Capital*

The Company has historically, and continues to have, access to both public and private capital in Canada in order to support its continuing operations. The Company has had cannabis-related activities in the United States since its inception, including in July 2017 when the CSE approved the Business Combination and the resulting reverse takeover and listing of the Company's Common Shares. In addition, the Company has had success completing private offerings in the past, including the November 2017 Offering which raised US$12.0 million and the May 2018 Offering which raised $23.0 million of capital for the Company, and has an ongoing banking relationship with WFCU Credit Union, a Canadian credit union based out of Windsor, Ontario ("**WFCU**"). The Company also has a banking relationship with Partner Colorado Credit Union, based out of Denver, Colorado. Although the Company has accessed private financing in the past and accessed the Canadian public market with the May 2018 Offering, there is neither a broad nor deep pool of institutional capital that is available to cannabis license holders and license applicants. There can be no assurance that additional financing, if raised privately, will be available to the Company when needed or on terms which are acceptable. The Company has never needed to access public equity capital in the United States.

*Regulation of Medical Cannabis in Florida*

Liberty is licensed to produce and sell medical cannabis in the State of Florida through the Department under the provisions of the Florida Legislation. The Florida Department of Health issued the License to Chestnut on November 23, 2015 and Liberty acquired the rights to the License on May 23, 2017 via the Management Agreement entered into between Liberty and Chestnut. On September 28, 2017, the Department approved the transfer of the License to DFMMJ, the wholly-owned subsidiary of Liberty, which now solely owns and is entitled to utilize the License in Florida.

The License permits the sale of low-THC cannabis (now grandfathered to produce and sell high-THC cannabis) and medical cannabis to treat a number of medical conditions in the State of Florida which are delineated in Florida Statutes section 381.986. Under the terms of the License, Liberty is permitted to sell medical cannabis only to qualified medical patients that are registered with the state. Only certified physicians who have successfully completed a medical cannabis educational program can register patients and their medical cannabis orders on the Medical Marijuana Use Registry. Liberty maintains an open and collaborative relationship with the Florida Department of Health and Liberty's operations are in full compliance with all laws and regulations.

Under the Liberty License, Liberty can operate up to 40 dispensaries statewide. Currently, the dispensaries can be in any geographic location within the state as long as the local municipality's zoning regulations authorize such a use and/or the proposed site is zoned for a pharmacy use and is not within 500 feet of a church or school. In the State of Florida, only cannabis that is grown in the state can be sold in the state. As Florida is a vertically integrated system, Liberty (and other licensees) is required to cultivate, harvest, process and sell/dispense/deliver its own medical cannabis products. The State also allows Liberty to make a wholesale purchase of medical cannabis from, or a distribution of medical cannabis to, another licensed dispensing organization within the state under certain circumstances such as crop failure. At the present time, Liberty's principal products include cannabis oil in capsule, oral solution, sublingual solution, vaporizer, topicals, whole flower and pre-rolled cigarettes.



<u>Regulatory Framework</u>

The State of Florida Statutes 381.986(8)(a) provides a regulatory framework that requires licensed producers, which are statutorily defined as "Medical Marijuana Treatment Centers", to both cultivate, process and dispense medical cannabis in a vertically integrated marketplace.

<u>Licensing Requirements</u>

Licenses issued by the Department may be renewed biennially so long as the licensee meets requirements of the law and pays a renewal fee. License holders can only own one license and MMTC's can operate up to a maximum of 40 dispensaries throughout the State of Florida.

Applicants must demonstrate (and licensed MMTC's must maintain) that: (i) they have been registered to do business in the State of Florida for the previous five years, (ii) they possess a valid certificate of registration issued by the Florida Department of Agriculture, (iii) they have the technical and technological ability to cultivate and produce cannabis, including, but not limited to, low-THC cannabis, (iv) they have the ability to secure the premises, resources, and personnel necessary to operate as an MMTC, (v) they have the ability to maintain accountability of all raw materials, finished products, and any by-products to prevent diversion or unlawful access to or possession of these substances, (vi) they have an infrastructure reasonably located to dispense cannabis to registered qualified patients statewide or regionally as determined by the Department, (vii) they have the financial ability to maintain operations for the duration of the two-year approval cycle, including the provision of certified financial statements to the Department, (viii) all owners, officers, board members and managers have passed a Level II background screening, inclusive of fingerprinting, and ensure that a medical director is employed to supervise the activities of the MMTC, and (ix) they have a diversity plan and veterans plan accompanied by a contractual process for establishing business relationships with veterans and minority contractors and/or employees.

Upon approval of the application by the Department, the applicant must post a performance bond of up to US$5 million, which may be reduced by meeting certain criteria such as a minimum patient count.

<u>Dispensary Requirements</u>

An MMTC may not dispense more than a 70-day supply of cannabis. The MMTC employee who dispenses the cannabis must enter into the registry his or her name or unique employee identifier. The MMTC must verify that: (i) the qualified patient and the caregiver, if applicable, each has an active registration in the registry and active and valid medical cannabis use registry identification card, (ii) the amount and type of cannabis dispensed matches the physician certification in the registry for the qualified patient, and (iii) the physician certification has not already been filled. An MMTC may not dispense to a qualified patient younger than 18 years of age, only to such patient's caregiver. An MMTC may not dispense or sell any other type of cannabis, alcohol, or illicit drug-related product, except a cannabis delivery device as specified in the physician certification. An MMTC must, upon dispensing, record in the registry: (i) the date, time, quantity and form of cannabis dispensed, (ii) the type of cannabis delivery device dispensed, and (iii) the name and registry identification number of the qualified patient or caregiver to whom the cannabis delivery device was dispensed. An MMTC must ensure that patient records are not visible to anyone other than the patient, caregiver, and MMTC employees.

<u>Security Requirements for Cultivation, Processing and Dispensing Facilities</u>

With respect to security requirements for cultivation, processing and dispensing facilities, an MMTC must maintain a fully operational alarm system that secures all entry points and perimeter windows, and is equipped with motion detectors, pressure switches, and duress, panic and hold-up alarms. The MMTC must also have a 24-hour video surveillance system with specified features. MMTCs must retain video surveillance recordings for at least 45 days, or



longer upon the request of law enforcement. An MMTC's outdoor premises must have sufficient lighting from dusk until dawn.

An MMTC's dispensing facilities must include a waiting area with sufficient space and seating to accommodate qualified patients and caregivers and at least one private consultation area and such facilities may not display products or dispense cannabis or cannabis delivery devices in the waiting area and may not dispense cannabis from its premises between the hours of 9:00 p.m. and 7:00 a.m. but may perform all other operations and deliver cannabis to qualified patients 24-hours a day.

Transportation and Storage Requirements

Cannabis must be stored in a secured, locked room or a vault. An MMTC must have at least two employees, or two employees of a security agency, on the premises at all times where cultivation, processing, or storing of cannabis occurs. MMTC employees must wear an identification badge and visitors must wear a visitor pass at all times on the premises. An MMTC must report to law enforcement within 24 hours after the MMTC is notified of or becomes aware of the theft, diversion or loss of cannabis. A cannabis transportation manifest must be maintained in any vehicle transporting cannabis or a cannabis delivery device. The manifest must be generated from the MMTC's seed-to-sale tracking system and must include the: (i) departure date and time, (ii) name, address, and license number of the originating MMTC, (iii) name and address of the recipient, (iv) quantity and form of any cannabis or cannabis delivery device being transported, (v) arrival date and time, (vi) delivery vehicle make and model and license plate number; and (vii) name and signature of the MMTC employees delivering the product. Further, a copy of the transportation manifest must be provided to each individual, MMTC that receives a delivery. MMTCs must retain copies of all cannabis transportation manifests for at least three years. Cannabis and cannabis delivery devices must be locked in a separate compartment or container within the vehicle and employees transporting cannabis or cannabis delivery devices must have their employee identification on them at all times. Lastly, at least two people must be in a vehicle transporting cannabis or cannabis delivery devices, and at least one person must remain in the vehicle while the cannabis or cannabis delivery device is being delivered.

Department Inspections

The Department shall conduct announced or unannounced inspections of MMTCs to determine compliance with the laws and rules. The Department shall inspect an MMTC upon receiving a complaint or notice that the MMTC has dispensed cannabis containing mold, bacteria, or other contaminants that may cause an adverse effect to humans or the environment. The Department shall conduct at least a biennial inspection of each MMTC to evaluate the MMTC's records, personnel, equipment, security, sanitation practices, and quality assurance practices.

*Regulation of Medicinal Cannabis in Ohio*

Regulatory Framework

The State of Ohio Administrative Code Chapter 3796 provides a regulatory framework for medical marijuana dispensaries, statutorily defined as a "Medical Marijuana Entity." Chapter 3796 also provides the framework for Administration & Enforcement and Forms & Methods of Administration.

Licensing Requirements

A dispensary's certificate of operation expires on the date provided on its certificate of operation. A dispensary will receive notification ninety (90) days prior to the expiration of its certificate of operation. However, at least forty-five (45) days prior to the expiration of the certificate of operation, the dispensary is required to submit the following: (1) A medical marijuana dispensary renewal application; (2) A roster that includes all the dispensary's dispensary


liberty health sciences

Page │25

employees' names and dispensary employee license number; (3) The applicable fees; and (4) Any additional information required by the State Board of Pharmacy (the "**State Board**") in the licensing process.

If the premises on which the dispensary operates are leased, the renewal application must include an attestation that the premises identified on the application have been leased for the following two-year licensing term and is not subject to any contractual restrictions that would prevent it from operating in compliance with Chapter 3796.

Upon receipt of a renewal application, the State Board will consider: (1) The dispensary's history of compliance; (2) The number and severity of any violations; (3) The correction of violations, penalties, or other enforcement actions; and (4) Any additional criteria deemed necessary by the State Board. If the dispensary is operated in compliance with Chapter 3796, and the renewal fee is paid, the State Board must renew the certificate of operation within forty-five (45) days after the renewal application is received.

If a dispensary certificate of operation is allowed to lapse longer than thirty (30) days, the State Board will not renew the certificate of operation, and the dispensary will be required to cease operation and file for a new license.

<u>Security Requirements</u>

<u>*Dispensary Employee Supervision*</u>

A licensed dispensary key employee (statutorily defined as an administrator or other person responsible for the daily operation of the dispensary) shall provide personal supervision of the medical marijuana and medical marijuana products, order forms, all records relating to the dispensing of medical marijuana and medical marijuana products, unless the State Board has provided written approval to a dispensary allowing for the storage of records off-site. Whenever personal supervision of medical marijuana and medical marijuana products is not provided by a licensed dispensary key employee, physical or electronic security of such items must be provided according to the following requirements: (a) The dispensary department, restricted access areas and stock of medical marijuana must each be secured by a physical barrier with suitable locks and an electronic barrier to detect entry at a time when licensed dispensary employees are not present (the physical barrier shall be constructed from floor to ceiling to separate the public entry area from the dispensary department). Such a barrier, before being put into use, must be approved by the State Board; (b) A restricted access area within the dispensary department must contain all medical marijuana, and if maintained on the licensed premises, all records relating to the dispensing of medical marijuana, and any other items required to be under personal supervision of a licensed dispensary employee; (c) A dispensary maintaining records at a location other than the premises licensed by the State Board or via a computerized recordkeeping system shall maintain an executed agreement with the company possessing or storing the records authorizing an agent of the State Board with access to the records maintained in accordance with Chapter 3796 within three (3) business days, excluding weekends and holidays; and (d) No item, product, record, or equipment that must be accessible to anyone other than a licensed dispensary employee may be stored in restricted access areas.

