**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NANCY LIN, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:19-cv-00161 |
| Plaintiff, | Hon. May Kay Vyskocil |
| v. | |
| LIBERTY HEALTH SCIENCES INC., GEORGE SCORSIS, RENE GULLIVER, and VIC NEUFELD | |
| Defendants. | |

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................................i

I.      PRELIMINARY STATEMENT .................................................................................1

II.     STATEMENT OF FACTS ..........................................................................................4

        A.      Liberty Established as Aphria's U.S. Arm..........................................................4

        B.      Aphria Insiders Benefit From Share Issuance Scheme............................................6

        C.      Liberty Turns Blind Eye as DeFrancesco Uses the Company as a Piggy-Bank......8

        D.      Aphria Also Benefits Insiders at the Expense of Its Shareholders ..........................9

        E.      The Truth Emerges .......................................................................................9

III.    ARGUMENT.............................................................................................................12

        A.      Legal Standards.................................................................................................12

        B.      Personal Jurisdiction Exists Over Each Defendant...............................................13

                1.      Defendants Have Sufficient Minimum Contacts with the United States...14

                1.      Exercising Jurisdiction Over Defendants is Reasonable ...........................18

        C.      Forum Non Conveniens Is Not Cause for Dismissal..............................................19

        D.      Plaintiffs Allege A Purchase of Liberty Shares Within the United States.............22

                1.      OTCQX Best Market Is a Domestic Exchange .......................................23

                2.      Plaintiffs Transacted in Liberty Securities in the United States ................23

                3.      The Claims Are Not Predominantly Foreign...........................................24

        E.      The Complaint Sufficiently Alleges Each Element of Section 10(b)....................26

                1.      Defendants Made Materially Misleading Statements...............................26

                        a)      Defendants Make Statements That Are Materially
                                Misleading About the Company and its Goals ............................27

                        b)      The Statements About the Property Are Actionable......................30

                2.      The Complaint Alleges a Strong Inference of Defendants' Scienter.........33

a)      The Complaint Alleges Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness ...................34

b)      The Complaint Alleges That Defendants Had Both Motive and Opportunity to Commit the Alleged Fraud.................35

c)      Defendants' Scienter is also Supported by Resignations After Disclosure of the Fraud .........................................35

3.    The Complaint Sufficiently Alleges Loss Causation................................35

IV.    The Complaint States a Claim of Control Person Liability ...............................................39

V.    CONCLUSION.................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)..............................................................................................23

*Acosta v. JPMorgan Chase & Co.*,
219 F. App'x 83 (2d Cir. 2007) .......................................................................................20

*Acticon AG v. China Ne. Petroleum Holdings Ltd.*,
615 F. App'x 44 (2d Cir. 2015) .......................................................................................39

*Acticon AG v China Ne. Petroleum Holdings Ltd.*,
692 F.3d 34 (2d Cir. 2012)...............................................................................................37

*Alfandary v. Nikko Asset Mgmt. Co.*,
337 F. Supp. 3d 343 (S.D.N.Y. 2018).....................................................................15, 17, 20

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, No. 1:17-CV-1235-GHW,
2019 WL 1436993 (S.D.N.Y. Mar. 30, 2019) .................................................................13

*Ark. Teacher Ret. Sys. v. Bankrate, Inc.*,
18 F. Supp. 3d 482 (S.D.N.Y. 2014)................................................................................28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................................13

*Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13-CV-5790 (JMF),
2015 U.S. Dist. LEXIS 3209 (S.D.N.Y. Jan. 12, 2015) ..................................................25

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
2 F. Supp. 3d 550 (S.D.N.Y 2014),
*aff'd in part*, 813 F.3d 98 (2d Cir. 2016) ........................................................................23

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...............................................................................................26

*Axar Master Fund, Ltd. v. Bedford*,
308 F. Supp. 3d 743 (S.D.N.Y. 2018),
*aff'd*, No. 19-1132-cv, 2020 WL 1456482 (2d Cir. Mar. 23, 2020) ...........................35, 36

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................................13

*Biofrontera AG v Deutsche Balaton AG*,
2020 U.S. Dist. LEXIS 53749 (S.D.N.Y. Mar. 27, 2020) ...............................................12

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) .................................................................................................18

*Caiola v. Citibank, N.A., N.Y.,*
    295 F.3d 312 (2d Cir. 2002) ...............................................................................30, 31

*Carpenters Pension Tr. Fund of St. Louis v Barclays PLC,*
    310 F.R.D. 69 (S.D.N.Y. 2015) ...............................................................................38

*Chloe v. Queen Bee of Beverly Hills, LLC,*
    616 F.3d 158, 164 (2d Cir 2010 ...............................................................................14

*CompuDyne Corp. v. Shane,*
    453 F. Supp. 2d 807 (S.D.N.Y. 2006).......................................................................39

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014).............................................................................................14, 15

*Dietrich v. Bauer,*
    126 F. Supp. 2d 759 (S.D.N.Y. 2001).......................................................................39

*DiRienzo v. Philip Servs. Corp.,*
    294 F.3d 21 (2d Cir. 2002).................................................................19, 20, 21, 22

*DiStefano v. Carozzi N. Am., Inc.,*
    286 F.3d 81 (2d Cir. 2001).......................................................................................12

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,*
    722 F.3d 81 (2d Cir. 2013).......................................................................................12

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.,*
    323 F. Supp. 3d 393 (S.D.N.Y. 2018).......................................................................30

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005)..................................................................................................35

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009).....................................................................................30

*Freeland v. Iridium World Commc'ns, Ltd.,*
    545 F. Supp. 2d 59 (D.D.C. 2008) ...........................................................................38

*GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.,*
    838 F.3d 214 (2d Cir. 2016)......................................................................................26

*Giunta v. Dingman,*
    893 F.3d 73 (2d Cir. 2018)........................................................................................24

iv

*Goodrich Capital, LLC v. Vector Capital Corp.*, No. 11 Civ. 9247 JSR,
2012 WL 4123401 (S.D.N.Y. June 26, 2012) ........................................................32

*Guidi v. Inter-Cont'l Hotels Corp.*,
224 F.3d 142 (2d Cir. 2000).................................................................................20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).............................................................................................26

*Hayden v. Paterson*,
594 F.3d 150 (2d Cir. 2010).................................................................................13

*Hypefortype Ltd. v. Universal Music Grp., Inc.*, No. 17-CV-4468 (BMC),
2017 U.S. Dist. LEXIS 150500 (E.D.N.Y. Sept. 17, 2017)....................................12

*In re Allergan PLS Sec. Litig.*, No. 18 Civ. 12089 (CM),
2019 U.S. Dist. LEXIS 162510 (S.D.N.Y. Sept 20, 2019)......................................29

*In re Alstom S.A. Sec. Litig.*,
406 F. Supp. 2d 346 (S.D.N.Y. 2005)..............................................................16, 18

*In re Avon Ses. Litig.*, No. 19 CIV. 01420 (CM),
2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019).....................................28

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)...................................................................28

*In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)...................................................................33

*In re Carter-Wallace, Inc., Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000)...................................................................................33

*In re CINAR Corp. Sec. Litig.*,
186 F. Supp. 2d 279 (E.D.N.Y. 2002) ..................................................................20

*In re Citigroup Inc. Bond Litig.*,
723 F. Supp. 2d 568 (S.D.N.Y. 2010)...................................................................39

*In re Flag Telecom Holdings, Ltd. Securities. Litigation*,
308 F. Supp. 2d 249 (S.D.N.Y. 2004)...................................................................40

*In re Fuwei Films Sec. Litig.*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009)...................................................................38

*In re Lehman Bros. Sec. & Erisa Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011)...................................................................36

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999)........................................................................21

*In re Mylan N.V. Sec. Litig.*, No. 16-cv-7926 (JPO),
    2018 U.S. Dist. LEXIS 52084 (S.D.N.Y. Mar. 28, 2018) ........................................7

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y 2004)..........................................................................27

*In re Omnicom Group, Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010)......................................................................................38

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014).........................................................................35

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 449 (S.D.N.Y. 2005)........................................................................16

*In re Parmalat Sec. Litig.*,
    414 F. Supp. 2d 428 (S.D.N.Y. 2006)........................................................................39

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)..................................................................28, 29

*In re Poseidon Concepts Sec. Litig.*, No. 13cv1213 (DLC),
    2016 U.S. Dist. LEXIS 68127 (S.D.N.Y. May 24, 2016) ............................... *passim*

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................................39, 40

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).........................................................................................33

*In re Tellium, Inc. Securities Litigation*, No. 02-cv-5878 (FLW),
    2005 U.S. Dist. LEXIS 26332 (D.N.J. Aug. 26, 2005)............................................37

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)................................................................................36, 38

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001).........................................................................................20

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)......................................................................................18, 26, 28

*Johnson v. Priceline.com, Inc.*,
    711 F.3d 271 (2d Cir. 2013).......................................................................................13

*Kronfeld v. Trans World Airlines, Inc*,
    832 F.2d 726 (2d Cir. 1987)..................................................................................................31

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)..................................................................................................13

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)..................................................................................................29

*Masters v. GlaxoSmithKline*,
    271 F. App'x 46 (2d Cir. 2008) ............................................................................................37

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)...................................................................................39

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996).........................................................................................13, 18, 19

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)............................................................................................30, 34

*Morrison v Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010).....................................................................................................22, 23, 24

*Myun–Uk Choi v. Tower Research Capital LLC*,
    890 F.3d 60 (2d Cir. 2018)....................................................................................................24

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
    416 F.3d 146 (2d Cir. 2005)............................................................................................19, 20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................................28, 33, 34

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014).........................................................................................23, 24, 25

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    No. 05 Civ 9016 (SAS), 2006 U.S. Dist. LEXIS 11617 (S.D.N.Y. Mar. 20, 2006)................12

*Perkins v. Benguet Consolidated Mining Co.*,
    342 U.S. 437 (1952)...............................................................................................................14

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)........................................................................................................19, 20

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015)...............................................................................34, 35

*Pollus Holding Ltd. v. Chase Manhattan Bank*,
329 F. 3d 64 (2d Cir. 2003)..................................................................................20, 21, 22

*Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011)...........................................................................38

*Rodman v. Grant Found.*,
608 F.2d 64 (2d Cir. 1979)............................................................................................32