<u>*Policies & Procedures*</u>

Licensed dispensaries are required to develop, implement, and maintain security policies and procedures. These policies and procedures include without limitation:  (1) A security plan with protocols for patient, caregiver, and employee safety and management and security of medical marijuana and currency; (2) Restricted access to the areas in the dispensary that contain medical marijuana to authorized employees; (3) Identification of authorized employees through means including current employee identification card in the employee's immediate possession whenever the employee is present at the dispensary; (4) Controlled access and prevention of loitering both inside and outside of the facility; (5) Conducting electronic monitoring; (6) Use of a panic button; and (7) Prepares for, protects against, and addresses how to handle any crisis that affects the security or operation of a dispensary in the event of strike, fire, flood or other natural disaster, or other situations of local, state or national emergency.



*Security System*

Licensed dispensaries are required to have an operable security system, which uses commercial grade equipment, at all times. The aforementioned security system must include: (1) A perimeter alarm; (2) Motion detectors; (3) Video cameras in all areas, unless prohibited by law, including all points of entry and exit from the dispensary, the dispensary department, and restricted access areas which shall be appropriate for the normal lighting conditions of the area under surveillance, so as to allow for the capture of clear and certain identification of any person located in the surveillance area; (4) A video camera or cameras recording at each point of sale location allowing for the identification of the dispensary employee dispensing the medical marijuana and any patient or caregiver purchasing the medical marijuana. The camera or cameras shall capture the sale, the individuals and the computer monitors used for the sale; (5) Constant streaming from all video cameras during hours when a dispensary is closed; and (6) Recording from all video cameras during hours of operation, which the dispensary shall make available for immediate viewing by the State Board or the State Board's authorized representative upon request and shall be retained for at least six (6) months; (7) A duress alarm, meaning a silent security alarm system signal generated by the entry of a designated code into an arming station to signal that the alarm user is being forced to turn off the system; (8) A panic alarm, meaning an audible security alarm system signal generated by the manual activation of a device intended to signal a life threatening or emergency requiring law enforcement response; (9) A holdup alarm, meaning a silent alarm signal generated by the manual activation of a device intended to signal a robbery in progress; (10) An automatic voice dialer, meaning any electrical, electronic, mechanical, or other device capable of being programmed to send a prerecorded voice message, when activated, over a telephone line, radio or other communication system, to a law enforcement, public safety or emergency services agency requesting dispatch; (11) A failure notification system that provides an audible, text or visual notification of any failure in the surveillance system. The failure notification system shall provide an alert to the dispensary within five minutes of the failure, either by telephone, email, or text message; (12) The ability to immediately produce a clear color still photo that is a minimum of ninety-six hundred (9600) dpi from any camera image, either live or recorded. All cameras shall be capable of capturing at least thirty (30) frames per second; (13) A date and time stamp embedded on all recordings. The date and time shall be synchronized and set correctly and shall not significantly obscure the picture; (14) The ability to remain operational during a power outage and ensure that all access doors are not solely controlled by an electronic access panel to ensure that locks are not released during a power outage; and (15) All video surveillance equipment shall allow for the exporting of still images in an industry standard image format, including .jpg, .bmp, and .gif. Exported video shall have the ability to be archived in a proprietary format that ensures authentication of the video and guarantees that no alteration of the recorded image has taken place. Exported video shall also have the ability to be in an industry standard file format that can be played on a standard computer operating system. All recordings shall be erased or destroyed prior to disposal.

The State Board can request or approve alternate security measures that it determines are an adequate substitute for a security measure specified in Chapter 3796.

*Storage Requirements*

Medical marijuana is required to be stored on the licensed premises of the dispensary, and the medical marijuana must be stored in restricted access areas and tracked in the inventory tracking system. A dispensary is required to maintain adequate lighting, ventilation, temperature, humidity control, and equipment. Required equipment includes, but is not limited to, adequate personal protective equipment for employees.

The dispensary must be maintained in a clean and orderly condition. Furthermore, medical marijuana shall be stored at appropriate temperatures and under appropriate conditions to help ensure that its identity, strength, quality and purity are not adversely affected. Containers storing expired, damaged, deteriorated, misbranded, adulterated or opened medical marijuana shall be separated from other medical marijuana until they are destroyed in accordance with the dispensary's destruction policy. Expired, damaged, deteriorated, misbranded, or adulterated medical marijuana shall not be stored at the licensed dispensary for more than one (1) week.


liberty health sciences

If a dispensary has reason to believe that an actual loss, theft, or diversion of medical marijuana has occurred, the dispensary is required to immediately notify the Ohio Department of Commerce ("**ODOC**") and law enforcement, within twenty-four (24) hours after the discovery of the event.

Transportation Requirements

*Process and Procedure*

Prior to transporting any medical marijuana, regardless of form, a medical marijuana entity is required to maintain a transportation log, in writing, that contains the following information: (1) The names and addresses of the medical marijuana entities sending and receiving the shipment; (2) The names and registration numbers of the registered employees transporting the medical marijuana or the products containing medical marijuana; (3) The license plate number and vehicle type that will transport the shipment; (4) The time of departure and estimated time of arrival; (5) The specific delivery route, which includes street names and distances; and (6) The total weight of the shipment and a description of each individual package that is part of the shipment, and the total number of individual packages.

The medical marijuana entity transporting medical marijuana must transmit a copy of the transportation log to the receiving medical marijuana entity before the close of business the day prior to transport. The medical marijuana entity must enter the information required in the inventory tracking.

Before accepting a delivery of medical marijuana, a dispensary key employee must inspect and acknowledge that the delivery meets relevant packaging and labeling requirements. The delivery of any medical marijuana failing to adhere to relevant packaging and labeling requirements must not be accepted by a dispensary and must be immediately returned to the processor or cultivator holding a plant-only processor designation.

*The Transportation Vehicle*

The vehicle transporting the medical marijuana must drive directly to its intended location(s), with limited exceptions for stops at other medical marijuana entities on transportation log, to refuel the vehicle, or to notify the medical marijuana entities, law enforcement, or ODOC of an emergency. The vehicle transporting the medical marijuana or any product containing medical marijuana shall meet the following requirements: (1) Be insured as required by law; (2) Store the medical marijuana and any product containing medical marijuana in a locked, safe, and secure storage compartment that is part of the motor vehicle, or in a locked storage container that has a separate key or combination pad; (3) Ensure any medical marijuana or product containing medical marijuana is not visible from the outside of the vehicle; (4) Be staffed with a minimum of two employees registered with ODOC, with at least one employee remaining with the vehicle at all times that the vehicle contains medical marijuana; (5) Have access to a secure form of communication with personnel at the medical marijuana entity and the ability to contact law enforcement through the 911 emergency system at all times that the vehicle contains medical marijuana, unless notification is impractical under the circumstances; and (6) Not contain any marks, logos, brands, or other illustrations on the exterior of the vehicle, other than those affixed to the vehicle by the vehicle manufacturer or dealership.

*Transportation Employee*

A registered employee transporting medical marijuana shall do the following: (1) Display his or her ODOC issued employee identification card at all times when transporting or delivering medical marijuana and shall produce it for ODOC or ODOC's authorized representative or law enforcement official upon request; (2) Ensure delivery times vary and routes are randomized; (3) Report any vehicle accident that occurs during the transportation to a person designated by the transporting medical marijuana entity to receive such reports within two hours after the accident occurs; (4) Report any loss or theft of medical marijuana that occurs during the transportation of medical; (5) Carry a copy of the completed transportation log; and (6) Notify the medical marijuana entity when the delivery has been completed.



Inspections and Enforcement

Dispensaries are subject to random and unannounced dispensary inspections and medical marijuana testing by the State Board. The State Board and its authorized representatives are allowed to: (1) Enter any place, including a vehicle, in which medical marijuana is held, stored, dispensed, sold, produced, delivered, transported, manufactured, or disposed of; (2) Inspect in a reasonable manner, the place and all pertinent equipment, containers, and labeling and all things including records, files, financial data, sales data, shipping data, pricing data, personnel data, research, papers, processes, controls, and facility, and inventory of any stock of medical marijuana; and (3) Obtain any medical marijuana or medical marijuana product, any labels or containers for medical marijuana, or paraphernalia.

Every person charged with preparation, obtaining or keeping records, logs, reports or other documents in connection with Chapter 3796, and every person in charge, or having custody of those documents shall, upon request by the State Board, make the documents immediately available for inspection and copying by the State Board, the State Board's authorized representative or others authorized by law to review the documents.

The State Board may investigate a licensed dispensary, principal officer, dispensary employee, third-party vendor, or any other party associated with a dispensary for an alleged violation of Chapter 3796. The State Board may require a dispensary to produce documents, records, or any other material pertinent to the investigation of an alleged violation of Chapter 3796. Failure to provide the required material may be grounds for discipline.

Any dispensary that does not store medical marijuana in compliance with this division, or that stores medical marijuana at a location other than that for which the dispensary license was issued, may have its license suspended or revoked. In such a case, all medical marijuana under the dispensary's control will be subject to being placed under seal by the State Board.

*Compliance of United States Operations*

Liberty is in compliance with applicable licensing requirements and the regulatory framework enacted by the State of Florida and Ohio. As further detailed above, Liberty is licensed to operate as a "medical cannabis treatment center" under applicable Florida law pursuant to the terms of the License. The License grants Liberty the authority to possess, cultivate, process, dispense and sell medical cannabis in the State of Florida. In Ohio, Liberty is licensed to operate a dispensary in Dayton, Ohio. Liberty has not experienced any non-compliance nor has been subject to any notices of violation by the Department. Although the Company's state chartered bank, First Green Bank, has recently ceased its line of business servicing businesses in the cannabis industry, the business was taken up by Safe Harbor Private Banking ("**Safe Harbor**") from Colorado, which is now providing banking services to the Company in Florida. Liberty also maintains a banking relationship with WFCU and is capable of lawfully paying all expenses and managing its operations and assets in full compliance with all federal statutes and regulations. The Company also engages armored car services as a custodian for cash and deposits, which are delivered to the Federal Reserve Bank on behalf of the Company and then reflected in the Company's Safe Harbor bank account. The armored car services picks up cash from the dispensaries as well as from the cultivation facility for home deliveries from that site.

The Company has a full time Compliance Officer on staff in Florida whose responsibilities are to monitor the day to day activities of staff, including ensuring that the established standard operating procedures are being adhered to at each stage of the cultivation, processing and distribution cycle, to identify any non-compliance matters and to put in place the necessary modifications to ensure compliance. The Compliance Officer performs monthly, unannounced audits against the Company's established standard operating procedures and state regulations. Each employee is provided with an employee handbook outlining the standard operating procedures and state regulations upon hiring, and is then provided with one on one quality and regulatory training by the Compliance Officer. The Company has 24 hour surveillance of every room, including greenhouses, in which marijuana is cultivated, processed, and stored. This footage is kept for at least 45 days as per the requirements of the Department. Security officers also perform a walk through every four hours to check each room and look for unusual activity. The Company also utilizes state approved



software for tracking marijuana inventory from seed to sale.The Compliance Officer's duties also include ongoing education of staff on the state regulations. State inspections to date have not resulted in any non-compliance issues.