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)............................................................................................33

*SEC v. PlexCorps*, No. 17-CV-7007 (CBA) (RML),
2018 U.S. Dist. LEXIS 156308 (E.D.N.Y. Aug. 8, 2018)......................................16, 17

*SEC v. Sharef*,
924 F. Supp. 2d 539 (S.D.N.Y. 2013).....................................................................13, 16

*SEC v. Straub*,
921 F. Supp. 2d 244 (S.D.N.Y. 2013)...........................................................................16

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06-cv-13447 (CM),
2008 U.S. Dist. LEXIS 19854 (S.D.N.Y. Mar. 7, 2008) ..............................................16

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)..........................................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................................................33

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)......................................................................................................30

*United Paperworks Int'l Union v. Int'l Paper Co.*,
985 F.2d 1190 (2d Cir. 1993)........................................................................................31

*United States v. Isaacson*,
752 F.3d 1291 (11th Cir. 2014) ....................................................................................23

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
751 F.2d 117 (2d Cir. 1984)..........................................................................................15

*White v. H&R Block, Inc.*, No. 02 Civ. 8965 (MBM),
2004 WL 1698628 (S.D.N.Y. July 28, 2004) ..............................................................32

## Statutes

15 U.S.C. § 78u-4(b)................................................................................................26, 33

15 U.S.C. § 78j(b) ............................................................................................ *passim*

15 U.S.C. 15 U.S.C. § 78t(a) ........................................................................... *passim*

PSLRA ....................................................................................................12, 13, 26, 33

## **Rules**

Fed; R. Civ. P. 9(b) ....................................................................................13, 26

Fed. R. Civ.P. 12(b)(6)........................................................................................13

Fed. R. Civ. P. 15.................................................................................................40

Lead Plaintiff Nancy Lin and Plaintiff Gilbert Lee Silverbird (collectively, "Plaintiffs") hereby submit their opposition to the Motions to Dismiss filed by Liberty Health Sciences Inc. ("Liberty"), George Scorsis and Rene Gulliver and Vic Neufeld (collectively, "Defendants").[1]

## I.    PRELIMINARY STATEMENT

Defendant Liberty is a cannabis company that is headquartered in Canada but is focused entirely on the United States ("US") market. It was established by Aphria, Inc. ("Aphria"), a Canadian cannabis company, to operate as Aphria USA. What Liberty shareholders did not know is that Aphria insiders were using Liberty as part of a broader scheme to enrich themselves with related-party transactions and other financial machinations at Liberty and Aphria investors' expense.

The salient facts of this case begin before Liberty was even officially formed in July 2017. The formation of Liberty was coordinated by Andrew DeFrancesco, a longtime Aphria investor and consultant. As part of the deal orchestrated by DeFrancesco, an undisclosed list of individuals and entities—including many associated with DeFrancesco—were issued 242.6 million shares for nearly nothing, i.e., $0.001. While Liberty promoted Aphria's 37.63% stake in Liberty, and the fact that Aphria's CEO, Defendant Vic Neufeld, was Chairman of the Board of Liberty, Liberty never disclosed that DeFrancesco, his family and friends also had a stake in the Company. They also never disclosed that Aphria insiders, including DeFrancesco and the Serruya family, were using Liberty as a personal piggybank.

---

[1] Citations to the Second Amended Consolidated Class Action Complaint (ECF No. 48) (the "Complaint") are in the form of "¶__." Citations to the Memorandum of Law in Support of Motion to Dismiss Second Amended Complaint (ECF No. 56) are in the form of "Liberty MTD." Citations to exhibits attached to the Declaration of Matthew Riccardi in support of the Liberty MTD (ECF No. 55) are in the form of "Riccardi Ex.." Citations to Memorandum of Law of Rene Gulliver and George Scorsis's Motion to Dismiss (ECF No. 59) are in the form of "Management MTD." Citations to Defendant Vic Neufeld's Memorandum of Law in Support of Motion to Dismiss (ECF No. 64) are in the form of "Neufeld MTD." Citations to the Declaration of Cara David, dated today, in support of Plaintiffs' Opposition, are in the form of "David ¶__," if to a paragraph and "David Ex. __," if to an exhibit to the declaration.

1

In January 2018, Liberty announced it was buying a company, 242 Cannabis Canada Ltd. ("242 Cannabis"), that was going to buy a property in Florida. What Liberty did not announce was that 242 Cannabis was going to be paying millions less for the property than Liberty would be paying 242 Cannabis for it just six days before Liberty's purchase. Who owned 242 Cannabis? DeFrancesco-affiliated entities and individuals and members of the Serruya family. The deal was disclosed as an "arms-length transaction" because no one who owned 242 Cannabis was technically a Liberty officer or director. For example, members of the Serruya family owned 242 Cannabis, but not Aaron Serruya, who was on the Liberty Board. For its part, Aphria then made a similar deal for DeFrancesco-related properties, also paying considerably more than DeFrancesco and friends had paid.

On December 3, 2018, Hindenburg Research and Quintessential Capital Management, two market analysts, released a report showing the assets Aphria had bought from DeFrancesco et al. were virtually worthless. The report named DeFrancesco and Defendant Neufeld, among others, as part of a scheme to line insiders' pockets. Aphria's stock plummeted along with Liberty's stock. Three days later, Hindenburg Research released another report, this time focusing on Liberty. The report detailed the undisclosed grants of 242.6 million shares at $0.001 per share to corporate insiders and related parties, as well as Liberty's overpayment for the Florida property. That day, Liberty's stock dropped sharply intraday, then rebounded briefly by the end of the day (thanks to positive news about Aphria), only to fall again the next day when the market had completely digested the released information regarding Liberty.

To recover losses incurred by both of these stock drops, Plaintiffs sued Liberty, its Chief Executive Officer George Scorsis, its Chief Financial Officer Rene Gulliver and Neufeld for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5, and Scorsis, Gullivar and

Neufeld (the "Individual Defendants") for control person liability, under Section 20(a) of the Exchange Act. Defendants try multiple theories to escape liability for their fraud; each one fails.

Defendants primarily try to hide in Canada, claiming Plaintiffs' claims are based on a foreign transaction, the Court does not have jurisdiction over them and that the forum is inconvenient for them. However, this was a company which targeted and did all its business in the US, which specifically sought US investors by taking actions to list itself on a prestigious over-the-counter market based in New York, and which certainly otherwise purposely availed itself of the privileges of conducting business in the US. The US has a significant interest in enforcing its own laws, especially in a case such as this where the Company, while headquartered in Canada, conducts *all* its business in the US. Plaintiffs' claims are predominantly domestic and it is disingenuous for Defendants to now argue otherwise in an attempt to shelter themselves from liability to investors they so actively sought.

Defendants also argue that none of Plaintiffs' alleged misstatements are actionable. In so doing, they argue that they had no duty to tell investors any of the omitted information, that none of the information was material to investors, the property Liberty bought was a good deal, and the disclosure of their alleged fraud did not cause Plaintiffs' losses. Defendants' arguments are not supported by the law in this circuit or the facts of this case. Defendants affirmatively spoke about the 242 Cannabis deal and misrepresented that it was an "arms-length" transaction and spoke about its relationships with insiders and parties related to those insiders, giving rise to a duty to provide full and complete information. Their scheme was hidden from an unsuspecting public thanks to profits being funneled to related entities and individuals instead of named officers and directors. This scheme was material to investors as shown by Liberty stock dropping when the vast amount of insider transactions was revealed. For, contrary to what Defendants

3

seem to think, insiders reaping quick profits at the expense of shareholders is the type of thing that is material to shareholders. This is true whether or not an acquisition may have been worth the money spent (which, regardless, is a factual issue inappropriate for adjudication at this stage).

Plaintiffs sufficiently plead the elements of their fraud and control person claims. For the reasons set forth below, the Court should deny all Defendants' motions to dismiss.

## II.  STATEMENT OF FACTS

### A.  Liberty Established as Aphria's U.S. Arm

Aphria Inc. is a Canadian cannabis company. ¶¶31-32. Andrew DeFrancesco ("DeFrancesco") and his private equity firm, the Devalco Group, along with a fund with ties to DeFrancesco, Serruya Private Equity ("Surraya"), made a founding investment in Aphria and acted as strategic advisors to the company. ¶32. On April 4, 2017, it was announced that Aphria and Serraya would be backing an arrangement in which a company, established by the Devalco Group, would merge with a pre-existing Canadian company, SecureCom Mobile, Inc. ("SecureCom"), to form "Liberty Health Sciences Inc." ¶¶34-35. In his biography, DeFrancesco refers to himself as a Liberty founder and consultant. ¶62. When the transaction closed at the end of July 2017, Aphria owned 37.63% of Liberty. ¶59. Defendant Neufeld, Aphria CEO, was Chairman of the Board. ¶22. Aaron Serruya was also on the Liberty Board. *Id.*

From the start, Liberty was meant to target the U.S. market. ¶¶35-41. The April 4, 2017 "Aphria Launches US Expansion Strategy" press release from Aphria announcing the new company stated Liberty was to "operate in the United States under the brand Aphria USA" and noted Liberty marked "the launch of [Aphria's] US expansion strategy." ¶40; Riccardi Ex. 4. It was Neufeld who made it clear Aphria would oversee Liberty and its U.S. expansion. ¶41. He is quoted as saying: "We will continue to examine other U.S. opportunities and strive to introduce new states to Liberty's business model." *Id.* Aphria announced Liberty's investments related to

the State of Florida initially, but that Liberty would be expanding in the US. *Id.* Liberty operated in the US through a wholly-owned subsidiary, formed by DeFrancesco, DFMMJ Investments, LLC d/b/a Liberty Health Sciences Florida, Ltd. ¶58. There are also alleged misstatements that are based on interviews or presentations that occurred in the US. *See, e.g.*, ¶¶150-52.

Liberty and Aphria were always intertwined, not simply because of Aphria's ownership stake, but because of the contracts between the two. ¶79. Liberty sold Aphria products and licensed its "know-how." ¶35. A Confidential Witness reported that Aphria company-wide emails would be sent to Liberty and Liberty staff regularly answered to Aphria personnel. ¶79.