The Company has worked with its legal advisors in Florida to implement, and will work with management and legal advisors in Ohio, to ensure that Schottenstein Aphria III LLC implement measures designed to ensure compliance with applicable state laws in the United States on an ongoing basis, including:

- weekly correspondence and updates with advisors;

- development of standard operating procedures with respect to cultivation, processing and distribution;

- ongoing monitoring of compliance with operating procedures and regulations by on-site management;

- appropriate employee training for all standard operating procedures; and

- subscription to monitoring programs to ensure compliance with the FCEN Memo.

While the Company's business activities are compliant with applicable state and local law, such activities remain illegal under United States federal law. See *Risk Factors – Risk Factors Related to the United States*.

RISK FACTORS

There are a number of risk factors that could cause future results to differ materially from those described herein. The risks and uncertainties described herein are not the only ones the Company faces. Additional risks and uncertainties, including those that the Company does not know about now or that it currently deems immaterial, may also adversely affect the Company's business. If any of the following risks actually occur, the Company's business may be harmed and its financial condition and results of operations may suffer significantly.

**Risk Factors Related to the United States**

***While cannabis is legal in many US state jurisdictions, it continues to be a controlled substance under the United States federal Controlled Substances Act.***

Investors are cautioned that in the United States, cannabis is largely regulated at the state level. To the Company's knowledge, there are to date a total of 33 states, plus the District of Columbia, Puerto Rico, Guam, the Northern Mariana Islands and the US Virgin Islands that have legalized cannabis in some form, including Florida and Ohio. Ten states, the District of Columbia and the Northern Mariana Islands have legalized recreational cannabis in some form. Notwithstanding the permissive regulatory environment of medical cannabis at the state level, cannabis continues to be categorized as a controlled substance under the CSA and as such, violates federal law in the United States. Senators Elizabeth Warren and Cory Gardner have introduced a bipartisan Senate bill titled "Strengthening the Tenth Amendment Through Entrusting States (STATES) Act" that would lift the Controlled Substance Act's restrictions on cannabis in states that have written their own laws. However, there can be no assurances as to when this bill will pass, or if it will pass at all.

The United States Congress has passed appropriations bills in 2019 and each of the last four years that have not appropriated funds for prosecution of cannabis offenses of individuals who are in compliance with state medical cannabis laws. American courts have construed these appropriations bills to prevent the federal government from prosecuting individuals when those individuals comply with state law. However, because this conduct continues to violate federal law, American courts have observed that should Congress at any time choose to appropriate funds to fully prosecute the CSA, any individual or business—even those that have fully complied with state law—could be



prosecuted for violations of federal law. And if Congress restores funding, the government will have the authority to prosecute individuals for violations of the law before it lacked funding under the CSA's five-year statute of limitations.

Violations of any federal laws and regulations could result in significant fines, penalties, administrative sanctions, convictions or settlements arising from civil proceedings conducted by either the federal government or private citizens, or criminal charges, including, but not limited to, disgorgement of profits, cessation of business activities or divestiture. This could have a material adverse effect on the Company, including its reputation and ability to conduct business, its holding (directly or indirectly) of medical cannabis licenses in the United States, the listing of its securities on various stock exchanges, its financial position, operating results, profitability or liquidity or the market price of its publicly traded shares. In addition, it is difficult for the Company to estimate the time or resources that would be needed for the investigation of any such matters or its final resolution because, in part, the time and resources that may be needed are dependent on the nature and extent of any information requested by the applicable authorities involved, and such time or resources could be substantial.

**Liberty derives 100% of its revenues from the cannabis industry in certain states of the United States, which industry is illegal under the federal laws of the United States. While the Company's business activities are compliant with applicable state and local law, such activities remain illegal under United States federal law. The enforcement of relevant laws is a significant risk.**

***The approach to the enforcement of cannabis laws may be subject to change or may not proceed as previously outlined.***

As a result of the conflicting views between state legislatures and the federal government regarding cannabis, investments in cannabis businesses in the United States are subject to inconsistent legislation and regulation. The response to this inconsistency was addressed in the Cole Memorandum addressed to all United States district attorneys acknowledging that notwithstanding the designation of cannabis as a controlled substance at the federal level in the United States, several US states have enacted laws relating to cannabis for medical purposes.

The Cole Memorandum outlined certain priorities for the Department of Justice relating to the prosecution of cannabis offenses. In particular, the Cole Memorandum noted that in jurisdictions that have enacted laws legalizing cannabis in some form and that have also implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale and possession of cannabis, conduct in compliance with those laws and regulations is less likely to be a priority at the federal level. Notably, however, the Department of Justice has never provided specific guidelines for what regulatory and enforcement systems it deems sufficient under the Cole Memorandum standard.

In light of limited investigative and prosecutorial resources, the Cole Memorandum concluded that the Department of Justice should be focused on addressing only the most significant threats related to cannabis. States where medical cannabis had been legalized were not characterized as a high priority. In March 2017, newly appointed Attorney General Jeff Sessions again noted limited federal resources and acknowledged that much of the Cole Memorandum had merit; however, he disagreed that it had been implemented effectively and, on January 4, 2018, Attorney General Jeff Sessions issued the Sessions Memorandum, which rescinded the Cole Memorandum. The Sessions Memorandum rescinded previous nationwide guidance specific to the prosecutorial authority of United States Attorneys relative to cannabis enforcement on the basis that they are unnecessary, given the well-established principles governing federal prosecution that are already in place. Those principles are included in chapter 9.27.000 of the United States Attorneys' Manual and require federal prosecutors deciding which cases to prosecute to weigh all relevant considerations, including federal law enforcement priorities set by the Attorney General, the seriousness of the crime, the deterrent effect of criminal prosecution, and the cumulative impact of particular crimes on the community.

As a result of the Sessions Memorandum, federal prosecutors will now be free to utilize their prosecutorial discretion to decide whether to prosecute cannabis activities despite the existence of state-level laws that may be inconsistent with federal prohibitions. No direction was given to federal prosecutors in the Sessions Memorandum as to the priority


liberty health sciences

they should ascribe to such cannabis activities, and resultantly it is uncertain how active federal prosecutors will be in relation to such activities. Furthermore, the Sessions Memorandum did not discuss the treatment of medical cannabis by federal prosecutors.

Medical cannabis is currently protected against enforcement by enacted legislation from United States Congress in the form of the Rohrabacher-Blumenauer Amendment (as defined herein) which similarly prevents federal prosecutors from using federal funds to impede the implementation of medical cannabis laws enacted at the state level, subject to Congress restoring such funding. Subsequent to the issuance of the Sessions Memorandum on January 4, 2018, the United States Congress passed its omnibus appropriations bill, SJ 1662, which for the fourth consecutive year contained the Rohrabacher-Blumenauer Amendment language (referred to in 2018 as the Rohrabacher-Leahy Amendment) and continued the protections for the medical cannabis marketplace and its lawful participants from interference by the Department of Justice up and through the 2018 appropriations deadline of September 30, 2018. These protections were subsequently extended through December 7, 2018 and January 25, 2019 as part of short-term continuations of appropriations. On February 15, 2019, the amendment was renewed as part of an omnibus appropriations bill in effect until September 30, 2019. See *United States Enforcement Proceedings*. Due to the ambiguity of the Sessions Memorandum in relation to medical cannabis, there can be no assurance that the federal government will not seek to prosecute cases involving cannabis businesses that are otherwise compliant with state law.

Such potential proceedings could involve significant restrictions being imposed upon the Company or third parties, while diverting the attention of key executives.  Such proceedings could have a material adverse effect on the Company's business, revenues, operating results and financial condition as well as the Company's reputation, even if such proceedings were concluded in favour of the Company. In the extreme case, such proceedings could ultimately involve the prosecution of key executives of the Company or the seizure of corporate assets; however as of the date hereof, the Company believes and has obtained legal advice in respect thereof that proceedings of this nature are remote.

### *The Company's investments in the United States are subject to applicable anti-money laundering laws and regulations.*

The Company is subject to a variety of laws and regulations domestically and in the United States that involve money laundering, financial recordkeeping and proceeds of crime, including the *Currency and Foreign Transactions Reporting Act of 1970* (commonly known as the *Bank Secrecy Act*), as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada)*, as amended and the rules and regulations thereunder, the *Criminal Code* (Canada) and any related or similar rules, regulations or guidelines, issued, administered or enforced by governmental authorities in the United States and Canada.

In February 2014, the FCEN issued a memorandum (the "**FCEN Memo**") providing instructions to banks seeking to provide services to cannabis-related businesses. The FCEN Memo states that in some circumstances, it is permissible for banks to provide services to cannabis-related businesses without risking prosecution for violation of federal money laundering laws.  It refers to supplementary guidance that Deputy Attorney General Cole issued to federal prosecutors relating to the prosecution of money laundering offenses predicated on cannabis-related violations of the CSA. It is unclear at this time whether the current administration will follow the guidelines of the FCEN Memo.

In the event that any of the Company's operations, or any proceeds thereof, any dividends or distributions therefrom, or any profits or revenues accruing from such operations in the United States were found to be in violation of money laundering legislation or otherwise, such transactions may be viewed as proceeds of crime under one or more of the statutes noted above or any other applicable legislation. This could restrict or otherwise jeopardize the ability of the Company to declare or pay dividends, effect other distributions or subsequently repatriate such funds back to Canada. Furthermore, while the Company has no current intention to declare or pay dividends on its Common Shares in the foreseeable future, in the event that a determination was made that the Company's proceeds from operations (or



any future operations or investments in the United States) could reasonably be shown to constitute proceeds of crime, the Company may decide or be required to suspend declaring or paying dividends without advance notice and for an indefinite period of time.

*The Company's investments in the United States may be subject to heightened scrutiny.*

For the reasons set forth above, the Company's existing operations in the United States, and any future operations or investments, may become the subject of heightened scrutiny by regulators, stock exchanges and other authorities in Canada. As a result, the Company may be subject to significant direct and indirect interaction with public officials. There can be no assurance that this heightened scrutiny will not in turn lead to the imposition of certain restrictions on the Company's ability to operate or invest in the United States or any other jurisdiction, in addition to those described herein.

Given the heightened risk profile associated with cannabis in the United States, CDS may implement procedures or protocols that would prohibit or significantly curtail the ability of CDS to settle trades for cannabis companies that have cannabis businesses or assets in the United States. On February 8, 2018, following discussions with the Canadian Securities Administrators and recognized Canadian securities exchanges, the TMX Group announced the signing of a Memorandum of Understanding ("**TMX MOU**") with Aequitas NEO Exchange Inc., the CSE, the Toronto Stock Exchange, and the TSX Venture Exchange. The TMX MOU outlines the parties' understanding of Canada's regulatory framework applicable to the rules, procedures, and regulatory oversight of the exchanges and CDS as it relates to issuers with cannabis-related activities in the United States. The TMX MOU confirms, with respect to the clearing of listed securities, that CDS relies on the exchanges to review the conduct of listed issuers. As a result, there is no CDS ban on the clearing of securities of issuers with cannabis-related activities in the United States. However, there can be no guarantee that this approach to regulation will continue in the future. If such a ban were to be implemented, it would have a material adverse effect on the ability of holders of Common Shares to make and settle trades. In particular, the Common Shares would become highly illiquid as until an alternative was implemented, and investors would have no ability to effect a trade of the Common Shares through the facilities of a stock exchange.