Liberty trades on the Canadian Stock Exchange ("CSE"). ¶57. It also trades over-the-counter ("OTC") in the US. ¶22. On December 4, 2017, Liberty announced it was upgrading from the Pink Sheets market to trade on OTCQX Best Market ("OTCQX"). David Ex. 1. OTC Markets Group Inc., which operates the OTCQX, is based on New York. ¶23. OTC Markets is a privately owned company that permits members of the Financial Industry Regulatory Authority ("FINRA") to quote securities available over the counter. *Id.* FINRA only regulates brokerage firms and brokers in the US. *Id.*

According to information provided by the OTC Markets Group Inc. ("OTC Markets"), which operates both markets: "To qualify for the OTCQX market, companies must meet high financial standards, follow best practice corporate governance, demonstrate compliance with U.S. securities laws, be current in their disclosure, and have a professional third-party sponsor introduction." David Ex. 2. Liberty had to take affirmative actions as part of this upgrade to the OTCQX, including getting a sponsor, signing an agreement with the OTC Markets, verifying the Liberty description on the OTC Markets site, authorizing a background check of all company officers, directors and control persons, verifying compliance with certain reporting standards and

5

paying a one-time fee and agreeing to pay a yearly fee. David Ex. 3. Additionally, by upgrading, Liberty also agreed to "[t]imely disclosure of material news and other information required to be made publicly available pursuant to the Exchange Act Rule 12g3-2(b)[.]" *Id.* Liberty's financials and news releases are available on the OTC Markets site. David Ex. 4.

At the time of this upgrade, Liberty issued a release in which Defendant Scorsis stated that Liberty's focus was on US investors. David Ex. 1. In a Liberty release, he said: "Qualifying to trade on OTCQX represents an important and exciting milestone for our company as we continue our targeted U.S. expansion. We're committed to offering our growing U.S. investor base an industry leading trading experience and this step helps achieve that goal." *Id.*

Aphria began the process to divest its interest in February 5, 2018—a process that was not completed until fall of that year—precisely because of Liberty's focus on the US. ¶¶95; 98-99. The move was done under pressure from the Toronto Stock Exchange, which listed Aphria's shares, because it considered Liberty a US asset, and cannabis is still illegal under federal law in the US. ¶¶95, 98. Michael Serruya, Simon Serruya and Jack Serruya (whose private equity firm had made a founding investment in Aphria) and entities associated with DeFrancesco and his family bought Aphria's shares in Liberty. ¶¶96, 99.

### B.    Aphria Insiders Benefit From Share Issuance Scheme

On April 11, 2018, a week after the Liberty formation deal was announced, 242.6 million shares of the holding company established for the deal were sold at C$0.001. ¶42. This was *208 times less* than Aphria would pay for its shares weeks later, in another private placement. *Id.* This round was not announced to the public when it occurred, but became public via a SecureCom corporate filing on June 19, 2017. ¶43. In this June filing, the stock holdings of certain officers and directors of Liberty were disclosed but information was not disclosed about the timing or cost of these investments. Riccardi Ex. 3 at 76. The June filing did not disclose the heavily-

6

discounted investments of DeFrancesco and related parties. *Id.* The only Aphria shareholders that were listed were the ones that served as officers or directors of Liberty. *Id.* On July 25, 2017, after SecureCom officially became Liberty, Liberty filed a form with the CSE with a list of individuals who had purchased shares in an April 27, 2017 round of financing, the amount of shares they purchased in that round and the amount of shares they owned in total. ¶46. There is no such filing for the April 11, 2017 $0.001 round, but, because the July 25 filing provided the total amount of shareholdings for each individual or entity listed, it can be discerned how many participants in the April 27, 2017 round also participated in the April 11, 2017 round. *Id.*

The July 25 filing disclosed that DeFrancesco—who in his bio has taken credit for founding and advising Liberty—and his family members acquired an astounding number of shares at $0.001. ¶¶46-47; 62.[2] Almost 16.5 million shares were acquired by DeFrancesco's entities or trust for his children. ¶¶46-47. Millions of these shares were picked up by entities that were not identifiable as affiliated with DeFrancesco from their names. For example, an entity named Namaste Gorgie Inc. acquired over 5 million shares in the April 11 round. *Id.* That entity was owned by DeFrancesco's wife, but that fact was not apparent from the filing. *Id.* Additionally, other heavy investors at the stage included DeFrancesco's brother-in-law, a former member of the Aphria Board of Directors who also happened to be a frequent partner of DeFrancesco and another frequent DeFrancesco partner. ¶¶46-48. In total, DeFrancesco and his family and friends acquired at least 34,833,331 shares during this round. ¶46.[3] The relationship

---

[2] Liberty states, with no citation, that this behavior is common. Liberty MTD at 3. The Court should disregard this and the many other similar comments in the Background section of the Liberty MTD, as they are outside the scope of the Complaint. "On a 12(b)(6) motion, a court may look[] only to the complaint; documents that are attached as exhibits to, incorporated by reference, or integral to the complaint; and matters of which judicial notice may be taken." *In re Mylan N.V. Sec. Litig.*, No. 16-cv-7926 (JPO), 2018 U.S. Dist. LEXIS 52084, at *12 (S.D.N.Y. Mar. 28, 2018). Extraneous assertions are not within the gambit of what a court may consider.

[3] Because the full list of investors in the April 11, 2017 round is unknown—and even known investors could have unknown ties to Aphria and Liberty—this is the minimum amount related parties obtained in this round.

between these individuals and DeFrancesco was not disclosed in the filing. The full list of investors in the April 11 round has never been disclosed. ¶52.

### C.   Liberty Turns Blind Eye as DeFrancesco Uses the Company as a Piggy-Bank

Liberty, under the supervision of the Individual Defendants, continually made deals designed to enrich DeFrancesco related entities. ¶66. The company constantly acted through DeFrancesco-controlled middlemen entities, just as Aphria had when it established Liberty. ¶¶34, 58. On January 4, 2018, Liberty announced it had agreed to purchase shares of 242 Cannabis. ¶68. It was not disclosed that this "arms-length" transaction benefited DeFrancesco, his friends and family and members of the Serruya family. ¶¶68-70. Liberty touted the acquisition as providing tremendous benefits. ¶70. The only thing that was announced about the purchase of 242 Cannabis was that the entity, through its recently formed subsidiary 242 Cannabis, LLC, had agreed to purchase a parcel of land in Florida (the "Property"). ¶69.

242 Cannabis, LLC only paid $6.5 million (or approximately C$8,112,650) for the Property. ¶74. Liberty paid a much higher price just six days later. As per its published financials: "242 Cannabis did not have any operations" and therefore "this acquisition was accounted for as an asset acquisition, with [C]$13,492,572 allocated to land and greenhouse infrastructure." David Ex. 5 at 23-24. Liberty ended up paying approximately C$31 million for 242 Cannabis, which included the Property and "a cash balance of up to C$17.3 million in 242 Cannabis, LLC." ¶213. As such, Liberty overpaid for 242 Cannabis by at least C$5 million.

Over a month after the acquisition of the 242 Cannabis was announced, a form filed by Liberty revealed the owners of 242 Cannabis, LLC. ¶73. Not surprisingly, the list was comprised of DeFrancesco comrades: Honig, entities associated with DeFrancesco's wife and children and multiple Serruya-affiliated entities. *Id*. They are the ones who reaped profits. ¶¶73-77. Seemingly

understanding the public relations issue, later releases regarding the Property did not mention 242 Cannabis, making it appear as if Liberty had directly closed on the Property. ¶78.

### D.    Aphria Also Benefits Insiders at the Expense of Its Shareholders

Aphria management – including Defendant Neufeld – similarly turned a blind eye as insiders looted Aphria. On July 17, 2018, Aphria announced its intention to buy multiple companies in Latin America (the "Latin American Assets"). ¶80. Like Liberty had done with the Property, Aphria promoted these acquisitions as positive additions to the company's portfolio. ¶84. However, the Latin American Assets were far less valuable than purported. ¶¶81-92. Not coincidentally, like 242 Cannabis, the Latin American Assets were owned by DeFrancesco and other Aphria insiders who profited handsomely by unloading them on Aphria. ¶82.

### E.    The Truth Emerges

Before the market opened on December 3, 2018, Quintessential Capital Management and Hindenburg Research issued a report entitled *Aphria: A Shell Game with a Cannabis Business on the Side* (the "Hindenburg Report"), alleging that the Latin American Assets were little more than shell companies that Aphria acquired at artificially inflated prices. ¶102. The Hindenburg Report, which was based on an extensive investigation, specifically alleged: "Aphria is part of a scheme orchestrated by a network of insiders to divert funds away from shareholders into their own pockets." ¶105. The Hindenburg Report detailed, among other things, the attempts to hide DeFrancesco's involvement in the sub-entities that once owned the Latin American Assets, how these assets were purchased under the direction of Neufeld, and the many conflicts of interest in the transactions. ¶107.

Aphria issued a quick response generally denying the accusations in the report, but its stock still plummeted. ¶¶109-110. Liberty's stock followed Aphria's rises and falls during the Class Period and beyond, as demonstrated below:

9



¶79. It is not surprising that when Aphria's stock plummeted, Liberty's stock also cratered, especially given that the Hindenburg Report expressly called out those involved with Liberty, including DeFrancesco and Defendant Neufeld, raising the specter that Liberty was similarly part of the "scheme" orchestrated by Aphria's insiders/founders. ¶110. Liberty's stock fell $0.36, or nearly 34%, over the next two trading days to close at $0.70 on December 4, 2018. *Id.*

On December 6, 2018, Hindenburg issued another report, *Aphria Part 2: We Believe This Rot Runs Deep* (the "Liberty Report"). ¶112; Riccardi Ex. 7. The report highlighted the insider involvement in Liberty's establishment, detailing the $0.001 round of financing. ¶114. It also showed the Special Warranty Deed related to the Property and discussed how 242 Cannabis LLC had quickly flipped the Property for a hefty profit. ¶¶113-14. Hindenburg stated: "We urge readers to note the parallels between this transaction and those of the [Latin American Assets] transactions described in our previous report, which similarly involved Neufeld and DeFrancesco, intermediary shell entities placed between acquisitions, and presumed quick profits for the holders of those shell entities at the direct expense of public shareholders." ¶112.