In light of the political and regulatory uncertainty surrounding the treatment of U.S. cannabis-related activities, including the rescission of the Cole Memorandum discussed above, on February 8, 2018, the Canadian Securities Administrators revised their previously released CSA Staff Notice 51-352 *Issuers with U.S. Marijuana-Related Activities* setting out their disclosure expectations for specific risks facing issuers with cannabis-related activities in the United States. The Staff Notice confirms that a disclosure-based approach remains appropriate for issuers with U.S. cannabis-related activities. The Staff Notice includes additional disclosure expectations that apply to all issuers with U.S. cannabis-related activities, including those with direct and indirect involvement in the cultivation and distribution of cannabis, as well as issuers that provide goods and services to third parties involved in the U.S. cannabis industry. The Company views the Staff Notice favourably, as it provides increased transparency and greater certainty regarding the views of its exchange and its regulator of existing operations and strategic business plan as well as the Company's ability to pursue further investment and opportunities in the United States.

Government policy changes or public opinion may also result in a significant influence over the regulation of the cannabis industry in Canada, the United States or elsewhere. A negative shift in the public's perception of medical cannabis in the United States or any other applicable jurisdiction could affect future legislation or regulation. Among other things, such a shift could cause state jurisdictions to abandon initiatives or proposals to legalize medical cannabis, thereby limiting the number of new state jurisdictions into which the Company could expand. Any inability to fully implement the Company's expansion strategy may have a material adverse effect on the Company's business, financial condition and results of operations.


liberty health sciences

Page │33

*Regulatory risks*

The activities of the Company are subject to regulation by governmental authorities. The Company's business objectives are contingent upon, in part, compliance with regulatory requirements enacted by these governmental authorities and obtaining all regulatory approvals, where necessary, for the sale of its products in each jurisdiction in which it operates. Liberty cannot predict the time required to secure all appropriate regulatory approvals for its products, or the extent of testing and documentation that may be required by governmental authorities. Any delays in obtaining, or failure to obtain regulatory approvals would significantly delay the development of markets and products and could have a material adverse effect on the business, results of operations and financial condition of the Company. New risks may emerge, and management may not be able to predict all such risks or be able to predict how such risks may result in actual results differing from the results contained in any forward-looking statements.

Furthermore, although the operations of the Company are currently carried out in accordance with all applicable rules and regulations, no assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit or curtail the Company's ability to import, distribute or, in the future, produce marijuana. Amendments to current laws and regulations governing the importation, distribution, transportation and/or production of marijuana, or more stringent implementation thereof could have a substantial adverse impact on the Company.

Because of the conflicting views between state legislatures and the federal government of the United States regarding cannabis, investments in cannabis businesses in the United States are subject to inconsistent legislation, regulation, and enforcement. Unless and until the United States Congress amends the United States Controlled Substances Act with respect to cannabis or the Drug Enforcement Agency reschedules or de-schedules cannabis (and as to the timing or scope of any such potential amendments there can be no assurance), there is a risk that federal authorities may enforce current federal law, which would adversely affect the current and future operations of the Company in the United States. As a result of the tension between state and federal law, there are a number of significant risks associated with the Company's existing and future operations in the United States.

*Legislative or regulatory reform and compliance*

The Company's operations are subject to a variety of laws, regulations, guidelines and policies relating to the manufacture, import management, packaging/labelling, processing, production, advertising, sale, transportation, storage and disposal of medical marijuana, but also including laws and regulations relating to drugs, controlled substances, health and safety, relationships with health care providers, the conduct of operations and the protection of the environment.

The industry is subject to extensive controls and regulations, which may significantly affect the financial condition of market participants. The marketability of any product may be affected by numerous factors that are beyond the control of the Company's investments and which cannot be predicted, such as changes to government regulations, including those relating to taxes and other government levies which may be imposed. Changes in government levies, including taxes, could reduce the profitability of Company's operations and could make the Company's operations uneconomic. The industry is also subject to numerous legal challenges, which may significantly affect the financial condition of market participants and which cannot be reliably predicted.

The Company also incurs ongoing costs and obligations related to regulatory compliance. Failure to comply with regulations may result in additional costs for corrective measures, penalties or in restrictions on operations. In addition, changes in regulations, more vigorous enforcement thereof or other unanticipated events could require extensive changes to operations, increased compliance costs or give rise to material liabilities, which could have a material adverse effect on the business, results of operations and financial condition of the Company's investments and, therefore, on the Company's prospective returns. Further, the Company may be subject to a variety of claims and lawsuits. Adverse outcomes in some or all of these claims may result in significant monetary damages or injunctive



relief that could adversely affect the Company's ability to conduct its business. The litigation and other claims are subject to inherent uncertainties and management's view of these matters may change in the future. A material adverse impact on our financial statements also could occur for the period in which the effect of an unfavorable final outcome becomes probable and reasonably estimable.

The commercial medical and recreational marijuana industry is in its infancy and the Company anticipates that such regulations will be subject to change as the state and federal government monitors licensed producers in action. The Company will continue to monitor compliance on an ongoing basis in accordance with all applicable internal and external policies and procedures, which can be found in the Company's initial application for licensure and in company manuals and protocols.

### *Reliance on third-party suppliers, manufacturers and contractors*

The Company intends to maintain a full supply chain for the provision of products and services to the regulated cannabis industry. Due to the uncertain regulatory landscape for regulating cannabis in Canada and the United States, the Company's third party suppliers, manufacturers and contractors may elect, at any time, to decline or withdraw services necessary for the Company's operations. Loss of these suppliers, manufacturers and contractors may have a material adverse effect on the Company's business and operational results.

### *Banking*

Since the cultivation, distribution and possession of cannabis is currently illegal under U.S. federal law, it is possible that banks may refuse to open bank accounts for the deposit of funds from businesses involved with the cannabis industry. The inability to open bank accounts with certain institutions could materially and adversely affect the business of the Company. See *Issuers with U.S. Cannabis Related Business – Ability to Access Public and Private Capital* and *Issuers with U.S. Cannabis Related Business – Compliance of United States Operations*.

### *Operation permits and authorizations*

The Company's investments may not be able to obtain or maintain the necessary licenses, permits, authorizations or accreditations, or may only be able to do so at great cost, to operate their respective businesses. In addition, the Company's investments may not be able to comply fully with the wide variety of laws and regulations applicable to the cannabis industry. Failure to comply with or to obtain the necessary licenses, permits, authorizations or accreditations could result in restrictions on an investment's ability to operate in the cannabis industry, which could have a material adverse effect on the Company's business.

### *Liability, enforcement complaints, etc.*

The Company's participation in the cannabis industry may lead to litigation, formal or informal complaints, enforcement actions, and inquiries by various federal, state, or local governmental authorities against the Company or its investments. Litigation, complaints, and enforcement actions involving either of the Company or its investments could consume considerable amounts of financial and other corporate resources, which could have an adverse effect on the Company's future cash flows, earnings, results of operations and financial condition.

### Reliance on License

Liberty's ability to grow, store and sell medical marijuana and cannabis oil in the State of Florida is dependent on maintaining its License with the Florida Department of Health. Liberty's ability to sell medical marijuana in the State of Ohio is dependent on maintaining its license with the Ohio Board of Pharmacy. Failure to comply with the requirements of the License, or any failure to maintain any licenses held would have a material adverse impact on the business, financial condition and operating results of the Company.


liberty health sciences

## Expansion of Facilities

There is no guarantee that the Company's planned expansions in Florida or Ohio will be completed in the currently proposed form, if at all, nor is there any guarantee that the Company will be able to expand into additional jurisdictions. The failure of the Company to successfully execute its expansion strategy could adversely affect the business, financial condition and results of operations of the Company and may result in Liberty not meeting anticipated or future demand when it arises.

## Regulatory Risks

The activities of the Company are subject to regulation by governmental authorities. The Company's business objectives are contingent upon, in part, compliance with regulatory requirements enacted by these governmental authorities and obtaining all regulatory approvals, where necessary, for the sale of its products in each jurisdiction in which it operates. Liberty cannot predict the time required to secure all appropriate regulatory approvals for its products, or the extent of testing and documentation that may be required by governmental authorities.  Any delays in obtaining, or failure to obtain regulatory approvals would significantly delay the development of markets and products and could have a material adverse effect on the business, results of operations and financial condition of the Company.

Furthermore, although the operations of the Company are currently carried out in accordance with all applicable rules and regulations, no assurance can be given that new rules and regulations will not be enacted or that existing rules and regulations will not be applied in a manner which could limit or curtail the Company's ability to import, distribute or, in the future, produce medical marijuana. Amendments to current laws and regulations governing the importation, distribution, transportation and/or production of medical marijuana, or more stringent implementation thereof could have a substantial adverse impact on the Company.

## Environmental Regulations and Risks

Liberty's operations are subject to environmental regulation in the various jurisdictions in which it operates. These regulations mandate, among other things, the maintenance of air and water quality standards and land reclamation. They also set forth limitations on the generation, transportation, storage and disposal of solid and hazardous waste. Environmental legislation is evolving in a manner which will require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. There is no assurance that future changes in environmental regulation, if any, will not adversely affect Liberty's operations.

Government approvals and permits are currently, and may in the future be required in connection with Liberty's operations. To the extent such approvals are required and not obtained, the Company may be curtailed or prohibited from its proposed production of medical marijuana or from proceeding with the development of its operations as currently proposed.

Failure to comply with applicable laws, regulations and permitting requirements may result in enforcement actions thereunder, including orders issued by regulatory or judicial authorities causing operations to cease or be curtailed, and may include corrective measures requiring capital expenditures, installation of additional equipment, or remedial actions. The Company may be required to compensate those suffering loss or damage by reason of its operations and may have civil or criminal fines or penalties imposed for violations of applicable laws or regulations.

Amendments to current laws, regulations and permits governing the production of medical marijuana, or more stringent implementation thereof, could have a material adverse impact on the company and cause increases in expenses, capital expenditures or production costs or reduction in levels of production or require abandonment or delays in development.

 liberty health sciences

Volatile Market Price of the Common Shares

The market price of the Common Shares may be volatile and subject to wide fluctuations in response to numerous factors, many of which are beyond the Company's control. This volatility may affect the ability of holders of Common Shares to sell their securities at an advantageous price. Market price fluctuations in the Common Shares may be due to the Company's operating results failing to meet expectations of securities analysts or investors in any period, downward revision in securities analysts' estimates, adverse changes in general market conditions or economic trends, acquisitions, dispositions or other material public announcements by the Company or its competitors, along with a variety of additional factors. These broad market fluctuations may adversely affect the market price of the Common Shares.

Financial markets historically at times experienced significant price and volume fluctuations that have particularly affected the market prices of equity securities of companies and that have often been unrelated to the operating performance, underlying asset values or prospects of such companies. Accordingly, the market price of the Common Shares may decline even if the Company's operating results, underlying asset values or prospects have not changed. Additionally, these factors, as well as other related factors, may cause decreases in asset values that are deemed to be other than temporary, which may result in impairment losses. There can be no assurance that continuing fluctuations in price and volume will not occur. If such increased levels of volatility and market turmoil continue, the Company's operations could be adversely impacted and the trading price of the Common Shares may be materially adversely affected.

Risks Related to Dilutions

The Company may issue additional Common Shares in the future, which may dilute a shareholder's holdings in the Company. The Company's articles permit the issuance of an unlimited number of Common Shares, and shareholders will have no pre-emptive rights in connection with such further issuance. The directors of the Company have discretion to determine the price and the terms of issue of further issuances. Moreover, additional Common Shares will be issued by the Company on the exercise of options under the Company's stock option plan and upon the exercise of outstanding warrants.