Upon the release of the Liberty Report, Liberty's stock plummeted, at one point reaching $0.565 cents in intraday trading:



¶116. However, Aphria announced news that assuaged its investors: it announced it was going to appoint a special committee of independent directors to review the Latin American Assets transactions. ¶111. Upon that news, Aphria's stock increased 30% on December 6 and Liberty rebounded to follow Aphria. ¶¶116-17. (In the above graphic, the white line represents Aphria, whereas the green line represents Liberty OTC.) While Liberty had a slight bump on December 6, 2018, the following day it returned to its slide. Liberty's stock fell approximately $0.05 per share, or 7.09%, to close at $0.66 per share on December 7, 2018. ¶117.

The following month, Defendant Neufeld stepped down as CEO from Aphria. ¶118. He and John Cervini, another Aphria co-founder, both resigned from the Liberty Board. *Id.* In February, Liberty announced that both Defendants Scorsis and Gulliver were leaving. ¶131.

In a press release issued February 12, Liberty stated that an allegedly independent real estate company found that, while the owners of 242 Cannabis did realize a hefty profit from the immediate flip of the Property, it was still worth more than Liberty had paid for it. ¶¶122-23. The press release also stated that an independent committee found that the revelation regarding the identity of early investors in Liberty not "material." ¶125. While the press release labelled the Liberty report "inaccurate," as a report in *The Financial Post* noted, "Liberty Health Sciences highlighted a total of zero inaccuracies except for the company's own inaccurate filing. Four directors have since resigned, which should speak volumes."[4] ¶127.

## III.    ARGUMENT

### A.    Legal Standards

"[A] plaintiff in federal court need not make any mention of personal jurisdiction, nor the facts supporting it, in its complaint." *Hypefortype Ltd. v. Universal Music Grp., Inc.*, No. 17-CV-4468 (BMC), 2017 U.S. Dist. LEXIS 150500, at *2 (E.D.N.Y. Sept. 17, 2017).[5] When a defendant moves pursuant to 12(b)(2) challenging personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). Before discovery, "a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81,

---

[4] The four referenced were Neufeld and Cervini and their replacements, who resigned quickly after assuming Board service. ¶¶118-119, 121. Scorsis would also step down from the Board when he stepped down as CEO. ¶131.

[5] "[T]he court . . . may order discovery on defendant's business operations before determining whether plaintiff has stated a *prima facie* case." *Id.*at *4-5. If this Court does not believe Plaintiffs have stated a *prima facie* case for personal jurisdiction on any of the Defendants—and Plaintiffs believe they have—we ask that the Court permit discovery on the issue. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05 Civ 9016 (SAS), 2006 U.S. Dist. LEXIS 11617, at *29 (S.D.N.Y. Mar. 20, 2006) (even in actions governed by the PSLRA, "[j]urisdictional discovery should be granted where pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary." (internal quotations omitted)); *Biofrontera AG v Deutsche Balaton AG*, 2020 U.S. Dist. LEXIS 53749, at *14-15 (S.D.N.Y. Mar. 27, 2020) (ordering discovery to analyze defendants' contacts with the forum).

84-85 (2d Cir. 2013). The court in *SEC v. Sharef* outlined the burden at this stage: "A court may consider materials outside the pleadings, but must credit plaintiffs' averments of jurisdictional facts as true. [A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" 924 F. Supp. 2d 539, 543-45 (S.D.N.Y. 2013) (internal quotations omitted).

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must assume the truth of all "'well-pleaded factual allegations.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A court must sustain a complaint that "allege[s] sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). The court "does not impose a probability requirement at the pleading stage," however; "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556. In addition, claims under Section 10(b) and Rule 10b-5 are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"). *See Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, No. 1:17-CV-1235-GHW, 2019 WL 1436993, at *6 (S.D.N.Y. Mar. 30, 2019).

### B.    Personal Jurisdiction Exists Over Each Defendant

Exercising personal jurisdiction over defendants must be consistent with due process under the U.S. Constitution. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167-69 (2d Cir. 2013). The inquiry has two components: whether defendants have sufficient minimum contacts with the forum; if so, whether the exercise of personal jurisdiction is reasonable, *i.e.,* whether it comports with "traditional notions of fair play and substantial justice[.]" *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996).

1.    **Defendants Have Sufficient Minimum Contacts with the United States**

When examining "minimum contacts," a court differentiates between claims of general and specific jurisdiction. As articulated in *Chloé v. Queen Bee of Beverly Hills, LLC*:

> Specific jurisdiction exists when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum. A court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts.

616 F.3d 158, 164 (2d Cir 2010) (internal quotations and citations omitted). In this case, general and specific jurisdiction exists with regard to Liberty. Specific jurisdiction exists with regard to the other defendants.

Defendants cite the Supreme Court case *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014), as standing for the proposition that for a corporation to be subject to general jurisdiction in the US it "must be incorporated in that forum or have its principal place of business there." Liberty MTD at 11. However, that is simply a mischaracterization of the holding. The Supreme Court noted that it "[did] not foreclose the possibility that in an exceptional case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Daimler,* 571 U.S. at 139 n.19. It cited *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952), as that exceptional case. *Id.* In *Perkins*, the defendant, a foreign Philippine mining corporation, was sued in Ohio. *Id.* at 447-48. The defendant's only business was done in Ohio. *Id.* The Supreme Court held in *Daimler* that the district court in Ohio properly exercised general jurisdiction over the defendant because "Ohio could be considered a surrogate for the place of incorporation or head office." 571 U.S. at 130 n.8 (internal quotations omitted). While in this case, Liberty has claimed to operate out of its Toronto corporate office, and is listed

14

on the CSE, all its business operations are in the US. ¶40. Its CEO, Defendant Scorsis, reportedly split his time between Florida and Canada in order to supervise Florida operations. David Ex. 6.[6]

The holding in *Daimler* was based in substantial part on the premise that "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Bauman*, 571 U.S. at 139, n.20. Liberty solely operates in the US. ¶40. Whether it is through a wholly-owned subsidiary or not is of no importance – Liberty has clearly targeted its operations and activities at *solely* the US.[7] It was established as "Aphria USA." ¶40. Its deals were about property and services in the US. This is the "exceptional case" the Supreme Court was referencing. Liberty's contacts are "so substantial and of such a nature as to render the corporation at home" in the US. *See Daimler*, 571 U.S. at 139 n.19; *see also Alfandary v. Nikko Asset Mgmt. Co.*, 337 F. Supp. 3d 343, 361 (S.D.N.Y. 2018) (finding general jurisdiction over a company that was "incorporated and maintain[ed] its principal place of business in Japan" but had a subsidiary which was "incorporated in Delaware and ha[d] its principal place of business in New York" when plaintiffs pled facts sufficient to show the parent had "continuous and systematic operations in the [US] such that it may fairly be considered at home here").

Alternately, specific jurisdiction exists as to Liberty and the Individual Defendants. "[T]here is ample (and growing) support in case law for the exercise of jurisdiction over individuals who played a role in falsifying or manipulating financial statements relied upon by

---

[6] Scorsis argues that he worked out of the Toronto office, and while that may be true, it is unquestionable that he was frequently in the U.S. supervising Liberty's operations and participating in meetings and interviews for Liberty.

[7] There should be no question that the U.S. subsidiary is a "mere department" of the Canadian company. In *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984), the Second Circuit laid out four factors that must be considered in a "piercing the corporate veil" argument: first, "common ownership;" second, "financial dependency of the subsidiary on the parent corporation;" third, "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities;" and fourth, "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." In this case, the Canadian company wholly owns and operates the U.S. subsidiary. There is no daylight between the two entities. Each factor weighs in favor of a finding that the U.S. subsidiary is a "mere department" of the parent.

U.S. investors in order to cover up illegal actions directed entirely at a foreign jurisdiction." *Sharef*, 924 F. Supp. 2d at 547. "[T]he lynchpin of these decisions is that jurisdiction exists where an executive of a foreign securities issuer, wherever located, participates in a fraud *directed* to deceiving United States shareholders. It is by now well-established that signing or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors[,] satisfies this test." *Id.* (emphasis in original; internal quotations omitted). "It long has been recognized that effects in the United States attributable to conduct abroad may be sufficient predicate for the exercise of personal jurisdiction[.]" *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 451-54 (S.D.N.Y. 2005) (exercising personal jurisdiction over foreign national professor involved in issuing audit reports). The Second Circuit has explained that minimum contacts can be established by showing defendants purposefully availed themselves "of the privilege of conducting activities within the forum State" or that their out-of-state activity had in-state effects. *SEC v. PlexCorps*, No. 17-CV-7007 (CBA) (RML), 2018 U.S. Dist. LEXIS 156308, at *31-32 (E.D.N.Y. Aug. 8, 2018).[8] While these cases involve companies listed on the NYSE or NASDAQ – the analysis should not change. Just as the individuals in those cases knew and intended that their statements would be read or heard and ultimately relied on by U.S. investors, so did the Defendants in this case. After all, Liberty was seeking to expand its U.S. investor base by registering to trade on the OTCQX market. David Ex. 1. Defendants touted the fact that Liberty stock was trading well enough in the

_____

[8] *See also SEC v. Straub*, 921 F. Supp. 2d 244, 248, 252-59 (S.D.N.Y. 2013) (exercising personal jurisdiction over Hungarian telecommunications company's executives who engaged in bribery of public officials in Macedonia and Montenegro and made false statements because their conduct was "necessarily directed toward the United States" and "knew or had reason to know that any false or misleading financial reports would be given to prospective American purchasers of those securities."); *In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d 346, 401 (S.D.N.Y. 2005) (exercising personal jurisdiction over inside director, noting that "it would have been foreseeable to those creating and disseminating the [registration statements] that the documents would have an effect in the United States"); *TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06-cv-13447 (CM), 2008 U.S. Dist. LEXIS 19854, at *33-34 (S.D.N.Y. Mar. 7, 2008) (exercising personal jurisdiction over directors for having approved false statements).