Risks Inherent in an Agricultural Business

Liberty's business involves the growing of medical marijuana, an agricultural product. Such business will be subject to the risks inherent in the agricultural business, such as insects, plant diseases and similar agricultural risks. Although Liberty expects that any such growing will be completed indoors under climate controlled conditions, there can be no assurance that natural elements will not have a material adverse effect on any such future production.

Reliance on Key Personnel

The success of the Company is dependent upon the ability, expertise, judgment, discretion and good faith of its senior management (collectively, "**Key Personnel**"). Liberty's future success depends on its continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. Qualified individuals are in high demand, and the Company may incur significant costs to attract and retain them. The loss of the services of a Key Person, or an inability to attract other suitably qualified persons when needed, could have a material adverse effect on Liberty's ability to execute on its business plan and strategy, and the Company may be unable to find adequate replacements on a timely basis, or at all. In addition, if a Key Person leaves the Company, and the Company is unable to find a suitable replacement in a timely manner, or at all, there could occur a material adverse effect on the Company's business, financial condition and results of operations. While employment agreements are customarily used as a primary method of retaining the services of Key Personnel, these agreements cannot assure the continued services of such employees.



### Limited Operating History

Liberty has a limited operating history, which can make it difficult for investors to evaluate the Company's operations and prospects and may increase the risks associated with investment into the Company.

Liberty is in a development stage and as such, has not generated significant profits or revenues in the periods covered by its most recent financial statements, and as a result, has only a very limited operating history upon which its business and future prospects may be evaluated. Liberty is therefore subject to many of the risks common to early-stage enterprises, including challenges related to laws, regulations, licensing, integrating and retaining qualified employees; making effective use of limited resources; achieving market acceptance of existing and future solutions; competing against companies with greater financial and technical resources; acquiring and retaining customers; and developing new solutions. There is no assurance that the Company will be successful in achieving a return on shareholders' investment and the likelihood of success must be considered in light of the early stage of operations.

### Energy Costs

Liberty's medical marijuana growing operations consume considerable energy, which make the Company vulnerable to rising energy costs. Accordingly, rising or volatile energy costs may, in the future, adversely impact the business of the Company and its ability to operate profitably.

### Potential Conflicts of Interest with Directors

There are potential conflicts of interest to which some of the directors, officers and insiders of the Company may be subject in connection with the operations of the Company. Some of the individuals appointed as directors of the Company are also directors and/or officers of other reporting and non-reporting issuers. As of the date hereof, and to the knowledge of the directors and officers of Liberty, there are no existing conflicts of interest between the Company and any of the Company's director who act as directors or officers of other reporting and non-reporting issuers. Situations may arise where the directors and/or officers of the Company may be in competition with the Company. Conflicts, if any, will be subject to the procedures and remedies as provided under the BCBCA.

### Difficulty to Forecast

Liberty must rely largely on its own market research to forecast sales as detailed forecasts are not generally obtainable from other sources at this early stage of the medical marijuana industry in the United States. A failure in the demand for its products to materialize as a result of competition, technological change or other factors could have a material adverse effect on the business, results of operations and financial condition of the Company.

### Management of Growth

The Company may be subject to growth-related risks including capacity constraints and pressure on its internal systems and controls. The ability of the Company to manage growth effectively will require it to continue to implement and improve its operational and financial systems and to expand, train and manage its employee base. The inability of the Company to deal with this growth may have a material adverse effect on the Company's business, financial condition, results of operations and prospects.

### Internal Controls

Effective internal controls are necessary for the Company to provide reliable financial reports and to help prevent fraud. Although the Company has undertaken a number of procedures and implemented a number of safeguards, in each case, in order to help ensure the reliability of its financial reports, including those imposed on the Company under securities law, the Company cannot be certain that such measures will ensure that the Company will maintain



adequate control over financial processes and reporting. Failure to implement required new or improved controls, or difficulties encountered in their implementation, could harm the Company's results of operations or cause it to fail to meet its reporting obligations. If the Company or its auditors discover a material weakness, the disclosure of that fact, even if quickly remedied, could reduce the market's confidence in the Company's consolidated financial statements and materially adversely affect the trading price of the shares.

## Product Liability

As a distributor of products designed to be ingested by humans, Liberty faces an inherent risk of exposure to product liability claims, regulatory action and litigation if its products are alleged to have caused significant loss or injury. In addition, the sale of Liberty's products involves the risk of injury to consumers due to tampering by unauthorized third parties or product contamination. Previously unknown adverse reactions resulting from human consumption of Liberty's products alone or in combination with other medications or substances could occur. Liberty may be subject to various product liability claims, including, among others, that Liberty's products caused injury or illness, include inadequate instructions for use or include inadequate warnings concerning possible side effects or interactions with other substances. A product liability claim or regulatory action against Liberty could result in increased costs, could adversely affect Liberty's reputation with its clients and consumers generally, and could have a material adverse effect on our results of operations and financial condition of Liberty. Although Liberty has secured product liability insurance, there can be no assurances that Liberty will be able to maintain its product liability insurance on acceptable terms or with adequate coverage against potential liabilities. This scenario could prevent or inhibit the commercialization of Liberty's potential products.

## Product Recalls

Manufacturers and distributors of products are sometimes subject to the recall or return of their products for a variety of reasons, including product defects, such as contamination, unintended harmful side effects or interactions with other substances, packaging safety and inadequate or inaccurate labelling disclosure. If any of Liberty's products are recalled due to an alleged product defect or for any other reason, Liberty could be required to incur the unexpected expense of the recall and any legal proceedings that might arise in connection with the recall. Liberty may lose a significant amount of sales and may not be able to replace those sales at an acceptable margin or at all. In addition, a product recall may require significant management attention. Although Liberty has detailed procedures in place for testing its products, there can be no assurance that any quality, potency or contamination problems will be detected in time to avoid unforeseen product recalls, regulatory action or lawsuits. Additionally, if one of Liberty's brands were subject to recall, the image of that brand and Liberty could be harmed. A recall for any of the foregoing reasons could lead to decreased demand for Liberty's products and could have a material adverse effect on Liberty's results of operations and financial condition. Additionally, product recalls may lead to increased scrutiny of Liberty's operations by regulatory agencies, requiring further management attention and potential legal fees and other expenses. To date, there have been no recalls of Liberty products.

## Results of Future Clinical Research

Research in the U.S. and internationally regarding the medical benefits, viability, safety, efficacy, dosing and social acceptance of cannabis or isolated cannabinoids (such as CBD and THC) remains in early stages. There have been relatively few clinical trials on the benefits of cannabis or isolated cannabinoids (such as CBD and THC). Although Liberty believes that the articles, reports and studies support its beliefs regarding the medical benefits, viability, safety, efficacy, dosing and social acceptance of cannabis, future research and clinical trials may prove such statements to be incorrect, or could raise concerns regarding, and perceptions relating to, cannabis. Given these risks, uncertainties and assumptions, investors should not place undue reliance on such articles and reports. Future research studies and clinical trials may draw opposing conclusions to those stated by the Company or reach negative conclusions regarding the medical benefits, viability, safety, efficacy, dosing, social acceptance or other facts and perceptions related to



medical cannabis, which could have a material adverse effect on the demand for the Company's products with the potential to lead to a material adverse effect on the Company's business, financial condition and results of operations.

## Insurance Coverage

Liberty's business is subject to a number of risks and hazards generally, including adverse environmental conditions, accidents, labour disputes and changes in the regulatory environment. Such occurrences could result in damage to assets, personal injury or death, environmental damage, delays in operations, monetary losses and possible legal liability.

Although Liberty maintains insurance to protect against certain risks in such amounts as it considers to be reasonable, its insurance does not cover all the potential risks associated with its operations.  The Company may also be unable to maintain insurance to cover these risks at economically feasible premiums. Insurance coverage may not continue to be available or may not be adequate to cover any resulting liability. Moreover, insurance against risks such as environmental pollution or other hazards encountered in the operations of the Company is not generally available on acceptable terms. The Company might also become subject to liability for pollution or other hazards which may not be insured against or which the Company may elect not to insure against because of premium costs or other reasons. Losses from these events may cause the Company to incur significant costs that could have a material adverse effect upon its financial performance and results of operations.

## Unfavourable Publicity or Consumer Perception

Liberty believes the medical marijuana industry is highly dependent upon consumer perception regarding the safety, efficacy and quality of medical marijuana distributed to such consumers. Consumer perception of the Liberty's products may be significantly influenced by scientific research or findings, regulatory investigations, litigation, media attention and other publicity regarding the consumption of medical marijuana products. There can be no assurance that future scientific research, findings, regulatory proceedings, litigation, media attention or other research findings or publicity will be favourable to the medical marijuana market or any particular product, or consistent with earlier publicity. Future research reports, findings, regulatory proceedings, litigation, media attention or other publicity that are perceived as less favourable than, or that question, earlier research reports, findings or publicity could have a material adverse effect on the demand for Liberty's products and the business, results of operations, financial condition and cash flows of Liberty. Liberty's dependence upon consumer perceptions means that adverse scientific research reports, findings, regulatory proceedings, litigation, media attention or other publicity, whether or not accurate or with merit, could have a material adverse effect on Liberty, the demand for Liberty's products, and Liberty's business, results of operations, financial condition and cash flows. Further, adverse publicity reports or other media attention regarding the safety, efficacy and quality of medical marijuana in general, or Liberty's products specifically, or associating the consumption of medical marijuana with illness or other negative effects or events, could have such a material adverse effect. Such adverse publicity reports or other media attention could arise even if the adverse effects associated with such products resulted from consumers' failure to consume such products appropriately or as directed.

Public opinion and support for medical and recreational cannabis use has traditionally been inconsistent and varies from jurisdiction to jurisdiction. Legalization of medical and recreational cannabis remains a controversial issue subject to differing opinions surrounding the level of legalization (for example, legalization of medical marijuana as opposed to legalization in general).

Liberty's ability to gain and increase market acceptance of its products may require it to establish and maintain brand names and reputation. Federal protection of trademarks may be difficult or impossible for Liberty to obtain in the United States, given the federal illegality of cannabis and the necessity of making "lawful use" of the trademark in commerce to obtain federal protection. While state-level protection is available, this nevertheless increases the risks



in protecting Liberty's brands until such time as the Controlled Substances Act is amended by federal legislation. Furthermore, in order to obtain such protection, substantial expenditures on product development, strategic relationships and marketing initiatives may be required. There can be no assurance that these initiatives will be successful and their failure may have an adverse effect on the Company.

## Securing Adequate Financing to Fund Operations and Meet Expected Consumer Demand

There is no guarantee that the Company will be able to achieve its business objectives. The continued development of the Company may require additional financing. The failure to raise such capital could result in the delay or indefinite postponement of current business objectives or the Company ceasing to carry on business. There can be no assurance that additional capital or other types of financing will be available if needed or that, if available, the terms of such financing will be favorable to the Company. See *Issuers with U.S. Cannabis Related Business – Ability to Access Public and Private Capital*. In addition, from time to time, Liberty may enter into transactions to acquire assets or the shares of other corporations. These transactions may be financed wholly or partially with debt, which may increase the Company's debt levels above industry standards. Any debt financing secured in the future could involve restrictive covenants relating to capital raising activities and other financial and operational matters, which may make it more difficult for the Company to obtain additional capital and to pursue business opportunities, including potential acquisitions. Debt financings may also contain provisions which, if breached, may entitle lenders or their agents to accelerate repayment of loans and/or realize upon security over the assets of the Company, and there is no assurance that the Company would be able to repay such loans in such an event or prevent the enforcement of security granted pursuant to such debt financing. The Company will require additional financing to fund its operations until positive cash flow is achieved. See *Risk Factors – Negative Cash Flow from Operations*.