16

US to qualify for an upgrade to this market. *Id.* And Liberty agreed to disclosure requirements in order to satisfy OTCQX standards. *Id.*

Here, Defendants clearly purposefully availed themselves of the privileges of conducting business in the US. *In re Poseidon Concepts Sec. Litig.*, No. 13cv1213 (DLC), 2016 U.S. Dist. LEXIS 68127, at *9-10 (S.D.N.Y. May 24, 2016) ("*Poseidon*") (holding that the court had jurisdiction of an auditor who chose to purposefully avail itself of doing business in the US by auditing a foreign client with significant US business and communicating with individuals within that US business). Active solicitation of US investors, and the U.S. market, is in and of itself sufficient to establish jurisdiction in this case. *See PlexCorps*, 2018 U.S. Dist. LEXIS 156308, at *20-24 (actively marketing to US consumers over the internet is enough to establish jurisdiction). Liberty took steps to target the US market by actively upgrading to the OTCQX and paying a fee to remain listed on that United States-based market. David Ex. 1. At the time of this upgrade, Scorsis spoke about how this action was done to target US investors. *Id*. Defendant Scorsis, who reportedly split his time between Canada and the US, gave multiple interviews and presentations in the US. David ¶8, Ex. 6. All Defendants, including Defendant Neufeld (who during the Class Period was also Chairman of the Liberty Board, as CEO of Aphria, exercised significant influence over "Aphria USA"), were makers of statements because they signed, were expressly referenced and quoted in press releases and filings, or had ultimate authority over the statements. ¶¶133-229. A substantial part of the conduct and damages occurred in the US. The Defendants directly or indirectly used the instrumentalities of interstate commerce to perpetuate the fraud. ¶19. US Class members suffered from this fraud. The Defendants knew their actions, even the ones that took place in Canada, would have an impact in the US because Liberty's entire business was in the US. *See Nikko Asset Mgmt. Co.*, 337 F. Supp. 3d at 363 (finding

17

jurisdiction over a president and CEO of a foreign company that was "intimately involved in business operations and management in the United States").

### 1.    Exercising Jurisdiction Over Defendants is Reasonable

Once a plaintiff makes a showing that defendant had minimum contacts, "the exercise of personal jurisdiction is favored unless the defendant makes a showing that such an exercise of jurisdiction is unreasonable." *In re Alstom*, 406 F. Supp. 2d at 398. To determine reasonableness, courts should consider (1) the burden on the defendant, (2) the forum State's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) shared interest of the several states in furthering fundamental substantive social policies. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

Liberty itself does not raise a reasonableness argument with regard to personal jurisdiction, implicitly conceding that the *Burger King* test is easily met in this circumstance. The Individual Defendants do argue that this Court's exercise of jurisdiction would be unreasonable, with Gulliver and Scorsis in particular focusing on two dubious assertions: (1) the "wrongful conduct bears no connection to Gulliver or Scorsis themselves;" (2) an American court's interest in adjudicating this case are "attenuated, it not nonexistent." Management MTD at 9.

*First*, Gulliver and Scorsis were the highest-level executives at Liberty. The wrongful conduct is necessarily connected to them. Who was involved in the deal for the 242 Cannabis if not Liberty's CEO and CFO? Who is alleged to have hidden the extensive amount of insider involvement?

*Second*, "[t]he United States has a strong interest in enforcing its own securities laws and protecting U.S. markets." *Poseidon*, 2016 U.S. Dist. LEXIS 68127, at *22. *Metropolitan Life*, 84 F. 3d at 574-75, the case on which Defendants rely, is wholly distinguishable. In that case, the

acts in the complaint were alleged to have taken place in St. Louis, Missouri; Houston, Texas; Dallas, Texas; and Miami, Florida. *Id.* The suit was filed in Vermont, arguably so that plaintiffs would be in a jurisdiction with a more favorable statute of limitation provision, and only general jurisdiction against the defendants was alleged. *Id.* Here, specific jurisdiction against the Individual Defendants is alleged because of their contacts with the forum state, in this case being the US.[9] The US' interest in adjudicating its own laws is far from "nonexistent." *See DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002) (vacating a lower court decision dismissing a complaint and stressing the plaintiffs had a valid reason to bring their action in the US: the country's "interest in having United States courts enforce United States securities laws"). Defendants cannot commit a scheme to enrich related parties with essentially free stock grants and engage in related-party transactions to the detriment of US investors whom they actively courted, and then hide behind their residence in Canada in order to evade liability from those very same defrauded investors.

### C.    *Forum Non Conveniens* Is Not Cause for Dismissal

A court in reviewing a *forum non conveniens* motion starts with "a strong presumption in favor of the plaintiff's choice of forum" and it is understood that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir. 2005) (*citing Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255 (1981)). When evaluating a motion to dismiss on *forum non conveniens* grounds, courts generally embark on a three-step test. *See Norex,* 416 F.3d at 153. "At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is

---

[9] Notably, none of the Defendants consents to jurisdiction in Florida or argues for Florida as an alternate forum.

adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum." *Id.* (internal citations omitted).

Here, the forum choice of Plaintiffs should be entitled to great deference. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001). "[P]laintiffs should not have been deprived of their choice of forum except upon defendants' clear showing that a trial in the United States would be so oppressive and vexatious to them as to be out of all proportion to plaintiffs' convenience." *DiRienzo,* 294 F.3d at 30. "[T]here is a strong presumption in favor of the choice of a United States plaintiff to litigate in his home forum." *Nikko Asset Mgmt. Co.*, 337 F. Supp. 3d at 354 (internal quotations omitted). While Liberty is correct that Plaintiff Lin is not American, her trades were executed through a US market maker, and Plaintiff Silverbird is a US resident. ¶¶21-22. Liberty bases its argument that Silverbird does not "allege a bona fide connection to Southern District." Liberty MTD at 12-13. However, that neglects established Second Circuit precedent that in a *forum non conveniens* case where the alternate forum is a foreign court, a US citizen's home forum is any US court, not necessarily the court in the home state of a plaintiff. *Guidi v. Inter-Cont'l Hotels Corp.,* 224 F.3d 142, 146 n.4 (2d Cir. 2000); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 297 (E.D.N.Y. 2002). There is also no showing that forum shopping was involved. *See Poseidon*, 2016 U.S. Dist. LEXIS 68127, at *26.[10]

Private and public interests also favor the case remaining in the US. Private interest factors include: "(1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or

---

[10] The cases Liberty cites do not help its cause. Liberty MTD at 13. In *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981), plaintiff admitted that the case was filed in the U.S. because of favorable law. Both *Acosta v. JPMorgan Chase & Co.*, 219 F. App'x 83 (2d Cir. 2007), and *Pollus Holding Ltd. v. Chase Manhattan Bank*, 329 F. 3d 64 (2d Cir. 2003), were cases with only foreign plaintiffs, which is not the case here.

less expensive." *DiRienzo,* 294 F.3d at 29-30; Liberty MTD at 13. Defendants argue that private interests favor dismissal because "the individual Defendants and other potentially relevant witnesses and documents are located in Canada." *Id.*[11] However, because Liberty's operations are in the US, there is a strong likelihood that many third-party witnesses and relevant documents would be in the US. To the extent corporate documents are located in Canada, that is not a strong factor favoring dismissal because modern technology makes document transmission easy. *DiRienzo*, 294 F.3d at 30; *see In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 211 (S.D.N.Y. 1999) ("technology … makes the documentary evidence factor far less important than it might have been in the past."). "As a transportation hub, travel to New York is relatively convenient for. . . Plaintiff[s] and the Canadian defendants." *See Poseidon*, 2016 U.S. Dist. LEXIS 68127, at *26. Requiring third-party witnesses to travel from Florida, where Liberty's operations are based, to Canada, on the other hand, imposes significant difficulties. Additionally, if this case were dismissed in favor of Canada as a proper forum, Plaintiffs would have to retain Canadian counsel and keep their American lawyers, who are more familiar with OTC trades.[12]

Additionally, Canada's securities laws cap damages, whereas US securities laws do not. If this case were brought under the Ontario Securities Act, Liberty's liability would be limited to the greater of 5% of its market capitalization or C$1 million. *See* Securities Act, R.S.O. 1990, c.

---

[11] Defendants also again argue lack of connection to New York, but, as discussed, *supra* at 20, that is not the relevant inquiry. Additionally, Neufeld is already subject to a class action in the Southern District of New York. While a motion to dismiss was filed on his behalf in that action, it did not include any argument related to jurisdiction or forum, though he joins in arguments on both grounds here. David ¶9.

[12] Scorsis and Gulliver both argue that coming to the U.S. would pose a significant burden. Management MTD at 10. Gulliver argues that he would be "subject to lengthy supplemental screenings at the border[.]" *Id.* However, he provides no real details as to what that would entail. *Id.* Gulliver's vague assertion of burden should certainly not tip this factor in his favor. Scorsis states he can still not enter the U.S. at all. *Id.* Neither the memorandum nor his accompanying affidavit provides any information as to why this would be or if he has tried to gain permission for reentry. *Id.* It is impossible to give deference to these assertions without additional information.

21

S.5, s 1381.1; 238.5-187.[13] The US thus provides greater protection to these investors, whose purchases occurred in the US.

Public interest factors include "(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) avoiding difficult problems in conflict of laws and the application of foreign law." *DiRienzo*, 294 F.3d at 31 (internal quotations omitted). None of these factors weighs in favor of dismissal, as New York courts and its citizens are familiar with the US law which forms the basis of this complaint. *See Poseidon*, 2016 U.S. Dist. LEXIS 68127, at *26 ("Securities litigation is regularly litigated in New York, which is the nation's financial center. As a result, its bar and courts are well-versed in suits of this nature."). Liberty argues that Canada has a greater interest because Liberty is a company incorporated in Canada and listed on the Canadian Stock Exchange. Liberty MTD 13-14. However, Liberty took specific action to make sure it was traded over-the-counter in the US, utilizing an exchange based in New York. The US has a great interest in ensuring foreign companies do not exploit US investors, especially when, as is the situation in this case, Defendants have explicitly targeted US investors.

### D.    Plaintiffs Allege A Purchase of Liberty Shares Within the United States

The US securities laws apply to "domestic" transactions, including "transactions in securities listed on domestic exchanges [] and domestic transactions in other securities." *Morrison v Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010). Plaintiffs' claims are domestic transactions under either prong of the *Morrison* analysis. The Second Circuit also requires the

---

[13] Liiability for each of the Individual Defendants would be capped at the greater of C$25,000 or 50% of the aggregate of each of their annual compensation at Liberty (unless knowledge of the misrepresentation can be established). *Id.*

claims in a case not be "predominantly foreign." *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014). The Complaint surpasses this hurdle as well.