## Negative Cash Flow from Operations

During the year ended February 28, 2019, the Company sustained net losses from operations and had negative cash flow from operating activities. Although the Company anticipates it will have positive cash flow from operating activities in future periods, to the extent that the Company has negative cash flow in any future period, certain of the proceeds from the Offering may be used to fund such negative cash flow from operating activities.

## Ability to Identify and Execute Future Acquisitions or Dispositions, or to Successfully Manage the Impact of Such Transactions on its Operations

As part of the Company's overall business strategy, the Company intends to pursue select strategic acquisitions, which would provide additional product offerings, vertical integrations, additional industry expertise, and an expanded footprint in new states and jurisdictions. The success of any such acquisitions will depend, in part, on the ability of the Company to realize the anticipated benefits and synergies from integrating those companies into the businesses of the Company. Future acquisitions may expose it to potential risks, including risks associated with: (a) the integration of new operations, services and personnel; (b) unforeseen or hidden liabilities; (c) the diversion of resources from the Company's existing business, including the distraction of management; (d) potential inability to generate sufficient revenue to offset new costs; (e) the expenses of acquisitions; (f) the anticipated benefits and cost savings of those transactions not being realized fully or at all or taking longer to realize than expected; (g) increasing the scope and complexity of the Company's operations, and (h) loss or reduction of control over certain of the Company's assets. In addition, any proposed acquisitions will likely be subject to regulatory approval.

While the Company intends to conduct reasonable due diligence in connection with such strategic acquisitions, there are risks inherent in any acquisition. Specifically, there could be unknown or undisclosed risks or liabilities of such companies for which the Company is not sufficiently indemnified. The presence of one or more material liabilities of an acquired company that are unknown to the Company at the time of acquisition could have a material adverse effect on the results of operations, business prospects and financial condition of the Company. The Company could



encounter additional transaction and integration related costs or other factors such as the failure to realize all of the benefits from the acquisition. All of these factors could cause dilution to the Company's earnings per share or decrease or delay the anticipated accretive effect of the acquisition and cause a decrease in the market price of the Common Shares.

The Company may not be able to successfully integrate and combine the operations, personnel and technology infrastructure of any such strategic acquisition with its existing operations. If integration is not managed successfully by the Company's management, the Company may experience interruptions in its business activities, deterioration in its employee and customer relationships, increased costs of integration and harm to its reputation, all of which could have a material adverse effect on the Company's business, financial condition and results of operations.

### Regulatory or Agency Proceedings, Investigations and Audits

The Company's business requires compliance with many laws and regulations. Failure to comply with these laws and regulations could subject the Company to regulatory or agency proceedings or investigations and could also lead to damage awards, fines and penalties. Liberty may become involved in a number of government or agency proceedings, investigations and audits. The outcome of any regulatory or agency proceedings, investigations, audits, and other contingencies could harm the Company's reputation, require the Company to take, or refrain from taking, actions that could harm its operations or require Liberty to pay substantial amounts of money, harming its financial condition. There can be no assurance that any pending or future regulatory or agency proceedings, investigations and audits will not result in substantial costs or a diversion of management's attention and resources or have a material adverse impact on the Company's business, financial condition and results of operation.

### Litigation

The Company may become party to litigation from time to time in the ordinary course of business which could adversely affect its business. Should any litigation in which the Company becomes involved be determined against the Company, such a decision could adversely affect the Company's ability to continue operating and the value of the Common Shares and could use significant resources. Even if Liberty is involved in litigation and wins, litigation can redirect significant Company resources, including the time and attention of management and available working capital. Litigation may also create a negative perception of the Company's brand.

### Intellectual Property

Third parties may claim that the Company's products infringe on their proprietary and perhaps patent protected rights. Such claims, whether or not meritorious, may result in the expenditure of significant financial and managerial resources, legal fees, result in injunctions, temporary restraining orders and/or require the payment of damages. As well, Liberty may need to obtain licenses from third parties who allege that the Company has infringed on their lawful rights. However, such licenses may not be available on terms acceptable to the Company or at all. In addition, the Company may not be able to obtain or utilize on terms that are favorable to it, or at all, licenses or other rights with respect to intellectual property that it does not own.

### Constraints on Marketing Products

The development of the Company's business and operating results may be hindered by applicable restrictions on sales and marketing activities imposed by government regulatory bodies. The regulatory environment in the United States limits the Company's ability to compete for market share in a manner similar to other industries. If Liberty is unable to effectively market its products and compete for market share, or if the costs of compliance with government legislation and regulation cannot be absorbed through increased selling prices for its products, the Company's sales and operating results could be adversely affected.



**Fraudulent or Illegal activity by its employees, contractors and consultants**

The Company is exposed to the risk that its employees, independent contractors and consultants may engage in fraudulent or other illegal activity. Misconduct by these parties could include intentional, reckless and/or negligent conduct or disclosure of unauthorized activities to the Company that violates: (i) government regulations; (ii) manufacturing standards; (iii) federal and provincial healthcare fraud and abuse laws and regulations; or (iv) laws that require the true, complete and accurate reporting of financial information or data. It is not always possible for the Company to identify and deter misconduct by its employees and other third parties, and the precautions taken by the Company to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting the Company from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations. If any such actions are instituted against Liberty, and it is not successful in defending itself or asserting its rights, those actions could have a significant impact on our business, including the imposition of civil, criminal and administrative penalties, damages, monetary fines, contractual damages, reputational harm, diminished profits and future earnings, and curtailment of the Company's operations, any of which could have a material adverse effect on the Company's business, financial condition and results of operations.

**Information technology systems and cyber-attacks**

Liberty has entered into agreements with third parties for hardware, software, telecommunications and other information technology ("IT") services in connection with its operations, including the use of Aphria's IT group for support and systems work. The Company's operations depend, in part, on how well it and its suppliers protect networks, equipment, IT systems and software against damage from a number of threats, including, but not limited to, cable cuts, damage to physical plants, natural disasters, intentional damage and destruction, fire, power loss, hacking, computer viruses, vandalism and theft. The Company's operations also depend on the timely maintenance, upgrade and replacement of networks, equipment, IT systems and software, as well as pre-emptive expenses to mitigate the risks of failures. Any of these and other events could result in information system failures, delays and/or increase in capital expenses. The failure of information systems or a component of information systems could, depending on the nature of any such failure, adversely impact the Company's reputation and results of operations.

Liberty has not experienced any material losses to date relating to cyber-attacks or other information security breaches, but there can be no assurance that the Company will not incur such losses in the future. The Company's risk and exposure to these matters cannot be fully mitigated because of, among other things, the evolving nature of these threats. As a result, cyber security and the continued development and enhancement of controls, processes and practices designed to protect systems, computers, software, data and networks from attack, damage or unauthorized access is a priority. As cyber threats continue to evolve, the Company may be required to expend additional resources to continue to modify or enhance protective measures or to investigate and remediate any security vulnerabilities.

**Breaches of security at its facilities, or in respect of electronic documents and data storage and may face risks related to breaches of applicable privacy laws**

Given the nature of the Company's product and its lack of legal availability outside of channels approved by the Government of the United States, as well as the concentration of inventory in its facilities, despite meeting or exceeding all legislative security requirements, there remains a risk of shrinkage as well as theft. A security breach at one of the Company's facilities could expose Liberty to additional liability and to potentially costly litigation, increase expenses relating to the resolution and future prevention of these breaches and may deter potential patients from choosing the Company's products.

In addition, Liberty collects and stores personal information about its patients and is responsible for protecting that information from privacy breaches. A privacy breach may occur through procedural or process failure, information



technology malfunction, or deliberate unauthorized intrusions. Theft of data for competitive purposes, particularly patient lists and preferences, is an ongoing risk whether perpetrated via employee collusion or negligence or through deliberate cyber-attack. Any such theft or privacy breach would have a material adverse effect on the Company's business, financial condition and results of operations.

## Competition

There is potential that the Company will face intense competition from other companies, some of which can be expected to have longer operating histories and more financial resources and manufacturing and marketing experience than the Company. Increased competition by larger and better financed competitors could materially and adversely affect the business, financial condition and results of operations of the Company.

If the number of users of medical marijuana in the United States increases, the demand for products will increase and the Company expects that competition will become more intense, as current and future competitors begin to offer an increasing number of diversified products. To remain competitive, the Company will require a continued level of investment in research and development, marketing, sales and client support. The Company may not have sufficient resources to maintain research and development, marketing, sales and client support efforts on a competitive basis which could materially and adversely affect the business, financial condition and results of operations of the Company.

## Currency Fluctuations

Liberty's revenues and expenses are expected to be primarily denominated in U.S. dollars, and therefore may be exposed to significant currency exchange fluctuations. Recent events in the global financial markets have been coupled with increased volatility in the currency markets. Fluctuations in the exchange rate between the U.S. dollar and the Canadian dollar may have a material adverse effect on the Company's business, financial condition and operating results. Liberty may, in the future, establish a program to hedge a portion of its foreign currency exposure with the objective of minimizing the impact of adverse foreign currency exchange movements; however, there can be no assurance that such a program will effectively mitigate currency risks.

## DIVIDENDS

As of the date of this Annual Information Form, Liberty has no current intention to declare dividends on its Common Shares in the foreseeable future. Any decision to pay dividends on its Common Shares in the future will be at the discretion of Liberty's board of directors and will depend on, among other things, the Company's results of operations, current and anticipated cash requirements and surplus, financial condition, any future contractual restrictions and financing agreement covenants, solvency tests imposed by corporate law and other factors that the board of directors may deem relevant.

## CAPITAL STRUCTURE

The Company is authorized to issue an unlimited number of Common Shares. As of February 28, 2019, there were 345,290,635 Common Shares issued and outstanding. The holders of the Common Shares are entitled to one vote per share at all meetings of the shareholders of the Company. The holders of Common Shares are also entitled to dividends, if and when declared by the directors of the Company and the distribution of the residual assets of the Company in the event of a liquidation, dissolution or winding up of the Company.

The Company adopted a stock option plan under which it is authorized to grant options to officers, directors, employees, and consultants enabling them to acquire Common Shares of the Company. The maximum number of Common Shares reserved for issuance of stock options that may be granted under the plan is 10% of the issued and outstanding Common Shares of the Company. The options granted can be exercised for a maximum of 10 years and


liberty health sciences

vest as determined by the Board of Directors. The exercise price of each option may not be less than the market price of the Common Shares on the date of grant. As of February 28, 2019, there were 11,525,000 options outstanding to purchase Common Shares.

In addition, the Company has warrants outstanding to purchase up to an aggregate of 31,674,899 Common Shares and Broker Warrants to purchase up to an aggregate of 1,533,352 Common Shares and 1,533,352 warrants to purchase Common Shares.