### 1.     OTCQX Best Market Is a Domestic Exchange

Companies need not do anything for broker-dealers to begin quoting their securities on the OTC Link ATS. However, to upgrade to the OTCQX market, as Liberty did, a company must pay fees and comply with additional disclosure requirements, just as companies listed on other domestic exchanges must. David Ex. 3. The Second Circuit has expressly declined to decide the issue of whether the first prong of *Morrison* is satisfied when securities trade on the over-the-counter securities market, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012), and therefore it is still an open issue in this Circuit. The OTCQX exchange, with its heightened requirements and New York headquarters, should be found to be a domestic exchange for *Morrison* purposes. *See United States v. Isaacson*, 752 F.3d 1291, 1299 (11th Cir. 2014) (discussing an expert report detailing how over-the-counter "exchanges [were] 'similar to' the NYSE and the NASDAQ").

### 2.     Plaintiffs Transacted in Liberty Securities in the United States

Defendants seemingly acknowledge that a transaction is "domestic," and therefore satisfies the second prong of the *Morrison* analysis, if the point at which the parties become irrevocably bound is in the US or if title is transferred within the US. *See* Liberty MTD at 7-8; *Absolute Activist,* 677 F.3d at 68. The Complaint adequately alleges that Mr. Silverbird was bound to his purchase of Liberty shares in the US.

The Complaint pleads that Mr. Silverbird, a US resident, acquired Liberty shares in USD on the US OTC marketplace, using a broker in the US and a US market mater. ¶21. "[T]he question at this stage of the litigation is whether Plaintiffs have ***alleged facts suggesting*** that irrevocable liability was incurred in the United States." *Atlantica Holdings, Inc. v. Sovereign*

*Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 560 (S.D.N.Y 2014) (emphasis added) (internal quotations omitted), *aff'd in part,* 813 F.3d 98 (2d Cir. 2016). The Complaint does just that. *See Giunta v. Dingman*, 893 F.3d 73, 80 (2d Cir. 2018) ("irrevocable liability was incurred when the parties entered into the [a]greement" even though there were conditions subsequent); *Myun–Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 67 (2d Cir. 2018) (finding liability when trades were "matched" with counterparties in the US, but not cleared until the following day in Korea.)

*Poseidon*, 2016 U.S. Dist. LEXIS 68127, is comparable to this case in terms of the *Morrison* analysis. In that case, Plaintiff was a Florida resident who bought stock in a Canadian corporation traded in the US on an OTC market through the office of his local broker. *Id.* The court found that plaintiff had sufficiently alleged a "domestic transaction in other securities" because plaintiff could not revoke acceptance after he placed his order. *Id.* at *35-36.

Defendants argue that Plaintiffs have failed to allege "detailed facts" regarding the transaction, but fail to allege what more they are looking for other than the words "irrevocable liability." *See* Liberty MTD at 7-9. In fact, Defendants seek to distinguish *Poseidon* in a footnote, using only the inclusion of these buzz words in that complaint. *See* Liberty MTD at 7-9. The Complaint pleads that Mr. Silverbird executed a market order for Liberty shares, through only individuals and institutions in the US. Therefore, as occurred in *Poseidon,* the Complaint adequately alleges facts suggesting Mr. Silverbird incurred irrevocable liability in the US.

### 3.    The Claims Are Not Predominantly Foreign

Defendants next try to twist the Second Circuit's holding in *Parkcentral,* 763 F.3d at 201, to suit their purposes. Liberty MTD at 10. However, the holding in that case is inapplicable to this one.

In *Parkcentral*, certain US hedge funds entered into swap agreements referencing shares of a German company trading only on foreign exchanges. *Id.* at 201. Plaintiffs nevertheless commenced an action in the S.D.N.Y. alleging violations of Sections 10(b) and 20(a) of the Securities and Exchange Act. The swaps themselves were private transactions and purchasers were buying a derivative instrument, not direct shares. *Id.* The Second Circuit found the transactions "predominantly foreign," but cautioned against broadly applying its holding to other cases due to the unique nature of the relevant transactions and claims in that case. *Id.* at 215-16.

This case is not similar to *Parkcentral*. First, the Second Circuit based its holding in part on the fact that defendants had "no alleged involvement in plaintiffs' transactions," because the swap agreements were between two private parties. *Id.* at 201. Here, Plaintiffs bought shares issued by Liberty. ¶21-22. *See Poseidon*, 2016 U.S. Dist. LEXIS 68127, at *17 (stating *Parkcentral* is inapplicable because plaintiffs purchased stock); *see also Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13-CV-5790 (JMF), 2015 U.S. Dist. LEXIS 3209, at *14 (S.D.N.Y. Jan. 12, 2015) (refusing to extend *Parkcentral*'s holding to subordinated notes issued to debt holders). Second, Defendants argue that *Parkcentral* applies because many of Liberty's misstatements were allegedly issued from Canada or filed in Canada. But that does not make the claims "predominantly foreign." Unlike the company relevant in *Parkcentral*, Liberty was solely focused on the US. ¶¶40-41. Liberty's mission was US expansion of the Aphria footprint. *Id.* Liberty specifically targeted US investors such as plaintiffs by upgrading to the OTCQX market. ¶22; David Ex. 1. *Parkcentral* involved fraud that allegedly took place in Germany and was being investigated in that country. The Complaint, to the contrary, alleges many omissions and misstatements centering on actions occurring in the US. Additionally, at least one of the alleged misstatements is based on a presentation that occurred in the US. *See, e.g.*, ¶¶150-152.

A transaction is not "predominantly foreign" simply because a company—one that has affirmatively acted to attract US investors and primarily does business in the US—is headquartered in a foreign country and its stock listed on an exchange in that country.

### E.   The Complaint Sufficiently Alleges Each Element of Section 10(b)

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267(2014)). Here, Defendants contest all of these factors other than the fifth.

### 1.   Defendants Made Materially Misleading Statements

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). And under Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).[14] Here, the Complaint easily satisfies these pleading requirements.

The Complaint alleges with the specificity required under the PSLRA that Defendants misled the investing public by concealing the details of the early investment round and an

---

[14] Each of the Individual Defendants is alleged to have directly made a false or misleading statement. However, under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), individuals with "ultimate authority" over a statement can also be liable for making that statement. Here, Defendant Neufeld had ultimate authority over many statements he is not quoted in and has not signed.

overarching scheme that benefited insiders at the expense of shareholders, as well as critical details regarding the purchase of 242 Cannabis from corporate insiders.[15] ¶¶4; 42-101. This scheme included the purchase of the Property for a much higher amount than a company comprised of many Aphria and Liberty insiders had paid days before. Defendants knew DeFrancesco—a Liberty "founder"—and his family and friends profited handsomely from an early investment round when they received $12.3 million worth of shares for free. They also knew, or recklessly disregarded, that they were constantly doing deals with entities owned by DeFrancesco, his network and Aaron Serruya. They neglected to tell investors any of this information. For example, each MD&A included information on "Related Party Balances and Transactions," but did not disclose any of these deals. *See, e.g.,* ¶¶158, 182, 192, 200. Aaron Serruya was on the Liberty Board and multiple Serruya-affiliated individuals and entities were part-owners of 242 Cannabis. ¶¶64, 73. This was not disclosed because it was all done through relatives or affiliated entities to deceptively hide the truth from investors. *See, e.g.*, ¶73.

To guide the Court organizationally, the alleged misstatements can be divided into two groups: (1) those that are misleading because of the undisclosed amount of insider[16] involvement and related transactions; (2) those that are misleading because they omit facts about the Property.

### a) Defendants Make Statements That Are Materially Misleading About the Company and its Goals

Defendants made numerous statements where they spoke about the Company and its relationship with Aphria, but did not disclose the full truth: that not only did Aphria the entity

---

[15] Despite Defendants' argument, Plaintiffs identify the misleading portion of block quotes by bolding when necessary. That is sufficient. *See In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15 (S.D.N.Y 2004) (declining to dismiss a complaint, even when portions of long quotes were not identified as misleading, because plaintiffs identified the date, source, speaker and why the statements were misleading)., including

[16] Defendants object to the term "insiders." *See, e.g.*, Liberty MTD at 18; Management MTD at 9. However, the Individual Defendants and Neufeld were legally insiders. Others involved in the alleged scheme were credited with founding, consulting for and/or investing in Aphria and Liberty. While these individuals might not qualify as "insiders" for reporting requirements, they had greater access to information than a member of the investing public.

have a stake in Liberty, but Aphria insiders, including DeFrancesco, set up Liberty as part of a scheme to enrich themselves on the backs of investors through related-party transactions and undisclosed share issuances. While Defendants' statements referenced "stringent investment criteria" and gave investors the impression that all deals were thoroughly vetted and done in their best interests, Defendants were engaging in undisclosed related-party transactions. Defendants offer various theories why the misleading statements they issued about the interrelationship between the relevant companies and individuals are not actionable, but each one fails.

*First*, Defendants' statements regarding how Liberty was "focused on maximizing shareholder returns" are not puffery. Although "[i]t is possible . . . that . . . challenged statements are mere puffery when viewed in isolation, the context in which they were made could lead a reasonable investor to 'rely on them as reflective of the true state of affairs at the [c]ompany.'" *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017); *see In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (addressing proclamations such as "conduct[ing] its business with transparency and integrity" and stating: "While some of the alleged statements, viewed in isolation, may be mere puffery, nonetheless, when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company.").[17] Here, Plaintiffs adequately allege that Defendants continually misrepresented Liberty's goals: investors were led to believe that Liberty was looking out for its

---

[17] *See also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (finding general statements that inventory was "in good shape" and "under control" actionable where defendants knew contrary was true); *In re Avon Ses. Litig.,* No. 19 CIV. 01420 (CM), 2019 U.S. Dist. LEXIS 200816, at *46 (S.D.N.Y. Nov. 18, 2019) ("a court is neither required nor permitted to view such statements in isolation. . . . [With] repeated representations on the same topic, even where those representation[s] would otherwise be puffery, the repetition itself communicates to investors what matters are particularly important, and those statements may become material to investors." (internal quotation and alteration marks omitted); *Ark. Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless[.]").

shareholders' best interests, and relied on that fact when investing, when in fact each of the Defendants was concealing a scheme which benefited early insider investors at the expense of retail shareholders.