## MARKET FOR SECURITIES

### Common Shares

The outstanding Common Shares are traded on the CSE under the trading symbol "LHS" and on the OTCQX under the symbol "LHSIF". Prior to July 26, 2017, the Common Shares were traded on the CSE under the symbol "SCE" and on the OTC grey market under "SCQBD". The following table sets forth the reported intraday high and low prices and monthly trading volumes of the Common Shares on the CSE for the period between March 1, 2018 and February 28, 2019:

| Period | High Trading Price | Low Trading Price | Volume (#) |
|---|---|---|---|
| February 2019 | $1.23 | $1.02 | 34,591,294 |
| January 2019 | $1.14 | $0.88 | 31,316,138 |
| December 2018 | $1.40 | $0.72 | 47,903,266 |
| November 2018 | $1.59 | $1.20 | 20,898,214 |
| October 2018 | $1.63 | $1.04 | 47,369,979 |
| September 2018 | $1.50 | $0.91 | 63,367,264 |
| August 2018 | $0.94 | $0.62 | 24,233,894 |
| July 2018 | $0.99 | $0.79 | 19,429,597 |
| June 2018 | $1.10 | $0.84 | 31,991,928 |
| May 2018 | $0.95 | $0.78 | 29,044,307 |
| April 2018 | $1.09 | $0.69 | 53,511,462 |
| March 2018 | $1.34 | $0.90 | 16,501,204 |

## PRIOR SALES

The following table summarizes details of the following securities that are not listed or quoted on a marketplace issued by Liberty during the year ended February 28, 2019:

| Date of issuance | Security | Issuance/Exercise price per security | Number of securities |
|---|---|---|---|
| January 24, 2019 | Stock Options | $0.96 | 2,260,000 |
| January 22, 2019 | Common Shares | $0.624 | 2,802,885[1] |
| November 8, 2018 | Common Shares | $1.10 | 686,500[1] |
| October 22, 2018 | Common Shares | $1.10 | 2,794,444[1] |
| July 7, 2018 | Common Shares | $0.93 | 10,092,583[2] |
| July 4, 2018 | Stock Options | $0.92 | 450,000 |
| May 10, 2018 | Common Shares | $0.90 | 25,555,875[3] |
| May 10, 2018 | Warrants | $1.10 | 25,555,875[3] |
| May 10, 2018 | Broker Warrants | $0.90 | 1,533,352[3] |



(1)    Issued upon exercise of warrants.
(2)    Issued to settle outstanding payables to Thermo Energy Systems Inc.
(3)    Issued in connection with the Company's Bought Deal Offering.

## ESCROWED SECURITIES AND SECURITIES SUBJECT TO RESTRICTION ON TRANSFER

The following table summarizes details of the Company's securities of each class held, to the Company's knowledge, in escrow or that are subject to a contractual restriction on transfer as of the date of this Annual Information Form:

| Designation of Class | Number of securities held in escrow or that are subject to a contractual restriction on transfer escrow | Percentage of class |
|---|---|---|
| Common Shares | 3,299,998[1] | 1.0%[2] |

Notes:

(1) TSX Trust Company is the escrow agent for these Common Shares held in escrow. The Common Shares are being held as per exchange escrow requirements and will be fully released by July 26, 2020.

(2) Based on 345,290,635 Common Shares outstanding.



DIRECTORS AND OFFICERS

*Name, Occupation and Security Holding*

Below are the names, province or state and country of residence, principal occupation and periods of service of the directors and executive officers of the Company.

| Name and Municipality Residence | Principal Occupations For Last Five Years | Director of Liberty Since | Position with Liberty | Number of Common Shares Beneficially Owned, Controlled or Directed, Directly or Indirectly[1] |
|---|---|---|---|---|
| William Pfeiffer Tallahassee, FL | CEO of The Pfeiffer Law Group | February 12, 2019 | Director and Chair of the Board of Liberty | Nil |
| Jeremy Straub[1] Ft. Lauderdale, FL | Founder and CEO of Coastal Wealth | February 28, 2019 | Director | Nil |
| Victor E. Mancebo Miami, FL | Partner of Gelatys Managing Director of iAgriGroup | February 22, 2019 | Interim Chief Executive Officer and Director | Nil |
| Sheri Cholodofsky Miami, FL | Consultant and Senior Officer of multiple businesses Vice President, Finance of Miami Air International | n/a | Chief Financial Officer | Nil |

Notes:
(1) Chair of the Audit Committee.

The term of each director of Liberty will expire on the date of the next annual meeting of shareholders of Liberty.

The following is a summary biography of each of the directors and executive officers of Liberty:

*William Pfeiffer*
*Chair of Board of Directors*

Bill is a highly experienced attorney, governmental strategist and owner of multiple businesses with a strong record of leadership and achievement in the legislative, executive and judicial branches of Florida government as well as private business. He possesses an excellent record of solving high-level, complex business, legal, legislative and regulatory issues while maintaining trusted relationships with seasoned business leaders and key decision-makers in various levels of government.

*Jeremy Straub*
*Director*



Jeremy Straub is the Founder and Chief Executive Officer of Coastal Wealth, a financial firm headquartered in Fort Lauderdale, Florida, and also owns a portfolio of other complementary companies such as Coastal Wealth Property Casualty and Coastal Wealth Benefits Solutions. Mr. Straub earned his Bachelor of Arts degree from Moravian College in Bethlehem, Pennsylvania, and holds a variety of other security licenses and designations in the field of finance. Prior to Coastal Wealth, Mr. Straub spent 15 years at Fortune 500 financial company as an executive, and after launching Coastal Wealth in 2016, he quickly grew the business into the 14-office, 300-person team that it is today.

*Victor E. Mancebo*
*Interim Chief Executive Officer and Director*

Mr. Mancebo has over 15 years of diverse operational experience, launching and leading several national and regional companies in the United States. Mr. Mancebo has amassed executive leadership roles in Banking, Education, Logistics, Technology, Food Safety, Manufacturing, Agriculture, and Retail. Mr. Mancebo led companies such as CompUSA, Smart4Retail, Chemstar, EnviroStar, and Palettas to name a few. Mr. Mancebo brings ample knowledge, keen insight, and a visionary approach in operations strategy, accompanied with a boundless passion for efficiency and process improvement. Most notably, Mr. Mancebo has held Chief Operations Officer and Managing Director roles for several private reputable companies.

*Sheri Cholodofsky*
*Chief Financial Officer*

Ms. Cholodofsky is an accomplished Certified Public Accountant based in Florida and has extensive experience in finance, accounting, human resources, operations management and driving capital market and M&A activities. She began her career in public accounting with global accounting firm BDO and then continued to hold the senior finance and accounting role with an executive recruiting and human resources company for fourteen years.  For the next nine years, Cholodofsky worked in the highly regulated aviation sector for a global charter airline.  She headed up all aspects of the finance and accounting department including financial statement reporting, budgeting, analysis, cash flow management, cost reduction programs, and fraud prevention. She also secured a central role on the Executive Strategy Team, evaluating major capital projects, strategic partnerships, fleet management and M&A opportunities. Ms. Cholodofsky received her Bachelor of Science degree in accounting from the University of Florida and a Master of Accounting degree from Florida International University.

**Cease Trade Orders, Bankruptcies, Penalties or Sanctions**

To the knowledge of Liberty, no director or executive officer of Liberty, or shareholder holding a sufficient number of securities of Liberty to affect materially the control of the Company:

(a)      is, as at the date hereof, or has been, within the ten (10) years before the date hereof, a director or executive officer of any corporation that, while that person was acting in such capacity:

   (i)      was subject to a cease trade or similar order or an order that denied the relevant company access to any exemption under securities legislation, that was in effect for a period of more than thirty (30) consecutive days, that was issued while the director or executive officer was acting in the capacity as director, chief executive officer or chief financial officer; or

   (ii)      was subject to a cease trade or similar order or an order that denied the relevant company access to any exemption under securities legislation, that was in effect for a period of more than thirty (30) consecutive days, that was issued after the director or executive officer ceased to be a director, chief executive officer or chief financial officer and which resulted from an event that occurred while


liberty health sciences

that person was acting in the capacity as director, chief executive officer or chief financial officer; or

(iii)    within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold its assets.

(b)    has, within the ten (10) years before the date hereof, become bankrupt, made a proposal under any legislation relating to the bankruptcy or insolvency, or become subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of the director, officer or shareholder.

To the knowledge of Liberty, no director or executive officer of Liberty, or a shareholder holding sufficient number of securities of Liberty to affect materially the control of Liberty, has been subject to:

(a)    any penalties or sanctions imposed by a court relating to securities legislation or by a securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or

(b)    any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable investor in making an investment decision.

## Conflicts of Interest

We may from time to time become involved in transactions which conflict with the interests of our directors and the officers. The interests of these persons could conflict with those of the Company. Conflicts of interest, if any, will be subject to the procedures and remedies provided under applicable laws. In particular, in the event that such a conflict of interest arises at a meeting of our directors, a director who has such a conflict will abstain from voting for or against the approval of such participation or such terms. In accordance with applicable laws, the directors of the Company are required to act honestly, in good faith and in the best interests of the Company.

## LEGAL PROCEEDINGS AND REGULATORY ACTIONS

Subsequent to its fiscal year end, the Company was served a summons in a class action lawsuit against the Company and certain of its former officers. These claims relate to alleged misconduct in connection with the Company's transactions with Aphria and its insiders. At this time, one class action claim originating in the United States has been served on the Company. The Company intends to vigorously defend itself in this action. As at February 28, 2019, the Company had not made any provision related to this contingency.

The Company is also the defendant in other legal actions arising out of the ordinary course and conduct of its business.

## INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Aphria, a related party to the Company by virtue of its 24.4% ownership interest (21.2% on a fully diluted basis) in Liberty, is party to the Trademark License, the Know-How License, the Investor Rights Agreement and the Registration Rights Agreement. On February 5, 2018, it was announced that a group of buyers led by members of the Serruya family had entered into a purchase and sale agreement with Aphria to purchase all of the Common Shares in the Company owned by Aphria that are not subject to CSE escrow requirements over the course of the next two and a half years. See *General Development of the Business - Relationship with Aphria - Sale of Aphria's Position*.



TRANSFER AGENT AND REGISTAR

The transfer agent and registrar of Liberty is Odyssey Trust Company at its offices in Toronto, Ontario.

MATERIAL CONTRACTS

Except for contracts entered into in the ordinary course of business, the only contracts entered into by the Company during the period ending February 28, 2019 which are material or entered into before the period ending February 28, 2019 but are still in effect are:

(a)    the indenture dated November 22, 2017 between Liberty, DFMMJ and Odyssey Trust Company (the "**Indenture**") for the issue of $12,000,000 of Notes under the November 2017 Offering entitling the holders thereof to purchase an aggregate of Common Shares at a price of $2.00 per Common Share at maturity, subject to earlier redemption or forced conversion by the Company upon certain conditions being met.

AUDIT COMMITTEE INFORMATION

As of February 28, 2019 the Audit Committee (the "**Committee**") consists of Jeremy Straub, William Pfeiffer and Victor Mancebo. A majority of the Committee is "independent" within the meaning of National Instrument 52-110 — Audit Committees. The Audit Committee has an understanding of the accounting principles used to prepare Liberty's financial statements, experience preparing, auditing, analyzing or evaluating comparable financial statements and experience as to the general application of relevant accounting principles, as well as an understanding of the internal controls and procedures necessary for financial reporting.