*Second*, Defendants' truth-on-the-market argument regarding the $0.001 round is misleading at best. Liberty MTD at 18-19. From reading the Liberty MTD, one might get the impression that all the details regarding the financing were disclosed by either Liberty or its predecessor company. *Id.* In fact, Liberty so overstates its case that Defendant Neufeld alleges, purportedly based on the Liberty MTD, that "Liberty's predecessor company publicly disclosed who the participants in the April 2017 private placement were and what they paid." Neufeld MTD at 5. That is plainly false. As Plaintiffs allege, a list of the participants in the $0.001 round was never made public. ¶52. Liberty points to a filing that disclosed the holdings of "certain officers and directors of Aphria." Liberty MTD at 3. Not included in this list was the substantial share issuance to DeFrancesco and friends because— despite his extensive involvement in Aphria and Liberty—he was not an official officer or director of Liberty.[18]

*Third*, Defendants argue that the identity of early investors, and the price of their shares, is not material to retail Liberty investors. Liberty MTD at 19. Defendants cite no case law for this proposition, instead dropping a footnote regarding how this is supported by "the carefully considered judgement of the Canadian securities regulators" because the disclosure is not legally required. *Id.* Defendants ignore that an analysis of materiality "depends on all relevant

---

[18] While certain investors in the $0.001 round of financing, including many affiliated with DeFrancesco, were disclosed via a filing regarding a later round of financing, the full list is still unknown. ¶ 52. Additionally, even that later filing did not clearly reveal the earlier investors – a retail shareholder would have had to do calculations and analysis in order to reveal the truth. "[C]ase law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 718 (2d Cir. 2011); *see also In re Allergan PLS Sec. Litig.*, No. 18 Civ. 12089 (CM), 2019 U.S. Dist. LEXIS 162510, at *77 (S.D.N.Y. Sept. 20, 2019) ("A truth-on-the-market defense—an "intensely fact-specific" inquiry as it is—is not applicable unless the truth conveyed to the public was done with a degree of intensity and credibility so as to counter-balance any misleading impression created by the defendant' fraud.).

circumstances." *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 440 (S.D.N.Y. 2018). Surely Defendants cannot possibly be alleging that everything that could possibly be material to investors is required to be disclosed in security filings. Regardless, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quotations and alteration omitted); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (stating that materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact"). That Liberty "gifted" more than $12.3 million worth of shares to DeFrancesco and his related individuals and entities at the expense of Liberty shareholders is a far cry from an "obviously unimportant" fact to investors.

Defendants chose to speak multiple times regarding these share issuances but failed to disclose that DeFrancesco and his cohorts were the beneficiaries of $12.3 million in free Liberty shares. Even if Defendants were not under a pre-existing duty to disclose this information, that they spoke on the subject gave rise to a duty to speak fully on the topic. *See Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth," "[e]ven when there is no existing independent duty to disclose [such] information" in the first place.); *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("upon choosing to speak, one must speak truthfully"). They did not comply with that duty.

### b)     The Statements About the Property Are Actionable

Defendants take a different tact regarding the alleged misstatements which center on Liberty's purchase of the Property. Liberty MTD at 20-22. They pluck Plaintiffs' allegations out

of context, quoting partial sentences, and argue that Plaintiffs' allegations are factually incorrect. *Id.* Plaintiffs, in fact, allege that a series of statements made by Defendants "were materially false and misleading because DeFrancesco and other insiders were the sellers of 242 Cannabis and the transaction would benefit these insiders at the expense of retail shareholders because Liberty would pay more than C$5 million for the Property than 242 Cannabis, LLC paid six days prior." *See, e.g.*, ¶¶205, 211, 214, 218 (stating similar). Defendants cite to nothing disclosing the immense and immediate benefit to DeFrancesco and other insiders, nor do they cite to anything that contradicts the fact that DeFrancesco and other insiders received this benefit.

Plaintiffs allege—and nothing Defendants argue contradicts—that Defendants never mentioned the ownership of 242 Cannabis in any of the press releases regarding the purchase of the Property. *See, e.g.*, ¶211, 214. Over a month after the deal to purchase 242 Cannabis was announced, Liberty filed a Form 9 with the CSE, a form that did disclose the full ownership. ¶46. That form—which misleadingly stated the transaction was the result of an "arm's length negotiation"—listed 28 owners in a list that spanned three pages. Riccardi Ex. 16. It did not state any entity's prior relationship with Liberty or Aphria. There are "serious limitations on a corporation's ability to charge its stockholders with knowledge of information" "on the basis that the information is public knowledge and otherwise available to them." *Kronfeld v. Trans World Airlines, Inc*, 832 F.2d 726, 736 (2d Cir. 1987). While Liberty's purchase of the Property made the mainstream news, this Form 9 and its contents were not "widely reported in readily available media." *United Paperworks Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993).[19]

---

[19] Defendants point to two reports, from March 21, 2018 and March 22, 2018, which are both outside the scope of the Complaint, where it is mentioned that DeFrancesco owned 242 Cannabis. Liberty MTD at 21; Riccardi Exs. 12; 13. The first is another Hindenburg Research report that mentions this ownership on page 9 of a document about Aphria's acquisition of a Canadian company seemingly unrelated to Liberty. Riccardi Ex. 12. The second is a report from the Canadian newspaper, *The Globe and Mail*, about the short-seller report. Riccardi Ex. 13. This information certainly did not hit Liberty OTC investors with the "same 'degree of intensity and credibility' as Liberty's own

However, even if Defendants can possibly argue that Plaintiffs should have known the owners of 242 Cannabis—and equated those owners with various Aphria and Liberty inside deals—they still would not have known the price 242 Cannabis paid for the Property unless they dug through Florida property records. The price was not "reasonably available to the shareholders." *Ganino,*, 228 F.3d at 167 (*quoting Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979)).

Defendants next argue that the amount Liberty paid for the property is irrelevant because, according to *one* valuation report paid for by Liberty, they did not overpay. Liberty MTD at 22-23. First, the fact that Liberty paid millions more for the Property than insiders paid six days prior is material to investors even if the Property was worth more than Liberty paid. This is clear from the following hypothetical: Scorsis, while still CEO of Liberty, pays $500,000 for a greenhouse. Two days later he sells it to Liberty for $20 million. An independent appraisal values the greenhouse at $21 million, so Liberty still allegedly got a bargain. If one follows Defendants' argument, it would not be material to investors that Liberty could have in theory saved $19.5 million by buying the greenhouse three days prior. That is simply preposterous.

Second, Plaintiffs do not "acknowledge" that "the assets that Liberty acquired from 242 Cannabis were worth more than what Liberty paid for them." Liberty MTD at 22. Plaintiffs acknowledge that *one* valuation report paid for by Liberty came to that convenient conclusion. ¶123.[20] And the key issue here is not the subjective value of the Property, but rather that insiders

---

press releases." Liberty MTD at 21-22 (quoting *White v. H&R Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004)).

[20] Plaintiffs have not at this state—nor should they be required to—commissioned their own reports regarding the value of the Property. If Plaintiffs had, those would possibly show differently, but then the Court would essentially be asked "to resolve a factual issue, which is inappropriate on a motion to dismiss." *See Goodrich Capital, LLC v. Vector Capital Corp.*, No. 11 Civ. 9247 JSR, 2012 WL 4123401, at *4 (S.D.N.Y. June 26, 2012) (refusing to consider a presentation deck that conflicts with the pleadings).

pocketed millions on a property they owned less than a week, which was undisclosed to Liberty shareholders.

### 2.      The Complaint Alleges a Strong Inference of Defendants' Scienter

Under the PSLRA, to plead scienter adequately, a complaint must allege facts that, when viewed holistically, give rise to a strong inference that the defendant acted with "the required state of mind." 15 U.S.C. § 78u-4(b)(2). To plead scienter in a securities fraud claim, a complaint "may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (citations omitted).[21]

Courts assessing scienter must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). Indeed, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (internal citation omitted). In addition, while generally the most straightforward way to raise an inference of scienter for a corporate defendant is to plead it for an individual defendant whose intent could be imputed to the corporation, it is also possible to plead an inference of corporate scienter directly. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008).

---

[21] "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Kasaks*, 216 F.3d at 308-11). Alternatively, a complaint adequately pleads a reckless omission if it alleges that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Kasaks*, 216 F.3d at 308; *see also In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 486 (S.D.N.Y. 2011) (quoting *Kasaks*, 216 F.3d at 311). "An egregious refusal to see the obvious" is a hallmark of recklessness. *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000).

### a)   The Complaint Alleges Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

Taken as a whole, the Complaint raises a strong inference of scienter because it specifically alleges Defendants' "knowledge of facts or access to information contradicting their public statements." *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015) (citing *Kasaks*, 216 F.3d at 308). In this case, "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Kasaks*, 216 F.3d at 308 (vacating a dismissal).

Plaintiffs' allegations center on a free share issuance, a scheme to benefit insiders and purchase of the Property. Obviously, at least Liberty knew the details of this share issuance to DeFrancesco and his affiliates. Therefore, Defendants do not even address the round directly in the scienter section. Defendants' arguments regarding the alleged scheme is not that they had no knowledge of the related-party transactions, but rather that the "scheme" was not pled with particularity and that they had no duty to speak on these topics. Liberty MTD at 27. However, Plaintiffs adequately allege the scheme. The Complaint alleges multiple circumstances in which insiders benefited from both Aphria and Liberty. Additionally, individuals and entities that speak on material topics assume a duty to "tell the whole truth." *Jinkosolar*, 761 F.3d at 250. Defendants did not comply with that duty.

If Defendants did not know DeFrancesco, Serruya, relatives and friends were profiting at the expense of Liberty, they were certainly reckless in not knowing. The purchase of the Property serves as the perfect example of this fact. Either Defendants knew that 242 Cannabis was turning a hefty profit on the Property or they were reckless in not knowing. After all, the deal to acquire the 242 Cannabis was announced before 242 Cannabis Canada LLC even closed on the Property. Certainly someone in the negotiation process at least *should have asked* how

34

much the entity was paying for the Property. As detailed *supra* at 32, Defendants' argument that they felt "no reason to disclose" any "overpayment" because "Liberty believed it was acquiring 242 Cannabis at a fair price" is foolhardy. Liberty MTD at 27. It is also an implicit admission that Defendants *knew* insiders were pocketing a substantial amount for doing basically nothing.