The Audit Committee has the primary function of fulfilling its responsibilities in relation to reviewing the integrity of Liberty's financial statements, financial disclosures and internal controls over financial reporting; monitoring the system of internal control; monitoring Liberty's compliance with legal and regulatory requirements, selecting the external auditor for shareholder approval; reviewing the qualifications, independence and performance of the external auditor; and reviewing the qualifications, independence and performance of Liberty's internal auditors. The Audit Committee has specific responsibilities relating to Liberty's financial reports; the external auditor; the internal audit function; internal controls; regulatory reports and returns; legal or compliance matters that have a material impact on Liberty; and Liberty's whistleblowing procedures. In fulfilling its responsibilities, the Audit Committee meets regularly with the internal and external auditor and key management members. Information concerning the relevant education and experience of the Audit Committee members can be found in "*Directors and Officers*" above. The full text of the Audit Committee's charter is disclosed in Schedule "A".

**Pre-Approval Policies and Procedures**

The Committee will pre-approve all non-audit services to be provided to Liberty or any subsidiary entities by its external auditors or by the external auditors of such subsidiary entities. The Committee may delegate to one or more of its members the authority to pre-approve non-audit services but preapproval by such member or members so delegated shall be presented to the full Committee at its first scheduled meeting following such pre-approval.

**External Auditor Service Fees**

The following table sets forth, by category, the fees (including estimates, but excluding disbursements) for all services rendered by the Company's external auditors, MNP LLP, for the period ending February 28, 2019.

|  | Period Ended February 28, 2019 | Period Ended February 28, 2018 |
| --- | --- | --- |



| | | |
|---|---|---|
| Audit Fees[1] | $186,554 | $100,000 |
| Audit Related Fees[2] | $- | $65,000 |
| Tax Fees[3] | $41,436 | $15,000 |
| All Other Fees | $- | $- |

Notes:

(1) Includes fees necessary to perform the annual audit and quarterly reviews of the Company's financial statements. Audit Fees include fees for review of tax provisions and for accounting consultations on matters reflected in the financial statements. Audit Fees also include audit or other attest services required by legislation or regulation, such as comfort letters, consents, reviews of securities filings and statutory audits.

(2) Includes services that are traditionally performed by the auditor. These audit-related services include employee benefit audits, due diligence assistance, accounting consultations on proposed transactions, internal control reviews and audit or attest services not required by legislation or regulation.

(3) Includes fees for all tax services other than those included in "Audit Fees" and "Audit-Related Fees". This category includes fees for tax compliance, tax planning and tax advice. Tax planning and tax advice includes assistance with tax audits and appeals, tax advice related to mergers and acquisitions, and requests for rulings or technical advice from tax authorities.

### INTERESTS OF EXPERTS

MNP LLP was re-appointed as the auditor of the Company on August 16, 2018. MNP LLP is independent within the meaning of the Rules of Professional Conduct of the Chartered Professional Accountants of Ontario.

### ADDITIONAL INFORMATION

Additional information including disclosure of the Company's corporate governance practices, remuneration and indebtedness to the Company of the directors and officers, principal holders of the Company's securities, and securities authorized for issuance under the equity compensation plan, where applicable, is included in the Company's Management Information Circular dated July 18, 2018, and may be found on SEDAR at http://www.sedar.com. www.sedar.com. Additional financial information is included in the Financial Statements of Liberty and Notes thereto and in the accompanying Management's Discussion and Analysis for the fiscal year ended February 28, 2019, and may be found on SEDAR at www.sedar.com..



**Schedule A – Audit Committee Charter**

_____

This charter (the "**Charter**") sets forth the purpose, composition, responsibilities and authority of the Audit Committee (the "**Committee**") of the Board of Directors (the "**Board")** of Liberty Health Sciences Inc. (the "**Corporation**").

## 1.    Purpose

1.1.    The audit committee of the Corporation (the "**Committee**") is ultimately responsible for the policies and practices relating to integrity of financial and regulatory reporting, as well as internal controls to achieve the objectives of safeguarding of corporate assets; reliability of information; and compliance with policies and laws. Within this mandate, the Committee's role is to:

(a)    support the Board of Directors in meeting its responsibilities to shareholders;

(b)    enhance the independence of the external auditor;

(c)    facilitate effective communications between management and the external auditor and provide a link between the external auditor and the Board of Directors; and

(d)    increase the credibility and objectivity of the Corporation's financial reports and public disclosure.

1.2.    The Committee will make recommendations to the Board of Directors regarding items relating to financial and regulatory reporting and the system of internal controls following the execution of the Committee's responsibilities as described herein.

1.3.    The Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board of Directors from time to time prescribe.

## 2.    Membership

2.1.    Each member of the Committee must be a director of the Corporation.

2.2.    The Committee will consist of at least three members, the majority of whom are neither officers nor employees nor control persons of the Corporation or any of its associates or affiliates in accordance with applicable corporate and securities laws and applicable stock exchange rules and policies.

2.3.    Board of Directors, at its organizational meeting held in conjunction with each annual general meeting of the shareholders, shall appoint the members of the Committee for the ensuing year. The Board of Directors may at any time remove or replace any member of the Committee and may fill any vacancy in the Committee.

2.4.    Unless the Board of Directors shall have appointed a chair of the Committee, the members of the Committee shall elect a chair and a secretary from among their number.

2.5.    The Committee's composition shall meet all independence, legal and regulatory requirements.

3.    Authority

3.1.    In addition to all authority required to carry out the duties and responsibilities included in this charter, the Committee has specific authority to:

(a)    engage, and set and pay the compensation for, independent counsel and other advisors as it determines necessary to carry out its duties and responsibilities;

(b)    communicate directly with management and any internal auditor, and with the external auditor without management involvement, including for non-audit services; and

(c)    approve interim and annual financial statements and MD&A for recommendation of the same to the Board of Directors.

3.2.    The Committee shall have access to such officers and employees of the Corporation and to the Corporation's external auditors, and to such information respecting the Corporation, as it considers to be necessary or advisable in order to perform its duties and responsibilities.

4.    Duties and Responsibilities

4.1.    The overall duties and responsibilities of the Committee shall be as follows:

(a)    to assist the Board in the discharge of its responsibilities relating to the Corporation's accounting principles, reporting practices and internal controls and its approval of the Corporation's annual and quarterly consolidated financial statements and related financial disclosure;

(b)    to establish and maintain a direct line of communication with the Corporation's internal and external auditors and assess their performance;

(c)    to ensure that the management of the Corporation has designed, implemented and is maintaining an effective system of internal financial controls; and

(d)    to report regularly to the Board on the fulfillment of its duties and responsibilities.

4.2.    The duties and responsibilities of the Committee as they relate to the external auditors shall be as follows:

(a)    to recommend to the Board a firm of external auditors to be engaged by the Corporation, and to verify the independence of such external auditors;

(b)    to review and approve the fee, scope and timing of the audit and other related services rendered by the external auditors;

(c)    to review the audit plan of the external auditors prior to the commencement of the audit; (d) to review with the external auditors, upon completion of their audit:

(i) contents of their report;

A - 2

(ii) scope and quality of the audit work performed;

(iii) adequacy of the Corporation's financial and auditing personnel;

(iv) co-operation received from the Corporation's personnel during the audit;

(v) internal resources used;

(vi) significant transactions outside of the normal business of the Corporation;

(vii) significant proposed adjustments and recommendations for improving internal accounting controls, accounting principles or management systems; and

(viii) the non-audit services provided by the external auditors;

(e)     to discuss with the external auditors the quality and not just the acceptability of the Corporation's accounting principles; and

(f)     to implement structures and procedures to ensure that the Committee meets the external auditors on a regular basis in the absence of management.

4.3.    The duties and responsibilities of the Committee as they relate to the Corporation's internal auditors are to:

(a)     periodically review the internal audit function with respect to the organization, staffing and effectiveness of the internal audit department;

(b)     review and approve the internal audit plan; and

(c)     review significant internal audit findings and recommendations, and management's response thereto.

4.4.    The duties and responsibilities of the Committee as they relate to the internal control procedures of the Corporation are to:

(a)     review the appropriateness and effectiveness of the Corporation's policies and business practices which impact on the financial integrity of the Corporation, including those relating to internal auditing, insurance, accounting, information services and systems and financial controls, management reporting and risk management;

(b)     review compliance under the Corporation's business conduct and ethics policies and to periodically review these policies and recommend to the Board changes which the Committee may deem appropriate;

(c)     review any unresolved issues between management and the external auditors that could affect the financial reporting or internal controls of the Corporation; and

(d)     periodically review the Corporation's financial and auditing procedures and the extent to which

A - 3

recommendations made by the internal audit staff or by the external auditors have been implemented.

4.5.    The Committee is also charged with the responsibility to:

(a)    review the Corporation's quarterly statements of earnings, including the impact of unusual items and changes in accounting principles and estimates and report to the Board with respect thereto;

(b)    review and approve the financial sections of:

(i) the annual report to shareholders;

(ii) the annual information form;

(iii) annual and interim management's discussion and analysis;

(iv) prospectuses;

(v) news releases discussing financial results of the Corporation; and

(vi) other public reports of a financial nature requiring approval by the Board, and report to the Board with respect thereto;

(c)    review regulatory filings and decisions as they relate to the Corporation's consolidated financial statements;

(d)    review the appropriateness of the policies and procedures used in the preparation of the Corporation's consolidated financial statements and other required disclosure documents, and consider recommendations for any material change to such policies;

(e)    review and report on the integrity of the Corporation's consolidated financial statements; (f) review the minutes of any Committee meeting of subsidiary companies;

(g)    review with management, the external auditors and, if necessary, with legal counsel, any litigation, claim or other contingency, including tax assessments that could have a material effect upon the financial position or operating results of the Corporation and the manner in which such matters have been disclosed in the consolidated financial statements;

(h)    review the Corporation's compliance with regulatory and statutory requirements as they relate to financial statements, tax matters and disclosure of financial information;

(i)    develop a calendar of activities to be undertaken by the Committee for each ensuing year and to submit the calendar in the appropriate format to the Board following each annual general meeting of shareholders; and

(j)    evaluate, annually, the adequacy of this Charter and recommend any proposed changes to the Board.

5.    Meetings

5.1.    The quorum for a meeting of the Committee is a majority of the members of the Committee who are not officers or employees of the Corporation or of an affiliate of the Corporation, present in person or by telephone or other telecommunication device that permits all persons participating in the meeting to speak to and hear each other.

5.2.    The members of the Committee may determine their own procedures.

5.3.    The Committee may establish its own schedule that it will provide to the Board of Directors in advance.

5.4.    The external auditor is entitled to receive reasonable notice of every meeting of the Committee and to attend and be heard thereat.

5.5.    A member of the Committee or the external auditor may call a meeting of the Committee.

5.6.    The Committee will meet separately with the President and separately with the Chief Financial Officer of the Corporation at least annually to review the financial affairs of the Corporation.

5.7.    The Committee will meet with the external auditor of the Corporation at least once each year, at such time(s) as it deems appropriate, to review the external auditor's examination and report.

5.8.    The chair of the Committee must convene a meeting of the Committee at the request of the external auditor, to consider any matter that the auditor believes should be brought to the attention of the Board of Directors or the shareholders.

6.    Reports

6.1.    The Committee will record its recommendations to the Board in written form which will be incorporated as a part of the minutes of the Board of Directors' meeting at which those recommendations are presented.

7.    Minutes

7.1.    The Committee will maintain written minutes of its meetings, which minutes will be filed with the minutes of the meetings of the Board of Directors.