**b)    The Complaint Alleges That Defendants Had Both Motive and Opportunity to Commit the Alleged Fraud**

While Defendants argue that the Complaint "contains no allegation of motive" that is far from the truth. Liberty MTD at 26. Plaintiffs allege that Liberty early investor/founder/consultant DeFrancesco reaped profits from his undisclosed affiliation with the Company. *See, e.g.*, ¶¶6; 72-78. So did the Serruya family: they were significant Liberty shareholders, one family member sat on the Board, and they also profited from Liberty's purchase of the Property. *See, e.g.*, ¶73. Defendants also obviously had the opportunity to execute these inside deals and perpetuate a fraud on retail investors.

**c)    Defendants' Scienter is also Supported by Resignations After Disclosure of the Fraud**

"The timing and circumstances of individual defendants' resignations . . . lend further weight to an inference of scienter." *Orthofix, N.V.*, 89 F. Supp. 3d at 619. This is certainly the case here where, within months of the disclosure of the fraud, all of the Individual Defendants resigned. ¶118, 131. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 n.84 (S.D.N.Y. 2014).

**3.    The Complaint Sufficiently Alleges Loss Causation**

Pleading loss causation is not supposed to "impose a great burden on a plaintiff." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Loss causation may be established either by demonstrating (1) that the defendant made a corrective disclosure revealing the earlier fraud or (2) that the risk concealed by the defendant's fraud subsequently materialized. *See Axar Master Fund, Ltd. v. Bedford,* 308 F. Supp. 3d 743, 760 (S.D.N.Y. 2018), *aff'd*, No. 19-1132-cv, 2020

35

WL 1456482 (2d Cir. Mar. 23, 2020). "A plaintiff pleading that its economic loss was caused by the materialization of a concealed risk 'must allege that the loss was (1) foreseeable and (2) caused by the materialization of the concealed risk.'" *Id.* (quoting *In re Lehman Bros. Sec. & Erisa Litig.,* 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011)). "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260-61, 262 (2d Cir. 2016).

Plaintiffs allege that for the entirety of Liberty's existence it was part of an overarching scheme to line the pockets of Aphria insiders via related-party transactions. The two companies were so intertwined publicly that Liberty, also known as Aphria USA, followed Aphria's stock movements. Therefore, it was foreseeable that when the Hindenburg Report hit the market, causing a dip in Aphria's stock, Liberty's stock would follow. But what is more is that the Hindenburg Report, while not naming Liberty, disclosed the bad acts that Aphria insiders, many of whom were associated with Liberty, were involved with. Here, the Hindenburg Report constructively disclosed that Liberty insiders, including Aphria founders Defendant Neufeld and Cervini, and Liberty's "founder" and frequent consultant, DeFrancesco, were fraudulent actors that were utilizing Aphria to enrich themselves. In fact, crediting Defendants' arguments that Plaintiffs should have known about DeFrancesco's involvement in 242 Cannabis, then the Hindenburg Report provided an even stronger indication to Liberty investors that Liberty might also be overpaying for property. After all, the Hindenburg Report exposed Aphria vastly overpaying for property owned by DeFrancesco entities, and Liberty investors would have known that Liberty had just bought property from a DeFrancesco entity. Liberty took the risk of engaging in related-party transactions without disclosing the full truth to its investors, and its

36

investors paid the price. The Hindenberg Report alerted Liberty investors to the stark possibility that the Aphria insiders were enriching themselves at the expense of Liberty—i.e., "Aphria USA," in the same fashion as which they had done to Aphria itself, thereby causing the securities of both companies to decline.

The one case that Defendants cite for the proposition that the Hindenberg Report could not have caused Plaintiffs' loss is irrelevant to the analysis in this case. Liberty MTD at 29. In *In re Tellium, Inc. Securities Litigation*, No. 02-cv-5878 (FLW), 2005 U.S. Dist. LEXIS 26332, at *15-17 (D.N.J. Aug. 26, 2005), the Court declined reconsideration of an order dismissing a complaint when, *inter alia*, defendants countered there was an overall drop in stock prices in general in the business sector in which defendants engaged. Liberty does not argue that cannabis stocks in general took a hit when the fraud engaged in by Aphria and Liberty insiders was disclosed, but rather these specific companies' share prices were damaged because of the interrelationship between the two.

Defendants next argue that the Liberty Report did not cause a stock drop, but Plaintiffs allege that is patently false. As clearly articulated in the Complaint, intraday on December 6, 2018, Liberty stock plummeted when the Liberty Report was released, only to rebound later in the day as Aphria announced news that the market believed was positive. ¶¶116-17. It then sank the following day when Aphria's false assurances wore off and investors fully digested the news revealed in the Liberty Report. ¶117. *See Acticon AG v China Ne. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) ("a share of stock that has regained its value after a period of decline is not functionally equivalent to an inflated share that has never lost value"). Defendants cite a case holding that a drop that occurs approximately four months after the close of a class period "cannot be relied upon for loss causation." Liberty MTD at 29; *see also Masters v.*

37

*GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir. 2008) (upholding dismissal and explaining that a stock drop in December cannot be used for loss causation when the class period ended in August). Here, this drop was the next day. Experts frequently use "both the day of the event and the day following an event" in event studies measuring stock drops. *See Carpenters Pension Tr. Fund of St. Louis v Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015).

Lastly, Defendants rely on *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501, 512–13 (2d Cir. 2010), and its progeny to argue that there was no loss causation because of the information in the Liberty Report was publicly disclosed. Liberty MTD at 29. Those cases stand for the proposition that, when the factual information is already widely known by the market, no journalistic spin of that information will suffice to plead loss causation. Here, while the Liberty Report was based on public information, it was not public information widely known. For example, in order to ascertain the price that 242 Cannabis LLC paid for the Property, an investor would have had to dig through Florida land records. Liberty never disclosed this information to the market. This was new news to the majority of Liberty investors. *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) ("sporadic press reports" not "reasonably available" to investors); *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 80 (D.D.C. 2008) (noting that, in addressing loss causation, defendants "trie[d] to inject its truth on the market defense," and finding that defendants' argument "that the disclosures revealed information already known to the market, and thus could not have negatively affected the market," was "a factual determination to be decided by the jury").[22]

---

[22] *See also Vivendi Universal, S.A.*, 838 F.3d at 262 (loss causation found when the company hid a specific risk and the risk was revealed); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 415-16 (S.D.N.Y. 2011) (holding that certain "publicly discoverable" information "cannot be said to be so manifestly well-known that it was, as a matter of law, already part of the total mix of information available to investors").

**IV.    The Complaint States a Claim of Control Person Liability**

The elements of control person liability pursuant to Section 20(a) are: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Acticon AG v. China Ne. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015). Courts within the Second Circuit broadly construe the control person provisions "as they 'were meant to expand the scope of liability under the securities laws.'" *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (*quoting Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001)). Control "need not be pleaded with particularity." *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006). As a general rule, "[d]etermining an individual defendant's liability as a control person is a 'fact-intensive inquiry that . . . should not be resolved on a motion to dismiss.'" *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 587 (S.D.N.Y. 2016).

As detailed herein, the Complaint states valid claims for violations of Section 10(b). As to the second prong, "control" for these purposes "entails only the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *In re Citigroup Inc. Bond Litig.,* 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010) (quotations omitted). Here, this prong is easily satisfied.

Instead, each Individual Defendant disputes that he was a "culpable particip[ant]" in the fraud. Neufeld MTD at 20; Management MTD at 22-23. This prong has been likened to scienter, as the Individual Defendants acknowledge in their motions. *Id.*; *see In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 662 (S.D.N.Y. 2007). Such is the case here, where the Complaint, taken as a whole, raise a strong inference that the Individual Defendants intentionally or recklessly made misleading statements to investors. *See supra* at 33-35.

Defendant Neufeld also argues the Complaint fails to allege he had actual control of Liberty or the misstatements. Neufeld MTD at 20-21. However, Plaintiffs clearly allege his substantial control of all aspects of Liberty. Neufeld, CEO of Aphria, touted Liberty as Aphria USA. He also was Chairman of the Board of Liberty. ¶24. Therefore Neufeld had two means of control – he was at the head of the Board and also controlled a significant shareholder. *Id.* Plaintiffs allege that the entire scheme took place under Neufeld's supervision. *See, e.g.*, ¶¶3, 29, 41, 53. Neufeld's own statements would lead to an inference that he and Aphria were in charge of Liberty. *See, e.g.*, ¶ 41 (quoting Neufeld as saying of Liberty "Aphria's success story is no longer limited to Canada"); ¶53 (an acquisition done on behalf of Aphria before Liberty was officially formed was an "an entry into an attractive market" for Liberty). The cases Neufeld cites are all distinguishable based on the amount of power alleged – in no cited case was the defendant CEO of a large shareholder which was admittedly intertwined with the relevant entity **and** also chairman of the board of the relevant entity. Neufeld MTD at 20.[23]

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety. Alternatively, if any part of the Complaint is dismissed, Plaintiffs respectfully requests leave to replead. *See* Fed. R. Civ. P. 15.

---

[23] Neufeld may argue on reply that this case is most similar to *In re Flag Telecom Holdings, Ltd. Securities. Litigation*, 308 F. Supp. 2d 249, 273-74 (S.D.N.Y. 2004). In that case, in dicta, the court discussed how Verizon owned 30% of shares of another entity, could appoint directors of that entity and "key strategic decisions" were approved by both entities. *Id.* The Court said that was not enough to plead control. Here, Plaintiffs have alleged more. Flag was not alleged to be an extension of Verizon, whereas Liberty is alleged to be an extension of Aphria, which Neufeld commanded as CEO. Additionally, Neufeld was not only a board member, he was Chairman of the Board. Neufeld chose to speak frequently about opportunities for Liberty and Liberty's key role in Aphria expansion. (While Aphria divested its interests in Liberty during the Class Period, its agreements with Liberty and large stamp on Liberty continued.)

Dated:  June 1, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Cara David
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email: jalieberman@pomlaw.com
         cdavid@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Counsel for Plaintiffs*